**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Miscellaneous Action No. 96-y-00203-M

**In re Special Grand Jury 89-2**

---

**Government's Brief Addressing the Turley Proffer's Allegations
of Prosecutorial Crimes and Professional Misconduct**

---

The United States, by Assistant U.S. Attorney John Haried, submits the

following brief addressing the factual context of the Petitioners' allegations of

prosecutorial "crimes" and "professional misconduct," together with the law

governing disclosure of grand jury matters:

## I. <u>INTRODUCTION</u>

**Background of the case:** The Rocky Flats special grand jury was

discharged by then-Chief Judge Sherman Finesilver on March 24, 1992.  Four

years later, on August 1, 1996, most of the members of the grand jury – the

Petitioners – filed with the court a petition requesting that the secrecy obligation

imposed upon them by Rule 6(e) be lifted.  According to that pleading, their

avowed purpose was to give "an accurate account" of (1) the conduct of the

Justice Department, including evidence of obstruction of the grand jury, (2)

criminal conduct known and condoned by the U.S. Department of Energy (DOE),

and (3) the evidence evaluated by the grand jury that demonstrated the

commission of crimes.  Former grand juror Kenneth Peck separately filed a

similar petition.  In 1997, this Court authorized *ex parte* depositions of the

Petitioners.  The depositions were taken and they led to the sealed Turley Proffer,

which is Professor Turley's summary setting forth the Petitioners' allegations that

the prosecutors committed crimes and professional misconduct.  The Petitioners

let this litigation languish for five years, until it was revived in 2003 after the Court

received a letter from a Petitioner.  After further proceedings, this Court denied

both petitions on March 12, 2004.  This Court concluded that it lacked jurisdiction

because the petitions sought only an advisory opinion and therefore did not

present a case or controversy under Article III of the United States Constitution.

The Tenth Circuit Court of Appeals reversed this Court's judgment.  *See In

re: Special Grand Jury 89-2*, 450 F.3d 1159 (10th Cir. 2006).   The Tenth Circuit

directed further proceedings before this Court to determine two things: (1)

"whether *Rule 6(e)* authorizes disclosure for [Petitioners'] purposes, and if so,

whether they have met 'the standard for determining when the traditional secrecy

of the grand jury may be broken;'" and (2) "[i]f [the Petitioners] seek relief beyond

what, if any, is granted by the court under *Rule 6(e)*, the court must then

determine whether relief outside of *Rule 6(e)* is appropriate."  *Id.*, 450 F.3d at

1177-78.  As to the second inquiry, the Tenth Circuit posited two steps: first,

whether some of the parties' pleadings that the Petitioners seek to disclose can

be disclosed in redacted form, and, second, whether some relief may be proper

under a legal theory that the Court has "inherent authority" to grant relief beyond

what is authorized in Rule 6(e).  The Tenth Circuit cited some appellate decisions

finding an "inherent authority" beyond Rule 6(e)'s limitations.  However, the Tenth

Circuit also noted that there is substantial authority opposing the notion of

"inherent authority."  The Supreme Court has not explicitly recognized such

authority, and, in fact, has stated that "any disclosure of grand jury minutes is

covered by *Fed. Rules Crim. P. 6(e)* promulgated by this Court."  *Id.* (citing

*Pittsburgh Plate Glass Co. v. United States*, 360 U.S. 395, 398 (1959)).

> The Tenth Circuit concluded its ruling with this direction:

> [I]t would be unwise for us to resolve this delicate issue on the present
> record. The cases that have recognized this inherent authority "have
> confined [it] to exceptional cases." [Citation omitted.]  The district court
> should therefore first determine whether such circumstances are present
> before deciding whether it has inherent power to permit or order disclosure.

This Court has directed the parties to address the factual context of the Turley

Proffer's allegations in order to assist the Court in determining how to proceed.

> In separate pleadings previously filed, the parties have addressed the

matter of which pleadings can be unsealed, so the government will not address

that matter here.  In short, that government asserts that the parties' legal

pleadings can be made public to the extent that they do not reveal grand jury

matters, in accordance with the Tenth Circuit's opinion.  *See In re: Special Grand*

*Jury 89-2*, 450 F.3d, at 1175-78.

> **Petitioners' requested relief:** The Petitioners' requested relief has

changed over the life of these proceedings.  As stated above, initially their

avowed purpose was to give "an accurate account" of (1) the conduct of the Justice Department, including evidence of obstruction of the grand jury, (2) criminal conduct known and condoned by the U.S. Department of Energy (DOE), and (3) the evidence evaluated by the grand jury that demonstrated the commission of crimes.

The Petitioners now seek:

1.      to unseal most of the legal filings in the case,

2.      to unseal the 1997 *ex parte* deposition transcripts and the Turley Proffer,

3.      to unseal unspecified excerpts from the grand jury transcript and from the sealed grand jury report, and

4.      to get unspecified additional relief involving a published opinion that would address fundamental aspects of this controversy.

The Petitioners want to provide the information to law enforcement officials, attorney disciplinary officials, and Congress in hopes of finding an official body to investigate their allegation that the prosecutors committed crimes and professional misconduct.  Further, the Petitioners have expressed, in vague terms, their desire to speak publicly about their views.

**Summary of the government's position:**  Each of the Turley Proffer's allegations of prosecutorial misconduct either are entirely false or are half-truths due to the omission of material facts.  Those errors are due to several factors, in

the government's analysis. The former grand jurors and Professor Turley did not have the grand jury transcripts to work from, and the grand jurors' memories were five years old when they gave their depositions in 1997.  The grand jurors were frustrated by the law's limitations on their authority to issue indictments and a report and to close Rocky Flats, and their memories were influenced by those frustrations.  Professor Turley's proffer, based, as it was, on *ex parte* depositions and his leading questions, became more of a manifesto than a factual recitation.

The grand jury transcripts show that the prosecutors committed no crimes or professional misconduct.  Indeed, there was disagreement between the grand jury and prosecutors over who should be charged with crimes.  But the prosecutors understood their burden of proof beyond a reasonable doubt, the limits of the criminal statutes, and the genuine defenses available to potential targets.  The prosecutors used sound judgment in refusing to accede to the grand jury's demand to make someone pay for the problems at Rocky Flats with an indictment.  The check-and-balance allocation of authority between the grand jury and prosecutors worked.  The prosecutors' restraint in making charging decisions was an appropriate and lawful exercise of their discretion.  The prosecutors' exercise of their professional judgment and prosecutorial discretion was not obstruction of justice, as the Turley Proffer alleges.

The government asserts that the Petitioners have failed to meet their burden to show that they are entitled to relief under Rule 6(e).  Rule 6(e), which

was formulated by Congress and the Supreme Court, carefully guards traditional grand jury secrecy by limiting disclosure of grand jury matters to situations of special need.  The Petitioners' request fails because it is not "preliminarily to or in connection with a judicial proceeding," and because it has not established a "particularized need."

Further, the government asserts that the Court either has no "inherent authority," or that, if it has some inherent authority, the Court should not invoke it here for three reasons: (1) as discussed in the government's sealed brief, the grand jury transcripts make clear that Turley Proffers' allegations are factually inaccurate and that there was no prosecutorial misconduct before the grand jury; (2) the former grand jurors already have – through numerous leaks, disclosures, and publications – made public their allegations of prosecutorial misconduct and nothing has prevented Congress, law enforcement officials, attorney disciplinary officials, or the public from pursuing the Petitioners' allegations; and (3) a Congressional subcommittee reviewed the case and did not find prosecutorial crimes or misconduct.  Given all of the allegations already made public by the former grand jurors 15 years ago, public officials could have sought access to the grand jury transcripts to pursue the Petitioners' allegations, but they have not done so, and the Statutes of Limitations for doing so have expired.  While the public certainly has an interest in knowing whether the prosecutors engaged in misconduct, the public can satisfy that interest because the grand jury has

already made their allegations public and available on the internet.

## II.  <u>FACTUAL CONTEXT OF PETITIONERS' CLAIMS</u>

The government will limit this brief to those facts which are pertinent to the Turley Proffer, as directed by the Court.  To that end, the discussion of the facts will address these topics:

- The special grand jury investigation of Rocky Flats:

    - Overview of the investigation
    - Alleged "crimes" and "professional misconduct" of the prosecutors contained in the Turley Proffer
    - Professionalism of the prosecutors
    - Government's assessment of the Turley Proffer allegations

- Judge Finesilver's disclosure of the redacted grand jury report

- The Petitioners' previous disclosures of grand jury matters to the press and public:

    - Disclosure to Rocky Mountain News and Denver Post
    - Disclosure to Westword
    - Disclosure to Vanity Fair and Harpers
    - Disclosure of grand jury's report on the internet
    - Former grand juror McKinley's disclosure in his published book <u>The Ambushed Grand Jury</u>
    - Former grand juror Peck's disclosure of the grand jury's indictments, presentments, and report

- The government's post-hoc investigations of the Rocky Flats criminal case

- Publicly disclosed judicial proceedings concerning Rocky Flats

**A.      The Special Grand Jury Investigation of Rocky Flats**

**1.      Overview of the Special Grand Jury investigation**

Rocky Flats produced nuclear components for the nation's nuclear weapons arsenal at the direction of and under the supervision of Congress, the President, and the Department of Energy (DOE).  Production began in the 1950s. Rockwell International operated Rocky Flats under contract with DOE.  The Department of Justice, EPA, and the FBI executed a search warrant at Rocky Flats in June 1989.  Beginning on January 1, 1990, EG&G operated Rocky Flats under contract with DOE.

The Special Grand Jury was selected and sworn on August 1, 1989. Except for three months, the Special Grand Jury met during one week each month from October 1989 to June 1991.  Thereafter, it met less often until March 24, 1992, when the special grand jury members met with Chief Judge Finesilver, and voted to terminate their service.  Prosecutors presented approximately 110 witnesses, including current and former employees of DOE, Rockwell, EGG, federal EPA regulators, state regulators from the Colorado Department of Health, and others.  Their testimony fills approximately 15,000 pages.  The prosecutors presented more than 2,100 exhibits.

In December 1991 and March 1992, the prosecutors presented their proposed indictment charging 10 counts against Rockwell International Corporation to the grand jury.  According to an account published by one of the

Petitioners,[1] on a split vote the grand jury did not sign that indictment; instead, the grand jury proposed its own indictment, presentments, and report, which the prosecutors did not sign or endorse.  The prosecutors filed an information against Rockwell, which entered guilty pleas to 10 counts.  Chief Judge Sherman Finesilver sentenced Rockwell to an $18.5 million fine and released a redacted version of the grand jury's report.

### 2.     The allegations of prosecutorial "crimes" and "professional misconduct" in the Turley Proffer

*Note: The information relevant to this portion of the government's brief contains grand jury matters.  For that reason, it is not produced here.  Instead, it is contained in the sealed portion of the government's brief.*

### 3.     Professionalism of the Prosecutors

*Note: The information relevant to this portion of the government's brief contains grand jury matters.  For that reason, it is not produced here.  Instead, it is contained in the sealed portion of the government's brief.*

### 4.     Argument:  Government's Assessment of the Turley Proffer's Allegations

*Note: The information relevant to this portion of the government's brief contains grand jury matters.  For that reason, it is not produced here.  Instead, it*

---

[1] Wes McKinley was the grand jury's foreman.  According to his account in his published book, The Ambushed Grand Jury, Attachment 34, pp. 148-155, "[t]here were not enough votes to kill the government's proposed indictment against the corporation [Rockwell]."

*is contained in the sealed portion of the government's brief.*

**B.**     **Judge Finesilver's Disclosure of the Redacted Grand Jury Report**

As noted above, the grand jury provided its draft report to Chief Judge

Finesilver on March 24, 1992.  After careful consideration of the draft report and

the government's comments, Chief Judge Finesilver redacted some portions, and

publicly released substantial portions of the report.  *See* Attachment 29.

The publicly released portions of the report contained the following

assertions by the grand jury:

| Page | Summary of Grand Jury's Assertion in the Released / Redacted Report: |
|------|---------------------------------------------------------------------|
| 2    | DOE and Rockwell engaged in an ongoing criminal enterprise at Rocky Flats. |
| 12   | Little has changed.  DOE employees continue to violate many federal environmental laws at Rocky Flats. |
| 16   | For 40 years, federal, Colorado, and local regulators and elected officials have been unable to make DOE and the corporate operators of Rocky Flats obey the law. |
| 17   | The special grand jury has approved indictments against certain current and former federal employees, corporate employees and corporations. The special grand jury has made presentments to the Court of evidence of criminal conduct by certain corporations and persons. |
| 20   | The special grand jury was told by an Assistant U.S. Attorney that it could not indict Rockwell or DOE for endangering drinking water supplies of downstream users by releases of radioactive materials. |
| 22   | The government failed in its duty to adequately protect the public.  The Colorado Department of Health, the Department of Energy, and the Environmental Protection Agency were lax and ineffective and did not adequately perform their oversight and regulatory functions. |

| 36 | The government agencies have established no deadline by which DOE must stop breaking the law at the Rocky Flats plant. |
|----|---|
| 49 | Government employees should be held responsible for their criminal acts at the Rocky Flats plant.  Government employees were in charge of the plant, yet took no action to comply with environmental laws; they must be held accountable for their complicity with and toleration of criminal acts. |
| 54 | DOE and Rockwell violated RCRA by illegally storing, treating, and disposing of hazardous wastes at Rocky Flats.  They consistently violated RCRA and released hazardous materials – and potentially radioactive materials – into the air of metropolitan Denver at levels substantially greater than allowed. |
| 83 | Rockwell violated RCRA and the terms of DOE's NPDES permit by spray irrigating chromic acid and raw sewage. |
| 96 | Rockwell violated RCRA by illegally storing thousands of pondcrete and saltcrete blocks outdoors. |
| 103 | Rockwell violated RCRA and the Clean Water Act by engaging in inappropriate spray irrigation practices. |
| 113 | Rockwell has operated Rocky Flats in violation of the Clean Water Act with a deficient groundwater monitoring system. |
| 118 | DOE and Rockwell conspired to violate environmental laws. |

**C.    The Petitioners' Previous Disclosures of Grand Jury Matters to the Press and Public**

After the conclusion of their grand jury service, the Petitioners made numerous public disclosures of grand jury matters.  Sometimes they acted in concert, and sometimes alone.  The government has not pursued sanctions against any former grand juror.  Their disclosures include the following:

1.    **Disclosure of Grand Jury Matters to Rocky Mountain News and Denver Post**

In September 1992, unnamed members of the special grand jury met with Rocky Mountain News reporter Sue Lindsay and disclosed the names of three individuals named in the grand jury's proposed indictments.  According to the September 30, 1992, article, "jurors" identified the three targets as:  Albert Whiteman, former DOE manager at Rocky Flats, and his supervisors, former DOE regional manager Ray Romantowski, and his successor Bruce Twining. *See* Attachment 30.  Those indictments were not approved by the prosecutors. Further, according to the article, "jurors said" that the grand jury also wanted to indict Rockwell International, its officials, and EG&G.  The "jurors" also stated that their February 19, 1992, report charged that DOE political appointees directed and endorsed ongoing violations of environmental laws.

Some members of the special grand jury also met with and made similar statements to reporters Mark Obmascik and Peter Sleeth, according to a Denver Post story published also on September 30, 1992.  *See* Attachment 31.

These articles are still available on the newspapers' web sites.

2.    **Disclosure of Grand Jury Matters to Westword**

In 1992, unnamed members of the special grand jury met with Bryan Abas, a reporter for Westword, a local Denver newspaper.  The resulting published story named individuals who were never charged with a crime and who never had an opportunity to defend or clear their names in court.  The story related that the

former grand jurors voted to indict Ray Romantowski, Bruce Twining, Albert Whiteman, Ed Naimon, William Weston, Kirk McKinley, Jack Erfurdt, George Campbell, and EG&G for hazardous waste violations and false statements, some of which were particularly described in the story. The story also recounted the grand juror's opinions, their votes, their discussions with prosecutors in the grand jury room, their draft report, and the prosecutors' evaluation of potential charges, and a transcript of the prosecutors' presentation to the grand jury. The article summarized grand jury transcripts. The WestWord article quoted the special grand jury's proposed report. *See* Attachment 32.

The Westword article also set forth the <u>very same</u> allegations contained in the Turley Proffer: that the prosecutors would not assist the grand jury in preparing its own indictments and report, that the prosecutors refused to subpoena a witness they wanted to question again, that the prosecutors directed a witness not to answer a question posed by a grand juror, that the prosecutors tried to intimidate them, that the prosecutors made false statements to them, and that the prosecutors thwarted their work.

### 3.    Disclosure of Grand Jury Matters to Harpers Magazine

The December 1992 edition of Harper's contained a description of the special grand jury's proposed indictments and verbatim excerpts from its proposed report. *See* Attachment 33.

13

**4.     Disclosure of the Grand Jury's Report on the Internet**

In 1992, the special grand jury's complete, unredacted report was provided to various interest groups who published it on the internet.  Currently, it is still available on the internet at several sites, including:

> http://rmc.sierraclub.org/rocky.shtml
>
> http://www.staynehoff.net/rocky-flats-grand-jury-report.htm
>
> http://web.archive.org/web/20000823173803/http://www.scruznet.co
>
> m/~paul/solutions/Rocky_Flats_Grand_Jury_Rep.html

The complete report can be located simply by doing a Google internet search of "Rocky Flats grand jury report."

The internet version includes all of the material redacted by Chief Judge Finesilver on the grounds that it did not meet the requirements of 18 U.S.C. §3333.  It identifies individual criminal actors by their job titles.  It contains the grand jury's criticisms of the job done by state and federal regulators.  It engages in public policy analysis and contains the grand jury's recommendations for public policy, including closure of the plant.  In particular, it includes the following allegations that had been redacted by Chief Judge Finesilver.  The internet version does not have page numbers.

**Direct Quotes from the Internet Version of the Complete Grand Jury Report:**

"DOE's Plant Manager made false written statements with knowledge of the falsity of his statements or with a disregard for knowing whether his statements were false. For example, when the Plant Manger signed DOE's 1985 RCRA Permit application for the Plant, he had been working at the Plant less than one week, he had read none of the Permit application, and he knew virtually nothing about RCRA. Nonetheless, he signed the Permit application, although it was a lengthy, complex document, without investigating the truth or falsity of any statement in the Permit application. Thereafter, he signed other permit applications, which Rockwell gave him to sign, although the applications were typically lengthy, complex documents, and he had insufficient personal knowledge to certify the statements made in the applications were true."

"DOE continues today to tolerate violation of environmental laws at the Rocky Flats Plant.

DOE continues today to practice devious techniques of mass communication. DOE's officially announced policy is that the "obeying the law is our No. 1 priority." However, DOE is violating with EG&G numerous environmental laws at the Plant. As discussed elsewhere in this Report, DOE and EG&G are presently operating the Plant with full knowledge that a presidential exemption has not been issued to allow the Plant to continue to:

(a)    violate the groundwater monitoring requirement of the Clean Water Act;
(b)    continue to store radioactive, mixed waste residues at the Plant without a RCRA permit or RCRA interim status;
(c)    continue to store RCRA wastes at the Plant without fully complying with the procedural requirements for storage of RCRA wastes at a permitted facility;
(d)    violate RCRA by generating mixed wastes in a clean-up effort at the Plant although there is no permanent storage site for such wastes; and
(e)    related environmental crimes as discussed elsewhere in this Report."

"During the negotiation of the 1991 Federal Facilities Compliance Agreement, DOE employees at the regional and national levels insisted that DOE would not sign a compliance agreement, which contained any enforcement penalties for noncompliance with RCRA and other environmental laws. Throughout these negotiations, DOE implied that EG&G would resign as the operator of the Plant if the Agreement contained any such penalties. Consequently, when EPA's Denver Regional Administrator refused in the spring of 1991 to sign a proposed agreement for the Plant because it lacked any stipulated penalties for noncompliance, EPA's national Deputy Administrator relieved the Regional Administrator of responsibility for approving the Agreement.

EPA's Deputy Administrator subsequently negotiated and signed during the spring of 1991 a two-year Federal Facilities Compliance Agreement for the Plant. He negotiated the terms of this Agreement with the White House Counsel and high-ranking political appointees in Washington, D.C., in the Department of Defense, Department of Justice, EPA and DOE.

The 1991 Federal Facility Compliance Agreement for the Plant contains no deadlines by which the Plant must be operated in compliance with the law. Likewise, the 1991 Agreement lacks any civil penalties or enforcement mechanisms if DOE and EG&G fail to remedy the environmental noncompliance problems at the Plant."

"DOE can ship to Idaho some of the wastes which are presently stored illegally at the Rocky Flats Plant.

Subsequent to the FBI raid in June of 1989, the Governor of Idaho advised DOE that Idaho would no longer permit DOE to ship additional radioactive mixed waste from Rocky Flats to the Idaho National Experimental Laboratory ("INEL"), which could legally store such material and to which Rockwell had shipped such wastes before the FBI's raid. DOE, EPA, and CDH did not challenge this unilateral embargo on waste shipments.

When the Governor of Idaho attempted to impose the same embargo on the shipment of similar radioactive waste from the Public Service Company's nuclear plant in Platteville, Colorado, the Public Service Company sued the Governor of Idaho and the Public Service Company won. The federal judge in the Public Service Company case held - as the DOE had advised the Governor of Colorado during 1989 with regard to Rocky Flats - that the Governor of Idaho did not have any authority to stop such shipments of the radioactive waste from Colorado to INEL. Despite the decision in the Public Service Company case and the continuing illegal storage of mixed wastes at the Plant, DOE, EG&G and CDH have made no effort to force INEL to again begin accepting waste shipments from the Plant."

Judge Babcock ruled in 1990 that the Rocky Flat's residues are subject to RCRA regulation.

Judge Lewis Babcock of the Colorado Federal District Court held in Sierra Club v. DOE 734 F. Supp. 946 (D.Colo. 1990) that residues at the Plant are subject to EPA's authority to regulate the STD of RCRA wastes. Judge Babcock specifically rejected DOE's argument under American Mining Congress that Plant's residues were exempt from RCRA.

Judge Babcock distinguished the facts in American Mining Congress from the circumstances under which residues were (and continue to be) stored, treated, and disposed of at the Plant. He noted that the residues at the Plant were not in-process, secondary materials passing in a continuous stream from one production process to another in an ongoing manufacturing process. He found that neither the hazardous waste component nor the plutonium mixed in the residues was destined for immediate reuse. Instead, the mixed waste residues at the Plant were (and continue to be) stored for treatment at some future date when processing may allow for ultimate recovery of the plutonium.

"DOE does not have to continue storing the residues at the Rocky Flats Plant.

All of the residues, which have been stored (and are stored today) at the Plant, could have been shipped to INEL many years ago (and could be shipped there today). These residues could have been placed in retrievable storage at INEL for reprocessing when and if a treatment process is developed for recovering the plutonium from the residues and it is economically wise to attempt to recover the plutonium from such residues. However, DOE has chosen through this date to leave the residues in storage at the Plant, although DOE does not have a RCRA Permit or interim status to store the residues at the Plant."

"Rockwell decided in the fall of 1989 to terminate its contract to operate the Plant when its National Director of Environmental Affairs advised the Chairman of Rockwell that any operation of the Plant would expose the company to criminal prosecution under RCRA. The Director of Environmental Affairs recommended this action because RCRA makes it a crime for any person or company to generate mixed wastes for which there is no permitted, permanent storage facility. Since no facility in the United States has a permit to permanently store low-level, mixed waste, Rockwell violated RCRA, prior to the termination of its contract to operate the Plant, each and every time that it generated any low-level mixed waste at the Plant."

"On November 1, 1985, DOE's Acting Plant Manager signed a RCRA Part A Permit application for the Plant. Rockwell's Plant Manager signed the same Permit application on behalf of Rockwell. Both of these men knew or had sufficient information to know, when they signed this Permit application, that it contained a substantial misstatement of fact."

"DOE AND EG&G HAVE VIOLATED VARIOUS PROVISIONS OF RCRA SUBSEQUENT TO JANUARY 1, 1990

1.      On January 1, 1990, EG&G assumed responsibility for operating the Rocky Flats Plant in compliance with applicable law.

Rockwell terminated its contract to manage the Plant, effective December 31, 1989. DOE entered a separate contract with EG&G to operate the Plant, commencing on January 1, 1990. EG&G agreed in its contract with DOE to operate the Plant in compliance with all applicable laws.

2.      EG&G has violated and continues to violate RCRA in operating the Rocky Flats Plant.

Subsequent to the FBI raid, EPA and DOE produced a series of reports concerning environmental conditions at the Plant. However, DOE and EG&G have not corrected all of the violations of RCRA and other environmental laws, which were highlighted for DOE and EG&G in those reports. When EPA and CDH have questioned EG&G's failure to bring the Plant into compliance with these laws, DOE has typically responded on behalf of EG&G with a report, which discloses more information about environmental conditions at the Plant but which does nothing to cure violations of RCRA.

During its management of the Plant, EG&G has not put the Plant in compliance with RCRA. EG&G has perpetuated many of the RCRA violations, which prompted the FBI to raid the Plant in 1989.  [Continued in next box.]

During questioning before Colorado Federal District Court Judge Lewis Babcock on August 6, 1991, DOE's counsel in the Sierra Club case publicly admitted that DOE and EG&G were still violating RCRA in the improper storage of RCRA wastes at the Plant. The evidence before this Grand Jury shows that DOE and EG&G have violated since January 1, 1990 and continue to violate RCRA in at least the following respects in operating and managing the Plant:

(a) they are storing 19 categories of hazardous and mixed wastes at the Plant, which are banned from land disposal and for which they do not have a RCRA storage permit for RCRA interim status;

(b) they are storing approximately 28,000 gallons of liquid hazardous and mixed wastes at the Plant, which consist primarily of land-banned liquid solvents and oil mixtures for which they do not have a RCRA storage permit nor RCRA interim status;

(c) they are storing at the Plant large quantities of RCRA land-banned solid wastes, which contain various hazardous constituents and for which they do not have a RCRA storage permit for interim storage status;

(d) they are storing at the Plant large volumes of solid, mixed waste "residues" and for which they do not have a RCRA storage permit nor RCRA interim storage status;

(e) they are storing various solid and liquid hazardous wastes at the Plant in violation of RCRA's requirements for spacing, packaging, labeling, and other physical compliance matters; and

(f) they are storing various solid and liquid hazardous wastes at the Plant without permitting scheduled inspections of all of the storage areas.

On September 28, 1990, EG&G reported to DOE that it was storing at the Plant 2,188 drums (i.e. 55-gallon capacity) of mixed waste residues, 302 cans (i.e. 10-gallon capacity) of mixed waste residues, 561 drums of radioactive residues in which the hazardous component (if any) had not been identified. DOE and EG&G did not have then and do not have now a RCRA storage permit nor RCRA interim status storage for these residues.  [Continued in next box.]

3.     EG&G's clean-up efforts at the Rocky Flats Plant have violated RCRA.

During the more than two-year period of its management of the Plant, EG&G has engaged in some "clean-up" efforts at the Plant. Some of these efforts have generated mixed wastes. Since there is no permitted, permanent storage site for these wastes, EG&G has violated RCRA when it has generated mixed wastes for which there is no permitted, permanent storage facility. Further, EG&G has violated RCRA by storing these wastes at the Plant during its management of the Plant without having a RCRA Permit or RCRA interim status to store these wastes there. Moreover, by storing these additional mixed wastes at the Plant for longer than one year, EG&G has violated that provision of RCRA, which forbids the storage of mixed wastes for longer than 12 months at a location, which does not have a permanent RCRA storage permit or RCRA interim status.

4.     EG&G cannot restart operations at the Rocky Flats Plant without violating RCRA.

The Rocky Flats Plant cannot be restarted without violating RCRA and other environmental laws. Any decision to operate the Plant without a Presidential proclamation exempting operation of the Plant from compliance with RCRA for the illegal generation and STD of RCRA wastes would constitute a willful and knowing violation of the criminal laws of the United States."

"[Note: the italicized portion was contained in the version released by Chief Judge Finesilver: *Rockwell controlled all of the material information, data, and analysis regarding environmental matters at the Plant. Since Rockwell often failed to disclose all of the relevant facts to DOE's employees, Rockwell and its managers were able to consistently manipulate and control DOE policy*] to assure that DOE endorsed Rockwell's illegal conduct in pursuit of very large bonus and contract fee awards. To the extent to which DOE may have authorized Rockwell to break the law, DOE acted more often than not at Rockwell's direction and after Rockwell had independently formed an intent to break the law."

"As the situation before the FBI raided the Plant in June of 1989, DOE continues to direct and endorse this course of illegal activity in violation of applicable environmental laws and in the name of political expediency. It is primarily for this reason that this Grand Jury has recommended that the Rocky Flats Plant be closed!"

"EPA never inspected the spray irrigation system at the Plant nor any records for operation of the spray irrigation system. If EPA had inspected the records or if EPA had inspected the spray fields, EPA would have discovered what would have been obvious.  Rockwell was engaging in spray irrigation as a means to avoid reporting discharges of its treated wastewater effluent downstream. Likewise, EPA would have realized that Rockwell was spraying 72 times more water onto the spray fields than they could absorb under ideal circumstances. EPA would have also learned from an inspection of the records or the spray fields that Rockwell was spray irrigating at times when it would have been impossible for any of the sprayed water to have evaporated or infiltrated into the ground before it migrated off of the Plant site."

### 5.    Former Grand Juror McKinley's Disclosure of Grand Jury Matters in His Published Book: <u>The Ambushed Grand Jury</u>

Wes McKinley, the former foreman of the special grand jury, wrote and published a book – <u>The Ambushed Grand Jury</u> – in 2004.  In substance, the book is identical to the Turley Proffer.  Presently, excerpts from the book are available at McKinley's web site: ambushedgrandjury.com.  A copy of <u>The Ambushed Grand Jury</u> is included as Attachment 34 to this pleading.  The book has been filed with the court and made part of the court record.  One of Mr. McKinley's avowed purposes in publishing the book was to disclose what happened inside the grand jury room:

> I know some folks think I'm violating my Rule 6(e) Grand Jury secrecy oath by doing this.  But we don't think the rule or the Constitution or the law was meant to protect illegal acts of the Justice Department.  So here's what happened inside the Grand Jury Chambers. ....

<u>The Ambushed Grand Jury</u>, Attachment 34, p. 139.  Chapter 9, entitled

"Flashbacks from Wes' Journals: Inside the Grand Jury chambers, 1989-1992,"

provides extensive details, as does the entire book.  Some examples:

22

| Page | Summary of information from <u>The Ambushed Grand Jury</u> |
|------|-----------------------------------------------------------|
| 91 - 92 | Mr. McKinley described in detail an exchange during a witness' testimony between a prosecutor and juror Peck over Peck's questions to FBI agent Lipsky. |
| 126 - 127 | Mr. McKinley described in detail the exchange in the grand jury room during Robert Duprey's testimony between Murtha and juror Peck over Peck's questioning of Duprey, described above, which led to the alleged book-throwing episode. |
| 140 - 155 | In one chapter dedicated to disclosing what occurred in the grand jury room, Mr. McKinley described in detail, with quotes, exchanges between the grand jurors and the prosecutors concerning indictments and a report, the deliberations and votes of the jurors, and the grand jury's sessions with Chief Judge Finesilver. |

In this book, Mr. McKinley provides factual details of <u>the very same allegations</u> of criminal and professional misconduct that are contained in the Turley Proffer.  Many of Mr. McKinley's allegations are demonstrably incorrect, as shown by the transcripts.  Nonetheless, Mr. McKinley's book is already in the public domain and available on the internet for $19.95.

**6.    Former Grand Juror Peck's Disclosure of Grand Jury Matters**

On the advice of her attorney, Ms. Janet Folcke contacted federal authorities in August, 1997, to report that her estranged brother, Mr. Peck, had sent her a package containing a letter signed by Mr. Peck, two computer disks containing the special grand jury's proposed report, indictments, and presentments, and copies of newspaper articles concerning the Rocky Flats grand jury investigation.  The package came "out of the blue" around September 1992.  A few days later, Mr. Peck called her to confirm she received the package.

Mr. Peck told her that she needed to go to the media to talk about it all, and that it was up to him to get justice done, as the other jurors were "bimbos or a bunch of idiots." Ms. Folcke told Mr. Peck that she refused to do anything. Ms. Folcke provided the FBI with the package and its contents. All of Ms. Folcke's information is recounted in two FBI reports of Ms. Folcke's statements as well as the package and its contents that she provided, which are Attachment 35.

When preparing this pleading, undersigned counsel spoke with Ms. Folcke to determine whether she objected to this information being disclosed to the Court. She said she did not object.

The government has possession of the materials provided by Ms. Folcke, if the Court or counsel wants to review them. The computer disks contain electronic versions of the special grand jury's report, presentments, and proposed indictments, all of which were presented to Chief Judge Finesilver on March 24, 1992, in court.

**D.     Congress' Post-Hoc Investigation of the Rocky Flats Criminal Case**

Congress investigated and publicly aired many criticisms of the government's handling of the case. The Wolpe Report of the House Committee on Science, Space, and Technology was published on January 4, 1993. *See* Attachment 36. The subcommittee report reviewed the investigation and settlement of the Rocky Flats case. Pertinent findings included:

1.     Main Justice was too conservative.
2.     Prosecutors were too willing to meet Rockwell's core demands for

settlement.

3.    The evidence strongly suggests that DOJ was willing to trade individual indictments for a plea agreement.

4.    Prior to completion of the investigation, prosecutors set a "bottom line" of no individual indictments.

5.    Main Justice forced the front-line prosecutors to refrain from helping the jurors write their report.

The subcommittee did not report finding any crimes or professional misconduct by the prosecutors.

**E.    Publicly Disclosed Judicial Proceedings Concerning Rocky Flats**

There have been several publicly disclosed judicial proceedings concerning the operation of and problems at Rocky Flats.  They include the following:

| Date | Proceeding | Citation |
|------|-----------|----------|
| 8/13/1991 | Sierra Club v. U.S. Dept. of Energy<br>District Court (J Babcock) opinion denying injunction against restart of Rocky Flats based upon alleged RCRA storage violations | 770 F.Supp. 578 (D. Colo. 1991) |
| 12/3/1992 | In Re Special Grand Jury 89-2<br>District Court (CJ Finesilver) opinion re: legal deficiencies in sealed grand jury report | 813 F.Supp. 1451 (D. Colo. 1992) |
| 1/26/1993 | In Re Special Grand Jury 89-2<br>District Court (CJ Finesilver) opinion releasing redacted grand jury report | 1993 WL 245557 (D.Colo. 1993) |
| 4/30/1998 | In Re Special Grand Jury 89-2<br>Tenth Circuit opinion re: district court's order releasing transcripts of grand jury testimony | 143 F.3d 565 (10th Cir. 1998) |
| 3/10/1999 | U.S. ex rel Stone v. Rockwell International Corp.<br>Tenth Circuit opinion re: district court's order releasing transcripts of grand jury testimony | 173 F.3d 757 (10th Cir. 1999) |

| 6/15/2006 | In Re Special Grand Jury 89-2<br>Tenth Circuit opinion re: district court's order denying Petitioners' motion to release grand jury matters | 450 F.3d 1159<br>(10th Cir. 2006) |
|---|---|---|

## III.  GOVERNMENT'S ANALYSIS
## OF THE APPLICABLE LEGAL STANDARDS

**A.    The Petitioners have failed to meet the legal standards for obstruction of justice.**

The Turley Proffer alleges obstruction of justice by the prosecutors.  That allegation is unwarranted and contrary to the evidence.

The elements of "obstruction of justice" include corruptly influencing, obstructing, or impeding the due administration of justice.  18 U.S.C. §1503. "Corruptly" means to act unlawfully.  *U.S. v. Ogle,* 613 F.2d 233, 238 (10th Cir. 1979).

Here, the prosecutors exercised their discretion and charged Rockwell International with 10 crimes, but did not charge any other persons or organizations.  The prosecutors accommodated the grand jury's desires to obtain further evidence from additional witnesses, including government regulators and officials.  The prosecutors conscientiously explained to the grand jury the prudential concerns underlying their exercise of discretion.

Understandably, the former grand jurors were frustrated that they did not have plenary authority to independently investigate every issue at Rocky Flats, to

26

indict everyone they wanted, or to issue a report describing their thoughts about Rocky Flats.  At substantial personal cost, they participated in the process and it did not turn out as they wanted.  But the law does not empower the grand jurors to act independently of the prosecutors, to investigate matters beyond the commission of crimes, or to advise the public generally on matters of public interest.  While the authority of the grand jury is substantial, the law has created checks and balances.  The law requires that an indictment may be returned only upon the joint agreement of the grand jury and the prosecutor.  U.S. CONST., AMEND. V; F.R.Crim.P. 7.  Thus, in the same way that the grand jury is a check on the government's power to indict, the law provides that the prosecutors are a check on the power of the grand jury in order to prevent mistakes and injustices. *Fields v. Soloff,* 920 F.2d 1114, 1117 (2nd Cir. 1990).

Yes, there were disagreements between the prosecutors and grand jury. However, the prosecutors' exercise of their discretion was not a "corrupt" act.

**B.**     **The Petitioners have failed to meet the legal standards for professional misconduct.**

The Turley Proffer alleges unprofessional conduct by the prosecutors. That allegation is unwarranted and contrary to the evidence.

The Turley Proffer failed to specify which, if any, applicable ethics rule the prosecutors violated, or the manner in which they were violated.  Instead, the Turley Proffer merely alleges the conclusion of "unprofessional conduct."

The Colorado Rules of Professional Conduct, Title 7, Colorado Revised

Statutes, apply to federal prosecutors in the District of Colorado.  None of those Rules specifically address a prosecutor's relationship to a grand jury.  The Rules require honesty and candor of all lawyers.  The record here, the grand jury transcripts, show that here the prosecutors demonstrated honesty and candor.

**C.**     **The statutes of limitations for crimes and professional misconduct have expired.**

The Statute of Limitations for criminal conduct is five years.  18 U.S.C. §3282.  The Statute of Limitations for professional misconduct is also five years, as provided in C.R.C.P. 251.32(I).[2]

Here, the alleged "criminal conduct" occurred prior to March 1992.  The Petitioners filed their petition on August 1, 1996.  The Petitioners allowed this litigation to languish from 1997 until it was revived in April 2003, by a letter from one of the Petitioners to the Court.  The Petitioners' proposal to disclose grand jury matters in order to report "crimes" and "professional misconduct" is a null proposal due to the passage of time and their own delay.

---

[2]C.R.C.P. 251.32(I) provides: "Statute of Limitations. A request for investigation against an attorney shall be filed within five years of the time that the complaining witness discovers or reasonably should have discovered the misconduct. There shall be no statute of limitations for misconduct alleging fraud, conversion, or conviction of a serious crime, or for an offense the discovery of which has been prevented by concealment by the attorney."

**D.**     **The Petitioners have failed to satisfy the Rule 6(e) standards for disclosure of grand jury matters.**

   **1.**     **The Petitioners have failed to establish a "need" for their requested disclosure.**

There is no need for the Petitioner's requested disclosure.  Every allegation of misconduct against the prosecutors contained in the Turley Proffer is already in the public domain via Wes McKinley's book, The Ambushed Grand Jury, the WestWord, Vanity Fair, and Harper's articles, and the Rocky Mountain News and Denver Post stories.  Between those six publications, every allegation of prosecutorial misconduct is – and has been for years – available to everyone. Public disclosure of the Turley Proffer will not add to the allegations of prosecutorial misconduct that the Petitioners already have disseminated in those six publications.

What is striking here is that, despite the fact that these allegations have been in the public domain for 15 years, no prosecutor and no ethics official has come to this Court and said "I want to investigate these allegations of serious prosecutorial misconduct, and I have a particularized need to review the grand jury transcripts."  If a prosecutor or ethics official wanted to begin an investigation, then there would be a particularized need.

Similarly, no United States Representative or Senator has come to this Court with the same request, or obtained Congressional immunity for any former grand juror to testify.  Congress has already investigated this case, and

concluded its inquiry with a public report.  At the February 1 hearing, the

Petitioners said they want to go back and try to interest Congress in investigating

their allegations.  First, they can take <u>The Ambushed Grand Jury</u>, the WestWord,

Harpers, and Vanity Fair articles, and the Rocky Mountain News and Denver Post

stories with them to present every allegation they want to make.  Second, the

passage of 15 years and the total absence of any investigation by anyone directly

contravenes the Petitioners' claim of Congressional interest.

> **2.      The Petitioners have failed to establish a "particularized need."**

> **a.      Summary of the Petitioners' arguments**

The Petitioners contend that a balancing of the competing interests here

militates in favor of disclosure.  The Petitioners contend that information

concerning alleged prosecutorial and judicial misconduct is relevant to

"anticipated" (but not currently ongoing, or even contemplated) judicial and

legislative proceedings – *i.e.*, disciplinary and criminal investigations of the

prosecutors and congressional hearings.  In an effort to show their need for

disclosure "with particularity," the Petitioners purport to identify various "crimes" or

"professional misconduct."

> **b.      The roles of the grand jury and the prosecutor**

In essence, the Petitioners' complaints reflect a disagreement between the

grand jurors and the prosecutors over who should and should not be charged.

Therefore, the Petitioners' position stems from a fundamental misunderstanding

of the respective roles of the grand jury and the prosecutors in the criminal justice system: the former grand jurors sought to usurp the historical role of the prosecutor by commandeering the roles of both the grand jury and the prosecutor.

The Fifth Amendment to the United States Constitution states, in relevant part: "No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury."

Through this provision, the framers sought to preserve the power to thwart government prosecution of innocent citizens.  *Fields*, 920 F.2d at 1117.  *See also In re Grand Jury January, 1969*, 315 F. Supp. 662, 671 (D. Md. 1970).  In serving this purpose, "[t]he role of the grand jury is restricted to a finding as to whether or not there is probable cause to believe that an offense has been committed." *United States v. Cox*, 342 F.2d 167, 171 (5th Cir. 1965).   However, while it is true that no indictment can be returned absent the consent of the grand jury, it is equally true that no indictment approved by a grand jury is valid absent the signature of the prosecutor.  *Fields*, 920 F.2d at 1118; *Cox*, 342 F.2d at 171; *Rocky Flats Grand Jury*, 813 F. Supp. 1451, 1461, 1463 (D. Colo. 1992).  The prosecutor's discretion in determining whether or not to charge someone with a crime is absolute.  *Fields*, 920 F.2d at 1118; *Cox*, 342 F.2d at 171-72.  *See also Bordenkircher v. Hayes*, 434 U.S. 357, 364 (1978).

Because the discretion and responsibility to prosecute ultimately rests with

the prosecutor, it is the prosecutor, not the grand jury, who determines what witnesses to call, what questions to ask, and generally what evidence will be submitted to the grand jury.  *United States v. Pabian,* 704 F.2d 1533, 1536 (11th Cir. 1983); *United States v. Chanen,* 549 F.2d 1306, 1312 (9th Cir. 1977); *In re Lopreato*, 511 F.2d 1150, 1153 (1st Cir. 1975); *Federal Practice and Procedure* § 101, at 298-99.  *Cf. United States v. Williams*, 504 U.S. 36, 45-55 (1992) (prosecutor cannot be compelled to present exculpatory evidence to the grand jury).  The historical vesting of these powers in the prosecutor recognizes, too, that (1) prosecutors, unlike grand juries, must evaluate the strength of a case based on the burden of proof applicable at trial; (2) prosecutors are much more knowledgeable about the applicable law; and (3) "whether a prosecution shall be commenced or maintained may well depend upon matters of policy wholly apart from any question of probable cause."   *See Cox*, 342 F.2d at 171; *id.* at 193 (Wisdom, J., concurring); *Fund for Constitutional Government v. National Archives and Records Service*, 656 F.2d 856, 863 (D.C. Cir. 1981).

### c.    The importance of grand jury secrecy

Due to the limited role of the grand jury, it is generally "'unrestrained by the technical, procedural and evidentiary rules governing the conduct of criminal trials . . . .'"  *United States v. R. Enterprises, Inc.*, 498 U.S. 292, 298 (1991) (quoting *United States v. Calandra*, 414 U.S. 338, 343 (1974)).  Indeed, a grand jury may receive and be influenced by rank hearsay, speculation, rumor, and innuendo,

*see Costello v. United States*, 350 U.S. 359, 362-64 (1956), and evidence which is unconstitutionally obtained, *see Lawn v. United States*, 355 U.S. 339, 348-50 (1958).  As previously noted, exculpatory evidence need not be presented to a grand jury.  *Williams*, 504 U.S. at 45-55.  A grand jury proceeding is simply not subject to trial standards of proof and evidence; typically, one side of an issue is presented, in a secret forum where the evidence cannot be objected to, cross-examined, or rebutted.

In light of these realities, the courts have consistently "recognized that the proper functioning of our grand jury system depends upon the secrecy of grand jury proceedings."  *Douglas Oil v. Petrol Stops Northwest*, 441 U.S. 211, 218 (1979).  *See also In re Special Grand Jury 89-2*, 143 F.3d 565, 569 (10th Cir. 1998).  The rule of grand jury secrecy is, in fact, "older than our Nation itself." *Pittsburgh Plate Glass Co. v. United States*, 360 U.S. 395, 399 (1959).

The Supreme Court has recognized at least five reasons for the policy of grand jury secrecy: (1) to prevent the escape of persons against whom an indictment is contemplated; (2) to allow grand jurors to investigate with the utmost freedom, insulated from improper outside influences; (3) to prevent subornation of perjury or witness tampering; (4) to encourage those who provide evidence to the grand jury to do so openly and fully; and (5) to protect person investigated, but not indicted, from public ridicule.  *Douglas Oil*, 441 U.S. at 219 n.10; *United States v. Proctor & Gamble Co.*, 356 U.S. 677, 681 n.6 (1958).

"In order to effectuate these objectives, the scope of secrecy is necessarily broad." *Fund for Constitutional Government*, 656 F.2d at 869.  This broad conception of grand jury secrecy is codified in Fed. R. Crim. P. 6(e).  Specifically, as discussed above, secrecy applies to "a matter occurring before the grand jury," *see* Rule 6(e)(2)(B), a phrase that has been interpreted broadly to encompass *any* material or proceeding that might reveal what occurred before the grand jury. Further, the obligation of secrecy continues indefinitely: it does not end when the grand jury proceeding ends.  *See Douglas Oil*, 441 U.S. at 222; *Rocky Flats Grand Jury*, 813 F. Supp. at 1464-65.

### d.   The standards for considering lifting grand jury secrecy

Rule 6(e)(3) sets forth a number of exceptions to grand jury secrecy.  The Petitioners, however, do not argue that the facts of this case bring it within any of those exceptions.  Instead, they claim that the Court possesses "inherent authority" independent of Rule 6(e).  It is not clear that any inherent authority exists to create additional exceptions.  A few courts have held that such authority exists.  *See, e.g., In re Petition of Craig*, 131 F.3d 99, 102-03 (2d Cir. 1997); *In re Petition to Inspect and Copy Grand Jury Materials*, 935 F.2d 1261, 1268-69 (11th Cir. 1984).[3]  On the other hand, at least one Circuit Court of Appeals has held that "[a] district court to whom application for disclosure is made does exercise

---

[3] The cases the Petitioners cite for the proposition that a court has inherent discretion in relaxing the rule of secrecy independent of Rule 6(e) do not so hold.  They expressly involve claims under Rule 6(e) itself.

discretion in granting disclosure but may not thereby enlarge the exceptions [in Rule 6(e)] to grand jury secrecy." *In re J. Ray McDermott & Co., Inc.*, 622 F.2d 166, 172 (5th Cir. 1980).  *See also Fund for Constitutional Government*, 656 F.2d at 869 (Rule 6(e) "sets forth in precise terms to whom, under what circumstances and on what conditions grand jury information may be disclosed"); *In re Biaggi*, 478 F.2d 489, 493-94 (2d Cir. 1973) (Hays, J., dissenting).  The Tenth Circuit has not decided that question, though in *In re Lynde* the Court stated that "Rule 6(e) . . . codifies the traditional rules governing the disclosure of grand jury materials."  922 F.2d at 1451.

The government submits that the proposition that the courts may, through the exercise of "inherent authority," essentially circumvent the strictures of Rule 6(e)(3) is of doubtful validity.[4]  In *Carlisle v. United States,* 517 U.S. 416 (1996),

---

[4]In its opinion in this case, the Tenth Circuit noted that whether a district court even possesses any "inherent authority" to disclose matters occurring the grand jury was a "delicate issue."  *In re Special Grand Jury 89-2,* 450 F.3d at 1178.  In light of the fact that the Supreme Court "has not explicitly recognized such authority," the Tenth Circuit determined "it would be unwise for us to resolve this delicate issue on the present record."  *Id.*  Though the former grand jurors ignore it in their arguments, the Tenth Circuit noted that the Supreme Court, the Advisory Committee's notes to Rule 6, and Wright & Miller all indicate that there is no such "inherent authority":

To be sure, [the Supreme Court] has recognized that disclosure of grand jury materials is "committed to the discretion of the trial judge," *Pittsburgh Plate Glass Co. v. United States,* 360 U.S. 395, 399, 79 S.Ct. 1237, 3 L.Ed.2d 1323 (1959); but it does not necessarily follow that Rule 6(e) sets no boundaries on that discretion.  Although the Court has said that "Rule 6(e) is but declaratory [of the proposition that disclosure is committed to the trial judge's discretion]," *id.,* it also said in the same opinion that "*any*

the Supreme Court squarely held that courts lack "inherent supervisory power" to develop rules that circumvent or conflict with the Federal Rules of Criminal Procedure.  *Id.* at 425-26.  *See also United States v. Aisenberg*, 358 F.3d 1327, 1347 n.32 (11th Cir. 2004) (recognizing that *Carlisle* may affect this issue but declining to decide the question since the district court exceeded any inherent authority it had).[5]

The Supreme Court has held that the requirement of a "judicial proceeding" reflects a deliberate legislative policy choice to limit disclosures of matters occurring before the grand jury:

---

disclosure of grand jury minutes is covered by Fed. Rules Crim. P. 6(e) promulgated by this Court," *id.* at 398, 79 S.Ct. 1237 (emphasis added). And the Advisory Committee notes state that "Rule 6(e) continues to spell out the general rule of secrecy of grand-jury proceedings *and the exceptions to that general rule.*" Fed.R.Civ.P. 6(e), advisory committee notes, 2002 Amendments (emphasis added); *see also* 1 *Wright & Miller, Federal Practice and Procedure* § 106 ("[R]eliance on the inherent powers doctrine is suspect." (internal quotation marks omitted)).

[5]The reason for Tenth Circuit's hesitancy to hold that courts have an "inherent authority" to go beyond the dictates of Rule 6(e) is that courts are not empowered to legislate.  The Supreme Court has very tightly circumscribed the authority of federal courts to ensure that lower courts do not exercise policy-making or legislative authority allocated to Congress.  *See, e.g., Touche Ross & Co. v. Redington,* 442 U.S. 560 (1979) (district court erred in implying a cause of action under securities act when Congress did not expressly provide for one).  In an area where Congress has already legislated, courts are particularly prohibited from legislating via statutory interpretation.  *Tennessee Valley Authority v. Hill*, 437 U.S. 153, 194 (1978); *Saxbe v. Bustos*, 419 U.S. 65, 80 (1974); *Dist. of Columbia v. Carter*, 409 U.S. 418, 422 (1973); *Maryland v. U.S.*, 381 U.S. 41, 53 (1965); *Commissioner v. Brown*, 380 U.S. 563, 579 (1965); *FTC v. Simplicity Pattern Co.*, 360 U.S. 55, 67 (1959).

The provision in (C)(I) that disclosure may be made "preliminarily to or in connection with a judicial proceeding" is, on its face, an affirmative limitation on the availability of court-ordered disclosure of grand jury materials. In our previous cases under Rule 6(e), we have not had occasion to address this requirement in detail, focusing instead on the requirement that the moving party show particularized need for access to grand jury materials. See [*United States v.*] *Sells* [*Engineering, Inc.*]*, ante,* at ---- - ----, 103 S.Ct., at 3147 - 3149, and cases cited. The two requirements, though related in some ways,[FN4] are independent prerequisites to (C)(I) disclosure. The particularized need test is a criterion of *degree;* the "judicial proceeding" language of (C)(I) imposes an additional criterion governing the *kind* of need that must be shown. <u>It reflects a judgment that not every beneficial purpose, or even every valid governmental purpose, is an appropriate reason for breaching grand jury secrecy. Rather, the Rule contemplates only uses related fairly directly to some identifiable litigation, pending or anticipated. Thus, it is not enough to show that some litigation may emerge from the matter in which the material is to be used, or even that litigation is factually likely to emerge. The focus is on the</u> *actual use* <u>to be made of the material. If the primary purpose of disclosure is not to assist in preparation or conduct of a judicial proceeding, disclosure under (C)(I) is not permitted.</u> See *United States v. Young,* 494 F.Supp. 57, 60-61 (ED Tex.1980).

> FN4. The particularized need test requires that the materials sought be "needed to avoid a possible injustice in another judicial proceeding" and that the moving party's request be "structured to cover only material so needed." *Douglas Oil Co. v. Petrol Stops Northwest,* 441 U.S. 211, 222, 99 S.Ct. 1667, 1674, 60 L.Ed.2d 156 (1979) (footnote omitted). See generally *id.,* at 221-224, 99 S.Ct., at 1674-1676; *United States v. Sells Engineering, Inc., ante,* at ---- - ---- , 103 S.Ct., at 3147 - 3149. <u>These inquiries cannot even be made without consideration of the particulars of the judicial proceeding with respect to which disclosure is sought.</u> See also the proposed new Rule 6(e)(3)(E), --- U.S. ----, 103 S.Ct. ----, 75 L.Ed.2d ----, to take effect August 1, 1983.

*U.S. v. Baggot*, 463 U.S. 476, 480(1983) (emphasis added).  *See also* 1 Wright &

Miller, *Federal Practice and Procedure* § 106 ("[R]eliance on the inherent powers

doctrine is suspect." (internal quotation marks omitted)).

Should the Court determine that Rule 6(e)(3)(E) sets forth the only exceptions to grand jury secrecy, that is the end of the matter since the Petitioners do not contend that their requests for relief fall within any exception set forth in the Rule.

Even if some inherent authority exists to allow disclosure independent of Rule 6(e), this case is not one which calls for its application.  Those few courts that have recognized this authority have been careful to severely restrict its potential application.  In *In re Petition to Inspect and Copy Grand Jury Materials*, 935 F.2d 1261, 1269 (11th Cir. 1984)*,* the court was faced with a request by a judicial investigating committee for grand jury material about a sitting federal judge who had been ultimately charged with (and later acquitted of) soliciting a bribe.  The district court, relying on its inherent authority, ordered that the grand jury materials be turned over to the committee.  The Eleventh Circuit affirmed, holding that "in the special circumstances of a judicial investigation," Rule 6(e) did not provide the exclusive authority for disclosing grand jury material.  The court went on to further limit its holding:

> Certainly . . . , courts must adhere to Rule 6(e) in "garden variety" petitions for grand jury disclosure.  The rule was intended to provide a reliable statement of the law in this area, and would be rendered meaningless if departures were freely sanctioned.  We assume that courts are not empowered to act outside Rule 6(e) in other than exceptional circumstances consonant with the rule's policy and spirit.

735 F.2d at 1269.  *See also In re Biaggi*, 478 F.2d at 494 (affirming order allowing disclosure of redacted grand jury transcript concerning investigation of New York

City mayoral candidate; supplemental opinion recognized "special circumstances" of the case); *In re Petition of Craig*, 131 F.3d at 102-05 (alleged public interest in 1948 grand jury testimony of public official accused of being a communist spy did not present "special circumstances" warranting exercise of inherent authority to order disclosure; "Rule 6(e)(3) governs almost all requests for the release of grand jury records"); *Aisenberg*, 358 F.3d at 1347-52 (petitioners who claimed wrongful prosecution in case involving disappearance of their daughter failed to show "special circumstances" justifying disclosure of grand jury material; inherent authority is "exceedingly narrow").

In any event, the Petitioners have not met their heavy burden of justifying disclosure.  The Petitioners erroneously assert that there is but one question that must be answered in determining whether grand jury materials should be disclosed pursuant to the court's inherent authority – does the need for disclosure outweigh the public interest in continued secrecy?

They are incorrect.  A party seeking disclosure must show that (1) "the material they seek is needed to avoid a possible injustice in another judicial proceeding"; (2) "the need for disclosure is greater than the need for continued secrecy"; and (3) the "request is structured to cover only material so needed." *Aisenberg*, 358 F.3d at 1348 (quoting *Douglas Oil*, 441 U.S. at 222).[6]  "These

---

[6] This is the same test applied in the context of Rule 6(e)(3).  *Id.* at 1347-48.  In the Second Circuit's view, while this test, derived from *Douglas Oil*, "cannot be carried over directly to 'special circumstances' cases (because the *Douglas Oil* test's first prong

same demanding standards apply even *after* the grand jury has concluded its operations." *Aisenberg*, 358 F.3d at 1348 (emphasis in original) (citing *Douglas Oil*, 441 U.S. at 222).  "[W]hen the issue . . . involves the exercise of discretion outside the bounds of Rule 6(e)," the burden on the party seeking disclosure is even greater.  "A more lenient test appropriate for Rule 6(e) cases cannot simply be applied to non-6(e) cases as well." *In re Petition of Craig*, 131 F.3d at 106 n.10.

> **e.  The Petitioners' request does not satisfy any of the requirements for the exercise of the Court's inherent authority.**
>
> > **1)  The material is not needed to avoid a possible injustice in another judicial proceeding.**

The Petitioners claim that disclosure is needed to initiate criminal or ethics proceedings which have not been commenced during the last 15 years, and which, in all likelihood, will never be commenced.  As the Supreme Court made clear in *United States v. Baggot, supra*, to establish this factor the party seeking disclosure must demonstrate more than the hypothetical possibility of a judicial proceeding – the party seeking disclosure must show that "actual use" of the material in a judicial proceeding is likely.  463 U.S. at 48.  Thus, where the

---

presumes use of the grand jury material in a subsequent judicial proceeding), it serves as a useful aid to guide [the] inquiry." *In re Petition of Craig*, 131 F.3d at 104 n.5.  In this case, however, the Petitioners ostensibly seek disclosure in large part for the purpose of providing it to authorities who might decide to commence judicial proceedings.  It therefore makes sense in this context to require a showing under the first *Douglas Oil* factor.  *See Aisenberg*, 358 F.3d at 1347-48.

possibility that an investigation will ripen into a judicial proceeding is speculative and uncertain, disclosure will be denied.   *See*, *e.g., In re Grand Jury 89-4-72*, 932 F.2d 481, 487-88 (6th Cir. 1991);  *In re Special February, 1975 Grand Jury*, 662 F.2d 1232, 1238-39 (7th Cir. 1981);  *In re J. Ray McDermott & Co., Inc.*, 622 F.2d at 171.

As discussed above, the possibility of any proceedings against the prosecutors (who have long since left the Department of Justice) is virtually nonexistent.  The statutes of limitations for any disciplinary or criminal action ran many years ago.  The Petitioners have not articulated with any specificity any criminal conduct by the prosecutors, and the chances of a federal prosecutor even starting an investigation over a grand jury which was discharged 15 years ago are remote.

The Petitioners argue that Rule 6(e) does not apply when a prosecutor commits a crime before the grand jury.  That argument fails here.  As the grand jury transcripts show, the prosecutors committed no crimes or professional misconduct.  If, contrary to the government's position, this Court finds in the transcripts probable cause to believe that the prosecutors committed obstruction of justice or professional misconduct, then the Court can refer the matter to the appropriate public official.  In that event, the Court could fashion appropriate limiting orders that would strike a balance between preservation of grand jury secrecy and appropriate law enforcement.

    **2)**    **The need for disclosure does not outweigh the need for continued secrecy.**

The first part of this factor requires the party seeking disclosure to demonstrate a need for grand jury information "with particularity."   *See Douglas Oil*, 441 U.S. at 221; *In re Special Grand Jury 89-2*, 143 F.3d at 570.  Indeed, this is the most significant aspect of the entire disclosure analysis.  *United States ex rel. Stone*, 173 F.3d at 759; *In re Special Grand Jury 89-2*, 143 F.3d at 570; *In re Lynde*, 922 F.2d at 1452.  "Requiring a showing of particularized need impliedly requires the party seeking disclosure to demonstrate a specific and allowable use for the [material], a showing that the [material] would be relevant and helpful in a connected proceeding is not sufficient to meet this burden."   *In re Lynde*, 922 F.2d at 1452.  Further, "[a]lmost uniformly, the federal courts have interpreted the requirement of particularized need literally, and rejected a blanket approach to the determination."   *In re Special Grand Jury 89-2*, 143 F.3d at 570.

The Petitioners point to the public's interest in Rocky Flats (and its presumed interest in the manner in which the Grand Jury investigation was conducted) in an effort to demonstrate particularized need.  But the public's potential interest in a matter has been repeatedly rejected as a sufficient basis, by itself, for disclosure.  Were it otherwise, Rule 6(e) would be rendered meaningless.  *In re Petition of Craig*, 131 F.3d at 104-05.  Moreover, the former grand jurors cannot point to any expressions of public interest in the matter in the last 10 years, save for fleeting notice generated by their own activities (*e.g.*, press

conferences and a book).  Despite the former grand jurors' serious and well-publicized allegations in WestWord, The Ambushed Grand Jury, etc., there simply is no public clamor for information about what occurred before this special grand jury 15 years ago.

In sum, the Petitioners have fallen short of demonstrating a particularized need for disclosure.

On the other hand, the need for continued secrecy remains substantial.

"Where, as here, the criminal proceedings are concluded and the grand jury disbanded, the interests are reduced, but not eliminated. . . .  The focus shifts from the immediate effects on a particular grand jury to the possible effect upon the functioning of future grand juries. . . .  Persons called upon to testify will consider the likelihood that their testimony may one day be disclosed to outside parties.  Fear of future retribution or social stigma may act as powerful deterrents to those who would come forward and aid the grand jury in the performance of its duties." *In re Special Grand Jury 89-2*, 143 F.3d at 571-72 (internal quotations marks and citations omitted) (quoting in part *In re Lynde*, 922 F.2d at 1454 (quoting *Douglas Oil*, 441 U.S. at 222)).  This need to encourage witness cooperation is regarded as an interest of "'paramount importance.'" *Federal Practice and Procedure* § 106, at 366 (quoting *United States v. Scott Paper Co.*, 254 F. Supp. 759, 761 (W.D. Mich. 1966)).

Further, as the Tenth Circuit previously has recognized, there is a

continuing need to protect individuals who were investigated but not indicted.  *In re Special Grand Jury 89-2*, 143 F.3d at 572 (recognizing the interests of three interveners who were subjects of the Rocky Flats Special Grand Jury investigation).   *See also Rocky Flats Grand Jury*, 813 F. Supp. at 1454 (noting that two unnamed individuals had intervened to oppose disclosure).  These individuals "'have been subjected to charges before the grand jury which have thus far proven unfounded, thereby increasing their interest in limiting disclosure of the grand jury proceedings.'"  *In re Special Grand Jury 89-2*, 143 F.3d at 572 (quoting *United States v. Fischbach & Moore, Inc.*, 776 F.2d 839, 844 (9th Cir. 1985)).  This fact "contributes to the weight of the secrecy interests."  *In re Special Grand Jury 89-2*, 143 F.3d at 572.

The balancing of the claimed need for the materials against the continued need for secrecy clearly militates against disclosure in this case.  Accordingly, the Petitioners have failed to carry their burden on this factor.

### 3)   The Petitioners have not specified what material was needed.

The Petitioners were not specific at all about what material they wanted disclosed.  Of the thousands of pages of testimony and documents presented to the Grand Jury, and the hundreds of pages of grand juror affidavits and testimony, they did not identify any specific portion for disclosure.  As the Tenth Circuit has held, such a generalized request for disclosure is insufficient to satisfy this factor.  *In re Lynde*, 922 F.2d at 1454 (petitioners made "[n]o attempt . . . to

narrow the scope of their request for the release of [a witness's] testimony").

E.    **Congressional immunity**

Congress has the authority to immunize the former grand jurors to obtain their testimony about alleged "crimes" and "professional misconduct."  Not only that, but Congress has the responsibility to write the laws to create a criminal justice system that properly balances the role of the common citizen summoned to serve on the grand jury with the role of the prosecutor in assuring that indictments can be proved beyond a reasonable doubt and that the grand jury, through misunderstanding or an excess of zeal, does not indict cases which are inappropriate for the criminal justice system.

In The Ambushed Grand Jury, at pages 54-55, Mr. McKinley wrote about the former grand jurors having requested immunity from Congress, and the fact that Congress refused their request.  Fifteen years later, it appears that Congress has not changed its mind, but the Petitioners are free to solicit Congress anytime.

F.    **Court imposed limitations on any disclosure**

If the Court determines that some disclosure is appropriate, then it must address several important practical problems:

- To whom would disclosure be made?

- What would be disclosed?  The Turley Proffer, the grand jury transcripts, or something else?

- What use could be made of the information?  Would use be

restricted to official investigative uses only, or would the former

grand jurors be allowed to write books, sign movie deals, and

discuss their experiences and opinions with the media and public?

● How would the disclosed materials be collected and disseminated?

As to these matters, the government takes the following position:

**To whom would disclosure be made?**  Disclosure should be limited to

the official use of governmental officials charged with enforcing the criminal laws

and ethics rules.  There should not be general public dissemination, because that

would violate the public policies behind grand jury secrecy.  If, as the former

grand jurors allege, the prosecutors committed crimes and unprofessional

conduct, then that is a matter to be resolved by the responsible government

officials.

**What would be disclosed?**  Any disclosure should be limited to the grand

jury transcripts.  The Turley Proffer was designed to be an "opening statement," a

persuasive piece, not a factual record.  Based upon the transcript references

cited above, it is apparent that the Turley Proffer contains many factually incorrect

and misleading allegations.  Better to disseminate the best evidence of what

actually occurred – the grand jury transcripts themselves.  That way, the reader

would be able to form his own judgment about what transpired without having to

separate truth from fiction.  If the Court decides to unseal the grand jury

transcripts, then the Court also should unseal the government's sealed pleading

discussing the transcript references that disprove the Turley Proffer's allegations.

**What use could be made of the information?**  Use of the grand jury transcripts should be restricted to official investigative uses only.  The former grand jurors should not be allowed to write books, sign movie deals, or discuss their experiences and opinions with the media and public.

**How would the disclosed materials be collected and disseminated?** The grand jury transcripts were put onto paper originally.  The government has scanned the paper versions and created electronic images of each transcript. Thus, the transcripts are easily reproduced and disseminated.

## IV.  <u>CONCLUSION</u>

Based upon the foregoing, the government requests that the Court deny the Petitioners' request for disclosure of grand jury matters.


Respectfully submitted on June 1, 2007.

> Troy A. Eid
> United States Attorney
>
> <u>s/ John Haried               </u>
> John Haried
> Assistant United States Attorney
> 1225 Seventeenth Street, Suite 700
> Denver, Colorado 80202
> Phone: (303) 454-0100

## CERTIFICATE OF SERVICE

I hereby certify that on this 1st day of June, 2007, I electronically filed the foregoing **Government's Brief Addressing the Turley Proffer Allegations of Prosecutorial Crimes and Professional Misconduct** with the Clerk of the Court using the CM/ECF system, and sent notification of such filing to opposing counsel at the following e-mail addresses:

Kenneth Peck
kenpeck@bushellandpeck.com

Bette K. Bushell
bkbesq@ecentral.com

Jonathan R. Turley
jturley@law.gwu.edu

s/John Haried_____
John Haried
Assistant United States Attorney
