FILED
UNITED STATE....  ....... COURT
DENVER

JAN 26 1993

JAMES R. MANSPEAKER
CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 92-Y-180

BY_____

IN RE GRAND JURY PROCEEDINGS, SPECIAL GRAND JURY 89-2 (Rocky Flats Grand Jury)

## ORDER REGARDING RELEASE OF GRAND JURY DOCUMENTS

Sherman G. Finesilver, Chief Judge

This matter comes before the Court on the question of whether all or part of the report ("the Report") of Special Grand Jury 89-2 should be filed as a public record. The Court initially addressed this question in its order of December 3, 1992. *See In Re Grand Jury Proceedings, Special Grand Jury 89-2 (Rocky Flats Grand Jury)*, Civil Action No. 92-Y-180, Order Regarding Motion for Release of Grand Jury Documents (D. Colo. Dec. 3, 1992). In keeping with that prior order, we now hold that the redacted Report shall be filed as a public record.

I.

Special Grand Jury 89-2 ("the Special Grand Jury" or "the Grand Jury") was empaneled on August 1, 1989, to investigate federal environmental crimes, if any, that may have occurred at the Rocky Flats Nuclear Weapons Plant in Jefferson County, Colorado ("Rocky Flats"). After a three-year investigation, the United States Attorney for the District of Colorado concluded that there was sufficient evidence to warrant bringing criminal charges against Rockwell, the corporate operator of Rocky Flats. However, the U.S. Attorney also concluded that indictments against certain individuals who had been employed at Rocky Flats by Rockwell and the Department of Energy ("DOE") would not be legally supportable.

On March 24, 1992, the Special Grand Jury, upon being discharged, submitted to the Court a report of its findings ("the Report"). The Report itself was dated February 19, 1992. On March 26, 1992, Rockwell and the U.S. Department of Justice entered into a plea agreement whereby Rockwell pled guilty to ten criminal charges involving violations of federal environmental laws in its

1

0382

operation of Rocky Flats and paid a fine of $18.5 million.

On September 25, 1992, the Court entered an order disallowing any filing of the Report as a public record. The Report contained material violative of the statutory requirements for public filing of a grand jury report and no suitable redacted version of the Report was then in existence. In October 1992, petitioners Denver Publishing Company, doing business as *The Rocky Mountain News* ("The *News*") and Combined Communications Corporation, doing business as KUSA-TV, Inc. ("KUSA"), moved for public disclosure of the Report or appropriate portions thereof. The Government and John Does 1 and 2 filed motions in opposition to any disclosure.

On December 3, 1992, the Court denied petitioners' request to file the Report in its entirety, but left open for later consideration whether portions of the Report might be filed as a public record subject to certain enumerated conditions. *See id.* The Court directed a response from the Government. The Government, through the U.S. Attorneys Office for the District of Colorado,[1] filed its response.

II.

In this Court's order of December 3, 1992, the Court stated that the Report would not be filed as a public record in its entirety because, in violation of the statutory and common law standards, it accused individuals identifiable by name or position, including accusations against public officials that lacked the required recommendation for removal; dealt in rumor and conjecture; engaged in social and even legal argument; dealt with political and social issues outside the province of the special grand jury's duty of investigating crime; contained charges not based upon a preponderance of the evidence; and followed a serious breach of grand jury secrecy. *See generally id.* Although the

---

[1]The United States Attorney has statutory responsibility for federal grand juries, was an integral and equally informed part of the grand jury inquiry into criminal activity at Rocky Flats Nuclear Weapons Plant in Jefferson County, Colorado ("Rocky Flats"), and is the government representative for federal agencies involved in the oversight and operation of Rocky Flats.

0383

statute dealing with special grand jury reports, 18 U.S.C. § 3333, dictates that noncomplying reports shall be sealed, it is silent regarding redacted versions of special grand jury reports.[2]

The Court has determined that notwithstanding 18 U.S.C. § 3333, the entire Report need not be sealed merely because part of it is inappropriate for public filing. Rather, the Court has sought a principled course of sealing those parts of the Report not appropriate for public filing while releasing for the benefit of the public interest the vast amount of unobjectionable material contained in the Report. In its redacted form, the Report comports with the applicable statutes, 18 U.S.C.A. § 3333 *et seq.* (West 1992) and Fed. R. Crim. P. 6(e). It is also is in compliance with the spirit of the standards of due process, grand jury conduct, and secrecy outlined in the Court's prior order. Therefore, because the Report, with redactions, is now in a legally acceptable form, we hold that it may be filed as a public record.

To date, information on Rocky Flats has been either incomplete or ignored or both. The Court, however, has considered the Report, the materials underlying it, and other filings in this litigation. The Court finds that the Report taken in isolation does not present a balanced view of the inquiry into possible criminal activities in the operation of Rocky Flats. However, the following documents, taken together, provide a more accurate and complete picture of this matter of great public concern:

(1) the Special Grand Jury's Report in redacted form,
(2) the Government' Response,
(3) the Government's Sentencing Statement of March 26, 1992,
(4) the Government's Supplemental Sentencing Memorandum of May 28, 1992,
(5) the transcript of the June 1, 1992 Sentencing Hearing, and
(6) Rockwell's Sentencing Memorandum of March 26, 1992.[3]

---

[2] The statute also has not generally been used in the context of environmental crime but rather for the purpose of investigating organized crime.

[3] The Government's Sentencing Statement of March 26, 1992, the Government's Supplemental Sentencing Memorandum of May 28, 1992, the transcript of the June 1, 1992 Sentencing Hearing, and Rockwell's Sentencing Memorandum of March 26, 1992, have been public records since their

0384

The exhaustive and thorough Response of the Government is particularly helpful in understanding the operation of the facility at Rocky Flats.[4] However, we have long been familiar with the various aspects of civil and criminal proceedings at Rocky Flats, and we note that the continuing safety, health, and environmental problems at Rocky Flats will be solved neither by the sum of all these documents and the disclosures they contain nor by empaneling another special grand jury. Other avenues must be explored that coordinate study, action, and mature judgment in the service of a thorough and fair assessment of the health, safety, and environmental concerns at Rocky Flats now and in the future.

III.

The discharge of the Special Grand Jury, Rockwell's pleas of guilty, the public filing of the Report, and the Government's Response all signal the completion of the proceedings and activities of Special Grand Jury 89-2. Any past breaches of confidentiality and grand jury secrecy remain a subject of inquiry.

Interested parties, attorneys, grand jurors, court personnel, and other persons in possession of confidential grand jury material continue to be bound by the standards of confidentiality and secrecy of grand jury matters embodied in Fed. R. Crim. P. 6(e) and enforced through 18 U.S.C.A.

---

submission to the Court and copies are on file with the Clerk of the Court.

[4]Although the Government has suggested redactions, the Court has not agreed in every case with the Government's suggestions. For example, in some cases where the Government has recommended redaction because it believed a statement to be false, inflammatory, or misleading, we have chosen to retain the material, to let the Government's response speak for itself, and ultimately to allow interested parties to decide the truth, if such a thing can be said to exist among the ambiguities of this case, for themselves.

 The Court redacted passages of legal argumentation and unsubstantiated, inappropriate charges against nongovernmental entities. In keeping with this Court's Order of December 3, 1992 and the relevant case law, the Court also redacted the following types of material: material highly critical of identifiable individuals, forays into recommendations on national nuclear facilities policy, charges against entities beyond the scope of the Grand Jury's inquiry, conclusions without any factual bases whatsoever, and discussions of policy or activities outside the Grand Jury's charged jurisdiction of the state of Colorado.

0385

§§ 401 (providing for contempt citations for violations of court rules in general), 1503 (providing for prosecution for obstruction of justice), and 3333 *et seq.* (West 1992) (providing for contempt citations following unauthorized publications of grand jury reports). Attorneys, of course, remain subject to guidelines of professional responsibility contained in state and federal statutes, rules, and other applicable codes of conduct.

IV.

The Court has considered the Objection and Alternative Requests for Relief of John Does 1 and 2 to Release Redacted Grand Jury Report. They are respectively overruled and denied. The Court's order of December 3, 1992 explicitly stated the Court's concern for individual privacy and due process, saying that because "the key consideration is the prevention of harm to named individuals who have not been, outside of the legally inadequate Report, accused of anything, the great potential of harm to those individuals named in the Report persuades the Court against disclosure." *Id.* at 22-23. The redacted Report has in fact omitted all references to the John Does. Where no right of the John Does is implicated by the redacted Report, the John Does have no standing either to object to or stay its release.

V.

Accordingly, it is ordered that:

(1) The Clerk of the Court is DIRECTED to file the redacted Report as a public record.

(2) The unredacted form of the Report shall not be filed as a public record and shall remain sealed under order of Court.

(3) The Objection and Alternative Requests for Relief of John Does 1 and 2 to Release Redacted Grand Jury Report, filed December 21, 1992, are OVERRULED and DENIED.

5                                                    0386

Dated this 26th day of January 1993, at Denver, Colorado.

BY THE COURT:

Sherman G. Finesilver, Chief Judge
United States District Court

0387

0388

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

JAN 26 1993

JAMES R. MANSPEAKER
**CLERK**

BY _____

Civil Action No. 92-Y-180

IN RE GRAND JURY PROCEEDINGS, SPECIAL GRAND JURY 89-2 (Rocky Flats Grand Jury)

## ORDER REGARDING REDACTED REPORT OF SPECIAL GRAND JURY 89-2

Pursuant to this Court's order in *In Re Grand Jury Proceedings, Special Grand Jury 89-2 (Rocky Flats Grand Jury)*, Civil Action No. 92-Y-180, Order Regarding Release of Grand Jury Documents (D. Colo. January 26, 1993), the redacted report of Special Grand Jury 89-2, attached hereto, shall be filed as a public record.

Dated this 26th day of January 1993, at Denver, Colorado.

BY THE COURT:

Sherman G. Finesilver, Chief Judge
United States District Court

0389

(What follows is the report of Special Grand Jury 89-2 in redacted
form.  In order to preserve the integrity of the Report's dates and
title, the cover sheet information detailed below has been left
intact despite any inaccuracy or obsolescence in the information.)

Colorado Federal District Court

Report of the Special Grand Jury 89-2

February 19, 1992

**CONFIDENTIAL DOCUMENT**

**NOT FOR PUBLIC DISCLOSURE WITHOUT PRIOR COURT ORDER**

0390

## *Grand Jury Report ("GJ Report")*: [1/]

### *I.   INTRODUCTION*

The Department of Energy ("DOE"), its contractors – Rockwell International, Inc. ("Rockwell") . . . and many of their respective employees have engaged in an on-going criminal enterprise at the Rocky Flats Plant ("the Plant"), which has violated Federal environmental laws.  This criminal enterprise continues to operate today at the Rocky Flats Plant, and it promises to continue operating into the future unless our Government, its contractors, and their respective employees are made subject to the law.

> *United States' Response:  The grand jury's statement is both legally and factually wrong.  There was no preponderance of evidence or legal basis for the grand jury to accuse DOE of engaging in an "on-going criminal enterprise . . . which violate[s] Federal environmental laws."  The preponderance of the evidence does not support the allegation that any individual DOE official or employee was guilty of a RCRA or Clean Water Act crime.  See, infra.  Rockwell's contract to operate the Plant was terminated on December 31, 1989, and it was there-*

---

[1/]   *The balance of this document employs the following format:  One or more paragraphs of the grand jury's report are set forth in regular type.  Following each paragraph (or in some instances, several related paragraphs) of the grand jury's report, the United States' response is printed in bold, italic print.*

0391

fore incapable of participating in an "ongoing criminal enter-
prise."[2]

It is clear from reading the report that the grand jury's
false conclusion that there was, or is, a continuing criminal
enterprise at Rocky Flats is based on its position that the
continued storage of (1) LDR mixed wastes and (2) mixed resi-
dues are prosecutable RCRA crimes. However, as the grand jury
was repeatedly informed, and as detailed above and below, the
storage of such wastes and residues at Rocky Flats are not
crimes and are covered by various orders and regulatory agree-
ments.

Storage of LDR Mixed Wastes. The 1984 amendments to RCRA
prohibit certain wastes from being disposed of on or in the
land (for example, being placed in a landfill) unless they
first meet various treatment standards. See 42 U.S.C. § 6924
(d). These wastes include, for example, various solvent, di-
oxin, heavy metal and otherwise toxic wastes, and the ban was
to be phased-in from November 1986 through May 1990, depending
on the particular waste. See 40 C.F.R. Part 268. A number of
variances and exemptions effectively delayed the actual effec-
tive date of these regulations by two years, so that the "Land

---

[2]    With one limited exception not pertinent here, evidence was
last presented to the grand jury on November 12, 1991. Thus, the
evidentiary record before the grand jury and reviewed here (i.e.,
"the evidence") is as of November 12, 1991. In a few instances,
the United States' responses include more recent information.

- 3 -

0392

*Ban," in general, only began to apply to certain wastes in November 1988.*

*The evidence showed that at some time in 1988, DOE recognized that the Land Ban requirement would have implications for various mixed wastes containing LDR constituents, even though the regulations made no specific reference to LDR mixed wastes, and provided no treatment standards specific to LDR mixed wastes. The evidence further indicated that for many of DOE's LDR mixed wastes, no treatment method, or insufficient (or unproven) treatment capacity, existed either at DOE facilities or elsewhere. The absence of treatment capability is significant because RCRA authorizes storage of LDR wastes only when stored "solely for the purpose of accumulating sufficient quantities of waste to facilitate proper treatment, recovery or disposal." 40 U.S.C. § 6924(j). Since in many instances there were (and are) no available treatment processes, and therefore no Land Ban basis for legally storing such wastes, Rocky Flats has been (and is), in a regulatory sense, violating the Land Ban prohibition.*

*The Plant's violation is not, however, a RCRA crime, since various regulatory agreements and an Act of Congress allow Rocky Flats to store such wastes and DOE may not be penalized for violating the Land Ban prohibition until at least 1995.*

*The evidence showed that DOE's Rocky Flats Area Office (the "RFAO") notified EPA Region 8 of the Land Ban problem in*

- 4 -

*1988 and that DOE headquarters was primarily responsible for resolving the issues with EPA. In August 1989, shortly after the search warrant was executed at Rocky Flats, Rockwell announced that it would terminate its contract at Rocky Flats, for fear of criminal prosecution, if some accommodation regarding the storage of LDR mixed wastes was not reached. Negotiations between DOE and EPA ensued and, in September 1989, a Federal Facilities Compliance Agreement ("FFCA I") was reached. In essence, it established (1) a schedule for DOE to categorize the LDR mixed wastes at Rocky Flats (and other DOE facilities), and (2) requirements for the safe storage and minimization of such wastes.*

*The evidence was uncontroverted that DOE complied with FFCA I. Except for certain mixed residues described below, Rocky Flats' LDR mixed wastes were (and are) stored in interim status storage areas, and there was no grand jury evidence that such wastes, apart from the Land Ban prohibition itself, were illegally stored.*

*In May 1991, DOE and EPA signed a second Federal Facilities Compliance Agreement ("FFCA II"), which superseded and expanded upon FFCA I. This agreement requires far more comprehensive submissions from DOE to EPA, including a Comprehensive Treatment and Management Plan indicating when certain technology will be available to treat the identified wastes. Again, the evidence before the grand jury was uncontroverted that DOE has been complying with this agreement.*

- 5 -

Furthermore, if there *is* an "on-going criminal enter-
prise" at Rocky Flats concerning the continued storage of LDR
mixed wastes, it is one that Congress has, in essence, approv-
ed.  In the Federal Facilities Compliance Act of 1992, which
was passed by Congress on September 23, 1992, *Congress itself
provided a three-year "grace period"* -- until September 23,
1995 -- during which DOE may not be penalized for RCRA "land
ban" violations, so long as DOE complies with the statute's
other requirements.  *See* Sections 102(c)(2) and 102(c)(3)(B).

Accordingly, the *only* evidence, which was contrary to the
grand jury's conclusions, is that there was *no* ongoing *crim-
inal* violation of the Land Ban storage prohibition.

*Storage of Residues* -- As discussed in further detail
below, the evidence showed that in *late 1987* (after DOE had
published the so-called By-Product Rule, which conceded RCRA's
jurisdiction over mixed wastes), EPA indicated its intention
to regulate mixed residues, that is, radioactive residues
which also contain hazardous waste constituents.  Both DOE and
Rockwell resisted such regulation publicly and on the record.
In August 1989, CDH issued a Notice of Violation concerning
Rocky Flats' storage of mixed residues, and in November 1989,
CDH and DOE signed a Settlement Agreement and Compliance
Order.[3/]  The agreement and order required DOE to submit to

---

[3/]   The UNITED STATES also considered, in assessing whether to
charge Rockwell with illegal storage of mixed residues, the sig-
nificant legal issues posed by the recent case of *Shell Oil Co. v.
Environmental Protection Agency*, 950 F.2d 741 (D.C. Cir. 1991), in

- 6 -

*CDH a "residue compliance plan," which established a system for identifying, characterizing, classifying and managing mixed residues.*

*In July 1991, based on allegations that DOE's residue compliance plan was inadequate -- a fact which DOE disputed, CDH issued a new administrative order which directs DOE to submit a report to CDH describing a program to reduce Rocky Flats' inventory of mixed residues and including a schedule for removal of certain residues from Rocky Flats by no later than January, 1999.*

*In August 1991, in an action brought by the Sierra Club to enjoin DOE from, among other things, restarting plutonium processing at Rocky Flats, U.S. District Judge Lewis T. Babcock issued an opinion and order. See Sierra Club v. DOE, 770 F. Supp. 578 (D. Colo. 1991). In that opinion, in which the Court denied the injunction of the restart, the Court held: (1) "DOE may store legally the newly generated mixed residues up to the present 1601 limit," id. at 582 (emphasis added); and (2) because it had failed to apply for an appropriate permit, "DOE is storing 599.5 cubic yards of existing mixed residues in violation of RCRA." Id. at 583. The court*

---

*which the court vacated the RCRA "mixture" and "derived-from" rules on procedural grounds and remanded the regulations to EPA. Unlike the other mixed wastes which were the subject of criminal charges, it was not at all clear that the United States could demonstrate, beyond a reasonable doubt, that particular mixed residues were RCRA "hazardous wastes" (independent of the mixture and derived-from rules). This situation made the prosecution of such conduct very problematic, if not untenable.*

- 7 -

noted: "[A]t present, there is no facility in the country
legally capable of storing these mixed hazardous and radio-
active [residues]."  Id.[4/]

There was no substantial evidence before the Rocky Flats
grand jury that DOE has not been proceeding in good faith to
comply with CDH's and the Court's orders.  Although DOE is
currently storing certain mixed residues at Rocky Flats with-
out a permit, such storage is well-known to state and federal
regulators, and DOE filed the necessary permit application on
June 30, 1992.  Based on such evidence, and with the regula-
tory agreement and various orders in place, the storage of
mixed residues at Rocky Flats was (and is) not a RCRA crime.

## GJ Report:

When agents of the Federal Bureau of Investigation ("FBI") and
the Environmental Protection Agency ("EPA") raided the Plant on
June 6, 1989, they found compelling evidence that hazardous wastes
and radioactive mixed wastes had been illegally stored, treated,
and disposed ("STD") of at the Plant in violation of the Resource
Conservation and Recovery Act ("RCRA").  These agents also
discovered violations of the Clean Water Act and other
environmental statutes through a variety of continuing acts,

---

[4/]    Some critics of the Rocky Flats investigation have failed to
distinguish between the outcome of a civil injunctive action, which
resolves a disputed issue in a prospective or future-looking
fashion (i.e., "this issue has been disputed but is now resolved"),
with a criminal prosecution for past, knowingly illegal conduct.

- 8 -

including the illegal discharge of pollutants, hazardous materials, and radioactive matter into the Platte River, Woman Creek, Walnut Creek, and the drinking water supplies for the Cities of Broomfield and Westminster, Colorado.  These agents also uncovered a culture of criminal misconduct, which used illegal means to achieve corporate bonuses.

*United States' Response: Here and in various places, the grand jury's report conveys the impression that the FBI and EPA initially conducted an independent investigation that some-how reached different conclusions than those later presented or supported by the Justice Department. That is false. From the very beginning (and including the execution of the search warrant), the investigation was a joint Justice Department, FBI and EPA investigation, under the direction and supervision of experienced federal prosecutors. And, while much of the evidence supported the criminal charges that were eventually brought, other evidence was less than "compelling."*

*It is legally wrong and factually misleading to state that "radioactive matter" has been "illegal[ly] discharge[d]" into the referenced waterways.  First, the United States Supreme Court held in 1976 that the discharge of Atomic Energy Act radioactive materials into various waterways is not regu-lated by the Clean Water Act, and therefore does not violate that statute.  See Train v. Colorado Public Interest Research Group, 426 U.S. 1 (1976).  Second, there was no evidence of*

- 9 -

0398

any Rocky Flats pollutants, hazardous materials or radioactive
matter being discharged into the Platte River.   Extremely
small amounts of radioactive materials have reached Walnut and
Woman Creeks over the years, and have sometimes reached Great
Western Reservoir and Standley Lake.   This has been publicly
and widely known by federal, state, and local regulators for
many years.[5/]   There was no investigative or grand jury evi-
dence that any such materials, during the period investigated,
resulted in any criminal violation or any imminent or new (or
unknown) health threat.

As charged in Counts 5 through 10 of the Information,
there was evidence that other pollutants (potentially contain-
ing various industrial wastes which the sewage treatment plant
was not designed to treat) were sometimes discharged (either
via spray irrigation or, on a few occasions, directly from the
B-3 Pond) into on-site downstream holding ponds, and probably,
in some instances, Walnut Creek and/or Woman Creek.

Based on the evidence gathered in the criminal investi-
gation, the conduct to which Rockwell pled guilty (and similar
uncharged conduct)[6/] did not result in, and has not resulted

[5/]   See, e.g., June 1, 1988 Draft, Low Priority Sites Remedial
Investigation and Feasibility Study Plans, Rocky Flats Plant, Sec-
tion 3.45 (Great Western Reservoir) and Section 3.46 (Standley
Lake); Final Environmental Impact Statement, Rocky Flats Plant Site
(1980), Sections 1.3.1, 1.4.2, 2.3.9.4, 2.10.2.3 and 4.2.

[6/]   Some have criticized the settlement of the Rocky Flats prose-
cution because the United States did not, in some instances, charge
every possible day or instance of the same or a very similar viola-
tion.  Based on the investigative evidence, no off-site substantial

- 10 -

*in, substantial physiological harm, or the imminent threat of substantial physiological harm, to members of the public residing and working outside Rocky Flats' boundaries. The RCRA violations involved on-site treatment and storage of hazardous mixed wastes, and their environmental impacts appear to have been substantially limited to inside the Plant's boundaries.*

*To the extent that the conduct investigated involved discharges of industrial wastes and other materials to Rocky Flats' sewage treatment plant (as charged in Count 5), many of those wastes or materials volatilized (or evaporated) at the plant and others collected in the sludge and were removed. In terms of discharges or run-off to Rocky Flats' surface waters, the discharged substances, in large measure, either settled in Rocky Flats' holding ponds or were very substantially diluted before they crossed the Plant's boundaries.*

*Since January 1987 (and before), the City of Broomfield has monitored the flow in Walnut Creek as it leaves Rocky Flats' boundaries against the majority of criteria established by the Safe Drinking Water Act ("SDWA"), 42 U.S.C. §§ 300f et seq.,[1]/ and Rocky Flats' NPDES permit. The City's analyses*

_____

*physiological harm was caused by any such similar uncharged violations.*

*It should be noted that the United States hardly charged a trivial number of violations. The Information charged 330 felony crimes and 80 acts of criminal negligence.*

[1]/ *The SDWA sets criteria for the purity of water after it has been treated and is available for public consumption, as opposed to "raw" (i.e., untreated) water, such as the discharges from Walnut*

- 11 -

*show no instance in which these criteria were exceeded, and the City's drinking water has never violated any SDWA criter-ia.[2/] The City of Westminster, which receives water from Standley Lake (in the Woman Creek drainage) has also not re-ported any SDWA violations.*

*The reference to "illegal means to achieve corporate bo-nuses" is misleading. The investigation primarily focused on environmental violations, and the referenced statement conjur-es up of such things as double billing, etc., which was not shown by the evidence.*

GJ Report:

During the more than two and one-half years since the FBI raid, little has changed at the Rocky Flats Plant.   DOE . . . employees continue to violate many Federal environmental laws at the Rocky Flats Plant.   The continuing and pervasive nature of these criminal acts forms a pattern of behavior, which threatens to continue for an indefinite period of time into the future.

*United States' Response: The so-called "continuing . . . criminal acts" -- that is, the storage of LDR-mixed wastes and*

_____

*Creek.*

[2/] *Broomfield has, from time to time, expressed concerns about elevated nitrates coming from the Plant, algal blooms in Great Western Reservoir, BOD levels and spray irrigation practices.   It has also been known for some years that there are low-level radio-active sediments in Great Western Reservoir, which do not appear to affect the city's water supply.*

- 12 -

0401

mixed residues -- are not criminal acts, and are being ad-
dressed by DOE, EPA and CDH.  Moreover, it is simply false,
and wholly unsupported by the evidence, to say that "little
has changed" since June 1989.

First, even as the search warrant was being executed, DOE
Secretary Watkins directed that an independent team comprised
of DOE and outside technical and compliance experts (the so-
called "Tiger Team") -- none of whom were affiliated with the
Rocky Flats Area Office or the Albuquerque Operations Office
-- conduct a thorough examination of various environmental and
safety practices at Rocky Flats.  The fundamental purposes of
the Tiger Team were to determine:  (1) whether or not any immi-
nent threat existed to public health or the environment as a
result of Rocky Flats' activities; (2) if the operations were
being conducted in accordance with applicable environmental
requirements (as defined by regulatory requirements and DOE
orders); and (3) the current status of previously identified
environmental problems.

The Tiger Team issued a report in August 1989 containing
more than fifty significant "findings" and numerous instances
of failures to adhere to "best management practices."  DOE
formulated and then began implementing a plan of action to cor-
rect these deficiencies.  The Tiger Team did not discover any
instance in which the Plant's activities posed an imminent
risk to public health.

- 13 -

0402

*Second, DOE terminated Rockwell's contract at Rocky Flats, and replaced Rockwell with a new operator, which was given a specific mandate to make substantial improvements in the Plant's environmental performance.*

*Third, DOE implemented "line management responsibility." This initiative is directed at DOE's own oversight forces at DOE sites throughout the weapons complex and is designed to ensure that the responsible officials at various DOE facilities report to a specific Assistant Secretary of Energy (depending on the specific function(s) of the particular site). For example, at Rocky Flats, DOE's plant manager currently reports directly to the Assistant Secretary for Defense Programs. This new system of management helps ensure direct accountability of DOE's field managers, in contrast to DOE's previous management system in which the plant manager had no one to whom he or she was directly responsible at DOE Headquarters.*

*Fourth, DOE commenced immediate action and has continued to take steps to increase substantially the dollars and personnel dedicated to environmental and safety compliance. Environmental funding at Rocky Flats has increased more than fourfold, from roughly $50 million in 1989 to approximately $225 million in 1992. DOE's on-site environmental staff has also increased from approximately four positions in 1989 to forty people today. In a similar fashion, the contractor's*

- 14 -

0403

environmental workforce now involves nearly a thousand employ-
ees, compared to 300 in 1989.

*Fifth*, Rocky Flats' openness to outside scrutiny and co-
operation with environmental regulators has markedly improved.
Both EPA and CDH have full- or part-time staffed on-site
offices, and greater access to the plant.

*Sixth*, it is now DOE policy that no less than 51 percent
of the "award fee" component of operating contracts at Rocky
Flats and all other weapons facilities is based on a contrac-
tor's environmental and safety-related performance.  Obvious-
ly, by directly linking the contractor's primary financial in-
centive to environmental performance, DOE has encouraged a new
environmental awareness in contrast to the previous mindset
where production of nuclear weapons was the principal measure
of success.

*Seventh*, Secretary Watkins also spearheaded the "Account-
ability Rulemaking" to help heighten the responsibility of DOE
contractors with respect to environmental and safety-related
compliance.  See 56 Fed. Reg. 28099 (June 19, 1991) and 48
C.F.R. 970.3102-21.  DOE had long had a posture of simply re-
imbursing its contractors for fines or penalties assessed by
state and other regulatory authorities, in connection with
work performed under DOE contracts.[2/]   The Accountability

_____

[2/]   As a result of the United States' settlement with Rockwell,
Rockwell paid the first penalty ever assessed against a DOE con-
tractor which was not paid by the American taxpayer.  From 1984 to
the first part of 1992, various DOE contractors were penalized on

- 15 -

*Rulemaking signaled a clear departure from "business as usual" by requiring, under all new DOE contracts, that the contractor will not be reimbursed for any costs resulting from the negligence or willful misconduct of the company or its employees.*

*Eighth, DOE is also in the process of promulgating, for the first time, legally enforceable health and safety regulations. These efforts will plug a major regulatory loophole discovered by the United States' investigation.*

*Finally, a Federal Facilities Agreement was signed by EPA, CDH and DOE on January 22, 1991. This important agreement requires the most comprehensive assessment ever undertaken of environmental contamination at Rocky Flats, provides various interim measures to help ensure no immediate environmental impacts from the Plant and promises the ultimate restoration of the Plant's environment.*

*Again, it is simply false, and contrary to the evidence, to suggest that these changes haven't occurred.*

## GJ Report:

For 40 years, Federal, Colorado, and local regulators and elected officials have been unable to make DOE and the corporate operators of the Plant obey the law. Indeed, the Plant has been and continues to be operated by government and corporate employees, who have placed themselves above the law and who have hidden their

*approximately nineteen occasions by EPA or state agencies for environmental violations. In every instance, DOE either paid the fine or reimbursed the contractor with taxpayer money.*

- 16 -

0405

illegal conduct behind the cloak of "national security." Government and corporate employees have breached the public's trust by engaging in a continuing campaign of distraction, deception, and dishonesty.

> *United States' Response: While the United States does not pretend that all of the problems at Rocky Flats have been solved, significant progress has been made, including the plant's increased openness to outside scrutiny. There was no preponderance of evidence before the grand jury to support the allegation that there is "a continuing campaign . . . of dishonesty."*

## GJ Report:

The ongoing nature of the criminal enterprise at the Rocky Flats Plant has prompted this Special Grand Jury to take three actions. First, the Special Grand Jury has approved indictments against certain current and former Federal employees, corporate employees, and corporations. Second, the Special Grand Jury has made presentments to this Court of evidence of criminal conduct by certain corporations and persons. . . .

> *United States' Response: This paragraph is simply conclusory and only serves to highlight the grand jury's invalid or otherwise improper actions, which the Court has previously addressed. A grand jury report is a totally inappropriate ve-*

- 17 -

0406

hicle in which to mention "proposed" criminal charges.  *See*
*United States v. Christian*, 660 F.2d 892, 901 (3d Cir. 1981).
Defendants are either charged or not charged with a crime.
Where valid, duly-initiated charges have not been brought, it
is wholly inappropriate to accuse individuals of uncharged
criminal conduct.  The grand jury's so-called "indictments"
and presentments and have no legal significance whatso-
ever,[10] and should not be publicized further.  The report's
reference to proposed criminal charges violates Justice Depart-
ment policy and the important privacy interests of specific
individuals who have not been charged with any crime.


GJ Report:

II.  SCOPE OF THE INVESTIGATION

---

[10]    While the Fifth Amendment to the United States Constitution
mentions "presentments" as well as indictments as a means of initi-
ating federal criminal prosecution, Federal Rule of Criminal Pro-
cedure 7 does not include presentments as a charging document,
"since presentments as a method of instituting prosecutions are ob-
solete, at least as concerns the Federal courts." Fed. R. Crim. P.
7, Notes of Advisory Committee on Rules, Note to Subdivision (a),
Item 4.

    Federal courts agree that presentments are obsolete, and
cannot (and do not) provide a basis for criminal prosecution.  *See*
*United States v. Zavala*, 839 F.2d 523, 529 (9th Cir. 1988), *cert.*
*denied*, 488 U.S. 831 (1988) ("use of an adequate indictment has
become a constitutional imperative"); *United States v. Coachman*,
752 F.2d 685, 689 n. 23 (D.C. Cir. 1985); *United States v.*
*Christian*, 660 F.2d 892, 901 (3d Cir. 1981) (federal grand juries
are not empowered to make "reports . . . to the court asking that
a 'charge be drawn to cover the facts should they constitute a
crime'"); *United States v. Briggs*, 514 F.2d 794, 803 (5th Cir.
1975) (Rules 6 and 7 do not provide for presentments).

- 18 -

On August 1, 1989, this Court charged this Special Grand Jury with one principal function:

> The best interests of the people of Colorado and the national interest has necessitated the summoning of this Special Grand jury to inquire into criminal activity, if any, at the Rocky Flats Nuclear Weapons Plant in Jefferson County, Colorado.

Information to Special Grand Jury 89-2, p. 2 (D. Colo. Aug. 1, 1989). The members of the Special Grand Jury have taken this charge seriously and have completed their investigation.

*United States' Response: The Court's charge was for the grand jury to inquire into "criminal activity, if any." (Emphasis added.) As set forth in the United States' responses, the grand jury's report, in many instances, has exceeded and violated its charge, in calling certain conduct "criminal" which isn't, and making various policy or political statements beyond its proper role.*

*The grand jury was also charged with an obligation of absolute secrecy concerning its work and proceedings. This charge, too, was apparently violated.*

### GJ Report:

The Special Grand Jury focused its attention during its term of two and one-half years on whether any person violated the criminal provisions of RCRA and the Clean Water Act. The limits of time and space prevent this Special Grand Jury from detailing each

- 19 -

and every example of the criminal activity and misconduct at the Rocky Flats Plant, which was uncovered during the course of the Special Grand Jury's investigation. However, the Special Grand Jury now renders to the Court this Report, regarding ongoing organized criminal activity at the Rocky Flats Plant in this Federal Judicial District of Colorado. This Report is based on the preponderance of the evidence considered by the Special Grand Jury.

> *United States' Response: We have previously addressed the grand jury's allegation of "ongoing organized criminal activity," and incorporate our earlier responses here.*

GJ Report:

\*      \*      \*

Although the Special Grand Jury heard testimony that radio-active material had been released from the Plant into the drinking water supplies of various urban users and downstream agricultural users, the Special Grand Jury was told that it could not indict Rockwell or DOE officials for endangering the public in this manner. The Special Grand Jury was specifically advised by an Assistant U.S. Attorney that the United States Supreme Court had determined in Train v. COPIRG, 426 U.S. 1 that no Federal law (specifically the Clean Water Act) prohibits DOE, or Rockwell . . . from dumping radioactive wastes or other radioactive mater' directly into Standley Lake, the Great Western Reserv Platte River, or any other river or tributary of the U

- 20 -

Consequently, to the extent to which evidence was presented to the Special Grand Jury concerning the release of radioactive material into such waters, it could not be the subject of a criminal prosecution and such evidence is not discussed further herein.

*United States' Response*: *These portions of the grand jury's report contain false and inflammatory statements which are not supported by the evidence.*

*The grand jury was properly advised by the United States' attorneys that federal law precluded the enforcement of the Clean Water Act concerning potential discharges of Atomic Energy Act radioactive materials from the plant. See Train v. Colorado Public Interest Research Group, 426 U.S. 1 (1976). The only evidence which was arguably related to such discharges concerned certain minute releases of radioactive materials, which, as outlined above, were well-known to various regulatory officials, did not violate the Clean Water Act and were not deemed threatening by regulators and public health authorities to human health. Here again, the report is inaccurate, and apparently intentionally inflammatory, in suggesting that: (1) the public was endangered by this conduct and (2) the prosecutors did nothing in response. Both are false.*

*To the extent that these portions implicate public health concerns, such concerns have been fully addressed in response to other parts of the report, supra.*

- 21 -                                      0410

GJ Report:

III.  THE GOVERNMENT AGENCIES FAILED REPEATEDLY IN THEIR DUTY TO PROTECT THE PUBLIC'S INTEREST.

A.  CDH, DOE, AND EPA DID NOT PERFORM ADEQUATELY THEIR OVER-SIGHT AND REGULATORY FUNCTIONS.

The pervasive nature of the illegal practices discussed in this report may leave the Court wondering how such extensive, illegal conduct could have continued for such a lengthy period of time.  Four factors provide a substantial explanation of how these events occurred:

(a)  DOE managed the Plant with an attitude of indif-ference toward environmental laws;

(b)  DOE actively participated in and directed a con-scious and ongoing effort to evade the application of certain environmental laws to the Plant;

(c)  the Colorado Department of Health ("CDH") and EPA were lax and ineffective in attempting to enforce environmental laws and regulations at the Plant; and

(d)  Rockwell . . . - with the apparent knowledge of DOE - has excused its illegal conduct by asserting that it cannot operate the Plant without violating one or more environmental laws.

*United States' Response:  Subparagraph (a) and (b): While the United States, in its Sentencing Memoranda, has already provided a "scathing, well-documented critique[]" of DOE's oversight at Rocky Flats and the Department's environ-*

- 22 -

0411

mental policies generally,[11]/ the preponderance of the evi-
dence does not support the grand jury's allegation that "DOE
actively participated in and directed a conscious and ongoing
effort to evade the" nation's environmental laws, in the sense
of actively participating in or endorsing criminal conduct.
As the United States stated in its Sentencing Memorandum, at
8: "While the investigation showed that DOE did not endorse
the particular criminal conduct to which Rockwell has pled
guilty, a prevailing DOE 'culture' allowed Rocky Flats' crimes
to occur."[12]/  See also, infra.

Subparagraph (c):  While the grand jury's criticisms of
EPA and CDH do not concern criminal conduct or the sort of
malfeasance that might be appropriate for a report, to the
extent that such concerns should be addressed, they are
included below as they relate to specific issues.

While CDH and EPA oversight -- like the United States'
investigation and all human endeavors -- was less than per-
fect, the grand jury's broad-based criticisms are not support-
ed by the evidence.  The report overlooks substantial evidence

---

[11]/   December 3, 1992 Order Regarding Motion for Release of Grand
Jury Documents, at 26.

[12]/   As described elsewhere in this document, the one area where
DOE and Rockwell cooperated most directly in resisting a particular
application of environmental regulation was that involving the in-
cineration of mixed residues in the Building 771 incinerator.
While this resistance was active and perhaps ill-advised, it was a
public legal dispute in which DOE, on an institutional and policy
basis, endorsed the regulatory position advocated by DOE and Rock-
well.

- 23 -                    0412

*that CDH and EPA Region 8 were, in fact, very aggressive in their regulatory oversight of the Plant. For example, the grand jury's report ignores the fact that the July 31, 1986 Compliance Agreement among CDH, EPA and DOE to regulate mixed hazardous wastes at Rocky Flats <u>was the first of its kind in the nation and served as a model for gaining environmental jurisdiction over other DOE weapons facilities</u>.*

*The report also fails to mention the severe resource con-straints that CDH and EPA operated under, and the fact that both CDH and EPA allocated a relatively high proportion of their scarce resources to oversight of the Plant. Further, it fails to account for the very substantial difficulty that DOE's resistance to environmental regulation posed for such regulators, who, to their credit, nonetheless pressed forward in their efforts to see that our nation's environmental laws were applied to DOE facilities.*

*On balance, EPA Region 8 and CDH should be <u>commended</u>, not criticized, for their efforts, and the grand jury's harsh cri-ticism of these agencies is simply unwarranted.*

*Subparagraph (d): The grand jury has here again ignored the evidence indicating that Rockwell entered into various reg-ulatory agreements which address Rocky Flats' continued stor-age of LDR mixed wastes and mixed residues.*

*In August 1989, shortly after the execution of the search warrant at Rocky Flats, Rockwell sent a letter to DOE identi-fying three issues Rockwell believed might subject the company*

- 24 -

0413

*to "allegations of criminal conduct:" (1) resumption of oper-*
*ations of the liquid waste treatment facility; (2) generation*
*and storage of LDR mixed wastes; and (3) generation and stor-*
*age of mixed residues. CDH assured DOE that resuming opera-*
*tion of the liquid waste treatment facility would not violate*
*RCRA, based on certain regulatory exemptions and exceptions.*
*The other two issues were (or are being) resolved by various*
*orders and regulatory agreements, as previously discussed.*

## GJ Report:

B.   DOE MANAGED THE PLANT WITH AN ATTITUDE OF INDIFFERENCE
TOWARD CERTAIN ENVIRONMENTAL LAWS.

DOE employees at the Plant followed a policy of minimum
compliance with certain environmental laws during the period from
November of 1980 through June of 1989.   DOE did not review nor
monitor Rockwell's budget to assure that the Plant was operated in
compliance with environmental laws and regulations.

DOE exercised oversight at the Plant without displaying a
sense of accountability to the public for compliance with environ-
mental laws, particularly RCRA and the Clean Water Act.   DOE
managers at the Plant, Regional, and Headquarters offices engaged
in a conscious course of conduct to avoid accepting responsibility
for any operations at the Plant. DOE did not seek nor request any
information that might have uncovered evidence of Rockwell's
illegal conduct.   During the period from November of 1985 through

- 25 -                    0414

the date of the FBI raid of the Plant (June 6, 1989), the DOE never conducted a staff meeting, which focused solely on environmental compliance problems at the Plant.

*United States' Response:* *The evidence shows that Rockwell, far more than DOE, actually controlled Rocky Flats on a day-to-day basis, and that DOE was essentially dependant on Rockwell for most information concerning the Plant's operations. In this context, DOE's oversight activities were, in fact, generally poor. See United States' Sentencing Memorandum, at 8-16. The preponderance of evidence, however, does not support the view that DOE was completely blind to environmental problems. To the contrary, when DOE became aware of particular environmental problems, it generally took steps (although frequently inadequate) to resolve them.*

*The grand jury's statements also overlook important aspects of the evidence. First, the RFAO began improving its environmental posture in mid-1986, with the implementation of the July 1986 Compliance Agreement. Though its environmental posture was still inadequate even as late as 1989, DOE began to give environmental concerns higher priority in the mid to late 1980s, as compared with the early 1980s. The preponderance of evidence showed that DOE was not sufficiently prepared, however, to deal with oncoming environmental requirements, particularly those concerning mixed wastes.*

- 26 -

0415

*Second, the grand jury's statements fail to distinguish between the dedicated efforts of certain DOE environmental employees who attempted to bring the Plant into compliance, and DOE as an institution, which generally elevated production considerations over environmental concerns.*

GJ Report:

        \*       \*       \*

On those occasions when Rockwell advised DOE officials that Rockwell might be violating an environmental law or that its conduct could be challenged by regulatory agencies, DOE officials either ignored such notices from Rockwell, joined with Rockwell in rationalizing such conduct, or actively participated in plans to shield Rockwell from attack and conceal potentially damaging information from being disclosed to the public or regulatory agencies. Since this Special Grand Jury cannot indict a Federal agency for violating the laws, DOE is identified in this Report, as an unindicted coconspirator with Rockwell, and certain individuals in an ongoing conspiracy to violate certain environmental laws of the United States. . . .

*United States' Response: This statement is over broad and misleading, and not supported by a preponderance of the evidence. Of the numerous issues the grand jury addressed, the management of mixed residues and, to a lesser extent, groundwater monitoring were the only subjects investigated*

- 27 -

0416

*where the evidence showed that Rockwell and DOE jointly dis-*
*cussed the possibility of Rocky Flats being in violation of*
*environmental laws.[13]/   Although Rockwell and DOE very ag-*
*gressively defended their joint legal position that mixed*
*residues were "recycled" and therefore not subject to RCRA*
*regulation, they did so largely in the public sphere.   For*
*example, Rockwell and DOE filed joint comments in an ongoing*
*EPA rulemaking proceeding articulating their view that resi-*
*dues were not legally regulated.*

*A report is not an appropriate vehicle for charging par-*
*ties with crimes.   There was no preponderance of evidence or*
*legal basis to charge DOE as a "coconspirator," and there was*
*no preponderance of evidence that DOE endorsed Rockwell's crim-*
*inal conduct.   Further, Rockwell ceased operating the Plant at*
*the end of 1989, and, factually and legally, could not be part*
*of any ongoing conspiracy.*

## GJ Report:

Some of DOE's employees exploited one advantage of being
employed by a Federal agency.   They knew that one Federal agency
(EPA) could not impose sanctions against another Federal agency
(DOE) for violating environmental laws.   Consequently, these DOE

---

[13]/   *The joint discussion of deficient groundwater monitoring pri-*
*marily occurred in 1985 and 1986.   By the latter part of 1988 and*
*early 1989, Rockwell and DOE began to also discuss the possibility*
*of NPDES violations resulting from pondcrete runoff, at a time when*
*DOE was finally becoming aware of the full extent of the pondcrete*
*problems.*

- 28 -                    0417

employees ignored EPA's administrative requests for RCRA compliance
at the Plant.  This pattern continues today with DOE still refusing
to consent to the imposition of civil penalties against the
Department, its contractor, or their respective employees for
violating Federal environmental laws, which businesses, state gov-
ernments, local governments, and private citizens must obey.  In
this sense, the DOE has become a self-regulating agency, which is
above the law and without accountability, except to this Special
Grand Jury.

   *United States' Response*:  *There was little evidence that
   DOE officials "ignored" requests for environmental compliance,
   and no evidence of any calculation by DOE employees that they
   were immune from criminal charges.  The evidence was clear,
   for example, that DOE responded to RCRA violations when they
   were pointed out by EPA and CDH regulators during and after
   administrative inspections.  Meetings involving Rockwell and
   DOE employees were invariably held subsequent to receiving
   notices of violation from CDH to discuss how to correct the
   noted violation.*

   *The grand jury's statements apparently refer to the fact
   that the federal government took the legal position, based on
   sovereign immunity, that neither EPA nor CDH could fine DOE
   under the Federal Facility Compliance Agreements concerning
   the ongoing storage of LDR mixed wastes.  As the grand jury
   was informed, this position was a matter of established fed-*

- 29 -

*eral law*, *which had been upheld by the clear majority of federal courts which had considered the issue, including the Tenth Circuit Court of Appeals (and later the U.S. Supreme Court).  See U.S. Department of Energy v. Ohio, 112 S.Ct. 1627 (April 21, 1992).  This was the law, and regardless of the grand jury's frustration, they were required to accept it and could not use their disagreement with established law as a basis for falsely alleging criminal conduct.[11]/*

GJ Report:

    C.  DOE DID NOT PROPERLY PERFORM ITS OVERSIGHT DUTIES.

        1.  DOE did not emphasize to Rockwell the importance of operating the Rocky Flats Plant in compliance with environmental laws.

    DOE acted as a dependent endorser of Rockwell's illegal conduct from 1985 through 1989.  When DOE appointed a new Plant Manager in November of 1985, approximately 55 DOE employees worked at the Plant.  Only two of those 55 DOE employees concerned themselves with environmental and safety issues, and they only worked part-time in those areas.

---

[11]/ *In fact, Congress did not resolve the sovereign immunity issue until six months after Rockwell entered its guilty plea.  See Federal Facilities Compliance Act of 1992, September 23, 1992.*

- 30 -

_**United States' Response**_:   **As discussed elsewhere, the preponderance of evidence does not support the allegation that DOE endorsed Rockwell's illegal conduct.**

GJ Report:

> 2.   Rockwell controlled DOE through the flow of infor-
> mation concerning environmental conditions at the Rocky
> Flats Plant.

DOE lacked the capability between 1985 and 1989 to gather sufficient information to confirm independently whether Rockwell was complying with applicable environmental laws while Rockwell was operating the Plant.   DOE did not attempt to review critically, verify independently, or evaluate systematically any data, information, analysis, recommendation, or conclusion, which Rockwell provided to DOE on environmental matters.

DOE relied exclusively on Rockwell as the source of all information, which DOE provided to the public on environmental matters.   Although DOE was charged with responsibility for independent oversight of Rockwell's conduct operating the Plant, DOE acted often as the "puppet" of Rockwell.   For example, if Rockwell wanted to communicate a specific message to EPA, CDH, a news reporter, or some citizen or public interest group, Rockwell would usually prepare a "draft" letter for signature by an appropriate DOE employee, and the DOE employee would have the

- 31 -

0420

"draft" retyped on DOE letterhead and mailed to the person to whom
Rockwell wished to convey its message.

*United States' Response*: *These statements are largely
correct. The same issues are addressed and thoroughly des-
cribed in the United States' Sentencing Memorandum, at 8-16.*

GJ Report:

3. DOE prevented independent authorities from inspecting
the Rocky Flats Plant.

From January of 1985 through the date of the FBI raid, DOE
routinely denied - on the grounds of "national security" or lack of
jurisdiction - virtually all requests that EPA or CDH made for
their respective employees to inspect the Plant. By using DOE in
this manner, Rockwell was able to shield its operations from
independent inspections to determine its compliance with applicable
environmental laws and to verify the accuracy of information, which
DOE and Rockwell provided to regulatory agencies in support of
various applications for RCRA permits, the National Pollutant
Discharge Elimination System ("NPDES") Permit, and other
environmental permits. For example, when DOE applied in 1987 for
a RCRA permit to operate a fluidized bed incinerator to burn
radioactive wastes, hazardous wastes, and mixed wastes at the
Plant, DOE refused to allow EPA to inspect the incinerator to
determine the accuracy of statements that Rockwell had made in the

- 32 -

permit application concerning design, performance, and operational characteristics of the incinerator.

> *United States' Response: While the evidence showed that the invocation of "national security" did, in fact, impede the regulatory agencies in doing their job, by limiting the number of regulators who possessed the appropriate security clearance and also their access to the facility, this statement is somewhat over broad. The preponderance of the evidence does not support the allegation that DOE "denied . . . virtually all requests . . . to inspect the Plant." With particular respect to the regulation of residues (as opposed to other hazardous and mixed wastes), it appears that DOE did use "national security" to help justify its resistance to regulation.[15]*

GJ Report:

> 4.   Regional DOE managers ignored evidence of environmental problems at the Rocky Flats Plant.

The Albuquerque Operations Office played bureaucratic games with Rockwell and local DOE officials.   Although DOE's regional

---

[15]   *While it is true that DOE historically resisted RCRA regulation, by 1987 the only storage areas which were generally not permitted to be inspected were those containing mixed residues.*

*The grand jury ignores significant evidence that since the search warrant in June of 1989, the plant has been substantially more cooperative in terms of inspections and other regulatory matters.*

- 33 -

management instructed Rockwell to obey the law, it failed to budget the amounts necessary to comply with RCRA and other laws, when Rockwell advised them specifically of many of these needs. Likewise, DOE's Regional and Headquarters Offices did not follow up on their instructions to assure that the Plant was operated in compliance with applicable environmental laws. Quite the contrary, DOE management explicitly discouraged Rockwell from complying with environmental laws by omitting environmental compliance from the list of criteria on which the award of large performance bonus fees were paid to Rockwell during the period from 1985 through 1989. Significantly, these large financial incentives (which ranged in the millions of dollars) could be earned most easily if Rockwell ignored environmental compliance in striving to meet weapons production goals.

> *United States' Response:  While it is true that DOE's incentive structure generally rewarded weapons production and other activities over environmental matters, it is an over-statement, not supported by a preponderance of the evidence, to say that DOE "explicitly discouraged" environmental com-pliance. Either "environment [safety and health] management" and/or "waste management" was included as a rating factor on every single performance evaluation from 1986 through 1989.[16/]  In 1989, after the search warrant was executed,*

---

[16/]   *In fiscal year 1987, waste management comprised 10% of the functional performance areas upon which the overall award fee was*

- 34 -

DOE mandated that environmental, safety and health performance would be weighted no less than 51% in the award fee determination of its management and operating contractors.

Although there was conflicting evidence in a few specific instances, the preponderance of evidence showed that Rockwell played a substantial role in both establishing and spending Rocky Flats' budget, and had substantial authority to move money around.  See United States' Supplemental Sentencing Memorandum, at pages 5-11. Moreover, Rockwell managers from Health, Safety and Environment, Waste Operations and RCRA/ CERCLA indicated that the funding they received was generally adequate, and they could recall no instance where lack of funding prevented them from complying with the law.

Although there were some instances when Rockwell asked for additional environmental funds which it didn't receive, the investigation showed many occasions, from 1986 to 1989, when DOE provided additional funds.  In January 1988, DOE asked Rockwell for any supplemental budget requests for Rocky Flats' environmental programs, and Rockwell asked for $128,000. As of January 17, 1989, DOE had twice supplemented Rockwell's FY 1989 budget, for an additional $17,800,000, and $2,300,000 was used for waste operations.

---

based in the first half of the year, and 15% in the second.   In first half of fiscal year 1988, waste management comprised 10% and environment, safety and health comprised 20%.  In the second half of fiscal year 1988 and all of fiscal year 1989, environment, safety and health comprised 20% of the overall award fee basis.

0424

*During some periods, Rockwell actually had budget sur-
pluses. For the combined fiscal years 1986 to 1987 (covering
the period from October 1, 1985 to September 30, 1987), Rock-
well actually spent $4,574,873 less than DOE had authoriz-
ed.[17]*

*In terms of DOE not "follow[ing] up," the only signifi-
cant evidence before the grand jury which might support this
view concerned the failure of the RFAO management to fund a
request by Rockwell (and supported by RFAO environmental per-
sonnel) to build tent-like structures to cover the pondcrete
pads and protect them from the elements. The DOE area manager
testified that he turned this request down because he was un-
convinced that hazardous or radioactive wastes were escaping
the pads, and because he believed that adequate funds were
already available to Rockwell to address the problem (albeit
without the tents).*

GJ Report:

\*        \*        \*

D.    THE GOVERNMENT AGENCIES HAVE ESTABLISHED NO DEADLINE BY
WHICH DOE MUST STOP BREAKING THE LAW AT THE ROCKY FLATS PLANT.

---

[17]    *During FY 1988 (October 1, 1987 to September 30, 1988), when
many of Rockwell's environmental and waste management violations
occurred, Waste Operations -- which was responsible for properly
storing and managing pondcrete, saltcrete, salt brine and vacuum
filter sludge -- ended the year with a $1,402,000 budget surplus.
In late March 1988, Health, Safety & Environment -- charged with
monitoring Rocky Flats' surface waters and ensuring Clean Water Act
compliance -- returned $200,000 to Rockwell's general budget.*

- 36 -

0425

The Headquarters Offices of DOE and EPA in Washington, D.C. have been involved directly or indirectly in the negotiation of each of the three environmental Federal Facility Compliance Agreements for the Plant. These agreements were signed respectively in July of 1986, September of 1989, and May of 1991.

DOE has consistently refused to sign any compliance agreement for the Plant, which contains stipulated fines to be imposed for specific continuing environmental violations. DOE learned from its experience before the FBI raid that EPA and CDH are very reluctant to initiate enforcement proceedings against DOE or its contractor because such proceedings are labor intensive and expensive to prosecute. Instead of pursuing DOE on Rocky Flats, EPA and CDH prefer to dedicate their resources to other matters, where the opposition to compliance is not so intense, expensive, or politically charged.

> *United States' Response: As previously discussed, the federal government's position on penalties was based on established federal law.*
>
> *There was little or no evidence supporting many of these statements, particularly concerning EPA's and CDH's motivations. Further, they omit the fact that EPA brought an administrative penalty action under the Toxic Substances Control Act, 15 U.S.C. § 2601 et seq., against Rockwell in 1987 in which Rockwell was fined $75,000 and that in 1989 CDH administratively fined Rockwell $93,000 for RCRA violations occurring*

G426

*in mid-1988.   These statements also ignore evidence that EPA had a full-time RCRA regulator, and several employees on a part-time basis, assigned to Rocky Flats from 1987 on.   They also ignore the fact that CDH allocated a relatively large portion of its scarce resources, considering its other regulatory responsibilities throughout the state, to overseeing Rocky Flats.   (DOE paid or reimbursed both penalties.)*

GJ Report:

\* \* \*

E.  CDH AND EPA WERE LAX AND INEFFECTIVE IN THEIR ATTEMPTS TO ENFORCE ENVIRONMENTAL LAWS AND REGULATIONS AT THE PLANT.

In many respects during the 1980's and through this date, those government employees, who were and are charged with the duty to protect the public's interest, did not act responsibly.  Unless the government's inspectors and regulators change their focus and act more aggressively to enforce the law, it is unlikely that the culture of environmental indifference will change at Rocky Flats.

*United States' Response:  While CDH and EPA oversight -- like the United States' investigation and all human endeavors -- was less than perfect, the grand jury's broad-based criticisms are not supported by the evidence.  The report overlooks substantial evidence that CDH and EPA Region 8 were, in fact, very aggressive in their regulatory oversight of the Plant.*

- 38 -                              0427

*For example, the grand jury's report ignores the fact that the July 31, 1986 Compliance Agreement among CDH, EPA and DOE to regulate mixed hazardous wastes at Rocky Flats <u>was the first of its kind in the nation and served as a model for gaining environmental jurisdiction over other DOE weapons facilities</u>.*

*The report also fails to mention the severe resource constraints that CDH and EPA operated under, and the fact that both CDH and EPA allocated a relatively high proportion of their scarce resources to oversight of the Plant. Further, it fails to account for the very substantial difficulty that DOE's resistance to environmental regulation posed for such regulators, who, to their credit, nonetheless pressed forward in their efforts to see that our nation's environmental laws were applied to DOE facilities.*

*On balance, EPA Region 8 and CDH should be <u>commended</u>, not criticized, for their efforts, and the grand jury's harsh criticism of these agencies is simply unwarranted.*

GJ Report:

> 1.   <u>Before the FBI raided the Plant, CDH knew that DOE and Rockwell were violating environmental laws in their operation of the Plant</u>.

CDH knew as early as November of 1985 that DOE and Rockwell had violated and were continuing to violate RCRA and the Clean Water Act.  However, CDH did not publicize this information nor

- 39 -

0428

pursue criminal charges. If CDH had acted then, it may have not been necessary for the FBI to raid the Plant subsequently and fewer environmental crimes may have been committed thereafter at the Plant.

*United States' Response: These statements are contrary to the great weight of the evidence and are terribly mislead-ing. As previously stated, CDH was very aggressive in assert-ing its jurisdiction over Rocky Flats' environmental matters, and such efforts and CDH's criticisms of Rocky Flats were well-publicized.*

*EPA, and not CDH, was responsible for overseeing Rocky Flats' compliance with the Clean Water Act. There was no evi-dence that in November 1985, Rocky Flats was "continuing to violate" the Clean Water Act, or that CDH (or, for that mat-ter, EPA) was aware that Rocky Flats was "continuing to vio-late" the Clean Water Act.[18]/*

## GJ Report:

The shortcomings of CDH's regulatory efforts were also demonstrated by the manner in which CDH exercised its oversight of the 904 Pad, where thousands of Pondcrete blocks, which contained radioactive and hazardous wastes, were stored outdoors. Rockwell

---

[18]/    *In 1985, there was one reported discharge violation, in February, involving a discharge from the B-3 Pond which exceeded the permit limit for total residual chlorine. There were no re-ported discharge violations in 1986.*

0429

first gave CDH notice in December of 1987 through its r
Part A Permit application that Rockwell was storing t]
blocks on the 904 Pad at the Plant.  CDH, however, did nu~ __
aware that these thousands of very large Pondcrete blocks were
there until May of 1988, when radioactive and hazardous liquids
first spilled from a Pondcrete container.

*United States' Response: As previously discussed, the
grand jury's harsh criticism of CDH is unwarranted. Especial-
ly in light of the severe difficulties and frequent resistance
it encountered, CDH made considerable, good faith efforts to
regulate environmental issues at Rocky Flats.*

*There is no dispute that CDH was aware that mixed wastes
known as pondcrete and saltcrete were being stored at Rocky
Flats, and, in January 1987, gave the plant permission to
store such wastes on the 750 Pad, as an "interim solution"
only, while long-term storage and disposal options were being
explored. And, as the grand jury well knew, when CDH allowed
Rocky Flats to store the wastes on the 750 Pad, CDH properly
believed that (a) pondcrete was a solid concrete block, and
(b) Rockwell would store the wastes properly, in accordance
with RCRA requirements. CDH did not discover until much
later, in May 1988 and thereafter, that neither were true.*

*The evidence as to when CDH first learned about the 904
Pad was conflicting. While first mentioned in one of Rocky
Flats' ongoing submissions to CDH in December 1987, it was not*

- 41 -

0430

*clear when the pad was first actually observed or inspected. The evidence was clear, however, that the fundamental problems with pondcrete and its deficient storage were not known by CDH (or the RFAO or EPA) until a spill on the 904 Pad on May 23, 1988. After that time, CDH was engaged in ongoing efforts to resolve the pondcrete problems.*

## GJ Report:

When CDH first became aware that Rockwell was spray irrigating massive volumes of treated wastewater effluent onto a buried solid waste management unit ("the east trenches"), which contained a substantial volume of leaking hazardous and radioactive wastes, CDH responded in an inappropriate, ineffective method.   Instead of filing criminal charges against Rockwell for this continuing violation of RCRA and the Clean Water Act, CDH responded administratively with an exchange of letters of inquiry.

CDH, likewise, did not threaten to start an administrative, noncompliance proceeding against Rockwell for the continuing commission of this obvious environmental crime and threat to the public's health.

*United States' Response:  The preponderance of evidence showed that Rockwell's practice of spray irrigating over or near the East Trenches was not substantially known to the regulators until 1989.  The practice was discontinued after regulatory letters were "exchange[d]."*

- 42 -

0431

GJ Report:

> 2.    This investigation was prompted by evidence of criminal conduct that was found in CDH's files.

The FBI initiated its criminal investigation of the Plant in May of 1987, after DOE and Rockwell submitted to CDH a RCRA Part B Permit application for the Plant. Although there was substantial information included and excluded from that application to show that DOE and Rockwell were operating the Plant in violation of RCRA, CDH did nothing about it. When the FBI subsequently decided to raid the Plant, the FBI relied primarily on that Permit application and other documents, which had been and were subsequently filed with CDH to show that there was probable cause to believe that criminal acts had been committed by DOE and Rockwell at the Plant.

> *United States' Response: As previously discussed, the grand jury is unduly harsh in criticizing CDH, and it is both over broad and misleading to suggest that the criminal investigation was prompted by any particular RCRA application.*

GJ Report:

> 3.    EPA ignored environmental problems at the Rocky Flats Plant.

0432

- 43 -

EPA's employees, likewise, did not always act responsibly in exercising their regulatory authority over the Plant. For example, EPA learned during the summer of 1988 that Rockwell was spraying massive volumes of treated wastewater effluent onto the east trenches.   However, EPA waited 18 months (until January of 1990, when EG&G began to operate the Plant) before EPA bothered to inquire about the appropriateness or legality of this practice.

> *United States' Response:  Again, and like its criticism of CDH, the grand jury's blanket criticism that EPA "ignored" environmental problems is not supported by the record.*

GJ Report:

EPA made no attempt to stop spray irrigation at the Plant before or after the FBI raid in June of 1989. Although EPA wrote to DOE in January of 1990 to request that EG&G discontinue spray irrigation above the east trenches, EPA did not object to spray irrigation in the remainder of the east spray field until later in 1990.

> *United States' Response:  The first sentence simply ig- nores the evidence, well known to the grand jury, that EPA had no knowledge of the nature and extent of the ongoing spray ir- rigation problems at Rocky Flats until after the search war- rant was executed.  When EPA learned of an "unauthorized dis- charge" of spray irrigation run-off to Woman Creek in March*

- 44 -

*1987, the evidence was clear that EPA promptly issued a notice of violation and insisted that the problem be fixed. See United States' Sentencing Memorandum, at 88-90. The evidence was undisputed that both EPA and the RFAO believed that the spray field run-off to Woman Creek was a one-time incident that had been solved.*

*As the nature and full extent of the spray irrigation problems became known in 1989 and 1990, discussions involving EPA led to the spray irrigation practices being changed and later discontinued.*

GJ Report:

EPA has followed a double standard in enforcing RCRA laws in Colorado. EPA's Regional RCRA management admitted that EPA would not have permitted a private enterprise to violate RCRA to the extent and for the duration of the violations, which have occurred at the Plant. EPA Regional RCRA management stated that EPA would have been substantially more aggressive in seeking injunctive relief and fines to force a prompt conclusion of such illegal conduct. However, EPA management asserted that EPA's "enforcement hands" were effectively tied because EPA was not permitted to pursue RCRA enforcement through the courts against DOE.

*United States' Response: Here again, the grand jury ignored the law. At the time of the referenced events, the law, as explained to the grand jury, was abundantly clear:*

- 45 -

0434

based on the established legal doctrine of sovereign immunity, EPA could _not_ bring a judicial action against DOE, a federal agency. This is hardly the case of EPA having a "double standard," since the government's position was a matter of _law_, not policy.

The grand jury fails to mention that the FFCA II establishes enforceable deadlines for the delivery of various documents concerning the creation of treatment techniques for various LDR mixed wastes. The report's assertion that the FFCA II "lacks any . . . enforcement mechanism" was specifically refuted by the evidence. EPA-Region 8's RCRA management did not state that EPA's "enforcement hands were tied." EPA's Region 8 RCRA management stated that the FFCA II was judicially enforceable by the State of Colorado and citizens groups (in suits seeking injunctive relief), and an Executive Order also provided EPA with a compliance mechanism.

Thus, the evidence was clear that the requirements of the FFCA II are considered enforceable RCRA requirements. If the terms of the FFCA II are not met by DOE, the State of Colorado and citizen groups can file suit under RCRA to enjoin the Plant from continuing to operate. (The grand jury was apparently aware that this was essentially what happened in the _Sierra Club_ suit, yet ignored that fact here.)

As a further measure to enhance DOE's accountability and compliance, the FFCA II provides that, in the event of its vio-

- 46 -

0435

*lation, EPA is required to inform the Secretary of DOE, and he (or she) in turn is required to inform Congress.*

### GJ Report:

## 4. CDH and EPA continued to tolerate the accumulation of beryllium dust in ventilation ducts at the Rocky Flats Plant.

CDH and EPA have focused their regulatory attention with regard to beryllium dust at the Plant on a single, sealed bag of material, which contained some beryllium dust. The CDH and EPA regulators took exception to this bag - and only this bag - in December of 1988 because it was discovered in a closet for which Rockwell did not have a beryllium storage permit. However, the regulators from CDH and EPA have not attempted to force DOE and its contractors to remove the substantial quantity of beryllium dust, which they know is resident in the air ventilation duct work throughout the 400-series and 800-series buildings at the Plant.

In a classic illustration of bureaucratic form over substance, CDH and EPA have elected not to argue with DOE's position on the beryllium, which remains in the air ducts. Although beryllium dust is extremely hazardous to human health, DOE has argued that the beryllium dust in the Plant's ventilation system is exempt from RCRA regulation because the beryllium has not "been generated" as a "waste" within the meaning of RCRA. It is, therefore - in DOE's opinion, not subject to RCRA regulation, although it is possible

- 47 -

0436

that workers may be breathing the dust and it is possible that the dust may escape to the atmosphere outside of the Plant.

The negligent treatment by CDH and EPA of the beryllium dust in the Plant's ventilation duct system illustrates one reason that DOE and Rockwell were so successful in violating so many environmental laws for such a long period of time. The government's inspectors have tended to overlook obvious health hazards and environmental crimes committed at the Plant because their focus has been too narrow.

*United States' Response: This statement amounts to a legal and policy dispute between the grand jury and EPA over EPA's enforcement power. We are aware of no evidence in the grand jury record which supports the statement that CDH and EPA focused their efforts on "a single, sealed bag of material." To the contrary, evidence was submitted to the grand jury that in 1989, EPA sent a letter to DOE indicating its intention to regulate beryllium dust under RCRA. The RFAO replied, indicating its position that the beryllium dust was not RCRA-regulated.*

*The United States' investigation carefully considered whether the beryllium dust, in the context in which it was used, generated or otherwise occurred at Rocky Flats, was a RCRA "hazardous waste." After carefully reviewing the regulations and consulting with experts in the Waste Characterization Branch at EPA Headquarters, the investigation concluded*

- 48 -

they did not personally direct the illegal STD operations at the Plant and, therefore, they should not be held accountable for criminal conduct. Third, some government employees suggested that their incompetent and negligent mismanagement of the Plant were not crimes. Fourth, many of them told the Special Grand Jury that they were ignorant of the law or relied on faulty legal advice and, therefore, they should not be held accountable for their criminal acts. The Special Grand Jury rejects each of these defenses.

*United States' Response: There was no evidence that any DOE employee ever argued to the grand jury that he or she was immune from criminal prosecution because of his or her status as a government employee. We know of no basis for the grand jury's statement to the contrary.*

*To the extent that some DOE employee might have indicated that he or she was not personally engaged in, or otherwise legally responsible for, certain criminal conduct, such assertions (to the extent they were made) were generally true, based on the preponderance of evidence. No matter how much the grand jury or others may want to claim (or even insist) that individual DOE officials or employees engaged in prosecutable environmental crimes, the investigation showed no preponderance of evidence (let alone proof beyond a reasonable doubt) that that was true.*

*While there was little or no evidence before the grand jury that any DOE employee ever argued that his conduct, al-*

- 50 -

0438

*that beryllium dust was not a RCRA-regulated "hazardous waste"
except under certain conditions which did not apply here.[19]/*

*While this situation may illustrate a gap in the RCRA
statute and regulations, we believe that RCRA enforcement in
this situation would have been highly problematic, and EPA and
CDH should not be criticized for "negligent" regulation.*

*The absence of legally enforceable health and safety reg-
ulations was DOE's fault, and should not be blamed on EPA or
CDH.*

GJ Report:

\*       \*       \*

F.   GOVERNMENT EMPLOYEES SHOULD BE HELD RESPONSIBLE FOR THEIR
CRIMINAL ACTS AT THE ROCKY FLATS PLANT.

Employees of DOE defended themselves at various times before
this Special Grand Jury by asserting four arguments.   First, some
government   employees   asserted   that   they   were   immune   from
prosecution   for   their   criminal   acts.     Second,   some   claimed   that

---

[19]/   *This is another example of the grand jury ignoring or simply
glossing over a difficult, and probably dispositive, legal issue
which the United States' attorneys were not free to ignore.   The
RCRA statute and regulations are very complicated, and whether a
particular material or substance is a RCRA "hazardous waste" is
generally based less on common sense than it is on a difficult set
of legal, regulatory, scientific and technical questions.   In many
instances, the entire question of whether certain conduct can be
charged as a RCRA crime depends on whether the substance can be
proved to be a "hazardous waste," based on a complicated set of
criteria, beyond a reasonable doubt.*

- 49 -

though perhaps "incompetent and negligent," was not a crime, such an argument would be legally correct in most instances, whether the grand jury liked it or not. The standard of criminal conduct under most federal environmental laws, including RCRA, is that the defendant must have committed a "knowing" violation. The misdemeanor provisions of the Clean Water Act provide the only "negligent" criminal violation which was before the grand jury. As a general matter, poor program management and bad public policy are not crimes.

It was not part of the grand jury's proper function to "reject" various legal issues and potential defenses which the law recognizes. DOE's sovereign immunity, for instance, was a legal fact which the grand jury was not free to reject or ignore. Moreover, reliance on advice of counsel and other authorization defenses are, in fact, recognized by the law, and had to be seriously considered by the United States' attorneys in assessing the case and the likely success of any particular charge.[20/]

## GJ Report:

The sovereign immunity of the Federal Government does not immunize individual government employees from prosecution for their criminal conduct. Employees of the Federal Government should be

---

[20/]  This is another instance where the grand jury glosses over difficult issues which the United States' attorneys could not so blithely ignore. Prosecutors are not free to "reject" out of hand potential significant defenses which the law allows.

- 51 -                    G440

and are subject to the criminal laws of this Nation. Criminal conduct should never be a part of a government employee's work. If the government's employees do not obey the law, we cease to be one nation under the law.

The Special Grand Jury heard at length from government employees who said it was not their job to see that the private contractor operated the Plant in conformance with applicable law. Surprisingly, no DOE employee was disciplined for any reason after the FBI raided the Plant. These bureaucrats placed their emphasis on form or process over substance. However, the evidence is uncontested that they ignored repeated warnings from multiple sources that the Rocky Flats Plant was being operated in violation of numerous environmental laws. Since these government employees were in charge of the Plant, and since they took virtually no action to comply with environmental laws in operating the Plant, they must be held accountable for their complicity with and toleration of criminal acts at the Plant.

> *United States' Response: These statements are misleading, and are not supported by the preponderance of evidence. There was no evidence that any DOE employer said "it was not their job to see that the private contractor operated the Plant in conformance with applicable law." In fact, environmental compliance was a specific measure of contract performance in every evaluation period from October 1, 1986 forward.*

- 52 -

0441

As described in the United States' Sentencing Memorandum, at pages 8-16, the evidence showed that DOE relied (and had to rely) to a very large extent upon Rockwell furnishing it with reliable information on environmental compliance -- just as one would expect, given the extremely small DOE staff which was charged with overseeing approximately 6,000 Rockwell employees involved in complicated chemical-industrial processes in over 100 different buildings. This said, the preponderance of the evidence does not support a view that DOE was "willfully blind" to environmental problems at Rocky Flats.

In the areas of the criminal charges -- illegal treatment and storage of hazardous mixed wastes, spray irrigation and operation of the sewage treatment plant, DOE was either wholly unaware of the problem, or was not aware of anything approaching the true nature or extent of the problem. It was not until after the search warrant was executed, in June 1989, that the RFAO was finally provided sufficient resources to conduct a reasonable degree of independent oversight.[21]

While DOE's poor oversight and other institutional failures may be sorely criticized (and our Sentencing Memoranda have done so), such failures are insufficient cause to press criminal charges against individual DOE employees. There was

---

[21]    With one or two exceptions, the RFAO individuals who were primarily responsible for general plant management and environmental oversight during the period from 1986 to 1989 had all been relocated to other DOE facilities or had left DOE by a short time after the search.

- 53 -

*no preponderance of evidence (let alone proof beyond a reason-*
*able doubt) of criminal complicity by DOE individuals.*

GJ Report:

The root of the problem was and continues to be the negligent
mismanagement of wastes at the Rocky Flat Plant. The negligent STD
of wastes at the Plant originated with the DOE's aggressive efforts
to place the Plant and its operators above the environmental laws
by which all other companies must abide. . . . The Congress
enacted criminal penalties in RCRA, the Clean Water Act, and other
Federal environmental laws, which have been violated at the Rocky
Flats Plant, with the expressed intent to stop negligent environ-
mental practices.

It is an elementary principle of law that ignorance of the law
is no excuse for criminal conduct. . . .

*United States' Response: In large measure, this section*
*has nothing to do with "organized crime conditions," and, to*
*the extent it is redundant with other erroneous portions of*
*the grand jury's report, the United States has already*
*responded to it.*

GJ Report:

IV.   DOE AND ROCKWELL HAVE VIOLATED RCRA BY ILLEGALLY STORING,
TREATING, AND DISPOSING OF HAZARDOUS WASTES AND MIXED WAS
ROCKY FLATS PLANT.

- 54 -                           0443

A.  EPA HAS STATUTORY AUTHORITY TO REGULATE DOE FACILITIES UNDER RCRA.

1.  RCRA became effective in November of 1980.

The Resource Conservation and Recovery Act ("RCRA") prohibits the storage, treatment, and disposal of hazardous wastes at private and governmental facilities without a permit issued by EPA or an authorized state government, such as Colorado.   42 U.S.C. § 6925(a).  See 42 U.S.C. § 6961.  RCRA allows existing facilities, such as the Plant, to be treated as having been issued a permit pending issuance or denial of an actual permit in accordance with certain procedures, which the statute characterizes as "interim status."  42 U.S.C. § 6925(e)(1).  To obtain a RCRA Permit or RCRA interim status, a facility must submit a RCRA Part A Permit application and, subsequently, a RCRA Part B Permit application, which must be approved by Federal and/or Colorado authorities.

"Hazardous wastes" are those substances, which may be solid or liquid, that are listed or otherwise identified as "hazardous wastes" in the Colorado Hazardous Waste Code.  "Mixed wastes" or "mixed-hazardous wastes" are wastes, which contain both radioactive wastes and nonradioactive hazardous wastes.  "Low level, mixed wastes" are radioactive wastes containing transuranic material at or below 100 nanocuries per gram, together with hazardous wastes.

From November 19, 1980 (the effective date of RCRA), DOE has been obligated on behalf of its operator of the Plant to apply for

- 55 -

0444

a RCRA Permit for all hazardous waste STD operations at the Plant. However, DOE has failed to do so.

> *United States' Response:   The United States has previously and accurately addressed the DOE-RCRA history in its June 1989 application for a federal search warrant, at pages 26-30, and its Sentencing Memorandum, at pages 17-25.  It appears that the grand jury generally took these portions of the report from the search warrant document.  To the extent that the grand jury has deviated from that document, the report in some instances gives too little weight to significant legal disputes.*

GJ Report:

> 2.   DOE claimed in 1983 that the Rocky Flats Plant was completely exempt from EPA's jurisdiction under RCRA.

DOE has attempted in various ways to thwart the direct application of RCRA to the Plant.  DOE claimed initially that all hazardous wastes at the Plant were exempt from the RCRA permit requirements.   Subsequently, DOE narrowed its jurisdictional objection to argue that RCRA did not apply to mixed wastes, which were stored, treated, and disposed of at the Plant.   Finally, during the period from 1987 through 1990, DOE asserted that RCRA did not apply to "residues," which are one category of mixed wastes at the Plant.

From the outset, DOE challenged the jurisdiction of EPA to inspect and regulate DOE's facilities under RCRA. In 1982, DOE promulgated DOE Order No. 54,880.2, by which DOE attempted to establish a hazardous waste management program within DOE, which would parallel and conform to the requirements of RCRA, except that it would be a self-regulating program that was exempt from EPA's oversight. In December of 1983, DOE's general counsel issued an opinion letter in which he expressed his view that RCRA did not apply to DOE's weapons facilities, including the Plant, because, in his view, they were expressly exempted by certain provisions of the Atomic Energy Act. However, . . . purely hazardous wastes at DOE facilities are regulated by RCRA and subject to EPA's jurisdiction.

### 3. DOE asserted in 1984 that mixed wastes at the Rocky Flats Plant were exempt from RCRA regulation by EPA.

When EPA and CDH attempted in 1984 and 1985 . . . to exercise regulatory powers at the Plant, DOE and Rockwell refused to permit them to inspect or regulate the STD of the hazardous component of mixed wastes at the Plant. DOE asserted that EPA and CDH had no authority to regulate mixed wastes at the Plant because mixed wastes contain some radioactive matter. In DOE's view, the Atomic Energy Act gave DOE exclusive jurisdiction over any material, which contained a radioactive substance, including radioactive wastes that had been mixed with hazardous wastes. Consequently, Rockwell and DOE did not disclose to EPA or CDH that mixed wastes were

- 57 -

0446

stored at the Plant, when DOE submitted its RCRA Part B Permit application to CDH in November of 1985.

### 4. DOE acknowledged in 1986 that some mixed wastes at the Rocky Flats Plant were subject to RCRA regulation.

CDH responded to DOE's 1985 Permit application by issuing a Notice of Deficiency. CDH issued this Notice in December of 1985 because DOE had withheld in its Permit application all information regarding the STD of mixed wastes at the Plant. During the following seven months, DOE, CDH, EPA, and Rockwell engaged in a series of negotiations, which ultimately produced a compliance agreement in July of 1986. Under the terms of the 1986 Compliance Agreement among CDH, DOE, and EPA, DOE did not submit to the jurisdiction of CDH or EPA the storage, treatment, or disposal of transuranic mixed wastes at the Plant. However, DOE agreed that EPA and CDH had authority to regulate the STD of low-level, mixed wastes and hazardous wastes at the Plant.

In partial response to DOE's argument on mixed wastes, EPA subsequently issued a notice, which expressed EPA's view that RCRA applied to all mixed wastes, as well as hazardous wastes. 51 Fed. Reg. 24504 (July 3, 1986). On May 1, 1987, DOE revised its position on EPA's authority to regulate RCRA wastes, when DOE issued its "By-Product Rule." 10 C.F.R. § 962.3(b). Under this Rule [effective June 1, 1987], DOE acknowledged that EPA had authority under RCRA to regulate the STD of the hazardous portion

- 58 -

0447

of all mixed wastes at DOE facilities, including the storage, treatment, and disposal of transuranic, mixed wastes at the Plant.

> *United States' Response: Again, the United States has previously discussed the DOE-RCRA history in its application for a federal search warrant and its Sentencing Memorandum.* [22]/

GJ Report:

> 5. DOE argued in 1987 that mixed waste residues at the Rocky Flats Plant were exempt from regulation under RCRA.

Shortly after DOE announced the By-Product Rule, a decision was announced in American Mining Congress v. EPA, 824 F.2d 1177 (D.C. Cir. 1987). ∧Attorneys for DOE and Rockwell ∧used this decision to deny CDH and EPA access to inspect the Plant. Instead of following the By-Product Rule, these attorneys persuaded the DOE

---

[22]/ *Congress has frequently limited the application of federal environmental laws to DOE facilities and radioactive wastes (including mixed wastes). See, e.g., RCRA, 42 U.S.C. § 6903(27) (definition of "solid waste" excludes Atomic Energy Act material) and 42 U.S.C. § 6905 (a) ("[n]othing in [RCRA] shall be construed to apply to . . . any activity or substance which is subject to . . . the Atomic Energy Act of 1954 . . . except to the extent that such application . . . is not inconsistent . . ."); Clean Water Act, 33 U.S.C. § 1371(a) (CWA "shall not be construed as . . . limiting the authority or functions of any . . . [U.S.] agency . . . under any other law or regulation. . ."). In Train v. Colorado Public Interest Research Group, 426 U.S. 1 (1976) (a case specifically concerning Rocky Flats), the Supreme Court held that EPA does not have jurisdiction under the Clean Water Act concerning radioactive pollutants from Atomic Energy Act facilities.*

- 59 -

0448

and Rockwell plant managers during the summer of 1987 to assert that the mixed waste residues, which were stored at the Plant, were exempt from RCRA regulation. These attorneys argued that, since the residues were being held for reprocessing and since they were not being "discarded," the residues at the Plant were not subject to RCRA regulation. Residues are wastes that contain a mixture of some radioactive material and some hazardous constituents that Rockwell had stored (and EG&G continues to store) at the Plant at least in theory on the premise that the plutonium in the residues could be separated from the mixed waste at some future date and that the recovered plutonium could thereafter be recycled into a new weapon.

The residues at the Plant were not being immediately reused in a continuous manufacturing process to extract plutonium for reuse. However, DOE officials at the Plant and at Albuquerque were so obsessed with secrecy and avoiding any regulation of the Plant's operations by EPA that DOE's Albuquerque management authorized the RFAO to submit DOE's revised RCRA, Part A Permit application to CDH during October of 1987 without disclosing any information about the residues, which Rockwell was then storing at the Plant.  DOE and Rockwell specifically refused to provide CDH with the most basic information regarding these residues, including: (a) the number of barrels of residues which were stored at the Plant; (b) how long any of the residues had been stored at the Plant; and (c) what hazardous materials (if any) were mixed with the radioactive component of the residues.

- 60 -                    0449

*United States' Response*: *These statements are over broad and misleading. It is true that DOE and Rockwell attorneys used the American Mining Congress decision as a rationale for resisting RCRA regulation of mixed residues. However, the case was not used to dispute jurisdiction over other mixed wastes, which were not being accumulated for the ostensible purpose of recycling. Thus, to the extent this decision was used to restrict access to the plant, it was generally limited to those areas where mixed residues were generated, treated or stored.*

*Further, the grand jury ignores the fact that only certain residues -- those possessing hazardous waste characteristics or possessing listed hazardous waste constituents -- were potentially RCRA-regulated. The evidence was clear that less than a majority of the classes of residues generated at Rocky Flats met this test. Residues represented many different types of materials (e.g., "dry combustibles," incinerator ash, filters, salts, oxides, etc.), and these materials were not generated in a consistent manner assuring uniform characteristics. Because of this, it would have been (and was) problematic to conclude that any particular residues were also "hazardous wastes" and therefore "mixed residues," in the absence of detailed, comprehensive testing. Testing was not possible, however, because high levels of radioactivity prevented samples from being taken and analyzed.*

6450

GJ Report:

> 6.          *          *          *

> 7.    DOE has not requested nor received a Presidential
> proclamation exempting DOE from operating the Rocky Flats
> Plant in compliance with RCRA.

DOE and its contractors have stated frequently that it is
impossible for them to operate the Plant in compliance with the
applicable provisions of RCRA.    In contemplation of such a
situation arising, the Congress provided in the most recent
amendments to RCRA that DOE and other government agencies could
apply to the President for an exemption from RCRA in the interest .
of national security.  However, DOE and its contractors have not
applied for nor received a Presidential proclamation to exempt them
from the criminal sanctions, which flow as a matter of law from
violations of certain provisions of RCRA.

> *United States' Response: Contrary to what is stated in
> the report, the presidential exemption provided at 42 U.S.C.
> § 6961 is part of the original RCRA enacted in 1976.    The
> actual evidence was that Rockwell indicated its concern about
> complying with RCRA in a few, limited instances, primarily
> after the search warrant was executed and primarily concerning
> LDR mixed wastes and mixed residues.    Again, these concerns
> ultimately stemmed from the lack of technology for the treat-*

- 62 -

0451

*ment and disposal of these materials, and are the subject of various agreements and orders between DOE and state and federal regulators. The preponderance of the evidence does not support the allegation that DOE or its contractors have "frequently" stated their inability to comply with RCRA.*

GJ Report:

B.   DOE AND ROCKWELL VIOLATED RCRA BY ILLEGALLY STORING, TREATING, AND DISPOSING OF RESIDUES AT THE ROCKY FLATS PLANT FROM 1980 THROUGH 1989.

1.   <u>DOE and Rockwell accumulated a 40-year inventory of residues at the Rocky Flats Plant</u>.

When the FBI raided the Plant in June of 1989, the Plant had an existing backlog of approximately 4,500 drums of residue. Some of these residues had been "temporarily" stored at the Plant for plutonium "recovery" for more than 20 years, and the most optimistic projections suggested that it would then take at least 20 years to process the accumulated backlog of residues and recover the plutonium in them.   These residues included significant quantities of mixed wastes, which had been collected after a massive industrial fire destroyed significant portions of the Plant in 1969 and which had been stored continuously thereafter at the Plant.

- 63 -                          C452

*United States' Response:* *The grand jury's report creates the misleading impression that no residues were recovered by Rockwell in its operation of the Plant. To the contrary, the evidence was clear that residue recovery was a fundamental reason for the Plant's existence, and that Rockwell routinely recovered large amounts of certain types of residues. The residues that Rockwell was most involved in recovering during the 1980s were those that were relatively easy to recover, such as plutonium oxides, due to the higher concentrations of plutonium or the ease of the recovery process. The backlogged residues consisted of a number of plutonium scrap materials that, while above the economic discard limit ("EDL"),[23/] were more difficult to recover and therefore set aside for potential future recovery. These included, for example, approximately 1,100 drums of incinerator ash and ash heels. There was no evidence presented to the grand jury that any residues resulting from the 1969 fire contained hazardous wastes or exhibited hazardous waste characteristics.*

---

[23/]   *The EDL of a particular plutonium-bearing scrap material was determined by the cost of recovery -- given the difficulty in extracting the plutonium -- compared with the production of new plutonium.   Those materials containing a concentration of plutonium above the EDL were by definition "residues", and were required by DOE Headquarters and the Albuquerque Operations Office not to be discarded.*

- 64 -

**GJ Report:**

After the FBI raided the Plant, Rockwell suspended attempts to recover plutonium from the residues, which were then stored at the Plant and which Rockwell had been placing in storage continuously from at least 1979 forward. No subsequent effort has been made by EG&G or DOE to extract plutonium from those residues. All of the residues continue to be stored at the Plant.

> 2. DOE has never applied to EPA or CDH for a RCRA permit or interim status under RCRA to store, treat, or dispose of residues at the Rocky Flats Plant.

Subsequent to the FBI raid on the Plant, DOE and EPA entered into two Federal Facilities Compliance Agreements and various extensions of them. However, neither of the agreements nor any of the extensions granted DOE, Rockwell, or EG&G a RCRA permit or interim status to store, treat, or dispose of liquid, low-level, mixed wastes or solid residues at the Plant. . . .

> *United States' Response: The United States has previously responded in substantial detail to the grand jury's false allegations concerning Rocky Flats' "ongoing" "criminal" storage of LDR mixed wastes and mixed residues, and those responses will not be repeated here. See, supra.*
>
> *In brief, and as most relevant here, the evidence showed that DOE, beginning in late 1989, was in the process of ga-*

- 65 -

*thering detailed information for its RCRA permit application for treatment and storage of mixed residues.[24/]   As mentioned above, DOE submitted its Part A permit application on June 30, 1992.*

GJ Report:

        3.  DOE and Rockwell collected and stored a large volume of radioactive incinerator ash residues at the Rocky Flats Plant, although no process has ever existed by which plutonium can be recovered from these residues.

A substantial portion of the residue, which was stored at the Plant during Rockwell's management tenure (and which is stored at the Plant today), consists of mixed waste, incinerator ash. However, contrary to Rockwell's representations to DOE, other government agencies, the public, and Judge Babcock in Sierra Club, there is not now and never has been a treatment process available by which the plutonium in mixed waste, incinerator ash residue can be separated from the hazardous ash in which it is encased.

Incinerator ash residues have been collected for decades at the Plant as the by-product of burning mixed wastes in an in-

---

[24/]   *Various documents which compiled such information and were presented to the grand jury included a "Residue Inventory Report" (circa December 1989); a "Rocky Flats Plant Residue Compliance Evaluation and Interim Compliance Plan" (March 2, 1990); a "Rocky Flats Plant Residue Classification Report" (June 1, 1990); and a "Mixed Residues Compliance Plan" (September 28, 1990).  The vast majority of this information is (and has been) publicly available.*

    0455

cinerator, which is located in Building 771.   In an effort to extract plutonium from the mixed waste ash, which this incinerator produced, Dow Chemical (the prior operator of the Plant) expended $50 million in 1971 attempting to develop an effective treatment process for this mixed waste, incinerator ash.   However, Dow's experimental treatment process was abandoned as a failure shortly thereafter, and no one has attempted subsequently to extract plutonium from the large volume of mixed waste, incinerator ash residues, which the Plant has generated and which are stored at the Plant.

> *United States' Response: This section is not supported by a preponderance of evidence. The grand jury evidence show-ed that incinerator ash may or may not be a RCRA "hazardous waste," depending on the nature of the material burned in the incinerator -- in other words, particular incinerator ash is potentially a "mixed residue" only if the material which was incinerated contained hazardous waste constituents.[25/]   Further, the preponderance of the evidence showed that at some time prior to 1980, incinerator ash was recovered on a signi-ficant, non-experimental basis at Rocky Flats.   Around 1980, it apparently became less cost-effective to do so, relative to recovering other residues.*

---

[25/]   *As previously noted (see Note 5, supra), the Shell Oil decision cast a further significant cloud on whether the United States could demonstrate, beyond a reasonable doubt, that any particular residue was RCRA-regulated.*

- 67 -

*The evidence was clear that Rockwell and DOE were con-
cerned about the backlog of residues, and were working on a
number of residue recovery projects in the several years imme-
diately prior to the search warrant. The grand jury received
various evidence that one of these projects involved the in-
stallation of two dissolution lines specifically designed to
recover plutonium from incinerator ash. This project was un-
derway no later than May 1988, and was intended to be opera-
tional within the next several years.*

GJ Report:

> 4.   Rockwell established and operated a nonpermitted,
> mixed waste, permanent storage facility at the Rocky
> Flats Plant.

By maintaining the fiction that plutonium could be recovered
from the mixed waste, incinerator ash residues, DOE and Rockwell
concealed from regulators and the public what they were really
doing.   Rockwell characterized mixed waste, incinerator ash as a
"residue" in the "recycling" or "recovery" process to disguise:

    (a)   the real status of this hazardous and radioactive waste
    at the Plant; and

    (b)   an important function of the Plant.

Under Rockwell's management, the Plant took on two new roles.
First, (as discussed in greater detail below) Rockwell "treated" -
within the meaning of RCRA - large volumes of mixed wastes and

- 68 -

0457

hazardous wastes by burning them in an incinerator in Building 771 and reducing them to ashes with a volume less than 10% of their respective volumes before they were incinerated. Second, by characterizing the product of this waste treatment process as a "residue," which was being "temporarily" stored at the Plant awaiting recovery and recycling of the plutonium, Rockwell converted part of the Plant into a permanent storage facility for radioactive and hazardous incinerator ash, because Rockwell knew that the incinerator ash could not and would not ever be reprocessed or removed from "temporary" storage at the Plant.

*United States' Response: The grand jury evidence was consistent with the theory that DOE and Rockwell recognized that a collateral benefit of incineration was the ability to greatly reduce the residues' volume. As mentioned just above, however, the evidence showed that Rockwell planned to recover the ash in the relatively near term. There was no evidence -- but only the grand jury's speculation -- that DOE intended to turn Rocky Flats into a permanent repository for incinerator ash.*

GJ Report:

> 5. Rockwell had several reasons to avoid disclosing the true status of the residues, which were stored at the Rocky Flats Plant.

- 69 -

Rockwell management knew that the residues were being stored and labelled at the Plant in a manner, which violated several provisions of RCRA.  For example, Rockwell knew that the Plant lacked sufficient floor space to store the residues in compliance with RCRA's requirements for separation between storage containers. Likewise, Rockwell knew from an internal audit that the residues, which were being stored in a haphazard manner in Buildings 776 and 777, had improper and inadequate identification of the contents of the drums and the potential generation of explosive hydrogen gases within some of the drums containing mixed wastes.  In one storage room alone, more than 1,100 drums (each with a capacity of 55 gallons) were stored.  In another storage room, several of these 55-gallon drums of residues blocked the emergency exits because the drums were packed so tightly into the room.  The bottoms of most of these mixed waste residue drums had rusted and they posed a substantial risk of giving way - and spilling their radioactive and hazardous contents into the environment - if they had been lifted from the ground.

*United States' Response:  The grand jury evidence most pertinent here was a March 1988 Technical Safety Audit, which occurred at a time when RCRA's application to mixed residues was still disputed and unresolved.  The audit indicated that most of the bottoms of 1,100 drums in a particular storage room were, in fact, rusty, but did not indicate that any large-scale failure of the drums was imminent.  There was no*

- 70 -

*indication of how many of the drums, if any, contained mixed
residues. The drums were stored inside the building and there
was no evidence concerning how the drums' contents would have
"entered the environment." Although there was evidence indi-
cating that DOE was concerned that the formation of hydrogen
gas could force the lids open, the use of the word "explosion"
is misleading.*

*It is true that residues were historically stored in ac-
cordance with unenforceable DOE safety orders rather than RCRA
requirements. After it started becoming clear in 1989 that
mixed residues were RCRA-regulated, a DOE-commissioned study
revealed that virtually all of the mixed residues were being
stored in violation of RCRA's technical storage requirements,
concerning such matters as aisle space, labeling, etc. While
such deficiencies are not insignificant, they do not involve
the criminal storage of hazardous wastes without a permit or
interim status.*

*These issues have been (and are being) addressed in the
regulatory agreement and orders previously discussed.*

### GJ Report:

Rockwell management also resisted EPA's authority over the
residues because Rockwell wanted to prevent CDH and EPA from
conducting  inspections  throughout  the  Plant  and,  possibly,
discovering other RCRA operating violations, such as the usage of
the  incinerator  in  Building  771  as  a  nonpermitted,  treatment

- 71 -

0460

facility for hazardous wastes and mixed wastes. Moreover, Rockwell realized that DOE would have to apply for - and probably could not obtain - a RCRA Permit to continue storing mixed wastes residues in what had become a *de facto* mixed waste, permanent storage facility at the Plant.

When EPA gained access to the Plant for inspection purposes, one of Rockwell's fears was realized. EPA advised DOE and Rockwell in early 1989 (long before the FBI raided the Plant) that they were storing land-banned, hazardous solid and liquid wastes at the Plant in violation of RCRA. Many of these wastes were contaminated with low levels of radioactive material. Despite this clear notice of a RCRA violation, Rockwell continued to store these hazardous wastes at the Plant in violation of RCRA's one-year time limit on the temporary storage of such wastes at the Plant.

> *United States' Response: The evidence is that DOE in-formed EPA, rather than vice-versa, that it was storing LDR mixed wastes at Rocky Flats. The United States has previously addressed the issues concerning LDR mixed wastes, supra, and will not repeat the same response here.*

GJ Report:

> 6. DOE did not want to pay for the residues to be stored at the Rocky Flats Plant in accordance with the requirements of RCRA.

- 72 -

0461

The cost of RCRA compliance was a major motivating factor in DOE's decision to challenge EPA's authority to inspect and regulate the handling of the residues at the Plant. DOE did not want to spend the money, which RCRA would have required DOE to spend to continue to store the residue drums at the Plant, e.g. the construction of a residue drum storage facility.

7.          *     *     *

8. DOE and Rockwell violated several provisions of RCRA by treating, storing, and disposing of residues at the Rocky Flats Plant without having appropriate RCRA permits.

With regard to residues, which have been treated and stored at the Plant, DOE, Rockwell, and certain employees of each of them violated RCRA on virtually a daily basis between the effective date of RCRA and December 31, 1989 (Rockwell's last day managing the Plant) by:

(a) failing to report to EPA that they were storing the mixed waste residues at the Plant;

*United States' Response:* As previously discussed, it was not clear that RCRA applied to DOE mixed wastes until May 1, 1987, and RCRA regulation of mixed residues was not clarified until August 1989 and thereafter, as a result of CDH's enforce-

- 73 -

*ment efforts and the Sierra Club litigation. At that point, DOE directed the preparation of a comprehensive survey of residues at Rocky Flats, and provided that survey to EPA and CDH as it became available. In addition, Rockwell provided at least some information concerning the storage of residues to EPA and CDH as early as 1987.*

## GJ Report:

(b)  storing certain mixed waste residues at the Plant for longer than one year although there was no technology available to treat the residues or extract the plutonium from the residues;

*United States' Response: There is no one-year storage period concerning residues. This statement appears to be based on the grand jury's mistaken belief that the one-year limit during which LDR mixed wastes may be accumulated for treatment also applies to residues.*

## GJ Report:

(c)  storing certain mixed waste residues at the Plant for longer than one year although processes were known to exist by which the hazardous constituent could have been treated and the plutonium could have been extracted from the residues; and

*United States' Response: This again confuses specific LDR mixed waste requirements with the general RCRA storage requirements applicable to mixed residues (and all other RCRA-regulated wastes). Further, the evidence before the grand*

- 74 -

0463

*jury showed that, although Rockwell did not have the capacity to simultaneously recover all residues, it sought to reduce the residue backlog, although not very successfully.*

GJ Report:

(d)   engaging in the practices discussed in subparagraphs III.C.3. and III.C.4. above.

*       *       *

C.   DOE AND ROCKWELL VIOLATED RCRA BY ILLEGALLY TREATING AND DISPOSING OF HAZARDOUS WASTES AND MIXED WASTES THROUGH USE OF A NONPERMITTED TREATMENT FACILITY AT THE ROCKY FLATS PLANT.

1.   <u>DOE and Rockwell concealed from EPA and CDH that Rockwell was using an incinerator at the Rocky Flats Plant to treat hazardous wastes and mixed wastes.</u>

*       *       *

DOE and Rockwell represented in <u>Rocky Flats' November 1, 1985</u> RCRA Part A Permit application that the incinerator in Building 771 was <u>not</u> being used to burn or treat hazardous waste. However, they knew or should have known at that time that:   (a) Rockwell was burning hazardous wastes and mixed wastes in the incinerator in Building 771 at that time; and (b) the incinerator had been used for an extensive period before that date - and would continue to be used for the foreseeable future - as the exclusive means at the Plant to reduce the volume of certain hazardous wastes and mixed

- 75 -                          0464

wastes, which Rockwell could not otherwise treat and which DOE and Rockwell would have otherwise had to ship elsewhere for storage.

*United States' Response:*  It was DOE's and Rockwell's position that the Building 771 incinerator was not a RCRA-regulated unit.

The November 1985 permit application which failed to request a RCRA permit for the Building 771 incinerator must be viewed in light of the fact that DOE institutionally resisted the application of RCRA to *any* mixed radioactive material until the By-Product Rule was adopted in May 1987.  The evidence indicated that all DOE facilities nationwide refused to submit RCRA permits concerning the treatment, storage or disposal of mixed wastes until mid-1987 -- although, pursuant to the July 31, 1986 Compliance Agreement, DOE at Rocky Flats had already committed to do so.

The 1985 RCRA permit application made clear that radioactive material was being incinerated, and this was never concealed.  In fact, the incinerator was operated pursuant to a CDH permit under the clean air statute and was monitored for radioactive emissions.

## GJ Report:

CDH and EPA did not know when DOE submitted its RCRA Part A Permit application in November of 1985 that DOE was burning hazardous wastes or mixed wastes in the incinerator in Building

- 76 -                     0465

771.   Since DOE had never advised CDH or EPA that Rockwell was using the 771 incinerator as a treatment facility for hazardous wastes and mixed wastes, CDH and EPA had no reason to be aware that DOE and Rockwell were using a nonpermitted, hazardous waste treatment facility at the Plant.

### 2.   DOE and Rockwell illegally used the incinerator in Building 771 to treat hazardous wastes and mixed wastes.

Rockwell used the incinerator in Building 771 on a regular basis from 1980 through 1989, as a treatment facility to reduce the volume of hazardous wastes and mixed wastes at the Plant. Although there always was a large demand to use the 771 incinerator to burn mixed wastes, Rockwell also used this incinerator on various occasions (including as recently as February 26, 1989) to burn hazardous wastes, which had no radioactive components. By burning various hazardous wastes and mixed wastes in the 771 incinerator, Rockwell reduced the volume of such wastes by as much as 90%.

> *United States' Response: There was substantial evidence, though not amounting to proof beyond a reasonable doubt, that Rockwell on some occasions incinerated relatively small quan- tities of so-called plutonium scrap that did not contain suf- ficient quantities of plutonium to exceed the EDL, and should have been categorized as wastes. In some cases these materi- als were listed as containing "0" grams of plutonium, which*

- 77 -

*meant anything under a 0.5 gram, and would not necessarily in-dicate no radioactivity at all. While the great majority of this activity took place in 1986 and early 1987 (i.e., before the By-Product Rule made it clear that mixed wastes were RCRA-regulated), it also occurred later on an extremely limited and sporadic basis, including several occasions during the period from February to April 1989.[26/] There was no evidence that DOE approved the below-EDL burns.*

## GJ Report:

DOE and Rockwell knew when Rockwell was operating the 771 incinerator that RCRA required them to have a RCRA Permit or RCRA interim status to burn hazardous waste or mixed waste in the 771 incinerator.   DOE and Rockwell also knew, when Rockwell was operating the 771 incinerator, that DOE had never applied for and did not have a RCRA Permit or RCRA interim status to operate the 771 incinerator as a hazardous waste and mixed waste treatment facility.   However, they chose to ignore these RCRA requirements and they proceeded from 1980 through 1989 to use the 771 in-cinerator as treatment facility to reduce the volume of hazardous materials, which were stored at the Plant.   In the process, they consistently violated RCRA and released hazardous materials - and

---

[26/]     *The total weight of the materials burned on these few occa-sions in 1989 (including the papers, kimwipes, etc. themselves) was 684 pounds.   Consistent with general information, no more than half of the materials were probably mixed residues and only a fraction of their weight would be attributable to any hazardous waste con-stituents.*

- 78 -

0467

potentially radioactive materials - into the air of metropolitan
Denver at levels substantially greater than those amounts which
**RCRA** allows for a hazardous waste and mixed waste treatment
incinerators.

> *United States' Response:*   *The statement that "DOE and*
> *Rockwell knew [that the Building 771 incinerator required] a*
> *RCRA Permit or RCRA interim status" is fundamentally mislead-*
> *ing.   The preponderance of the evidence showed that DOE and*
> *Rockwell knew that it was the regulators' position that the*
> *Building 771 incinerator required RCRA authorization, and DOE*
> *and Rockwell did not "ignore," but publicly disputed this posi-*
> *tion, based on the American Mining Congress or "recycling"*
> *argument.   It was this very dispute that was not resolved un-*
> *til the Sierra Club litigation.   It is accurate to say that*
> *DOE and Rockwell recognized that, if the Building 771 inciner-*
> *ator was RCRA-regulated, then it was very unlikely that it*
> *could satisfy RCRA's requirements and efforts to upgrade the*
> *incinerator to meet such requirements would be very expensive.*
>
> *While it is reasonable to conclude that, in all likeli-*
> *hood, the Building 771 incinerator sometimes released RCRA con-*
> *taminants into the air above the amounts allowed by a RCRA-*
> *permitted incinerator, it is virtually sheer speculation, not*
> *supported by a preponderance of evidence, to indicate that it*
> *"consistently" occurred and to suggest that the amounts or*
> *concentrations were particularly significant.   As previously*

0468

discussed, not all of the materials burned (and in all likeli-
hood *less than a majority*) were "mixed residues" and it was
extremely problematic, if not impossible in many instances, to
prove that any particular scrap material was also RCRA-regu-
lated.   In addition, many of the items which *were* considered
mixed residues were such things as kimwipes that had been con-
taminated with very small (sometimes trace) amounts of clean-
ing solvents.

The total weight of all materials burned in the Building
771 incinerator during 1987 was approximately 33,000 pounds,
and, in 1988, was 24,200 pounds. By all indications, no more
than half of these materials were mixed residues, so that the
total weight of the mixed residues in 1987 was approximately
16,500 pounds and in 1988, 12,100 pounds. Further, the vast
majority of the burned materials' weight was due to the bulk
materials themselves -- that is, the papers, rags, filters,
kimwipes, etc., and not the small amounts of hazardous waste
constituents that such items *may* have been contaminated with.
Even assuming that the chemicals accounted for 20% of the to-
tal weight of the burned materials, this would mean that only
3,300 pounds of hazardous wastes were burned in 1987 and 2,420
pounds in 1988.

Thus, it is fundamentally misleading, not supported by
the evidence and a terrible disservice to the public to sug-
gest or imply (based on the evidence learned in the investiga-
tion) that huge quantities of known, highly toxic wastes were

- 80 -                                          0469

*intentionally burned on a routine basis and that substantial quantities of hazardous wastes were "consistently" released into the atmosphere. There is simply no evidence to support that.*

*It should be noted that Rocky Flats' use of the Building 771 incinerator to burn radioactive-contaminated materials was never a secret, but was conducted (and specifically allowed) for many years under a Clean Air permit issued and monitored by CDH. There was no evidence, from 1986 to the date that use of the Building 771 incinerator was terminated, that the Plant's radioactive emissions ever exceeded the air emission standards.*

*Finally, it should also be noted that the Building 771 incinerator has not been used since April 1989, and, by all indications, will never be used again. DOE has filed a RCRA "closure" plan to permanently decommission the incinerator, which is under CDH review.*

GJ Report:

> 3.   DOE did not apply for a RCRA Permit for the 771 incinerator because DOE knew the incinerator could not meet RCRA's standards for a hazardous waste treatment facility.

DOE has never applied for a RCRA Permit or RCRA interim status to operate the 771 incinerator because the incinerator could not

- 81 -                                    0470

meet the environmental, and operating, and safety standards, which RCRA imposes on incinerators that are used to burn hazardous wastes and mixed wastes.   Moreover, DOE and Rockwell knew from their independent engineering studies that the 771 incinerator could not be modified to bring it into compliance with RCRA's requirements.

The 771 incinerator used an inefficient filtering system which permitted substantial quantities of hazardous materials to escape into the atmosphere.   The incinerator's operating methods were, likewise, outdated and inappropriate for such dangerous materials. For example, Rockwell employees would start the fire in the incinerator by first igniting newsprint or some other readily flammable material outside of the incinerator with a cigarette lighter or match.   The Rockwell employee would then throw the burning newsprint or other object into the incinerator's combustion chamber, where the hazardous and radioactive materials would be burned.

*United States' Response:*   *While the evidence before the grand jury indicated that, due to its outdated technology, it was very unlikely that the Building 771 incinerator met RCRA efficiency standards of 99.99% destruction for most principal organic hazardous constituents, it is simply a gross, unsup-ported assertion to say that "substantial quantities" of haz-ardous material were released to the atmosphere.*

*It is unclear what the grand jury means by "inefficient filters."   The evidence showed that the incinerator used a*

- 82 -

0471

*series of "high efficiency particulate air" filters and its emissions were therefore filtered to some degree, although probably not at RCRA-required levels.*

GJ Report:

      D.       \*     \*     \*

      E.   ROCKWELL VIOLATED RCRA AND THE TERMS OF DOE'S NPDES PERMIT BY SPRAY IRRIGATING CHROMIC ACID AND RAW SEWAGE.

      1. <u>Rockwell used the STP to treat hazardous waste</u>.

On Thursday morning, February 23, 1989, Rockwell employees noticed that a green – slightly fluorescent – fluid had begun to flow into the STP. Although the Rockwell employees did not know what this unknown liquid was, they did not take any significant, precautionary measures. Specifically, Rockwell did not attempt to:

(a)   divert the unknown fluid into equalization basins and prevent it from entering the STP;

(b)   divert the unknown fluid to the B-Series Ponds after it had passed through the STP; or

(c)   shut down the Plant to diminish the subsequent need to discharge the contaminated wastewater effluent by spray irrigation or direct discharge into Walnut Creek.

      *United States' Response: This conduct was charged in Count 10 of the Information and is thoroughly described in the United States' Sentencing Memorandum, at pages 98-106.*

## GJ Report:

Rockwell attempted to use the STP to treat the unknown toxic substance, which was subsequently determined to be chromic acid. However, since the STP did not have a permit to treat RCRA wastes and since chromic acid is a RCRA listed hazardous waste, Rockwell violated RCRA by using the STP to treat RCRA wastes.

*United States' Response: The grand jury is once again mistaken concerning the law, in asserting that this conduct violated RCRA. The definition of "solid waste" under RCRA, 42 U.S.C. § 6903(28) -- which is a condition precedent to being a "hazardous waste" -- specifically exempts "industrial discharges which are point sources subject to [NPDES] permits." See 42 U.S.C. § 6903 (5). Since the sewage treatment plant was directly involved with, and discharged to, outfalls which were subject to such a permit, the "treatment" of the chrome spill at the plant, because of this and other regulatory issues, was probably not a RCRA crime.*

*RCRA also requires that the criminal violation be a "knowing" violation. Since the evidence showed that Rockwell did not "know" that the greenish substance was chromic acid or another toxic substance when it first entered the plant, only negligence charges (under the Clean Water Act) were appropriate.*

GJ Report:

> 2. The chromic acid spill destroyed the STP's ability to
> treat sewage.

When the chromic acid began flowing into the STP's settling basins, the level of turbidity in them increased between one and four turbidity units. By Saturday morning, the turbidity level reached seven turbidity units and the STP reached an "upset" condition. As a consequence, the STP lost its ability to treat the Plant's sewage before it was discharged into the B-Series Ponds, and Rockwell then began discharging partially treated and raw sewage to the B-3 Pond, where it was then illegally discharged with the chromic acid into the B-5 Pond and spray irrigated onto the spray fields.

The elevated level of turbidity in the STP's settling basins indicated to the operators of the STP that the unknown fluid was a highly toxic substance. The elevated level of turbidity also indicated that the unknown substance contained a metal that was killing the microbiological bacteria in the STP that typically treated and purified the wastewater effluent.

> *United States' Response: While largely correct, these statements are again the subject of Count 10, and are thor-oughly discussed in the United States' Sentencing Memorandum.*
>
> *While it is accurate to say that the "upset" treatment plant inadequately treated the influent to the plant, it is*

- 85 -                                        0474

*incorrect to allege that raw sewage was discharged.   It is also incorrect to suggest that the sewage plant could only have been upset by "a metal."*

*There was no direct discharge from the B-3 to the B-5 (or B-4) Pond.  Ponds B-4, B-5 and C-2 were contaminated, instead, by spray irrigation run-off.*

### GJ Report:

> 3.  <u>Rockwell spray irrigated the chromic acid to avoid adverse publicity</u>.

When the wastewater containing the unknown fluid began passing through the STP, Rockwell decided to spray irrigate the wastewater effluent, which was contaminated with the unknown fluid, onto the South Spray Field because Rockwell did not want to face potentially adverse publicity from discharging the colored wastewater effluent directly downstream into the Great Western Reservoir (i.e. Broomfield's drinking water supply) and because the Plant did not have sufficient storage capacity to retain all of the chromic acid on site.   Rockwell realized that a substantial quantity of the toxic liquid would run-off the spray field because the spray field was frozen at the time and it was covered completely with snow and ice.

> *United States' Response:  While there was no preponderance of evidence that the spray fields were activated speci-*

fically (or only) to deal with the "colored wastewater" when it was first observed entering the plant,[21] the evidence supports the theory that Rockwell negligently failed to follow Rocky Flats' NPDES permit and its own internal procedures, in allowing the then-unknown substance to pass through the sewage treatment plant and into the B-3 Pond to be spray irrigated.

There was no evidence whatsoever that a "substantial quantity" (or even a small quantity) of the "toxic liquid" that was spray irrigated reached Great Western Reservoir, and the great majority of it was apparently captured in the on-site ponds.  The United States' investigation confirmed that the City of Broomfield, which continually monitored the discharge into Great Western Reservoir from Walnut Creek, did not detect any significant chromium levels (or legal violations) resulting from the spill.

## GJ Report:

When DOE learned that the chrome spill had occurred, a DOE employee requested that Rockwell discontinue spray irrigation until the foreign substance could be identified.  DOE feared that spray irrigation of the unknown liquid could create a new solid waste management unit under the irrigated ground.  Rockwell ignored this

---

[21]   The preponderance of evidence showed that Rockwell routinely spray irrigated, on an almost day-to-day basis, if the spray field equipment operated at all.

- 87 -

0470

request and continued to spray irrigate the then unidentified, toxic liquid.

*United States' Response: The two principal witnesses concerning this issue testified directly contrary to one another on the point of whether DOE made such a request.*

GJ Report:

### 4. Rockwell acted slowly in determining the identity of the unknown toxic liquid which flowed into the STP.

Rockwell acted slowly in identifying what was the chemical composition of the unknown fluid. Although Rockwell took samples of the unknown fluid shortly after it entered the STP, management did not expedite the analysis of the sample. Consequently, Rockwell did not know until the following Monday that the unknown fluid consisted of chromic acid, which is a RCRA listed waste. A subsequent audit determined that 30.4 pounds of chrome was missing and presumed to have been part of the chromic acid spill.

Chromic acid, which contains hexavalent chrome, is a toxic and hazardous substance. Rockwell negligently failed to maintain and implement adequate spill detection, control, and containment procedures and equipment in Building 444, where the chromic acid spill occurred on February 22, 1989.

- 88 -

0477

*United States' Response: This account is basically correct. Rockwell was charged in Count 10 for failing to implement adequate spill detection, control and containment. While the chromic acid which entered the sewage treatment plant, putting aside other regulatory issues, may have been a RCRA "hazardous waste," the contaminated effluent which was sprayed from the B-3 Pond was not a RCRA waste, as it was less than the EP toxicity threshold of 5.0 milligrams of chromium per liter.*

GJ Report:

> 5.   Rockwell failed to promptly advise the regulatory agencies and surrounding communities that the chrome spill had occurred.

Rockwell did not advise DOE that the chrome spill had occurred until two days after it had happened.   Rockwell waited until Tuesday, February 28, 1989 to advise CDH and EPA that the chrome spill had occurred.

During the chrome spill incident, Rockwell disregarded the potential effect of its actions on the surrounding communities and the environment.   Rockwell did not advise Broomfield, Westminster, CDH, or EPA of the toxic spill, the spray irrigation of a toxic substance in an area supplying Broomfield's drinking water supply, or the discharge downstream from the spray irrigation fields of partially treated or raw sewage.   Rockwell waited until after the

- 89 -                    0478

toxic liquid had passed completely through the STP and the untreated sewage had been sprayed onto the spray fields before Rockwell advised the regulatory authorities of the problem.

> *United States' Response: The evidence indicates that the spill of chromic acid, which occurred on February 22, 1989, was not determined by Rockwell to involve chromium until March 1, 1989. Rockwell informed DOE that same day. The great majority of the chromic acid had already been spray irrigated by that time. There was no evidence that raw sewage (as opposed to partially treated effluent from the sewage treatment plant) was sprayed onto the spray fields. As previously indicated, the City of Broomfield detected no significant or illegal chromium levels concerning the spill. Rockwell later built a ditch to divert effluent containing chromic acid from the on-site holding ponds to a site near the Jefferson County airport where it was far from drinking water supplies.*

GJ Report:

> 6.   Rockwell violated RCRA and the Clean Water Act in several respects during the chrome spill incident.

When Rockwell sampled the B-Series Ponds into which the unknown fluid flowed before it was spray irrigated, Rockwell discovered that the concentration of chromium in the water being discharged from Pond B-3 to Pond B-5 was as much four times greater

- 90 -

0479

than the level considered to be safe for drinking water.   This circumstance violated the conditions of DOE's NPDES Permit for the ponds.

*United States' Response: The evidence does not support a direct discharge from Pond B-3 to Pond B-5, but indicates that a portion of the contaminated effluent which was spray irrigated from Pond B-3 ran off the hillsides into Ponds B-4 and B-5 (and was therefore a "bypass" violation). The water with elevated levels of chromium was not discharged from Pond B-5 to South Walnut Creek.*

GJ Report:

Rockwell violated RCRA and the Clean Water Act (33 U.S.C. § 1342) during and after this multi-day series of events in at least the following respects:

(a)   Rockwell "disposed" of a "hazardous substance" (within RCRA's definitions) through spray irrigating it onto the land without having a RCRA Permit or RCRA interim status to dispose of chromic acid in that manner;

(b) Rockwell used the STP to treat a hazardous substance (the chromic acid) although Rockwell did not have a RCRA Permit or RCRA interim status to use the STP as a hazardous waste treatment facility;

*United States' Response: The grand jury is again incorrect on the law, and there was no RCRA violation. The RCRA term is "hazardous waste," not "hazardous substance," which is a different legal term under a different statute. The prepon-*

- 91 -

*derance of the evidence does not support the allegation that the concentration of chromium in the liquid discharged by spray irrigation was a RCRA "hazardous waste," since it failed to satisfy the RCRA threshold (based on certain test protocols) of 5.0 milligrams of chromium per liter. See 40 C.F.R. § 261.24.[28]/*

GJ Report:

(c) Rockwell violated the terms of DOE's NPDES permit by failing to apply good engineering practices, i.e. spray irrigating the chromic acid and raw sewage onto a frozen ice field from which sheet run-off occurred;

(d) Rockwell violated the terms of DOE's NPDES Permit by discharging water from the B-3 Pond into the B-5 Pond, when the water had a concentration of chromium in it, which was greater than the amount permitted by the NPDES Permit;

(e) Rockwell negligently violated conditions and limitations in the NPDES Permit by discharging and releasing nonsanitary industrial wastes to the STP;

(f) Rockwell bypassed facilities necessary to maintain compliance with the Plant's NPDES Permit; and

*United States' Response: The conduct described in Subparagraph (e) was charged in Count 5, and the conduct described in Subparagraphs (c) and (f) was charged in Count 10. There was no evidence of a direct discharge from Pond B-3 into Pond B-5, as alleged in Subparagraph (d).*

---

[28]/ *This analysis may seem "overly technical," but it is exactly the type of determination that the United States' attorneys were required to make in deciding whether a crime had been committed and whether it could be proved, according to the rules of law and scientific evidence, beyond a reasonable doubt.*

0481

GJ Report:

(g)  Rockwell violated RCRA by creating a new solid waste management unit in the area in which it sprayed the chromic acid.

*United States' Response: "[C]reating a new solid waste management unit" is not a RCRA crime, and the evidence showed that the sprayed effluent was not an EP toxic "hazardous waste."*

GJ Report:

F.  ROCKWELL ILLEGALLY STORED AND TREATED LIQUID MIXED WASTES IN A CLOSED RCRA TREATMENT FACILITY.

DOE's 1985 RCRA Part A Permit for the Plant permitted DOE and Rockwell to use three solar evaporation ponds for the storage of liquid hazardous wastes in an "emergency" situation, such as a major spill, ruptured storage tank, or other event that posed a serious threat to human health or the environment. However, this Permit did not allow DOE and Rockwell to use the solar evaporation ponds as a regular STD area for production process wastes containing hazardous and radioactive materials.

Rockwell used Solar Evaporation Pond 207C on no less than 15 non-emergency occasions during 1986, 1987, and 1988 for the storage, treatment, and disposal of liquids containing mixed wastes, which were known as "concentrated salt brine" and which resulted from various liquid waste treatment processes in Building

- 93 -                0482

374.    Concentrated salt brine is a characteristic, corrosive,
hazardous waste, which has a Ph that is equal to or greater than
12.5.    Concentrated salt brine also contains various listed
hazardous wastes, including acetone, methylene chloride, benzene,
and toluene.

On April 4, 1986, Rockwell pumped 25,000 gallons of liquid
mixed wastes into Pond 207C, and Rockwell deposited 15,000 gallons
of liquid mixed wastes there on August 12, 1987.  On November 15,
1987, Rockwell stored 18,331 gallons of liquid mixed wastes in the
same pond, and the same event occurred with 11,231 gallons of
liquid mixed wastes on February 20, 1988.  Although the Plant's
records are incomplete, they show that liquid mixed wastes were
illegally deposited, treated, and stored in Pond 207C as late as
April 8, 1988.

The concentrated salt brine, which was deposited in Pond 207C,
would be treated by solar evaporation.  The liquid component of the
material would evaporate over a period of time and leave a solid
mixed waste in the Pond.  In the process, the concentrated salt
brine would be "treated" and "stored" - within the definition of
those terms under RCRA - in Pond 207C.

Rocky Flats did not have a RCRA permit or RCRA interim status
to treat and store concentrated salt brine in Pond 207C during the
period from 1986 through 1988.  DOE and Rockwell never applied for
a RCRA permit for these purposes because they knew that Pond 207C
could not comply with the minimal technology standards that were
required by the 1984 amendments to RCRA.  Specifically, they knew

- 94 -

that RCRA required and DOE would not pay for the Pond to have a leachate collection system and a double liner before the Pond could be used to treat and store hazardous waste or mixed waste.

Since Pond 207C was not a RCRA permitted operating unit during this period, Rockwell and various Rockwell employees violated the conditions of Rocky Flats' RCRA Part A Permit, when they stored, treated, and disposed of these liquid mixed wastes in Pond 207C. At the time at which of these transfers occurred, the Solar Evaporation Ponds were marked with signs, which stated clearly that the Ponds were "under closure" and that the Ponds should not be used for any purpose. At the time at which each of these transfers into the Ponds occurred, the Plant was not operating under a "state of emergency."

Rockwell employees transferred the liquid mixed wastes into the Solar Evaporation Ponds upon the specific approval of managers. Before any of the liquid mixed waste was transferred into Pond 207C, the transfer of the liquids had to be approved by Rockwell managers. The process of approval required between two and three days to complete. Some requests to transfer liquid mixed wastes into Pond 207C were denied by Rockwell managers.

> *United States' Response: The illegal treatment and stor-age of hazardous mixed wastes in Solar Pond 207C was charged in Count 3 of the Information and is thoroughly described in the United States' Sentencing Memorandum, at pages 51-54.*

0484

- 95 -

*While the United States agrees that the transfer of haz-
ardous mixed wastes into Solar Pond 207C violated RCRA, the
pertinent RCRA violation was that Rockwell treated and stored
the hazardous mixed wastes in the solar pond without a permit
or interim status, not that it "violated the conditions of
DOE's RCRA Part A Permit."*

*The signs at the solar ponds said "closed," not "under
closure."  "Closure" is a RCRA term which has a particular
meaning which may be misleading in this context.*

GJ Report:

G. ROCKWELL VIOLATED RCRA BY ILLEGALLY STORING THOUSANDS OF
PONDCRETE AND SALTCRETE BLOCKS OUTDOORS.

From 1986 through June 10, 1989, DOE and Rockwell manufactured
a total of more than 17,000 Pondcrete and Saltcrete blocks.
Rockwell stored these blocks outdoors on asphalt areas, which are
known as the "750 Pad" and the "904 Pad."  Officials in DOE's
Headquarters Office in Washington, D.C. and the Regional Office in
Albuquerque, New Mexico were directly involved in the decision to
produce and store Pondcrete and Saltcrete at the Plant.

*United States' Response:  This conduct was charged in
Counts 1 and 2 of the Information and is fully and accurately
described in the United States' Sentencing Memorandum, at
pages 28-51.*

- 96 -                                    0485

*The grand jury's indication that DOE Headquarters and the
Albuquerque Operations Office were involved in the decision to
produce and store pondcrete and saltcrete at Rocky Flats may
be misleading. While the statement on its face is true, it
should not be inferred that DOE approved of or participated in
Rockwell's illegal conduct. The clear preponderance of the
evidence showed that DOE, with one possible exception,[29/]
did not know until May 1988 and thereafter (as more became
known) that many of the pondcrete and saltcrete blocks were
not solid or were otherwise unstable, or that they were not
being stored in accordance with RCRA interim status storage
requirements.*

## GJ Report:

Pondcrete is a mixture of cement and sludge from a surface
impoundment at the Plant, which is called Solar Evaporation Pond
207A.    Sludge  from  Pond  207A  was  treated  and  Pondcrete  was
manufactured in Building 788 into large, rectangular blocks.   Each
of the Pondcrete blocks weighed between 1,500 pounds and 1,800
ponds.  Pondcrete is a low-level, mixed waste, which contains both

---

[29/]    *The United States' investigation showed that in July 1985, a
pondcrete box from Rocky Flats was being buried at the Nevada Test
Site when it broke and spilled "slurry" on the ground. An NTS pri-
vate contractor employee notified one of the local DOE staff about
the incident.  According to the DOE worker, he called and dealt di-
rectly with one of Rockwell's waste managers at Rocky Flats, con-
cerning the "solidification problem," and thought the problem was
corrected.    There was no evidence that the incident was ever re-
ported to DOE at Rocky Flats.*

- 97 -

0486

characteristic and listed hazardous wastes, including EP toxic cadmium wastes, methylene chloride, and acetone.

Saltcrete is mixture of cement, salts, and salt brine from liquid waste treatment processes in Building 374. Salts and salt brine were treated and Saltcrete was manufactured into rectangular blocks in Building 374. A Saltcrete block would weigh between 1,500 pounds and 3,000 pounds. Saltcrete is a low-level, mixed waste, which contains various hazardous wastes, including acetone, methylene chloride, benzene, and toluene.

In the manufacturing process, water and the raw materials for either Pondcrete or Saltcrete would be mixed together and then poured in a slurry form into a large cardboard box, which had plastic liner in it. After the box had been filled with the "crete" slurry, the plastic liner and the box would be closed. The Pondcrete or Saltcrete would then be moved to outside storage on the assumption that the Pondcrete or Saltcrete would soon thereafter harden into a solid, monolithic block. As many as three boxes might be stacked on top of each other outside, and they would only be covered by a tarp.

> *United States' Response: Most of these statements appear to be taken virtually verbatim from outlines which the United States' attorneys provided to the grand jury.*

0487

- 98 -

## GJ Report:

Rockwell and DOE intended originally in 1986 to store the Pondcrete and Saltcrete blocks at the Plant for no longer than six months before they would be shipped to the Nevada Test Site ("NTS") for permanent underground storage. The Pondcrete and Saltcrete blocks were supposed to harden into concrete monoliths that could be placed in trenches at NTS and be buried there forever without endangering the environment. The first batches of these blocks were stacked six high under the Nevada desert. When NTS learned in 1987 that Pondcrete contained some land banned substances, Rockwell stopped the Pondcrete and Saltcrete shipments to NTS, and thousands of Pondcrete and Saltcrete "blocks" began to accumulate on the outdoor pads at the Plant.

> *United States' Response: The shipments to NTS actually stopped in the fall of 1986. Shipments were terminated because the wastes were "discovered" to be mixed hazardous wastes and NTS was not permitted to receive RCRA mixed wastes. At least at that time, the problem was not based on the wastes containing "land banned substances."*

## GJ Report:

Rockwell was unable to make the Pondcrete and Saltcrete harden into solid blocks. After Rockwell first discovered this problem in January of 1987, Rockwell increased the amount of cement, which was used in each mixture, and Rockwell instituted new measures to exert

0488

better control over the manufacturing process. However, these modifications in the mixture and the manufacturing process did not correct the problem. The Pondcrete and Saltcrete blocks continued to take the form of "mush" or "Play-Doh". Under exposure to the elements outdoors and the crushing weight of one or more blocks, many of the cardboard containers collapsed and other boxes deteriorated significantly. In some cases, the plastic liner inside a box would rupture, and the Pondcrete or Saltcrete would then be released in a fluid or powdery forms as a "spill" of hazardous and radioactive materials onto the asphalt pads. From there, the wind and rain carried the Pondcrete and Saltcrete constituents into the drainage area for the B-Series Ponds.

Rockwell informed DOE management at the Plant when the first spill of mixed waste from one of the Pondcrete containers occurred during May of 1988. However, DOE did nothing in response until April of 1989. DOE did not give Rockwell permission to reprogram any of its money to reprocess the mushy Pondcrete or to diminish the potential that additional spills would occur. Likewise, DOE denied Rockwell's request for additional money to build protective structures in which the Pondcrete boxes could be sheltered from exposure to further deterioration caused by the brutal outdoor weather fluctuations at the Plant.

*United States' Response: The investigation showed that run-off from the pads flowed, to Ponds B-1, B-4 and B-5.*

- 100 -

0489

*There was no evidence that pondcrete or saltcrete contaminants flowed off the plant site or harmed public health.*

*The evidence showed that the May 23, 1988 spill was not, in fact, the first spill. It was, however, the first spill reported to the RFAO, EPA and CDH.*

*While the United States agrees that DOE's response to the pondcrete problems was inadequate, this was largely due to Rockwell's failure to provide DOE with timely and complete information, and DOE's view that sufficient funds were already available for Rockwell to deal with the problem.*

*Once DOE began to be aware of the full extent of the pondcrete problems, following the May 1988 spill, DOE was engaged in ongoing efforts to address the problems. On seeing Rockwell's insufficient progress in resolving the pondcrete problems, RFAO management, in September 1988, demanded and received from Rockwell a specific written plan to ensure that the problems were corrected.[30] The plan was required to include specific strategies or techniques to preclude further spills, methods for assuring safe storage for three years, a method for collecting precipitation off the pads and routine sampling of ponded water and run-off.*

*The preponderance of evidence showed that Rockwell had a substantial ability to "reprogram" the Plant's funds to deal*

---

[30]   *Rockwell was substantially downgraded in its award fee evaluation for its poor handling of the pondcrete situation, and lost a substantial amount of potential award fee profit as a result.*

0490

*with the pondcrete problems, although it did not have the ability to make major capital expenditures, i.e., in excess of $1 million, without DOE's permission. It is true, however, that the RFAO refused to fund the construction of tent-like structures to cover the 750 and 904 Pads. RFAO management thought Rockwell had sufficient funds to address the problem and was not convinced that waste contaminants were actually escaping the pads to any significant degree.*

## GJ Report:

In storing Pondcrete and Saltcrete at the Plant, Rockwell did not comply with RCRA's interim status storage requirements and regulations. 42 U.S.C. § 6928(d)(2)(c). In storing and treating Pondcrete and Saltcrete at the Plant, Rockwell violated the Colorado Hazardous Waste Regulations for interim status storage regulations in the following respects:

(a)  it failed to minimize the possibility of any unplanned, sudden, or non-sudden release of hazardous wastes or constituents into the air, soil, or water, which would threaten human health, the environment, or both (CWHR 265.31);

(b)  it failed to handle and store the blocks and their cardboard containers in a manner that would prevent them from rupturing or leaking (CWHR 265.173);

(c)  it failed to take remedial action to remedy deterioration and malfunction of equipment and structures; (CWHR 265.15) and

(d)  when it discovered that the Pondcrete and Saltcrete containers had begun to leak, it failed to transfer such wastes to containers in good condition (CWHR 265.171).

0491

*United States' Response: Each of these violations were
specifically charged in Count 1 of the Information, and are
discussed in great detail in the United States' Sentencing
Memoranda.*

GJ Report:

> H. ROCKWELL VIOLATED RCRA AND THE CLEAN WATER ACT BY ENGAGING
> IN INAPPROPRIATE SPRAY IRRIGATION PRACTICES.

On May 26, 1984, the EPA issued a National Pollution Discharge
Elimination Systems ("NPDES") Permit to DOE for the Plant.   The
Permit set specific limits under the Clean Water Act on the kinds
of water discharges that the Plant could make, where the discharges
could be made (a/k/a outfalls), and the amounts of specific
pollutants that could be discharged from certain outfalls.   The
NPDES Permit allowed direct discharge downstream from the Plant and
into Walnut Creek only from the outfall at Pond B-5.

Rockwell practiced spray irrigation on the East Spray Field to
dispose of water from the B-3 Pond, which received treated
wastewater effluent directly from the STP, and, thereby, diminish
the need for the Plant to discharge downstream from Pond B-5.
Rockwell spray irrigated an annual average of 68 million gallons of
treated wastewater effluent onto only 17 acres of land during 1987,
1988, and 1989, which was far in excess of the amount of fluid that
the ground could absorb or that could be expected to evaporate into
the air.

0492

- 103 -

*United States' Response: Rockwell's spray irrigation practices were charged in Count 9 of the Information and are thoroughly described in the United States' Sentencing Memorandum, at pages 80-98.*

### GJ Report:

Rockwell practiced spray irrigation in part out of fear that the public might react adversely if as much as 250,000 gallons of treated wastewater effluent per day flowed downstream from Rocky Flats into the drinking water supplies for Broomfield and Westminster, Colorado. Rockwell spray irrigated the treated wastewater effluent without prior testing and analysis to determine if the effluent contained unhealthy concentrations of any substance.

Rockwell was totally committed to the goal of avoiding any direct discharge of wastewater effluent downstream. Consequently, Rockwell always spray irrigated the effluent if the irrigation equipment was working.

*United States' Response: Limited sampling and analysis of only a very few parameters were performed as treated effluent left the sewage treatment plant, but there was no sampling and analysis at the B-3 Pond prior to spraying the pond's contents.*

*In a few instances, Rockwell terminated or did not initiate spray irrigation when the spray fields were frozen or saturated. Contrary to what happened during the February 1989*

- 104 -

*chromic acid spill, Rockwell, on a number of other occasions,
terminated spray irrigation when a toxic material or unknown
substance reached the sewage plant.*

## GJ Report:

Rockwell's spray irrigation practices resulted in sheet run-
off of the sprayed effluent into Woman Creek and Walnut Creek,
which ultimately flowed downstream to municipal water collection
basins.  During the driest months of the summer, no more than 35%
of the water, which was spray irrigated, was absorbed into the
ground on the Plant site.  The remaining volume of the treated
wastewater effluent continued downstream to Standley Lake and the
Great Western Reservoir.   During the winter months, Rockwell
continued the spray irrigation even during blizzards, when the
ground was covered with snow and ice, and it was impossible for any
of the treated wastewater effluent to evaporate from or penetrate
the surface of the ground.   Massive "ice castles" were formed
around these agricultural spray irrigation devices at those times,
but the flow of spray irrigation water never stopped.

*United States' Response: There is no question that Rock-
well's spray irrigation practices were extremely poor, and
that more effluent from the B-3 Pond was regularly sprayed
than could possibly evaporate or infiltrate into the ground.
In most instances, however, the vast majority of the remaining
effluent (i.e., the portion which did not evaporate or infil-*

- 105 -

*trate into the ground) ran off the hillsides and into the B-4, B-5 and C-2 Ponds. Although the investigation discovered a few specific instances from 1987 to June 1989 in which apparently small amounts of spray field run-off reached the Walnut Creek and Woman Creek drainages downstream of the B-5 and C-2 Ponds, respectively, there was no evidence that any substantial quantities of run-off actually reached Great Western Reservoir or Standley Lake on anything approaching a regular basis.[31/] Moreover, to the extent that some run-off might have reached the lakes, and to the extent that it might have been contaminated (if at all), such contamination, by the time it had been (a) diluted in the B-3 Pond, (b) sprayed on the ground (with some portion of it evaporating and another portion infiltrating into the ground), and (c) transported a considerable difference over the ground (with additional evaporation and infiltration), would have been extremely diluted.*

### GJ Report:

A Rockwell manager . 〈 recommended to Rockwell's management that Rockwell should stop its practice of spray irrigating the wastewater effluent when the spray fields were frozen. However, Rockwell management ignored his recommendation and directed him to

---

[31/]   *These statements concern run-off directly reaching Great Western Reservoir or Standley Lake without being first collected and released from the B-5 and C-2 Ponds. To the extent that the run-off flowed to (and increased the volumes in) the B-5 and C-2 Ponds, the collected run-off was eventually discharged downstream.*

0495

continue spray irrigation regardless of the meteorological
conditions which might be present.

Rockwell was engaging in spray irrigation as a means to avoid
reporting discharges of its treated wastewater effluent downstream.

*United States' Response: These portions of the report do
not involve "organized crime conditions." Here, as elsewhere,
the grand jury's quickness to criticize the regulators ignores
the fundamental point that Rockwell, and not EPA or CDH, was
the party responsible for violating the law and for not dis-
closing the true state of affairs to the same regulators that
the grand jury criticize.*

GJ Report:

Rockwell followed a continuous practice from 1984 through 1989
of spray irrigating massive quantities of treated wastewater
effluent onto the east trenches. The east trenches are a group of
old waste disposal sites at the Plant. They are located east of
the production buildings and on the north and south sides of the
East Access Road. The east trenches contain approximately 275,000
tons of uranium-contaminated sewage sludge, 300 flattened uranium-
contaminated drums, various plutonium-contaminated debris, and many
volatile organic compounds.

By spray irrigating over the east trenches, Rockwell flushed
unknown quantities of radioactive and hazardous materials into the
underlying groundwater and greatly expanded the plume of

- 107 -

0490

contaminated groundwater, which lies under the ground in that area of the Plant.  This practice also accelerated the migration of the contaminated groundwater downstream in the direction of Standley Lake.

*United States' Response:  This conduct was specifically charged in Count 9 of the Information and is thoroughly described in the United States' Sentencing Memorandum, at pages 90-97.*

*While there is no doubt that it was an extremely poor practice for Rockwell to spray irrigate over or immediately adjacent to the East Trenches, that the practice violated Rocky Flats' NPDES permit and that it added to or "recharged" the groundwater in the vicinity of the trenches, there was no preponderance of evidence to support the grand jury's allegations that the practice "greatly expanded the plume of contaminated groundwater" or "accelerated the migration of contaminated groundwater . . . [to] Standley Lake."*

GJ Report:  ⌐and DOF

Rockwell never disclosed to EPA that the spray irrigation practices and procedures were resulting in run-off into Woman Creek and Walnut Creek.  Rockwell knew in 1987 that its practice of spray irrigation was resulting in immediate downstream surface run-off (i.e. sheet flow run-off) of the treated wastewater effluent.  When Rockwell received a written report on this problem during 1987 it

- 108 -

0487

took no action to avoid or discontinue the surface run-off of the
spray irrigated wastewater effluent.

> *__United States' Response__: The evidence showed that Rock-
> well failed to disclose to EPA substantial information as
> early as 1986 that spray irrigation of Rocky Flats' treated
> wastewater was not a viable disposal option.*

GJ Report:

DOE ⟨reported⟩ in March of 1989 that Rockwell's practice of
spray irrigating its treated wastewater effluent was resulting in
muddy conditions and sloughing of the land surface because the
ground was being oversaturated.   However, DOE did not order
Rockwell to discontinue its spray irrigation practices.

> *__United States' Response__: By 1989, DOE was becoming more
> aware of problems with Rockwell's spray irrigation practices,
> but still didn't know their full nature and extent until after
> the search.*

GJ Report:

Rockwell chose to exploit the EPA's use of vague and ambiguous
terms, which the EPA chose not to define in the NPDES Permit for
the Plant.  For example, EPA directed DOE and Rockwell to engage in
spray irrigation of the STP's wastewater effluent in a manner

- 109 -                    0498

consistent with "good engineering practices."   However, EPA never
defined what it meant by this phrase.

> *United States' Response:   "Good engineering practices"
> required, among other things, that spray irrigation be prac-
> ticed only to the extent that the amount of effluent sprayed
> on the ground could reasonably be dispersed by evapo-trans-
> piration and infiltration, without significant run-off.   The
> evidence was abundantly clear, and the grand jury was well
> aware, that Rockwell clearly understood what "good engineering
> practices" meant.[32]   It was not until later, when Rock-
> well's spray practices were called into question, that it
> began to argue that it didn't understand what the phrase
> required.*
>
> *There was no evidence that Rockwell or any other party
> considered any other terms of Rocky Flats' NPDES permit "vague
> or ambiguous."*

GJ Report:

Under   the   Rockwell   standard   operating   procedures,   spray
irrigation was being conducted in accordance with "good engineering

---

[32]   *Internal Rockwell documents over many years showed the com-
pany's clear knowledge of what Rocky Flats' NPDES permit required,
and some of Rockwell's discussions of, or references to, "good en-
gineering practices" tracked virtually identical language which was
used by EPA regulators to describe what was required.   The prepon-
derance of evidence (including testimony) showed that Rockwell's
environmental managers and workers understood what was required.*

- 110 -

practices," as required by DOE's NPDES Permit for wastewater discharges from the Plant, whenever the spray irrigation system would work.    The Rockwell definition of "good engineering practices" did not give any consideration to whether the effluent, which was being sprayed, was toxic, nor did it any consider whether the spray field could absorb the effluent without resulting in a direct discharge of the effluent through sheet run-off or of the effluent at some point slightly downstream from where the effluent initially infiltrated into the ground.    Likewise, the Rockwell definition of "good engineering practices" gave no consideration to whether the practice of spray irrigating in a particular circumstance would result in the effluent bypassing some or all of the outfall discharge points at the Plant at which the EPA had authorized Rockwell to discharge the effluent.

Rockwell's practice of spray irrigating its treated wastewater effluent violated the conditions of its NPDES Permit and RCRA in the following respects.  First, the large volume of water, which ran directly off of the steeply pitched hillsides and beyond the designated outfalls at the B-5 Pond and C-2 Pond constituted unauthorized discharges into the waters of the United States. Second, some, unknown volume of the water, which was spray irrigated, entered into the ground and resurfaced as "seeps" discharging into the waters of the United States.  Third, spray irrigation moved some of the effluent from one collection pond to another collection pond, where the discharge standards were substantially more lenient and, thereby, illegally bypassed a

- 111 -

0500

discharge point. Fourth, the massive volume of spray irrigation on a relatively small parcel of land violated a condition of the NPDES permit that spray irrigation could occur if and only if it was consistent with "good engineering practices." Since it was impossible for the ground to absorb the large volume of treated wastewater effluent, which was spray irrigated onto it, the practice of spray irrigation at the Plant violated "good engineering practices." Fifth, the practice of spray irrigating over the east trenches was inconsistent with good engineering practices and, therefore, a violation of the NPDES Permit, because it recharged a solid waste disposal site with additional water.

*United States' Response: The various conduct described in this portion of the grand jury's report was charged in Count 10 of the Information and is described in detail in the United States' Sentencing Memoranda. The statements here generally track the evidence as it was outlined by the United States' attorneys to the grand jury.*

*As previously discussed, the preponderance of evidence showed that the substantial majority of spray irrigation run-off flowed to the B-4, B-5 and C-2 Ponds. While it is not unreasonable to conclude that, in all likelihood, some amounts of spray field run-off, especially under the most adverse conditions, reached Walnut and Woman Creeks downstream of the B-5 and C-2 Ponds, respectively, it was very difficult, if not impossible, to prove, after the fact, specific instances when*

- 112 -

0501

*such run-off occurred.[33/]   There was little direct evidence,
therefore, to support the grand jury's statements that large
volumes of run-off water were regularly discharged downstream,
or that the run-off water was regularly contaminated to any
significant degree, if at all.*

GJ Report:

V.  ROCKWELL HAS OPERATED THE PLANT IN VIOLATION OF THE CLEAN WATER
ACT WITH A DEFICIENT GROUNDWATER MONITORING SYSTEM.

        Rockwell operated the Plant through 1989 with a ground-
water monitoring system that violated the Clean Water Act.  From
March of 1985 forward, DOE and Rockwell management knew that the
Plant had significant Clean Water Act deficiencies, including:

        (a)  the improper placement of groundwater monitoring wells at
        the Plant;

        (b)  the inappropriate means by which the groundwater moni-
        toring wells had been constructed at the Plant; and

        (c)  the unreliable sampling data obtained from the ground-
        water monitoring wells.

        *United States' Response:   The statute applicable to
groundwater monitoring is RCRA, not the Clean Water Act.  The*

_____

[33/]   *The United States was able to identify by way of various logs
and documents, and in some instances by witness observations, on a
few occasions when small amounts of spray field run-off apparently
reached the Walnut and Woman Creek drainages downstream of the B-5
and C-2 Ponds.*

- 113 -                     0502

*preponderance of evidence showed that, as of November 1985, Rocky Flats' groundwater monitoring system was substantially deficient and in violation of RCRA interim status requirements, involving the placement and construction of, and the sampling data obtained from, Rocky Flats' groundwater monitoring wells. It was not until late 1984, however, that DOE finally gave Rockwell clear direction to comply with RCRA requirements in general, and the groundwater requirements in particular. (DOE began to address groundwater monitoring at all of its weapons facilities in 1984, shortly after the LEAF decision.)*

*With its November 1985 RCRA Part B application, DOE submitted a plan for bringing Rocky Flats into groundwater monitoring compliance, with the principal focus being the installation of hundreds of new, properly constructed wells. This plan was further negotiated among DOE, EPA and CDH, and was ultimately memorialized in the July 31, 1986 Compliance Agreement. During 1986 and 1987, DOE constructed approximately 136 new wells, and although some technical deficiencies and differences of opinion remained (concerning placement of the wells, etc.) between DOE on the one hand, and EPA and CDH on the other, it was clear by the second half of 1988 that the problem was being addressed and was no longer appropriate for criminal resolution.*

0503

*The preponderance of evidence showed that Rocky Flats' groundwater monitoring system, as of November 1991, complied with RCRA requirements.*

## GJ Report:

The groundwater monitoring wells at the Plant in 1985 had been designed and constructed to detect the presence of radioactive material in the groundwater. However, those wells were not adequate to satisfy the RCRA requirements for monitoring changes in the extent of the contamination of the groundwater.

EPA discovered in 1985 for the first time that DOE and Rockwell were violating their prior certificate of compliance for groundwater monitoring. However, when EPA became aware of this condition, EPA did not bring an enforcement action to require DOE to drill and operate a sufficient number of appropriate wells to monitor the expanding plume of contaminated groundwater at the Plant.

*United States' Response: The grand jury's statement that "DOE and Rockwell were violating their prior certificate of compliance" is fundamentally wrong, since the November 8, 1985 certification was the first such certificate. While it is technically true that EPA did not bring an "enforcement action," the evidence was clear that EPA and CDH were aware of Rocky Flats' groundwater monitoring deficiencies and, in December 1985, CDH issued a Notice of Intention to Deny DOE's*

- 115 -                    0504

*permit application, which was based, inter alia, on deficient
groundwater monitoring. This led to immediate negotiations to
address these and other problems at the Plant and culminated
in the July 31, 1986 Compliance Agreement. It is entirely
misleading to suggest that the regulators failed to take ag-
gressive action to "enforce" their concerns.[31/]*

### GJ Report:

A report in December of 1985 by a Rockwell consultant stated
that Rockwell could not obtain and did not have enough data from
the existing groundwater monitoring wells to comply with the law.
This consultant also criticized the construction and location of
these wells, and the consultant recommended that Rockwell plug the
existing wells and start over with a new system of groundwater
monitoring wells.

In July of 1986, an Assistant Secretary of DOE was advised by
a DOE staff member in a memorandum the Plant was being operated in
violation of the groundwater monitoring requirements of Clean Water
Act.  However, prior to the FBI's raid of the Plant in June of
1989, no one in DOE's Headquarters Office had directed DOE's
Regional or Plant managers to bring the Plant into compliance with
the  statutory  and  regulatory  requirements  for  groundwater
monitoring.

---

[31/]    *As previously discussed, the 1986 Compliance Agreement was a
landmark achievement and was used as a model by EPA and other state
agencies for gaining jurisdiction over DOE facilities.*

*United States' Response*:  *DOE was well aware, at DOE Headquarters and at the RFAO, that the July 31, 1986 Compliance Agreement required DOE to meet RCRA groundwater monitoring standards.  The grand jury's statements are not supported by the evidence and ignore the very substantial progress that was made in this area in 1987 and 1988, well before "the FBI raid."*

GJ Report:

During 1986 and 1987, Rockwell constructed 136 groundwater monitoring wells, but these wells were not constructed in a manner and in locations sufficient to satisfy the requirements of the law. On December 30, 1987, CDH advised Rockwell in writing of the specific deficiencies with the Plant's groundwater monitoring system.

*United States' Response*:  *Subsequent to 1987, DOE continued to construct groundwater monitoring wells until there were almost 350 wells in 1989.  While there were continuing disputes over various technical deficiencies (involving complicated geological and other scientific issues), CDH has since determined (and the grand jury was informed) that Rocky Flats' groundwater monitoring system complies with RCRA and is considered adequate.*

0506

- 117 -

<u>GJ Report</u>:

In 1988, DOE performed an internal audit on the risks, which each of its various facilities posed to the public's health.   At that time, DOE rated the extensive contamination of the groundwater at Rocky Flats as the number one environmental hazard among all of the DOE's facilities throughout the United States. The DOE reached this conclusion because the groundwater contamination was extensive, toxic, and migrating toward the drinking water supplies for the Cities of Broomfield and Westminster, Colorado.

\*          \*          \*

*United States' Response: There is no dispute that signi-ficant groundwater contamination exists at Rocky Flats. DOE's assessment of the groundwater hazard, however, was not based on any imminent or near-term serious threat, but was because Rocky Flats, compared to many of DOE's other facilities, is only a short distance upstream of public drinking water sup-plies. In this respect, the <u>potential</u> hazard is significant. Again, there was no evidence that the rate of migration poses a near-term serious threat.*

<u>GJ Report</u>:

VI.   DOE AND ROCKWELL CONSPIRED TO VIOLATE ENVIRONMENTAL LAWS.

From the perspective of this Special Grand Jury, Rockwell and DOE were indistinguishable coconspirators to violate RCRA.

- 118 -                    0507

Rockwell used DOE as a shield against environmental reporting, regulation, compliance, and enforcement.

Rockwell skillfully and in complicity with certain DOE officials conspired over a period of years to hide its criminal acts and the criminal acts of its employees behind the sovereign immunity of a department (DOE) of the Federal Government. Some DOE employees, likewise, became a *law unto themselves* and attempted to immunize themselves from prosecution by hiding behind the sovereign immunity of the U.S. Government.

*United States' Response*:  *As previously stated in response to various portions of the grand jury's report, there was no preponderance of evidence (and certainly no proof beyond a reasonable doubt) that DOE or any DOE individual, in any criminal or legal sense, conspired with Rockwell or was criminally responsible for Rockwell's conduct. As the United States stated in its Sentencing Memorandum, at page 8, and stands by today, "DOE was both a contributing cause and also a victim of the crimes at Rocky Flats. While the investigation showed that DOE did not endorse the particular criminal conduct to which ROCKWELL has pled guilty, a prevailing DOE 'culture' allowed Rocky Flats' crimes to occur."*

*As has always been the case, and as confirmed by recent and ongoing events, environmental issues at Rocky Flats are emotionally and politically charged. Anyone who becomes involved in them in any detail quickly becomes frustrated with*

- 119 -

0568

*their complexity and the difficulty in resolving them. Many of the issues are not criminal justice issues, and criminal law should not be determinative of what is (or was) good or bad at Rocky Flats. To say that something wasn't a crime is not to say that it was good policy or otherwise appropriate.*

*While it is accurate to say (and the United States has said) that DOE "bear[s] substantial responsibility" for Rocky Flats' environmental problems,[35/] the grand jury and others have failed to distinguish DOE's responsibility in a broad institutional and policy sense (involving, for instance, its long resistance to RCRA regulation) from actual involvement in specific criminal conduct. There are those who will never be- lieve that some particular DOE official at Rocky Flats didn't participate in Rockwell's crimes. Indeed, there are those for whom the belief that DOE engaged in criminal wrongdoing at Rocky Flats is a virtual article of religious faith. We have said, and can only say, what the evidence showed.*

### GJ Report:

Certain Rockwell employees conspired to persuade DOE's Plant Manager and other DOE employees to endorse their illegal acts as the official DOE policy. Further, they drafted correspondence and reports for DOE's approval, which approved of many of Rockwell's criminal acts and, thereby, set in motion the process for them to

---

[35/] *United States' Sentencing Memorandum, at 127.*

0509

subsequently argue that the defense of estoppel by entrapment bars
prosecution of Rockwell, Rockwell's employees, and DOE's employees.
In the process, Rockwell cleverly attempted to immunize itself, its
employees, and DOE's employees from subsequent prosecution for
violating the environmental laws of the United States while
operating the Rocky Flats Plant.

*United States' Response: The grand jury's statements
here apparently refer to Rockwell's Rocky Flats plant manager
and counsel advocating their position that residues (and the
incineration of residues in the Building 771 incinerator) were
not regulated under RCRA. We can recall no other evidence in-
volving arguably criminal conduct where Rockwell advocated
that DOE take a particular "official" position. While it is
true that Rockwell often prepared correspondence for the sig-
nature of a DOE official, there was no significant evidence of
any other instance where DOE was asked to sign a document
which, in the intentional sense suggested here, was meant to
approve or endorse some otherwise (or arguable) criminal con-
duct.[16]    It is clear, for instance, that Rockwell never
gained DOE's written endorsement for illegally storing pond-
crete and saltcrete or for improper use of spray irrigation.*

---

[16]     *This is not to suggest that Rockwell-prepared documents did
not often reflect DOE's institutional positions or policies, such
as its mid-1980s resistance to RCRA regulation of mixed wastes.*

- 121 -

> *There was no evidence that any DOE employee "attempted to
> immunize themselves . . . by hiding behind sovereign immun-
> ity." In fact, many DOE employees were aware of the success-
> ful prosecution of federal employees for environmental crimes
> in the so-called Aberdeen case. See United States v. Dee, No.
> CR 88-0211 (D. Md. 1989).*

GJ Report:

Rockwell controlled all of the material information, data, and
analysis regarding environmental matters at the Plant. Since
Rockwell often failed to disclose all of the relevant facts to
DOE's employees, Rockwell and its managers were able to consis-
tently manipulate and control DOE policy. . . .

The pervasive nature of the conspiracy between DOE and
Rockwell may be best illustrated by the means in which bonus fee
awards for Rockwell were determined semi-annually at the Plant.
During the period from 1986 through 1989, Rockwell semi-annually
prepared recommended bonus fee award reports for DOE's office at
the Plant. In virtually every circumstance, the DOE Plant Manger
would then adopt with almost no changes the recommended bonus fee
report as his report to justify paying a bonus fee award to
Rockwell. In determining the amount of bonus to be paid to
Rockwell, the DOE Plant Manager relied almost exclusively on
Rockwell to supply the information and suggested grades for each
category on which the amount of the bonus fee would ultimately be
determined.

0511

RFAO management would then return the recommended report to
Rockwell for minor revisions consistent with its reaction to
Rockwell's suggested report. When Rockwell had revised the report
to its satisfaction, the RFAO would submit the revised bonus fee
report to DOE's Albuquerque office on DOE letterhead, as its
recommended bonus fee award for Rockwell for that six-month period.
DOE's Albuquerque office would then rubber-stamp the report and
bonus fee award recommendation, which Rockwell had generated for
the RFAO.

The Federal Facility Compliance Agreements between DOE and EPA
and the operating contract between DOE and EG&G have essentially
duplicated the circumstances, which existed before the FBI raided
the Plant.    DOE has continued through the negotiation and
implementation of these Agreements to thwart the efforts of EPA and
CDH to bring the Plant into compliance with applicable
environmental laws.  Likewise, DOE has continued to attempt to
shield its contractor's illegal acts behind DOE's sovereign
immunity, as a means to avoid the imposition of civil penalties
against DOE and its contractor.  . . .

     *United States' Response: While the award fee process was
a legitimate source of inquiry throughout the investigation,
the preponderance of the evidence is that DOE did not place
significant (if any) weight upon Rockwell's self-appraisal,
and exercised its own judgement is assessing Rockwell's
performance.  The fact that this judgement may have been*

- 123 -

*insufficiently critical or focused, or that DOE's appraisal would have benefitted from greater independent oversight of environmental activities, does not in and of itself suggest that criminal conduct took place. Further, the evidence is uncontroverted that Rockwell was downgraded for its failures and poor performance concerning such matters as the pondcrete problems, the March 1987 run-off to Woman Creek and the chronic BOD violations.*

0513