

DENVER

# Westword

September 30–October 6, 1992 FREE

**Backbeat: The dogged determination of Suzi Katz**

Volume 16, Number 5



**Bill Gallo finds that winning isn't everything at Teikyo University**

**US West dials "D" for discrimination and gets a costly wrong number**



**Snap judgments: Meet the woman who took the mug out of mug shots. By Karen Bowers**

# THE SECRET STORY OF THE ROCKY FLATS GRAND JURY

BY BRYAN ABAS

# Why did

# U.S. Attorney

# Michael Norton

# sabotage the

# jury he was

# supposed to help?

### By Bryan Abas



The reluctant
prosecutor:
U.S. Attorney
Michael Norton.

September 30–October 6, 1992

# JUSTICE

For Michael Norton, the government's criminal case against Rocky Flats was all but wrapped up.

On March 26 the U.S. attorney announced that Rockwell International, the company that operated the nuclear weapons plant for fourteen years, had pled guilty to ten charges of violating federal hazardous waste disposal and clean water laws. Norton was recommending an $18.5 million fine, which Rockwell executives had agreed to pay. In one of the most celebrated criminal cases of environmental misconduct in the country's history, only court approval of the settlement and fine remained.

Those who'd been following recent events at Rocky Flats were stunned. Federal agents had spent more than three years investigating allegations of serious violations at the plant. In June 1989 they'd staged an electrifying predawn raid, hauling away 135 boxes of records. A tantalizing search warrant had detailed dozens of suspected violations and sensational charges of midnight burnings and clandestine dumpings. A grand jury, seated for two and a half years, had heard testimony from 110 witnesses and examined 760 boxes of documents.

So why was Rockwell's fine smaller than the government bonuses it won while operating the plant? Why didn't the grand jury—after all its work—return a single indictment? Why were individual Rockwell employees, and their supervisors at the Department of Energy, not going to be held accountable?

Norton noted the fine would be the largest ever collected by the federal government for violations of hazardous waste disposal laws, but he wouldn't comment on the actions of the grand jury. In accordance with federal law, he said, those were—and would remain—secret.

That was fortunate for Norton. Because what transpired behind the closed doors of the grand jury room sabotaged the will of the grand jury and enabled the Bush administration to do business as usual at Rocky Flats.

*Westword* has learned that the grand jury did, in fact, propose indictments against both Rockwell and energy department employees—and that Norton refused to sign them, rendering them invalid.

The result was an extraordinary behind-the-scenes constitutional confrontation pitting 22 ordinary citizens, determined to do their duty as they saw it, against Colorado's top federal prosecutor and his staff, the U.S. Department of Justice and Colorado's chief federal judge.

In this showdown, the jurors—most of whom had never served on any jury before or

Continued on page 16

# DENIED

## Rocky Flats
**Continued from page 15**

taken on any public official over so much as a parking ticket—stood their ground:

• When Norton told them he would not draft an indictment naming Rockwell or energy department employees, they drafted one themselves with the help of a lawyer on the jury and adopted it unanimously.

• When Norton asked them to approve an indictment he supported—which contained the charges Rockwell executives eventually pled guilty to—they refused. His indictment was a whitewash, they said, and they wouldn't be a part of it.

• When Norton discouraged them from drafting a "presentment," a document outlining charges of criminal conduct that doesn't carry the force of law, they drafted one anyway and adopted it unanimously.

• When Norton told them it would be "inappropriate" for them to prepare a report of their investigation, they prepared one anyway and adopted it unanimously.

*Westword* has obtained a copy of a nearly final version of the report written by Special Grand Jury 89-2. In clear, explicit language it details the range of environmental crimes jurors say were committed at Rocky Flats and describes the regulatory mind-set that allowed them to occur. It brands the plant "an ongoing criminal enterprise" allowed to operate only with the complicity of government and corporate employees who "have breached the public's trust by engaging in a campaign of distraction, deception and dishonesty." It calls for the immediate shutdown of the plant.

The grand jurors submitted their 42-page report to U.S. District Judge Sherman Finesilver and expected him to make it public. The judge has not released the document, however, despite a federal law that permits him to do so as long as he finds it meets certain legal requirements.

In the meantime, the legal system pressures the jurors to remain silent. On several occasions during the proceedings, Finesilver and Norton reminded jurors that talking about their actions publicly could result in their being held in contempt of court. Finesilver could then jail them. Some jurors say these were professional reminders; others call them threats.

Under federal law, grand jury proceedings are secret to protect those who are investigated but not charged with crimes and to help ensure that those who are charged get a fair trial not tainted by pretrial publicity. In the Rocky Flats case there will be no trial, because Norton refused to sign the grand jurors' charges. The only

goal served now by not discussing the jury's work publicly is political, not judicial. The Bush administration doesn't have to explain why its justice department squelched indictments proposed by members of a duly appointed grand jury.

The actions of a grand jury are so secret even the names of jurors are not a matter of public record. But *Westword* was able to obtain a list identifying the Rocky Flats grand jurors and initiated contact with twenty of them. Ten agreed to discuss their jury work at length providing that *Westword* didn't quote them by name. Most jurors said they still fear the possibility Judge Finesilver will hold them in contempt.

The following account is based on these interviews and a review of grand jury documents obtained by *Westword*, including two preliminary versions of the jury's report, a

**Continued on page 18**

---

# Duty Bound

Members of the Rocky Flats special grand jury began their work as 23 unrelated individuals. They ended as a family of sorts.

One week of every month for two and a half years, the jurors gathered in Denver to undertake a project they couldn't mention a word about to their spouses or closest friends.

For many, jury duty caused problems at work: Employers were irritated that jurors had to spend so much time off the job. Others found that their trips away from home put a big strain on family relationships. Seven of the 23 original jurors were excused from duty for one reason or another, replaced by alternates.

Jurors became emotionally close. They talked about their children. They held Christmas parties. One younger juror says he came to regard an older juror as a surrogate grandfather by the time their work was through.

They struggled with financial problems caused by their jury duty. Jurors were paid $40 a day plus mileage and parking costs. If they lived more than seventy miles from Denver, they received $103 a day as a per diem to cover motel and food expenses. (Most stayed at the Comfort Inn on 17th Street, a few blocks from the courthouse.) But the cost of calling home wasn't covered. Unless the out-of-towners stayed with relatives, they were lucky if they broke even.

But what irritated them more than the low pay was the incredible tedium of their work. There were hours upon hours of boring testimony. Sometimes jurors passed the time by writing notes to each other about the appearance or behavior of witnesses. Jurors talked for days about the man who put eyedrops in his eyes while on the witness stand.

Jury foreman Wes McKinley drove in from Walsh, a small community in the southeast corner of the state. McKinley is a rancher and owns a company that takes tourists on trail rides and covered-wagon excursions.

Like most ranchers, McKinley has a strong skepticism of government. The message on his telephone answering machine assures that if the caller is a bill collector, "prosperity is going to shine my way, and you'll be one of the first to be paid," but adds, "If you're from the IRS, forget it. I no longer exist."

McKinley has a degree in mathematics and was once a high school teacher. Jurors say that experience proved invaluable, because it was McKinley who explained the statistical evidence so everyone could understand it.

Jurors say they respected McKinley's sense of fair play, his tough questioning of witnesses and prosecutors, and his intelligence. "He always gave a lot of thought to things," one juror remarks.

The most controversial juror was Denver lawyer Ken Peck. In the early months, most of his fellow jurors disliked him. He frequently arrived late, and he regularly stretched what were supposed to be five-minute breaks to ten minutes, an annoying practice that became less frequent only after he was scolded by one of the jurors in front of the others.

Peck slept during testimony more often than most jurors. And he was an aggressive—sometimes abrasive—questioner,

particularly of the prosecutors. One juror blames Peck for a lot of the animosity between jurors and Michael Norton. "He had some kind of ax to grind," the juror says.

Peck can be faulted for failing to disclose to Judge Finesilver prior to joining the jury that he had done some work against Rocky Flats. According to the *Boulder Daily Camera*, he had tried to block trial burns at a Rocky Flats incinerator in 1987 and 1988. During questioning of prospective jurors, Finesilver asked if anyone had pre-judged any of the allegations that had been made in public against plant operators. Peck didn't respond. In their report and proposed indictment, jurors included sections on the illegal use of one of the incinerators; matters Norton ignored on the settlement he reached with Rockwell.

In response to a question from Finesilver about whether prospective jurors had any personal connections to the

plant, Peck told the judge only that his late father had worked there for about ten years. He said it would not affect his impartiality.

Jurors interviewed by *Westword* said they didn't know that Peck had worked against the incinerator trial burns. They say they wish he had told them, although they also say it wouldn't have made any difference in their deliberations.

All the jurors maintain, however, that Peck offered invaluable service to the jury. As a lawyer his advice was critical in drafting the proposed indictment and report. And they respected his attention to the evidence. "He wasn't just pulling stuff out of the air," one says.

"He knew the ropes," says another. "I couldn't see through the eyes of the prosecutors to see what they were really thinking. Ken could. None of the prosecutors liked him."

Another key juror was Paul Herzfeldt of Greeley, who jurors say was a good questioner, a good thinker and someone who provided a lot of leadership.

All the jurors signed the proposed indictment and the report, but there was dissent throughout the deliberations. One juror says the panel "argued big time." Another says she thinks some jurors were "brainwashed" by McKinley, Peck and Herzfeldt.

"Those three were drawing the whole thing out a lot further than it was worth," this juror says. "They liked to hear themselves talk, and they took everything way too personally. It was like they were playing for TV cameras."

This juror also contends that some sections of the jury's report were "made up." Nevertheless, this juror says she signed the report because, as a whole, it was on target. She also believes the report should be released, and agrees with her fellow jurors that energy department and Rockwell employees should be indicted for what happened at Rocky Flats.

Most of the jurors—even those who still firmly support the jury's proposed indictment and the report—acknowledge having doubts throughout their deliberations about whether they were doing the right thing. As jurors were completing work on their report, one passed a note to foreman McKinley. "I wonder how true and factual this really is," she wrote.

McKinley reassured her. "So true," he wrote back, "it makes my stomach jump."—*Abas*

---

## WE THE JURY

Like members of all federal grand juries, those on Special Grand Jury 89-2 were selected randomly from voter registration and driver's license records. One seat that became vacant late last year remained unfilled.

Listed in alphabetical order, the Rocky Flats grand jurors were:

Jim Bain of Littleton, swimming coach at the University of Denver.
Gary Boettcher of Colorado Springs, a computer systems analyst with a manufacturing firm.
Debbie Chesonis of Fort Collins, a computer science major at Colorado State University.
Scott Cless of Hayden, a maintenance technician at a property management firm.
Judith Edwards, a secretary at the Lutheran Medical Center in Wheat Ridge.
Tina Hall of Denver, a bartender who joined the jury in 1991 to fill a vacancy.
Paul Herzfeldt of Greeley, who helps manufacture equipment for a nationwide chain of photo developing stores.
Jerry Joyner of Divide, a retired deputy sheriff for El Paso County.
Ernest Konnerup of Morrison, a retired service station operator.
Shirley Kyle of Flagler, who jurors say operated a hairstyling salon.
Howard McCracken of Loveland, a general contractor.
Wesley McKinley of Walsh, a rancher and the jury foreman.
Connie Modecker of Wheat Ridge.
Ken Peck of Arvada, a Denver lawyer.
Audrey Poppe of Fort Collins, who jurors say worked at Foothills Mall.
Lori Rieder of Johnstown, an elementary school teacher.
Jerry Sandoval of Denver, an RTD bus driver.
Tom Stegall of Northglenn, a U.S. Postal Service mailman.
Joyce Smith of La Junta, who has since moved to Idaho.
Jim Vaughn of Fort Collins.
Rebecca Walker of Glade Park.
Carol Widener of Fort Morgan, who jurors say is a hairstylist.

# Rocky Flats
**Continued from page 16**

transcript of a presentation to the jury by Norton's assistants, a copy of Judge Finesilver's written directions to the grand jury and grand jury correspondence.

Judge Finesilver didn't respond to a request for comment for this article. Norton and Ken Fimberg, his chief assistant on the Rocky Flats case, refused to comment on any grand jury matter, noting that the secrecy rules that apply to jurors apply to them as well. Barry Hartman, the former acting assistant attorney general for the justice department's environment and natural resources division, couldn't be reached for comment. Hartman was above Norton in the department's chain of command at the time the Rocky Flats case was settled.

Meanwhile, the Bush administration is stonewalling the congressional subcommittee that's looking into the justice department's handling of the case. Unidentified senior justice department officials have directed Norton, members of his staff and the FBI agents who worked the case to refuse to answer questions about the department's decisions on Rocky Flats. Committee members last week decided to write President Bush to ask him to direct members of his administration to answer their questions.

But to get the right answers, the congressional subcommittee has to ask the right questions. And the committee's lead staffer told *Westword* the committee will not be asking about grand jury matters.

Those are secret, she explained.

---

Somewhere, Jim Stone is smiling. It was Stone, a Rocky Flats engineer laid off in 1986, who triggered the investigation of criminal violations of environmental laws at the plant. He says he was fired for complaining about unsafe working conditions.

Stone considered federal regulators a part of the problem, so at the suggestion of a friend, he approached the FBI. There his complaint made its way to agent Jon Lipsky, who, as it happened, had training in how to investigate environmental crimes.

> Federal and state regulators had known for years about violations of environmental laws at Rocky Flats, but they'd considered the violations civil—not criminal—matters. Sometimes they imposed fines. More often they simply worked with plant managers to try to bring Rocky Flats into compliance.

. Lipsky saw the violations differently, in part because Stone showed him an energy department memo indicating that bureau-crats at the highest levels knew they were violating environmental laws. Along with an investigator from the criminal enforcement division of the EPA, Lipsky launched an undercover investigation that culminated in the June 1989 raid. It was the first time one branch of the federal government had conducted a secret probe of suspected environmental crimes committed by another branch.

The scope of the Rocky Flats investigation was staggering. Just sorting through the documents would require extensive resources. Rather than ask grand juries with other items on their agenda to consider the Rocky Flats case, Norton requested that Judge Finesilver impanel a special grand jury. Finesilver agreed to do so, appointing the members of Special Grand Jury 89-2 in August 1989 (see related story page 16).

The trouble between the jurors and the prosecutors began in the fall of 1991. By that time, jurors had heard from most of the witnesses brought in by Norton's assistants, and from the FBI and EPA agents who'd worked the investigation. Jurors were prepared to start sifting through the evidence.

At this point Fimberg, the assistant prosecutor leading the legal work on the government's Rocky Flats team, announced his preliminary opinion that there was sufficient evidence to indict about ten Rockwell employees. But indictments against employees of the Department of Energy, which owns the Rocky Flats plant, weren't called for, he said, because their illegal conduct had been endorsed by the department as a whole. DOE officials had, for example, directed Rockwell to begin using an incinerator in 1988, even though Rockwell didn't have the requisite permit. The energy department "as an institution was so extensively involved in and approved of this practice, that criminal prosecution [of individual employees]...in our view is not appropriate," Fimberg told the jury, according to a transcript.

The grand jurors weren't swayed by Fimberg's argument. In their view, if DOE supervisors had approved the illegal conduct, then they should be indicted, too. Jurors did, in fact, eventually recommend that charges be brought against three supervisors in the energy department's Albuquerque office who had authority over Rocky Flats. "We wanted to indict everyone who committed a crime," one juror says. "We didn't care who they were or how high up the chain of command they were."

What particularly irked jurors was that



Federal Judge Sherman Finesilver refuses to release the jury's report.

Rockwell and DOE employees were "indistinguishable co-conspirators" in the criminal acts at the plant, each group protecting the other. As jurors noted in their report, sometimes Rockwell employees would keep evidence of illegal activity from their superiors at DOE. At other times, energy department officials were told of and agreed to tolerate the activity, believing that as federal employees they were immune from criminal charges.

That was another assertion rejected by the grand jurors. "Criminal conduct should never be a part of a government employee's work," they wrote. "If the government's employees do not obey the law, we cease to be one nation under the law."

The disagreement between jurors and prosecutors escalated when Norton entered the picture. Jurors say that during a November 1991 visit, Norton brusquely announced that he had no intention of signing any indictment he hadn't drafted and that he wouldn't draft any indictment naming any energy department or Rockwell employee. A preliminary version of the jury's report says Norton also told jurors it would be "inadvisable" for them to meet again or write a report.

"He wasn't real happy with us," one juror recalls. "He felt we were trying to run the show, and he was telling us we weren't the ones in charge of the investigation."

Jurors say Norton offered no explanation for his position, other than to say, "That's the way it's done."

"He said he'd never heard of it being any other way," one juror recalls. "Well, we hadn't heard of any investigation like this, either, so it didn't bother us."

Then one day in December, Fimberg announced that the government had concluded presenting evidence to the jury. "The prosecutors just got up and walked out," one juror recalls. "No instructions, no advice, no nothing. I was stunned."

Jurors were unsure how to proceed, or even if they could proceed. Federal prosecutors are supposed to assist and advise grand juries, bring witnesses in to testify, and draft indictments for jurors to consider. But Norton, Fimberg and Peter Murtha, the D.C. lawyer from the justice department's environmental section who was working the Rocky Flats case, stopped attending grand jury sessions. Jurors were on their own.

---

Abandoned by their advisers, the grand jurors turned to Judge Finesilver for help. They passed a message through court clerk Jim Manspeaker that they wanted to meet with the judge. They also submitted a list of questions—questions that go to the heart of the grand jury system: Could an indictment be issued without the signature of the U.S. attorney? Would it be valid? Could jurors compel the U.S. attorney to sign an indictment they had approved? Could they proceed without the help of the U.S. attorney? Could they issue a report? Would it be made public? Just what is the difference between an indictment and a presentment, a document mentioned in the Fifth Amendment to the U.S. Constitution? Would a presentment be made public?

Jurors have different views on whether Finesilver was helpful. Some say he did everything he could. Others say they suspect he was siding with Norton.

All agree Finesilver didn't say much. He told jurors an indictment had to have the signature of the U.S. attorney to be valid, but beyond that he simply referred jurors to the 21 pages of written instructions he had given them in 1989. Those instructions say that jurors may issue a presentment accusing people of criminal conduct, and they may issue it over the objection of the U.S. attorney. They may also issue a report describing noncriminal misconduct, malfeasance or misfeasance by public employees. "Through this vehicle," Finesilver's instructions say, "the public may be assisted in learning of the facts as they relate to Rocky Flats."

But then, jurors say, Finesilver seemed to discourage them from continuing. He sent jurors a note shortly before Christmas that one juror paraphrases as saying,



**LEARN TO DIVE!**
**$99 SCUBA CLASSES**

For any classes purchase & paid in full in October. Valid for classes between October 1st & December 31st, 1992. Does not include student kit. Please present ad at time of sign up.

*Underwater Phantaseas*
Where you learn does make a difference
**160 S. Union Blvd. Lakewood** (7 blks. S. of 6th Ave.)
CERTIFIED TRAINING AVAILABLE

PADI
5 STAR
TRAINING
FACILITY

**988-6725**
Sales • Rentals • Repairs • Ocean Resort Trips • Indoor Heated Pool

## Rocky Flats
### Continued from page 18

"Thank you for your work. You can go home now. Have a Merry Christmas."

The jurors decided to hang tough. On December 30 foreman Wesley McKinley sent clerk Manspeaker a request. "In the month of August 1989," McKinley wrote, "Judge Finesilver gave Special Grand Jury 89-2 an obligation. Special Grand Jury 89-2 was instructed to look out for the best interests of the people of Colorado and the national interest. Special Grand Jury 89-2 is very serious about fulfilling this obligation, and fully intends to complete the duty it was given responsibility for.

"In order for Special Grand Jury 89-2 to complete the duty...it is necessary for 89-2 to be in session January 21-24, 1992. So please schedule a session."

The jurors got their wish. During those January meetings they began drafting three documents:

• An indictment charging certain energy department and Rockwell employees with specific crimes. Jurors knew that Norton would have to sign this document in order for it to be valid, but they drafted it anyway in hopes that another prosecutor would be appointed.

• A presentment, with content almost identical to their proposed indictment. Jurors drafted it because they wanted to make a statement about who they thought should have been charged. They hoped Finesilver would eventually release it.

• A report of the noncriminal conduct of Rockwell and DOE employees and state and federal regulators, which jurors felt the public should know about. This report wouldn't name names.

Without any government lawyers or secretaries to help them, jurors were forced to fend for themselves. They relied in part on word processors at juror Ken Peck's downtown Denver office, where they worked into the night. Later they asked clerk Manspeaker for clerical help. An employee of Judge Finesilver's staff was made available to help process the documents.

Jurors completed their indictment, presentment and report in February. Nineteen of them gathered to sign the documents and place them, as well as their notes, in a courthouse vault they'd been directed to use. Jurors weren't allowed to keep copies for themselves.

---

As they drafted and voted on their list of criminal charges, jurors say, there was remarkably little disagreement. The votes on whom they wanted to indict all passed by wide margins. One juror says there was only one consistent "no" vote.

Jurors wanted charges brought against three energy department employees: Ray Romatowski, until his 1988 retirement manager of the department's Albuquerque field office, which had supervisory authority over Rocky Flats; Bruce Twining, who succeeded Romatowski and still holds the post today; and Albert Whiteman, Rocky Flats area office manager from 1985 to 1989, who today is director of the weapons quality division in the Albuquerque field office.

*Westword* was unable to learn the specific criminal acts Twining or Romatowski were accused of in the proposed indictment. Jurors wanted to hold them criminally liable for alleged violations of hazardous waste disposal laws at Rocky Flats that they directed, knew about or should have known about, including the use of the incinerator

in Building 771 from 1988 to 1990 without the required permit. The incinerator was in operation until 1990, when a federal judge ruled in a suit brought by the Sierra Club that its use was illegal.

Among the jury charges against Whiteman are that he made a false statement in 1988 when he signed a letter—drafted for him by a Rockwell employee—asserting that no waste had been deposited in any of the evaporation ponds at the plant during the previous twelve months, and that he made a series of false statements in the reports he signed that were the basis for awarding Rockwell bonuses for its management of the plant.

Jurors say they also recommended indictments against five Rockwell employees: Ed Naimon, director of waste operations; William Weston, director of plutonium operations and supervisor of environmental compliance programs; and midlevel plant managers Kirk McKinley, Jack Erfurd and George Campbell.

According to jurors, Naimon made a false statement in 1988 when he told a state health department inspector that no federally regulated hazardous wastes had been deposited in the plant's evaporation ponds during the previous twelve months. In fact, plant managers had regularly deposited hazardous materials there since 1986, grand jurors charged.

McKinley was alleged to have signed a statement concealing the dumpings and to have drafted the letter DOE plant manager Whiteman signed also lying about the dumpings. Weston and McKinley were charged with allegedly directing the storage of radioactive contaminated wastes at the plant without obtaining a federal pen

*Westword* was unable to identify the s cific charges against Campbell and Erfu but jurors say they wanted to hold th liable for their roles in crimes jur accused Rockwell of committing, includ operating the Building 771 incinerator w out a permit from 1988 to 1990 and mak false statements about what was bei burned.

None of these charges was a part of t settlement Norton reached with Rockw In a motion filed in support of the sett ment, Norton said no one was indicted the illegal use of the Building 771 incinc tor because energy department offici knew of and directed its use. He didn't s why he didn't hold those officials accou able for their decisions.

Continued on page 20



Photos by John Mueller



# Thome Scholz AT:
# L'HOMME

**HIGH FASHION EUROPEAN DESIGNERS**

3rd & St. Paul • Cherry Creek North • Denver, Colorado 80206 • 320-0360 FAX 320-0383

**THE DIAMOND LASTS FOREVER... THE BILL SHOULDN'T**

Buying a diamond is scary business... our customers tell us horror stories. We know we have the best value... we assure you we have the best prices... we guarantee you won't be ripped off. Ask around... shop around. Then visit us.

*Affordable quality from your engagement ring specialists*



**LAUREN DIAMONDS LTD.**

JEWELERS

HOURS:
TUES-FRI 10AM-5PM
SAT 12PM-3PM

410 17TH STREET
SUITE 425
DENVER, CO 80202
623-7977





**Futon FURNITURE STORE**

**25 Styles of Frames
300 Designer Covers**

**Many Clearance Items**



M-F 11-7, Sat. 10-5, Sun. 12-4

**880 S. HAVANA**
(2 blocks North of Mississippi)

**363-0062**

g6 20 Westword

## Rocky Flats
### Continued from page 19

In an interview with *Westword* last week, Norton added that there was "a paucity" of evidence about what was burned in the incinerator and that there had been a disagreement among regulators about whether federal hazardous waste disposal laws applied to the incinerator. "We simply didn't think we had a criminal case we could prove beyond a reasonable doubt against anybody at the department or Rockwell," he said.

The jury also proposed to indict EG&G, which took over as plant operator in 1990 after Rockwell was forced out in the wake of the FBI raid. According to jurors, EG&G's crimes included storing, treating and disposing of hazardous wastes without the requisite federal permits and allegedly failing to install and operate a groundwater monitoring system consistent with the requirements of the federal Clean Water Act. Internal memos reveal that DOE supervisors knew as early as 1986 that the monitoring system was illegally deficient. Even though this is one of the plant's most serious problems because of the threat of contamination to drinking water supplies for Broomfield and Westminster, little has been done to improve the system, jurors charged.

Transcripts show that prosecutor Fimberg dismissed the groundwater violations as technical disagreements between experts over matters such as where monitoring equipment should be located.

---

As irritated as they were by Rockwell's conduct, jurors reserved their strongest comments for the noncriminal actions of DOE managers at Rocky Flats and the state and federal regulators whose job was to monitor environmental compliance at the plant. In their report, jurors:

• blame what they call a pattern of "extensive illegal conduct" on DOE administrators' "attitude of indifference toward environmental laws" and on their "conscious and ongoing effort to evade" them. Energy department personnel consistently downplayed the significance of environmental concerns by failing to provide Rockwell with adequate sums to finance improvements or monitoring, jurors charged, and by failing to make Rockwell's bonuses contingent in any significant way in performance on environmental matters.

• accuse Colorado state health department and federal EPA regulators of "lax and ineffective" enforcement. The report cites as typical what happened when state officials learned Rockwell was spraying treated wastewater onto trenches on the east side of the plant without the requisite permit, even though the effluent contained hazardous and radioactive wastes that may have seeped into groundwater. Health officials wrote letters to Rockwell and decided to discuss the matter later. They made no on-site inspections, they took no ground water samples. Jurors say the appropriate response would have included seeking a court order to stop the spraying and filing criminal charges.

• conclude that there has been no significant improvement in the regulation of Rocky Flats since the 1989 FBI raid. Jurors note that the Bush administration continues to oppose legislation giving

state regulators the authority to levy fines against energy department contractors, legislation approved earlier this month by a congressional conference committee and now awaiting final action. It continues to negotiate "compliance agreements" with state and EPA regulators that jurors say are designed to thwart any serious enforcement efforts. DOE administrators continue to "direct and endorse this course of illegal activity in violation of applicable environmental laws and in the

# "WHEN NORTON TOLD US HE WAS ACTING ON HIS OWN, I KNEW THAT WAS A BALD-FACED LIE."

name of political expediency," jurors charge. As a result, jurors call for the closure of Rocky Flats.

*Westword* compared the grand jury's accusations with public records on the enforcement of environmental laws at the nuclear weapons plant. This review showed that either the jury accurately described what is happening or that the inconsistencies are inconsequential. For example jurors wrote that EG&G still did not have hazardous waste disposal permits for most of its waste storage, treatment and disposal operations at the time they wrote their report, and did not even have interim approval from regulators for what they were doing. In fact, although the firm doesn't have most of the required permits, most of its operations do have interim approval from regulators. However, that approval was obtained by simply notifying regulators of the hazardous waste activities, many of which are still not in compliance with federal laws.

The jurors take the same view of this failure as the federal agents who launched the original investigation of Rocky Flats: Without permits—mandated by the government to regulate the industry and safeguard the public—laws are being broken and criminal charges should be brought.

EPA and state health regulators have generally taken a different view. They argue that because of a forty-year accumulation of hazardous wastes at the plant, because of the lack of appropriate storage facilities or treatment equipment, and in some cases because of the absence of appropriate storage technology, it will be years before Rocky Flats can treat, store and dispose all of its wastes legally. In the interim, they say, what counts is that progress is being made and that any spills or accidents are addressed appropriately to protect public health. The regulators contend that's just what they've tried to do.

But one consequence of their lenient approach is that violations continue to accumulate. In June, after the grand jury completed its report, state health officials announced they'd cited EG&G for violating hazardous waste disposal laws 56 times in 22 months. They characterized

the violations as "serious." Three months later they're still trying to decide what to do about them. State regulators say settlement talks are under way and penalties have been proposed. They won't say whether they've made any referral for criminal action.

Members of the Rocky Flats grand jury also point out that federal law provides the energy department a way to circumvent its troubles. If DOE regulators feel violations can't be corrected without jeopardizing national security, or can't be corrected at all with available technology, they may apply to the president for an exemption. Yet they have never sought one.

Jurors suspect that's for political reasons. It would look bad if President Bush, who's proclaimed himself the "environmental president," gave his energy department the authority to violate hazardous waste laws.

As it is, the Bush administration is under fire for allegedly lax enforcement of environmental laws. Earlier this month a congressional committee issued a report citing twenty instances in which EPA regulators felt they had strong cases for prosecution, only to be thwarted by justice department lawyers. One Democratic congressman concluded that the cases represent "a pattern of disinterest, delay and dismissal."

---

Grand juries, introduced in England centuries ago, were intended in part as a check on prosecutorial power. The idea was to require the king or queen to get the consent of a group of citizens before being able to publicly accuse someone of a crime.

The most common problem with the system in the United States—where aggressive prosecutors act the part of the monarch—is that jurors end up as pawns. What do they know about the law? What evidence do they see except what the prosecutor provides? The joke in legal circles is that a skillful prosecutor can get a grand jury to indict a ham sandwich.

But the Rocky Flats case turned the grand jury/prosecutor relationship on its ear. Here the jury—not the prosecutor—was being aggressive. After 203 years, the U.S. judicial system still isn't sure how to handle that.

When Finesilver and Norton told the jurors that any indictment they approved would be meaningless without Norton's signature, jurors say they spoke as though the law were clear on this point. It isn't. According to Duke University law professor Sara Beale, co-author of the most definitive legal text on the grand jury, the U.S. Supreme Court has never addressed the question. Nor did Beale know of any case on the issue in the 10th circuit, the federal appeals court that covers Colorado.

The federal rules of criminal procedure state that an indictment returned by a grand jury "shall" be signed by a U.S. Attorney. The question is whether that statement means that such a signature is required to make the indictment valid or whether it directs U.S. attorneys to sign any and all indictments issued by a grand jury, even those they disagree with.

**Continued on page 22**

September 30-October 6, 1992

# Are You Missing One Or More Teeth? Now You Can Have Them Back!

Today, dental implants are tested and reliable tooth replacements. This remarkable procedure is revolutionizing dentistry.

In years past pulling a tooth was the only way to take care of a bad tooth. Even today many teeth cannot be saved due to gum disease. Every time a person has a tooth pulled they lose a little bit of themselves. They feel a little older. In the past dentists could only replace those teeth by hanging false teeth onto other teeth, or even worse with full dentures. People would ask: If we could put a man on the moon can't we find a better way to replace teeth? Dentistry can now answer with a resounding YES!!

Dental implants are the answer. Implants are "bionic" teeth. These small titanium cylinders function as artificial tooth roots and anchor your dentures and bridgework giving you back many of life's simple pleasures. They can eliminate bothersome gaps and troublesome dentures. They can make you feel like a whole person again.

So if you want to restore chewing function and eliminate those loose dentures or bridgework call The BAROTZ Group for an appointment today. You can enjoy the simple pleasures of eating and more importantly, improve the quality of your life by making this important decision now. **Mention this ad and receive a $50 credit towards treatment if you call before 10/14/92**

WHAT DENTAL IMPLANTS CAN DO FOR YOU:
• Provide a method for anchoring your lower or upper denture.
• Provide a method for replacing your partial or full denture with fixed bridgework.
• Provide a method for replacing a single tooth.
• Improve your quality of life by removing many frustrations associated with using dentures or removable bridgework.
• Improve your chewing function and restore the feeling of natural tooth function.

## THE BAROTZ GROUP
### Quality Dental Care

Preventive Dentistry & Dental Cosmetics
Experts In Bonding, Bleaching, Implants & Braces
216 Sixteenth Street Mall, Suite 860
(On The Mall Near Broadway)

### 595-4994

Charles S. Barotz, D.D.S. & Associates
*Offer good for new patients only. Offer Expires 10/14/92
Coupon only valid with full payment at time of service. Not valid with cleaning only.
*Treatment will be financed over 48 months. Call for details.
State law prohibits using for insurance deductible or co-payments.

## Rocky Flats
Continued from page 20

The case most similar to the Rocky Flats impasse was considered in 1965 by the federal appeals court that covers Louisiana. Under orders from Attorney General Nicholas Katzenbach, the U.S. attorney for Louisiana had refused to sign an indictment issued by a grand jury. A district court judge ordered the prosecutor to sign and found him in contempt when he refused. The prosecutor and Katzenbach appealed.

The circuit judges split two ways. A majority of four of the seven judges ruled that federal prosecutors cannot be required to prosecute cases they don't believe in. The authority to decide whom to prosecute for violations of federal laws rests entirely with the U.S. attorneys and the attorney general, they held.

In a blistering dissent, three judges argued that the majority had effectively emasculated grand juries. They noted there was no legal authority for the conclusion that the signature requirement is designed to give prosecutors the power to block indictments. It's more likely, the minority argued, that the requirement is there simply to require the U.S. attorney to attest that a grand jury has issued an indictment. "The U.S. attorney cannot, except in an advisory capacity, inquire into the merits of whether indictments should be found and returned," the judges wrote. "...Only the grand jurors themselves have that power. It would be grossly wrong for it to be usurped."

If prosecutors disagree with an indictment, the proper course is to ask a judge to dismiss it, the minority judges argued. One advantage of going that route is that the dismissal occurs in open court, where the actions of both jury and prosecutor can be evaluated publicly. Another is that if the judge determines that the prosecutor's refusal to sign is based on bad faith or irrational action, he can appoint a special prosecutor to take the case. If a prosecutor can keep a proposed grand jury indictment secret by refusing to sign it, there's no way for the public to know if the prosecutor is acting reasonably or if, for example, he's getting a bribe from the would-be defendant.

The option of appointing a special prosecutor is one that Federal District Court Judge John Kane told *Westword* he would consider if he were faced with a grand jury and a U.S. attorney at loggerheads. Kane has been vigilant in defense of grand juries. "The U.S. attorney functions as the agent of the jury, not the master," Kane says. "I don't have the right to substitute my judgment for that of Congress if I disagree with a law, and a U.S. attorney can't substitute his judgment for a grand jury's if he disagrees with what it wants to do, either. If the U.S. attorney won't prosecute an indictment issued by a grand jury, let somebody else do it."

Norton's refusal to help the Rocky Flats grand jury draft an indictment ran counter to one of the rulings in the Louisiana case. Four of the seven judges held that even if a U.S. attorney disagrees with an indictment a jury wants to issue, he must help the jury draft it. That Norton refused to do.

Norton's behavior so angered members of the Rocky Flats jury that they toyed with the idea of hiring a lawyer to advise them, and to determine whether it was appropriate to have Norton investigated. What

fueled their interest in going after Norton was the widespread belief among jurors that Norton's refusal to indict DOE and Rockwell employees had little to do with justice and everything to do with politics.

"When Norton told us he was acting on his own and that his higher-ups in the justice department had nothing to do with his decision, I knew that was a bald-faced lie," one juror says. "Why would they have changed their minds about indicting individual Rockwell employees if they hadn't all of a sudden gotten orders from above?"

One juror says Fimberg hinted that he and Norton were getting direction from the justice department. "He said several times that he'd just gotten back from D.C. and that there were things going on at the upper levels that he wasn't at liberty to discuss," this juror recalls.

Members of the congressional subcommittee looking into the Rocky Flats case apparently have unearthed evidence the FBI was directed by someone in the justice department to stop investigating energy department and Rockwell employees. News reports indicate that questions about that directive were among those committee members wanted to ask agent Lipsky last week. No other information about the directive was released by the panel.

Some grand jurors are so convinced that politics dictated Norton's actions that they say he should be investigated for obstructing their work. They charge that Norton or members of his staff:
• refused to help jurors draft an indictment they wanted to issue.
• refused to allow jurors to subpoena a witness they wanted to question again.
• directed a witness not to answer questions posed by jurors.
• tried to intimidate jurors by telling them it would be "inadvisable" for them to meet again.
• entered into settlement talks with Rockwell in late 1991 without telling the jurors, prematurely ending their ability to take additional testimony from Rockwell employees and get straight answers.
• made false statements to them, including telling them that it would be improper for them to write a report (federal law explicitly gives them that right, as Finesilver noted in his instructions) and that if they did, it had to be signed by all members (federal law requires only a simple majority).

Some jury members say they suspect Norton also thwarted their work by violating the secrecy of the grand jury. They suspect he disclosed their intentions to higher-ups in the justice department, to find out what his superiors were willing to accept.

They suspect he leaked grand jury information to Rockwell officers and lawyers to induce them to accept the plea bargain he wanted to use to head off the grand jury. These disclosures also undercut their efforts to get testimony, jurors argue.

Members of Congress could call hearings into the matter, subpoena grand jury members to testify and offer them immunity. But they would be motivated to do so only if they had an inkling of what happened behind the closed doors of the jury room. They don't, and because of the grand jury secrecy rules, they're not inclined to ask.

On March 24, 1992, the jurors filed into a second-floor courtroom in the federal building. They weren't sure what was going to
Continued on page 24



ARE YOU TIRED OF BEING SCREWED?

Finally A Mechanic You Can Trust

**Euromotive**

Complete service for Porsche, Audi, Volkswagen and other European Imports

4102 E. Virginia Ave.
Denver, CO 80222

**329-9951**



DON'T BE VICTIMIZED

**CAR ALARM SALE!**
**$199.00 ***
Installed
Remote Control Alarm w/ 2 transmitters

Status/Warning Red Light (LED)
Radar Sensor*
Glass Break Sensor*
Remote Trunk Release*
Starter Kill
Super Siren 120db
Flashing Parking Lights*
Impact Shock Sensor
Panic Feature
Door Entry Protection
Power Door Lock/Unlock*
*optional

**Associated**

1501 W. Alameda   **722-2191**



**Reserve Your Tickets Today!**

Channel Six Presents

*An Evening With . . . .*

James Burke
Creator/Host:
"The Day the Universe Changed" and "Connections"

**ALL NEW TOPIC**
"1 + 1 = 3"
Summing up the
Information Age

THE JOSEPH & GOULD FAMILY
**PARAMOUNT**
Call 303-534-8336

**six**
KRMA-TV·Denver

**TICKETMASTER**
SOUND WAREHOUSE
BUDGET TAPES & CD's • DISC JOCKEY
CALL-FOR-TIX (303) 290-TIXS

**Paramount Theatre**
Thursday, October 8, 7:00 p.m.
Tickets: $15, $20, $25
Channel Six Members Receive a $5 Discount

## Rocky Flats

Continued from page 22

happen. When Norton and his assistants entered, jurors braced for the worst. "It was pretty tense," one recalls.

Norton started by criticizing their report. In some cases, he said, there wasn't enough evidence to support their conclusions; in others, the conclusions drawn were incorrect.

Norton's comments angered many jurors, because he wasn't supposed to have a copy of their report. Jurors had been told to place all copies in their vault and were led to believe that only Finesilver could view them. Foreman McKinley asked Norton how he got a copy. From a grand juror, Norton said. Which one? He wouldn't say.

Jurors say they don't believe him. They suspect the leak came from a member of the court clerk's or Finesilver's staff. Either way, the secrecy of their work had been breached.

It was particularly galling for jurors to have to listen to Norton pick apart their report because he had refused to help them. If it was legally deficient, that was at least partly because they were left to their own devices. McKinley eventually cut Norton off and told him the jury had heard enough of his criticisms. (One juror, however, told *Westword* that after hearing Norton's critique, he decided he no longer supported the report.)

Then Norton asked jurors to approve an indictment he had drafted accusing Rockwell of ten violations of federal hazardous waste and clean water laws. Jurors retired to consider it and decided it was woefully inadequate. One juror remembers the vote being almost unanimous. Another says the vote was roughly split among the sixteen members present that day, but still short the twelve needed for approval.

Jurors then filed back into the courtroom to be polled. "It was pretty quiet in there," one recalls. "It got a lot quieter after the vote."

At noon a court staffer took jurors' orders for lunch, something that had never happened before. Jurors were usually sent out on their own during lunch hour. This time Finesilver apparently wanted them to stay put. Jurors say they had long joked about what their "Last Supper" would be like.

"Is this it?" one asked.

"Baby, this is it," one juror replied.

After lunch, they filed back into the courtroom. Judge Finesilver entered, thanked them for their work and asked them whether they wanted to be dismissed. One juror says the vote was 11 to 5 for dismissal. That was short of the minimum 12 votes required, but Finesilver dismissed the panel anyway. Another juror says the vote to disband was nearly unanimous.

One juror swears she saw Norton assistants Fimberg and Murtha shake their heads, as if to signal them to hang in there a while longer. Jurors say they had long considered Fimberg and Murtha potential allies in their fight with Norton. They had hoped to convert them to their side. That never happened, but they suspected that to the end the assistant attorneys were doing what they had been ordered to do, not what they believed was right.

But by March the time for fighting had passed, jurors say. They felt they'd done all they could. They'd completed their job. They wanted to go home. "Everyone was so angry," one recalls. "We were sick of the whole mess."

Two days later Norton held a press conference to announce the settlement with Rockwell. It was identical to the indictment jurors had rejected. Anticipating that rejection, Norton had drafted a statement of charges he wanted Rockwell to plead guilty to. The company executives could have insisted upon an indictment, but they waived their right to one and agreed to plead to the charges.

U.S. Attorney General William Barr proclaimed victory. "By painstakingly developing solid criminal cases such as this...the Department of Justice is making it quite clear that environmental crimes do not pay," he said in a press release issued that day. Barr also praised the work of the grand jury.

Critics quickly attacked the settlement as inadequate. For one thing, the energy department got off scot free. "The lesson is that the government is happy to let the contractor take the fall," commented Melinda Kassen of the Environmental Defense Fund in Boulder.

The *Denver Post* noted the fine amounted to only 3 percent of Rockwell's corporate profits for 1991. It was about $3.8 million less than the bonuses Rockwell had won during the time it was, by its own admission, knowingly breaking federal environmental laws. For Rockwell, crime paid.

Norton said the fine was the maximum allowed by law. Not so. Four of the ten convictions were for violations that continued every day for periods of up to nearly two years. Instead of imposing the $50,000-per-day fine allowed by law for every day of violation, Norton settled for a payment covering a few, randomly selected days of violations. Transcripts indicate that Fimberg acknowledged to jurors that in some cases the days selected were "arbitrary."

Had Norton demanded the fine for every day of violation, the total would have been about $86 million, *Westword's* calculations show— more than four times what Norton settled for.

When *Westword* asked Norton last week about his statement that the fine was the maximum allowable, he didn't explain his reasoning but did reiterate that the fine was the largest ever collected for violations of hazardous waste laws. He also noted that it was larger than the bonuses Rockwell received (unless you count the bonus Rockwell was given for avoiding major mistakes). The fine was large enough, Norton added, to serve as a deterrent to others.

Colorado Governor Roy Romer and Colorado Attorney General Gale Norton were among those supporting the settlement. Romer said he was "pleased" that "an unfortunate" episode was coming to a close, and he called the proposed fine "appropriate."

In court papers filed in support of the settlement, Rockwell claimed vindication. The salacious charges of midnight dumpings had been proved wrong, they noted. Either they blamed the violations they acknowledged on the energy department's refusal to provide more funds for environmental compliance or they noted that department officials knew of and approved their actions.

Prosecutors Hartman, Norton, Fimberg and Murtha filed papers most noteworthy for their pious praise of the grand jury for its "extraordinary attention, patience and vigilance."

Judge Finesilver approved the settlement in June but not before rejecting a request to release any report the jury may have writ-

Continued on page 26

## Rocky Flats
### Continued from page 24

ten. The request came from lawyer Adam Babich, who has represented the Sierra Club on matters involving Rocky Flats. Of course, Babich didn't ask for release of the presentment, the jury's findings of criminal conduct. He didn't know one had been adopted.

Federal statutes do not address whether presentments should be released to the public, but jurors say their impression was that presentments exist precisely to trigger public debate over a prosecutor's decision

not to prosecute. Presentments don't accomplish anything if they're kept secret, jurors say.

There *is* a federal law covering the release of special grand jury reports. It allows judges to release those reports if they find they are supported by a preponderance of the evidence and meet certain other legal requirements. Finesilver has twice been asked to release the report. Twice he has refused.

Most of the Rocky Flats grand jurors believe Finesilver will keep their work secret—forever. "One of the prosecutors

told us when we went our own way that none of what we were doing would ever see the light of day," one says. "They're certainly doing their best to make that come true."

And that leaves some jurors angry. "A lot of people gave of their hearts, their lives and their time, and they were treated rather shabbily by the whole system," one says. "If they had just told us the case was too complex, that they were going to reach an accommodation with the targets and cut their losses...But they didn't. They never clued us in on what was going on."

Others are depressed. "I keep waiting for something to happen," one says. "But nothing's happening. The whole thing was a waste of time. Nothing came of it. I don't think it's asking too much to release our report. We weren't headhunters. We were told to investigate. We investigated...and now no one knows what we found."

Still others take a philosophical approach. "I've mellowed a lot since March," one says. "Everything stays the same. You can't fight the federal government. You have to be God yourself to get past them, and I don't think that's going to happen anytime soon." ☒

---

# Proposed Constitutional Amendments and Laws Referred and Initiated

## LETTER A

I, Natalie Meyer, Secretary of State of the State of Colorado, do hereby give notice that at the General Election to be held on the Third day of November, 1992 there will be submitted to the registered electors of the State of Colorado the question of amending the constitution of said state.

The authority for submitting such question is found in Section One (1) of Article V of the Constitution of the State of Colorado and in Resolution No. 1003 of the fifty-eighth General Assembly, first regular session which is in words and following viz:

**HOUSE CONCURRENT RESOLUTION NO. 91-1003**

SUBMITTING TO THE REGISTERED ELECTORS OF THE STATE OF COLORADO AN AMENDMENT TO ARTICLE II OF THE CONSTITUTION OF THE STATE OF COLORADO, CONCERNING THE RIGHTS OF CRIME VICTIMS.

| AN AMENDMENT TO ARTICLE II OF THE CONSTITUTION OF THE STATE OF COLORADO, CONCERNING THE RIGHTS OF CRIME VICTIMS. | YES |
| | NO |

## LETTER B

I, Natalie Meyer, Secretary of State of the State of Colorado, do hereby give notice that at the General Election to be held on the Third day of November, 1992 there will be submitted to the registered electors of the State of Colorado the question of amending the constitution of said state.

**HOUSE CONCURRENT RESOLUTION NO. 92-1003**

| AN AMENDMENT TO ARTICLES VII, IX, XI, AND XII OF THE CONSTITUTION OF THE STATE OF COLORADO, CONCERNING THE REPEAL OF OBSOLETE CONSTITUTIONAL PROVISIONS. | YES |
| | NO |

## LETTER C

I, Natalie Meyer, Secretary of State of the State of Colorado, do hereby give notice that at the General Election to be held on the Third day of November, 1992 there will be submitted to the registered electors of the State of Colorado the question of amending the constitution of said state.

**SENATE CONCURRENT RESOLUTION 92-3**

| AN AMENDMENT TO SECTION 9 OF ARTICLE XVIII OF THE CONSTITUTION OF THE STATE OF COLORADO, STATING THAT IN ANY CITY, TOWN, OR COUNTY WHICH HAS BEEN GRANTED CONSTITUTIONAL AUTHORITY ON OR AFTER NOVEMBER 3, 1992, FOR LIMITED GAMING WITHIN ITS BOUNDARIES, SUCH LIMITED GAMING SHALL NOT BE LAWFUL UNLESS FIRST APPROVED BY AN AFFIRMATIVE VOTE OF THE ELECTORATE OF SUCH CITY, TOWN, OR UNINCORPORATED PORTION OF A COUNTY, AND ADDING A NEW SECTION 10 TO ARTICLE XVIII TO PROVIDE FOR THE SEVERABILITY OF CONSTITUTIONAL PROVISIONS. | YES |
| | NO |

September 30–October 6, 1992