FD-302 (Rev. 10-6-95)

- 1 -

## FEDERAL BUREAU OF INVESTIGATION

Date of transcription    8/11/97

        Donna Crouch, Secretary, United States Attorney's Office (US Attorney's Office), Byron G. Rogers Federal Office Building, Room 1200, 1961 Stout Street, Denver, Colorado 80294, telephone 303-844-2081 was contacted.  She was apprised as to the identity of the interviewing Agent and the nature of the interview.  She thereafter voluntarily provided the following information.

        Crouch received a telephone call from a female advising that she was Janet Fulke (phonetic) and that Fulke was the sister to Kenneth Peck.  Peck is an attorney who was a member of the Federal Grand Jury hearing evidence on the case involving the Rocky Flats Nuclear Weapons Facility.  Peck had sent Fulke documents he claimed to have been from the Grand Jury investigation.  The documents were on paper and diskette and Peck had requested Fulke to take the documents to the media.

        Fulke previously attempted to contact Mr. Skaggs office and was told to contact the US Attorney's Office.  Crouch believed that Fulke was speaking of Representative David Skaggs, but was not certain.  Fulke had spoken to her attorney who instructed Fulke to contact the US Attorney's Office in Denver, Colorado and to not destroy any of the documents obtained from her brother, Peck.

        Crouch advised Fulke that Fulke should speak to Henry Solano, US Attorney, District of Colorado concerning the documents received from her brother.  Fulke agreed and left telephone number (714)830-4083 where she could be reached for a short period of time and a client's telephone number (714)252-1116 where Fulke could be reached that afternoon.

Investigation on   7/28/1997   at Denver, Colorado

File # 69-DN-54606                   Date dictated  8/11/1997

by  SA Joseph C. Schwecke

This document contains neither recommendations nor conclusions of the FBI.  It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

FD-302 (Rev. 10-6-95)

- 1 -

## FEDERAL BUREAU OF INVESTIGATION

Date of transcription    8/11/97

　　　　Janet Folcke, 21412 Midcrest Drive, Lake Forest, California, telephone 714-830-4083 was contacted. Folcke was apprised as to the identity of the interviewing agent and the nature of the interview. She thereafter voluntarily provided the following information.

　　　　Folcke's brother, Kenneth Peck, is an attorney and was a juror on the Federal Grand Jury investigating wrongdoing at the Rocky Flats Nuclear Weapons (Rocky Flats) facility. Folcke and Peck had been estranged from each other for years when Peck contacted Folcke to advise her that he had documents pertinent to the Rocky Flats case. Peck's contact with Folcke was "out of the blue", and was a request for Folcke to take documents he was sending her to the media, specifically the newspapers. Peck had informed Folcke that the documents were classified. The documents were sent to Folcke from Peck, via the United States Postal Service. Folcke believes that she has the envelope in which the documents were sent to her by Peck.

　　　　Folcke advised that Peck was using the documents as "blackmail" over family matters. Louise Peck, Peck and Folcke's mother, resides at the Heritage House - Sutton Homes Nursing Home, 6610 South Oneida, Denver, Colorado. Louise Peck is suffering from Alzheimer's disease and has annually provided a $10,000 cash gift to both Folcke and Peck. Folcke was initially named the guardian for Louise Peck, but was replaced by her brother when Kenneth Peck destroyed the guardianship papers. Kenneth Peck issues the gift checks each year, but withholds sending the check to Folcke to antagonize Folcke. Kenneth Peck has, according to Folcke, held the fact the she is in the possession of classified documents "over her head" for four or five years. Kenneth Peck filed a restraining order against Folcke at their mother's nursing home and is verbally abusive to Folcke.

　　　　In approximately March, 1997, Folcke mailed some of the classified documents to Kenneth Peck to rid herself of possessing documents that Folcke believed she should not have. Believing that she had sent Kenneth Peck everything in her possession, Folcke discovered a few additional documents Kenneth Peck had previously mailed to her. Folcke contacted her attorney regarding

| Investigation on | 7/28/1997 | at Lake Forest, CA | | (telephonically) |
|---|---|---|---|---|

| File # 66-DN-54606 | Date dictated | 8/11/1997 |
|---|---|---|

by   SA Joseph C. Schwecke

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

FD-302a (Rev. 10-6-95)

66-DN-54606

Continuation of FD-302 of ___ Janet Folcke _____, On 7/28/1997 ___, Page ___ 2 ___

the Rocky Flats documents.  Folcke's attorney advised her to save
the documents and contact the appropriate authorities.
Representative David Skaggs' office was contacted by Folcke
first.  Representative Skaggs office informed Folcke to contact
the US Attorney's Office, District of Colorado regarding the
Rocky Flats documents.

        Folcke believes that she is a law abiding citizen whose
father was a colonel in the military.  She is a florist
consultant and is frequently traveling to clients places of
business.  Folcke agreed to meet with Special Agents of the FBI
to discuss the documents in her possession and release the same
to the FBI.

FD-302 (Rev. 3-10-82)

- 1 -

**FEDERAL BUREAU OF INVESTIGATION**

Date of transcription _____8/8/97_____

             JANET GAIL FOLCKE, 21412 Midcrest Drive, Lake Forest,
California, (714) 830-4083, DOB 03/10/48, was advised of the identity
of the interviewing agent and the purpose of the interview.  She then
provided the following information:

             FOLCKE recalled that since she and her brother, KENNETH
ELDON PECK, were children, PECK was always "very strange."  PECK did
not have a good relationship with her or any family member.   In
particular, PECK had a very poor relationship with their father.
Their father had been in the military, which PECK did not like; then
he retired and went to work for Rocky Flats, which infuriated PECK
even more.   PECK is an attorney with very strong political views.
FOLCKE and her family considered PECK fanatical and an extremist.
When their father worked at Rocky Flats, PECK consistently objected to
the fact he was working in a nuclear plant and said that "Dow Corning
as well as Rockwell were in cahoots with the U.S. Government, and were
all at fault."

             Sometime in 1992, FOLCKE's mother told her that PECK was in
the Denver grand jury panel on a Rocky Flats criminal investigation.
She also told FOLCKE that she was very concerned as she believed PECK
had "wiggled his way into the grand jury" for the purpose of getting
back at their father (who was now deceased).   The mother and FOLCKE
agreed that PECK thought he was going to use his juror leverage, "as a
projectile against their family."

             A few days later, PECK called FOLCKE and also told her about
him being a juror on the grand jury panel investigating Rocky Flats.
He told her he had gone to the media, and that he had a scheme to
unveil Rocky Flats; how he was going to "get away with it all," and
how it was going to "make him a congressman, and so on and so on."

             On or about September 1992, FOLCKE received a package from
PECK with a letter, two computer diskettes and copies of newspaper
articles regarding the Rocky Flats investigation.   FOLCKE read her
brother's letter and articles, but did not review the diskettes, so
she did not know of it's contents.   PECK then called FOLCKE to verify
if she had received his package.  He told her he believed he was "the
next Karen Silkwood" and then asked her to use whatever press or media

| | | | |
|---|---|---|---|
| Investigation on | 8/5/97 | at Lake Forest, Ca. | |

File # 69-DN-54606

by   SA BONI CARR/smw                              Date dictated   8/6/97

This document contains neither recommendations nor conclusions of the FBI.  It is the property of the FBI and is loaned to your agency;
it and its contents are not to be distributed outside your agency.

Case No. 1:96-y-00203-RPM   Document 137-7   filed 06/01/07   USDC Colorado   pg 5 of 83

FD-302a (Rev. 11-15-83)

69-DN-54606

connections  she had to talk to them about "it all."  He also told
her that, it was up to him to get justice done, as the other
grand jury members were either "bimbos" or "a bunch of idiots."
FOLCKE told him she refused to do anything and told him she
thought he was a "nut", and refused to talk to him about it any
longer.  FOLCKE then put the package away at that time and forgot
about it.

On or about January or February of 1993, FOLCKE
received another envelope package from PECK.  It contained copies
of a Plaintiff's sentencing memorandum, though not complete; a
complaint of Rockwell International Corporation, plaintiff, vs.
United States of America, defendant; a notice of appearance; a
letter from the Department of Energy to Rocky Flats dated
12/08/88, with it's enclosed performance evaluation; letter from
the Department of Energy to Rocky Flats dated 09/27/89, with it's
enclosed performance evaluation and a memorandum from the Acting
Assistant Secretary for Defense Programs; letter from the
Department of Energy to Rocky Flats dated 02/23/90, with it's
enclosed performance award; two newspaper clippings dated
02/27/90.

Later, other envelopes with more newspaper clippings
followed, however, FOLCKE simply threw them away.  She figured
the less she knew abut her brother's actions, the better for her.

By 1994, FOLCKE's mother had developed Alzheimer's
Disease and was put in a care facility.  Prior to her developing
her illness, however, her mother set-up a custodial trust
account, naming FOLCKE executor of the trust, whereby, both
FOLCKE and PECK were to get a dispensation of $10,000 each, every
year in April.  PECK immediately overrode their mother's
instructions and through legal manipulations took over the trust
account.  Consequently he was currently the custodian and
executor of the same.  FOLCKE consulted with an attorney to try
and get back her legal rights over the trust account, but was
told it would cost her approximately $50,000 in fees.  FOLCKE did
not have the $50,000, and was simply too scared to fight her
brother, so she decided to let PECK handle their mother's trust
for now.

FOLCKE had not heard from PECK for a few years until
March 1997, just before she was supposed to receive her $10,000
trust dispensation from him.  PECK told her he was not going to
send her her $10,000 check until she sent him back all of the
documents he had mailed her regarding the Rocky Flats grand jury

FD-302a (Rev. 11-15-83)

69-DN-54606

Continuation of FD-302 of ___ JANET  GAIL  FOLCKE _____ , On 8/5/97 _____ , Page ___ 3 ___

investigation.   FOLCKE told him she only had one set of
documents, that she could not find the other set because  she
believed she had thrown them away without realizing it.   PECK
continued by threatening her saying, "You'll never see your
daughter again", and "you'll never walk again" if he did not get
the documents back from her.   FOLCKE then agreed to send him back
the documents she did have.   She then made copies of the
documents to send him, and kept the originals.

Sometime in June 1997, FOLCKE found the other set of
documents and diskettes, which she believed had been lost.   At
that time she called her attorney, PETER CALAHAN, and told him
she had in her possession some classified documents her brother
had sent her, and wanted to know what she should she do.   CALAHAN
advised her she should not continue to keep them, nor should she
throw them away either.   He told her to call Congressman DAVID
SKAGS from Colorado and present the situation to him.

FOLCKE proceeded in calling SKAGS' office and talked to
his administrator DAVID ABELSON.   By his instructions, FOLCKE
flew to Denver, Colorado, and met with ABELSON.   From his office
he directed her to AUSA DONNA CROUCH.   From CROUCH's office, she
and CROUCH held a conference call with someone from the Denver
FBI Office.   Because of time constraints and conflicts, FOLCKE
was not able to meet with someone from the FBI to deliver the
documents she got from PECK and returned to California with them.

FOLCKE had not been in touch with PECK since the March
1997 incident.   She never disclosed or showed the contents of the
documents to anyone except her husband CHARLES FOLCKE, ABELSON,
AUSA CROUCH and the FBI agent in the conference call with CROUCH.
FOLCKE never made copies of the documents except for the time she
sent copies of the second set to her brother in March 1997.
Neither did she keep a copy for herself.

FOLCKE provided to the FBI the two sets of copies of
documents as originally sent to her from PECK.

FOLCKE felt she could not trust PECK at all and
believed he could be dangerous.   However, she would be willing to
testify for the government if requested to do so.




FINGERPRINT
IDENCE

DO NOT
TOUCH

**FIRST CLASS MAIL**

Ms. Janet Folck
1952 Derby Drive
Tustin Hills
Santa Ana, California  92705

The Law Firm of
**KENNETH E. PECK**
THE ARCO TOWER
707 SEVENTEENTH STREET
SUITE 2900
DENVER, COLORADO 80202-3429

KENNETH E. PECK
—————
MICHAEL L. SAMPLE

TELEPHONE
(303) 298-7887
FACSIMILE
(303) 296-9805

September 28, 1992

Dear Janet,

Enclosed are the following:

(a) my installment payment of $700;

(b) two computer discs, which are not secured with passwords; and

(c) a collection of significant recent newspaper articles.

Please do not review the discs unless you receive instruction from me, I am killed or otherwise incapacitated, or I am arrested in connection with this matter. Do not disclose the contents of the discs to any person, except my attorney (Walter Gerash) at 825-5400. If Gerash is dead or otherwise unable to assist you in my absence, please call the foreman of the Grand Jury (Wesley McKinley) at 719-324-9292. In his absence or unavailability, you should contact Macon Cowles, Esq. (444-9343) and advise him that you are my sister and that you have this sensitive material.

In any event in my absence, please attempt to consult with my law clerk (Bette Bushell) at this number or home (422-4906) or car (877-3484) before proceeding. She is aware of your role, but no one else is. To protect your identity in this matter, their will be no record made of this letter in the file or on the computer.

I have been advised by various persons that I face significant risk of bodily harm (if not death) and public smear attacks as a consequence of my role in this matter. For a fuller exposition of this, I suggest that you read the Westword article. Many people have compared this situation to the Karen Silkwood case in Oklahoma. I also face jail and disbarment if I am identified as having shared this information with any person, including you. I am not a source for the newspaper articles, but I anticipate being the primary target of a counterattack in criminal contempt proceedings, as well as disbarment efforts, which I expect the Judge and U.S. Attorney will initiate because they know that I was the key actor in these matters.

The Law Firm of
**KENNETH E. PECK**

September 30, 1992
Page 2

This is perhaps the most significant constitutional crisis in the history of our Country. The Judge, the prosecutor (apparently including high-ranking officials in D.C. and perhaps the White House), and some of the government regulators are engaged in what appears to be a massive cover-up of criminal violations of environmental laws (many of which violations are continuing today despite the FBI raid and the Grand Jury's work), obstruction of justice by the prosecutor, obstruction of justice by the judge, and various other problems too numerous and dangerous to discuss in this correspondence.

Please rent a safe, secure place in which to store the discs. Try to avoid using in direct association with your personal name to make it more difficult to trace the material to its storage location if the FBI interrogates you or attempts to determine if you have any of the material set forth here.

I have stored a large quantity of documents, notes, and extremely sensitive materials in a storage locker in my name at Private Self Storage at 7117 W. 56th Avenue, Arvada (423-2866) in storage locker 103. The access code to enter the premises is #10387*. You will have to cut the lock off of the locker or use a small key that I have placed in my center desk drawer (you can gain access to my office from a spare key that is hidden under the planter outside my office door). Alternatively, you can attempt to get a key number off of the lock at the locker.

I do not intend to be an alarmist by this letter. This is another Watergate situation, which could bring down Bush, if the Justice Department continues to assert executive privilege and if the Grand Jury Report is not released publicly, together with the indictments and presentments (copies of which are enclosed on the discs).

Please do not discuss with anyone (except Charles, if necessary) what you are doing. I regret exposing you to this criminal and physical risk. You are the person that I trusted the most with this sensitive information at this difficult time. Thanks again.

If you want to discuss any of this, please call me and I will call you back on a pay phone. I am assuming that all of my phones are tapped at this moment.

After you have reviewed this letter, please burn it and retain the vital information separately in a secure location. The information in this letter is enough to put both of us in jail, subject us to substantial fines, and result in my disbarment. Burn the letter to assure that it does not get into the wrong hands, even through the trash disposal bin.

With love,

# Juror Says Government Blocked Indictments in Bomb-Plant Case

### By MATTHEW L. WALD

Before the Government accepted a plea agreement with the contractor running an illegally polluted nuclear bomb factory, the grand jury hearing the case so badly wanted to indict the people who ran the plant that it wrote the indictments itself, a member of the jury has said. But the prosecutor blocked the grand jury, the juror said, and ultimately, no individuals were charged.

In a breach of the secrecy that usually surrounds grand jury proceedings, Westword, a weekly newspaper in Denver, yesterday published a long account of the two-and-a-half-year grand jury inquiry that ended in March about allegations against the operator of Rocky Flats, Rockwell International, its executives, and officials of the Department of Energy, which owns the plant. The Denver Post also reported Sunday that the grand jury had prepared its own indictments.

Rockwell, which ran the plant for 15 years, pleaded guilty in March to 10 violations of environmental laws, including five felonies. The company agreed to pay an $18.5 million fine.

No employees of Rockwell or officials of the Energy Department were charged for their roles in the pollution at the plant in the northwestern suburbs of Denver, where for three decades plutonium triggers for thermonuclear bombs were made.

### No Mention of Water

The plea agreement did not include the crimes that the Federal Bureau of Investigation said in court documents that it believed had been committed when it applied for a search warrant in 1989: dumping poisons into public drinking water supplies and running a radioactive waste incinerator that had been ordered shut.

And while prosecutors said the evidence showed that many certifications by plant executives that Rocky Flats complied with environmental laws were false, those individuals were not prosecuted either. In addition, the Government has asserted that there was insufficient evidence to prosecute some claims, but has not explained how this was possible for a manufacturing process in which extensive records were supposed to be kept in each stage. Plutonium, a man-made substance, is closely tracked because it is extremely costly, toxic in very small quantities and prone to explode spontaneously if too much is accidently brought together in one place.

### 'Really Frustrated'

The plant is extensively contaminated with plutonium and toxic wastes and will cost more than $1 billion to clean up.

Prosecutors said when the plea agreement was accepted by a judge in June that fairness prevented them from charging individuals who had simply followed bad public policy.

That argument does not appear to have swayed the members of the grand jury. "Everybody was really frustrated by not being able to get to the Department of Energy," said one member of the grand jury, which was discharged on March 24. The United States Attorney, Ken Norton, and other prosecutors blocked them, said the juror. "They told us all along it wasn't legal," the juror said about the proposed indictments of individuals.

Another juror said yesterday: "I was very unhappy with the way things turned out. We were not inadequate, but what happened was inadequate."

Mr. Norton said yesterday, "It's against the law for me to disclose matters appearing before a grand jury, and I won't violate the law." But he added that criticism of the plea agreement was coming from "people who are fundamentally uninformed, who write for partisan purposes and have their own agenda." He added: "There are a lot of Monday morning quarterbacks out there, and that's all well and good. They're all uninformed or ill-motivated."

But disagreement over the scope of the prosecution apparently began with the grand jury itself, which was empaneled on Aug. 1, 1989, two months after scores of armed F.B.I. agents raided Rocky Flats and carted off truckloads of documents. Among the 23 grand jurors there was a strong consensus for additional indictments, a juror said, adding that the group drafted indictments under the leadership of a Denver lawyer who was a member of the panel. Normally, a prosecutor presents the evidence to a grand jury and submits indictments for its approval.

The only lawyer on the jury, Ken Peck, lives in Arvada, which is adjacent to the plant, and had campaigned in the early 1980's to try to stop the incineration of radioactive waste there. His father worked at Rocky Flats for 10 years. Mr. Peck said yesterday that he could not comment on the proceedings.

The Westword report said Mr. Norton had refused to sign the indictments, which led to an argument over whether a prosecutor could be compelled to do so.

In the end, however, no indictments were issued, and the case ended with the plea bargain. Local and national environmental groups say that the effect was to shield the Department of Energy, which said it was supervising operations at Rocky Flats.

Before the grand jury dissolved it prepared a report of its proceedings, but that has not been released. One Denver newspaper filed a request for the report, but on Friday the Federal district judge who approved the plea agreement, Sherman G. Finesilver, issued a four-page decision refusing to release the report. The judge noted that Federal law provides for the release of such reports only if it concerns organized crime, is supported by a preponderance of the evidence, and is not critical of any identified person.



## Three People Found Dead on Florida Cam

On the campus of Florida International University in Miami, a car containing the bodies of two men and a woman, thought to be stabbed to death, was found with a six-inch noose dangling from the

# After 130-Year Absence.

LOS ANGELES, Sept. 29 (AP) — Comet Swift-Tuttle, which produces Earth's spectacular Perseid meteor shower every August, has been spotted for the first time in 130 years, astronomers said today.

Its reappearance came more than a decade later than expected by many astronomers, including Brian Marsden, director of the Central Bureau for Astronomical Telegrams. But in a 1973 study he also predicted that the comet might reappear late this year if it failed to appear between 1979 and 1983.

Until now, the longest time span after which a comet reappeared as predicted was 76 years for Halley's Comet, Mr. Marsden said from his Cambridge, Mass., agency, which reports new discoveries for the International Astronomical Union.

Even when it sweeps within 110 mil-

lion miles of Earth in N et Swift-Tuttle will be who know where to scopes, binoculars and ked eye, Mr. Marsden visible only through tel erful binoculars agains in northern skies, and w southward next month.

### Appears as a Fu

The comet, named ' tronomers who discove ently of each other i. Lewis Swift, of Mara Horace Tuttle of the Ha tory — was observed a day by Tsuruhiko Kiuc astronomer in Usuda, the comet as a fuzzy b power-by-150-millimete

"These are very b.



# Rocky Mountain News

September 30, 1992   **DENVER, COLORADO**   134th year, No. 161                                    35¢

## WEDNESDAY



Mongolian acrobats reach new heights.

### ENTERTAINMENT
**Mongolia to invade Denver**

More than 40 Mongolian entertainers perform dance, weight-lifting and contortion acts as Ringling Brothers and Barnum & Bailey Circus visits Denver Coliseum beginning Oct. 8. *Page 65*

### YEAR OF THE ARTS
**Kids have run of downtown**

Some events at the Colorado Performing Arts Festival on Saturday and Sunday have been designed especially for children. *Page 24*

### LIFESTYLES
**Tragedies strike close to home**

Three tragedies involving children frighten metro-area parents. They're horrified, yet grateful that their kids weren't the victims. *Page 62*

### FOOD FARE
**Fast food invades downtown**

Visit restaurants during Discover Downtown Denver and you'll find out that takeout food has gone uptown. *Page 1F*

### FINAL MARKETS

| | | | |
|---|---|---|---|
| Dow Jones | -9.46 | NASDAQ | +2.29 |
| AMEX | -1.64 | S&P 500 | -0.03 |
| Gold | +0.65 | Oil | +0.08 |

### INSIDE

| | | | |
|---|---|---|---|
| Break Time | 157 | Movies | 66 |
| Business | 45 | Obituaries | 155 |
| Classified | 92 | People | 162 |
| Comics | 158 | Science | 40 |
| Commentary | 58 | Sports | 74 |
| Dear Abby | 63 | Stocks | 51 |
| Editorials | 59 | Suburbs | 34 |
| Entertainment | 65 | TV listings | 72 |
| Lifestyles | 62 | Weather | 163 |

**Colorado's best-selling newspaper**
365,480 daily   434,177 Sunday

☞ For circulation information, call 892-6397.
☞ For classified information, call 892-7111.
☞ For all other information, call 892-5000.

**News:** 2, 3, 8, 11, 12, 18, 24, 25, 27, 28, 30, 31, 34, 37, 40, 43, 44, 49, 55, 59



**REUSE THE NEWS**
Recycle This Newspaper

# Drilling rush hits Colorado oil fields

State's natural gas producers defy industry slump as tax credits, higher prices bring burst of new exploration, production. **Page 45**



## Lakers regain the Magic

Magic Johnson, who abruptly retired from basketball last fall after contracting the virus that causes AIDS, said Tuesday he will rejoin the Los Angeles Lakers this season. His decision was greeted with joy by fans in Denver. **Pages 18, 74**

*Associated Press*

## Considine narrows the gap in Senate race to 11 points

■ KUSA 9 Voter poll shows Republican gaining ground on Campbell five weeks before election. **Page 7**

■ Now it's Campbell's turn to try to clarify his military background on question about Korea. **Page 7**

**CAMPAIGN '92**

■ Christian Coalition makes presence felt in Colorado politics with strong stands on issues; foes cry foul. **Page 8**

■ President proposes string of Sunday night debates, but Clinton wants to keep original plan. **Page 2**

## Norton barred indictments in Flats case

Special grand jury wanted to charge 3 DOE managers with environmental crimes, but U.S. attorney wouldn't allow it. Judge told jurors to keep mouths shut or face contempt charges. **Page 6**

**Investigators confirm that arson killed firefighter. Page 6**

—Rocky Mountain News   © Wed., Sept. 30, 1992

# Flats indictments quashed, grand jurors say

## U.S. attorney refused to cite Energy officials for environmental crime

By Sue Lindsay
Rocky Mountain News Staff Writer

The special grand jury that investigated the Rocky Flats nuclear weapons plant for 2½ years wanted to indict three Department of Energy officials for environmental crimes but U.S. Attorney Mike Norton refused, the Rocky Mountain News learned.

The grand jury returned indictments against Albert Whiteman, former DOE manager at Rocky Flats, and his supervisors, former DOE regional manager Ray Romatowski and his successor, Bruce Twining, jurors confirmed Tuesday.

The officials were accused of conspiring with plant operators to commit and conceal environmental crimes at the plant in the treatment and disposal of radioactive wastes from 1980 to 1989.





Norton          Finesilver

The 23-member grand jury empaneled in 1989 also wanted to indict Rockwell Corp., its officials and EG&G, jurors said. The companies operated the plant for DOE.

Jurors said they were ordered to keep quiet about their findings or face criminal charges.

Several grand jurors, who were guaranteed anonymity, told the Rocky Mountain News Tuesday that Norton refused to sign the indictments and asked them to return indictments against Rockwell only.

When the jury refused Norton's office dismissed the jury and announced a plea agreement in which Rockwell pleaded guilty to 10 felonies and misdemeanors and

agreed to pay $18.5 million in fines.

Although Norton boasted that the fines were among the largest ever collected, they were almost equal to the amount the government paid Rockwell in bonuses.

After they were stymied in their attempt to return indictments, the jurors gave chief Judge Sherman G. Finesilver similar charges in the form of "presentments" — charges by the grand jury that they thought those presentments would be made public, but they are part of the sealed court record.

"We were told in the judge's instructions that a misunderstanding with the U.S. attorneys, you have this power," one juror said. "But what good is the power if no one knows about it? It's like you have freedom of speech unless we don't like what you're saying."

They also wrote a 75-page report calling for the plant to be permanently closed.

The Feb. 19 report charges that

See ROCKY FLATS on 18

DOE "political appointees continue to direct and endorse the course of conduct at the plant in violation of environmental laws," the report says.

The draft of the report characterized the plant as "an ongoing criminal enterprise" that could survive only with the complicity of government and company officials who "have breached the public's trust by engaging in a campaign of distraction, deception and dishonesty."

On Friday, Finesilver ordered that the grand jury's report remain sealed. He said the report contained allegations not supported by facts, but one juror questioned by the News said Finesilver could know that without spending weeks reviewing the material from the grand jury's 2½-year investigation.

Jurors said Finesilver threatened them with contempt-of-court charges if they discussed the Rocky Flats probe.

Jurors contacted by the News

## Most jurors upset indictments quashed

### ROCKY FLATS from 6

duces nuclear weapons parts.

The News reported five days after the June 6 FBI raid that DOE officials, including Romatowski and Twining, were likely to be indicted. The affidavit on which the search was based stated that DOE officials allowed the plant to become polluted.

But one juror said he was less sure that DOE officials are less certain after the prosecutors "showed us the holes."

The jurors were reviewing evidence gathered by agents of the FBI and Environmental Protection Agency during a July 9, 1989, raid at the nuclear weapons plant.

One juror said "the prosecutors showed us the holes."

In a memo to DOE officials in Washington, Romatowski said DOE should fight all pollution-control efforts.

The plea bargain that ended the grand-jury investigation is under investigation by a House subcommittee.

Finesilver couldn't be reached for comment Tuesday night, and Norton said he couldn't comment on grand-jury matters.

The radioactive waste was produced in the manufacturing of plutonium triggers for nuclear bombs. The plant no longer produces nuclear weapons parts.

Ninety agents carted away truckloads of records in their probe of disposal of hazardous waste.

# Justice Dept. rejected call to indict DOE, Rockwell employees, jurors say

Wednesday, September 30, 1992

**FLATS** from Page 1A

well or Energy Department workers were charged with any crimes.

One juror said Rockwell's penalty was "a slap on the wrist." Another juror said, "We all [Energy Department officials] were at fault as Rockwell." That juror added, "If you're a government official, you can just about do whatever you want to do. Now we see that, and I think we pretty much believe that."

The weapons plant, located between Boulder and Golden on Colorado 93, is heavily contaminated with plutonium and chemical wastes. It's estimated it will cost more than $1 billion to clean up.

U.S. Attorney Mike Norton, who directed the federal probe of Rocky Flats, defended the Justice Department's decision against seeking indictments against individuals.

"We did not believe we had sufficient credible evidence to sustain a prosecution and conviction against any individuals," he said. "That's why we did not indict any individuals.

"We are not in the business of simply indicting people, to raise some political statement."

Norton declined to discuss any specifics of its dealings with the Rocky Flats grand jury, saying he is prohibited by law from doing so.

The Rocky Flats probe began in dramatic fashion in June 1989, when dozens of FBI and Environmental Protection Agency agents raided the plant in search of environmental law-breaking.

There was periodic speculation about allegations and charges as the grand jury investigation dragged on for more than 3½ years. The plea bargain announced by Norton in March was criticized by environmental groups, and a congressional subcommittee began looking into it. Last week, Norton and other Justice Department officials refused to answer some subcommittee questions.

News reports last weekend raised more questions about the grand jury, and detailed revelations about the grand jury recommending criminal prosecution of individual workers were reported yesterday by Westword.

Jurors told The Post yesterday that they had several disputes with prosecutors. At one point, the grand jury was conducting its own investigation of Rocky Flats, without any help from federal prosecutors.

"There were a lot of meetings where we did quite a bit on our own."

Jurors drew up their own report on Rocky Flats and delivered it to Finesilver, chief federal judge in Denver. On Friday, Finesilver said the jury's report contained "serious infirmities" and did not meet the legal standards for release as a public record. "Many of the restraints in the report are not relevant to the issue of federal environmental crimes and were outside the superiors to remain silent on those issues. Last week, Norton also refused to answer many questions

wrote. "In addition, many factual allegations in the report are not supported by a preponderance of the evidence."

No juror willing to speak to The Post yesterday opposed the release of the report.

"Personally, I think the American people should know what's in there," one juror said. "There's a bell of a story here. But it's all under wraps."

Several jurors expressed frustration over the amount of Rockwell's penalty. Rockwell's $18.5 million fine amounted to about 3 percent of the defense contractor's annual corporate profit.

One juror said, "Why put us through all that and then make a deal? It wasn't even a deal at all. It was nothing — a slap on the hand."

Members of Congress, saying they're focusing on prosecutorial judgment during the investigation, also have questioned whether the Rockwell plea bargain was too lenient. The Justice Department's handling of the Rocky Flats probe has come under scrutiny by an investigations subcommittee of the House Science, Space and Technology Committee.

The congressional investigation became confrontational when FBI agent Jon Lipsky refused to answer many of the subcommittee's questions about the Rocky Flats settlement, saying he had been directed by his Justice Department superiors to remain silent on those issues.

from subcommittee members. He was guided in part by new Justice Department direction.

As a result, the subcommittee voted to write President Bush and urge him either to direct the Justice Department to cooperate in the congressional investigation or to personally assert that the information is being withheld from the subcommittee because of executive privilege.

The subcommittee has given the panel Friday and explain the White House response to the subcommittee's request.

Regardless of the White House's

respond to that, said subcommittee legal counsel Edith Holleman.

If the White House does not respond, "there's not a whole lot we can do, frankly," Holleman said.

However, Rep. Howard Wolpe, chairman of the investigations subcommittee, yesterday wrote to White House counsel Boyden Gray inviting him to appear before the panel Friday and explain the White House response to the subcommittee's request.

Foremost is the fact that Congress is tentatively scheduled to adjourn, possibly for the remainder of the session, by as early as the end of this week.

"We're running against the clock," Holleman said.

*Denver Post staff writers Peter G. Chronis and Robert Kowalski contributed to this report.*

---

## Old American Indian Artifacts Wanted.

- Pottery
- Baskets
- Beadwork
- Navajo Rugs and Blankets

Experienced buyer.
Complete confidence assured.

**777-3521**



## FINALLY, A MICRO HEARING SYSTEM AT AN AFFORDABLE PRICE

### 4 DAYS ONLY
**$89.00** up to 40db

- Smallest in the world
- Wear it home today
- 30 Day Trial
- 2 yr. MFRS Warranty

Expires 9-18-92

### FINAL DAYS
THURS. Oct. 1    FRI. Oct. 2

CALL **THE HEARING AID PLACE**
FOR APPT (Only All Make Repair lab in state)

**782-0168** | 50% Off Repairs
Orig. $70.00 - $260.00

DENVER    WHEATRIDGE    WESTMINSTER    ENGLEWOOD

Wednesday, September 30, 1992

THE DENVER

# Schroeder, Skaggs say probe by Congress should proceed

**By Jennifer Gavin**
Denver Post Staff Writer

Two members of Colorado's congressional delegation said yesterday they're troubled by allegations about a federal grand jury probe of the Rocky Flats nuclear weapons plant — and said a congressional probe of the matter may not necessarily go away.

"I spent 45 minutes with the FBI this afternoon — I called them to my office and said, 'What is this nonsense?' " said U.S. Rep. Pat Schroeder, a Denver Democrat.

The FBI told her its key agent in the probe, who has been appearing before a special congressional subcommittee headed by U.S. Rep. Howard Wolpe, D-Mich., is "like a hungry dog before a dog dish, because he's under orders from the Justice Department not to talk about what he recommended to the U.S. attorney," she said.

## Waiver possible

Wolpe's committee may seek a waiver of those gag orders from the president or officials in the administration, Schroeder said. But "my guess is, 'Fat chance.' And I'm sure that's what their guess is, too," Schroeder said.

Members of the grand jury that investigated environmental crimes at Rocky Flats say U.S. Attorney Mike Norton refused to sign an indictment that included charges against individuals as well as

Rockwell International, former operator of the plant. Earlier this year, Norton reached a plea bargain with the corporation under which Rockwell agreed to pay a fine.

The greatest chance of getting at the truth, Schroeder said, may come from continuation of the Wolpe committee's work.

Some parties to the case may be hoping the panel will drop the probe because Wolpe is retiring from Congress, Schroeder said.

But Rep. John Dingell, another Michigan congressman and a close friend of Wolpe's, is likely to seize the initiative, Schroeder said.

"Here's Dingell in the wings, waiting to pick it up. . . . I just don't think they're going to get rid of it as easily as they think," Schroeder said.

"Obviously, when you look at what everyone thought this investigation was about and what it ended up being about, you say, 'Wait a minute. You spend all that time and all that money and this lion roars and we produce a mouse?'

"All those pieces lead to a credible suspicion."

Rep. David Skaggs, a Boulder Democrat, also said the Wolpe panel's work should continue.

While he declined to comment on the allegations that grand jurors wanted to bring indictments

but were thwarted by Norton, Skaggs said he believes there was a pact involving the Justice Department, the Environmental Protection Agency and the Department of Energy.

He believes the agreement "confined and limited the scope of the investigation and any charges that might flow out of it," Skaggs said.

"In particular, I think it is fair to infer that the Department of Energy and its employees were placed off-limits.

## 'Particularly disturbing'

"That is particularly disturbing in view of the fact that most of what Rockwell was charged with doing could only have been done with the knowledge of, and I believe in many cases at the direction of, Department of Energy officials, who were in turn acting with the knowledge of and at least the acquiescence of very high-level officials within the Department of Energy," Skaggs said.

The congressman emphasized, "I am not in a position to prove that this occurred; I have various anecdotal and unconfirmed reasons to draw that inference."

And, Skaggs added, "I don't know, obviously, what the grand jury wanted to do to whom. But it is this area that has been troubling to me."

DENVER

# Westword

September 30–October 6, 1992 FREE

**Backbeat: The dogged determination of Suzi Katz**

Volume 16.    Number 5



**Bill Gallo finds that winning isn't everything at Teikyo University**

**US West dials "D" for discrimination and gets a costly wrong number**



**Snap judgments: Meet the woman who took the mug out of mug shots.
By Karen Bowers**

# THE SECRET STORY OF THE ROCKY FLATS GRAND JURY

BY BRYAN ABAS

# JUSTICE

## Why did U.S. Attorney Michael Norton sabotage the jury he was supposed to help?

*By Bryan Abas*



The reluctant prosecutor: U.S. Attorney Michael Norton

September 30–October 6, 1992

For Michael Norton, the government's criminal case against Rocky Flats was all but wrapped up.

On March 26 the U.S. attorney announced that Rockwell International, the company that operated the nuclear weapons plant for fourteen years, had pled guilty to ten charges of violating federal hazardous waste disposal and clean water laws. Norton was recommending an $18.5 million fine, which Rockwell executives had agreed to pay. In one of the most celebrated criminal cases of environmental misconduct in the country's history, only court approval of the settlement and fine remained.

Those who'd been following recent events at Rocky Flats were stunned. Federal agents had spent more than three years investigating allegations of serious violations at the plant. In June 1989 they'd staged an electrifying predawn raid, hauling away 135 boxes of records. A tantalizing search warrant had detailed dozens of suspected violations and sensational charges of midnight burnings and clandestine dumpings. A grand jury, seated for two and a half years, had heard testimony from 110 witnesses and examined 760 boxes of documents.

So why was Rockwell's fine smaller than the government bonuses it won while operating the plant? Why didn't the grand jury—after all its work—return a single indictment? Why were individual Rockwell employees, and their supervisors at the Department of Energy, not going to be held accountable?

Norton noted the fine would be the largest ever collected by the federal government for violations of hazardous waste disposal laws, but he wouldn't comment on the actions of the grand jury. In accordance with federal law, he said, those were—and would remain—secret.

That was fortunate for Norton. Because what transpired behind the closed doors of the grand jury room sabotaged the will of the grand jury and enabled the Bush administration to do business as usual at Rocky Flats.

*Westword* has learned that the grand jury did, in fact, propose indictments against both Rockwell and energy department employees—and that Norton refused to sign them, rendering them invalid.

The result was an extraordinary behind-the-scenes constitutional confrontation pitting 22 ordinary citizens, determined to do their duty as they saw it, against Colorado's top federal prosecutor and his staff, the U.S. Department of Justice and Colorado's chief federal judge.

In this showdown, the jurors—most of whom had never served on any jury before or

Continued on page 16



DENIED

Westword Page 10

## Rocky Flats
**Continued from page 15**

taken on any public official over so much as a parking ticket—stood their ground:

• When Norton told them he would not draft an indictment naming Rockwell or energy department employees, they drafted one themselves with the help of a lawyer-on the jury and adopted it unanimously.

• When Norton asked them to approve an indictment he supported—which contained the charges Rockwell executives eventually pled guilty to—they refused. His indictment was a whitewash, they said, and they wouldn't be a part of it.

• When Norton discouraged them from drafting a "presentment," a document outlining charges of criminal conduct that doesn't carry the force of law, they drafted one anyway and adopted it unanimously.

• When Norton told them it would be "inappropriate" for them to prepare a report of their investigation, they prepared one anyway and adopted it unanimously.

*Westword* has obtained a copy of a nearly final version of the report written by Special Grand Jury 89-2. In clear, explicit language it details the range of environmental crimes jurors say were committed at Rocky Flats and describes the regulatory mind-set that allowed them to occur. It brands the plant "an ongoing criminal enterprise" allowed to operate only with the complicity of government and corporate employees who "have breached the public's trust by engaging in a campaign of distraction, deception and dishonesty." It calls for the immediate shutdown of the plant.

The grand jurors submitted their 42-page report to U.S. District Judge Sherman Finesilver and expected him to make it pub-

lic. The judge has not released the document, however, despite a federal law that permits him to do so as long as he finds it meets certain legal requirements.

In the meantime, the legal system pressures the jurors to remain silent. On several occasions during the proceedings, Finesilver and Norton reminded jurors that talking about their actions publicly could result in their being held in contempt of court. Finesilver could then jail them. Some jurors say these were professional reminders; others call them threats.

Under federal law, grand jury proceedings are secret to protect those who are investigated but not charged with crimes and to help ensure that those who are charged get a fair trial not tainted by pretrial publicity. In the Rocky Flats case there will be no trial, because Norton refused to sign the grand jurors' charges. The only

goal served now by not discussing the jury's work publicly is political, not judicial: The Bush administration doesn't have to explain why its justice department squelched indictments proposed by members of a duly appointed grand jury.

The actions of a grand jury are so secret even the names of jurors are not a matter of public record. But *Westword* was able to obtain a list identifying the Rocky Flats grand jurors and initiated contact with twenty of them. Ten agreed to discuss their jury work at length providing that *Westword* didn't quote them by name. Most jurors said they still fear the possibility Judge Finesilver will hold them in contempt.

The following account is based on these interviews and a review of grand jury documents obtained by *Westword*, including two preliminary versions of the jury's report, a
**Continued on page 18**

## Duty Bound

Members of the Rocky Flats special grand jury began their work as 23 unrelated individuals. They ended as a family of sorts. One week of every month for two and a half years, the jurors gathered in Denver to undertake a project they couldn't mention a word about to their spouses or closest friends.

For many, jury duty caused problems at work: Employers were irritated that jurors had to spend so much time off the job. Others found that their trips away from home put a big strain on family relationships. Seven of the 23 original jurors were excused from duty for one reason for another, replaced by alternates.

Jurors became emotionally close. They talked about their children. They held Christmas parties. One younger juror says he came to regard an older juror as a surrogate grandfather by the time their work was through.

They struggled with financial problems caused by their jury duty. Jurors were paid $40 a day plus mileage and parking costs. If they lived more than seventy miles from Denver, they received $103 a day as a per diem to cover motel and food expenses. (Most stayed at the Comfort Inn on 17th Street, a few blocks from the courthouse.) But the cost of calling home wasn't covered. Unless the out-of-towners stayed with relatives, they were lucky if they broke even.

But what irritated them more than the low pay was the incredible tedium of their work. There were hours upon hours of boring testimony. Sometimes jurors passed the time by writing notes to each other about the appearance or behavior of witnesses. Jurors talked for days about the man who put eyedrops in his eyes while on the witness stand.

Jury foreman Wes McKinley drove in from Walsh, a small community in the southeast corner of the state. McKinley is a rancher and owns a company that takes tourists on trail rides and covered-wagon excursions.

Like most ranchers, McKinley has a strong skepticism of government. The message on his telephone answering machine assures that if the caller is a bill collector, "prosperity is going to shine my way, and you'll be one of the first to be paid," but adds, "If you're from the IRS, forget it: I no longer exist."

McKinley has a degree in mathematics and was once a high school teacher. Jurors say that experience proved invaluable, because it was McKinley who explained the statistical evidence so everyone could understand it.

Jurors say they respected McKinley's sense of fair play, his tough questioning of witnesses and prosecutors, and his intelligence. "He always gave a lot of thought to things," one juror remarks.

The most controversial juror was Denver lawyer Ken Peck. In the early months, most of his fellow jurors disliked him. He frequently arrived late, and he regularly stretched what were supposed to be five-minute breaks to ten minutes, an annoying practice that became less frequent only after he was scolded by one of the jurors in front of the others.

Peck slept during testimony more often than most jurors. And he was an aggressive—sometimes abrasive—questioner,

particularly of the prosecutors. One juror blames Peck for a lot of the animosity between jurors and Michael Norton. "He had some kind of ax to grind," the juror says.

Peck can be faulted for failing to disclose to Judge Finesilver prior to joining the jury that he had done some work against Rocky Flats. According to the *Boulder Daily Camera*, he had tried to block trial burns at a Rocky Flats incinerator in 1987 and 1988. During questioning of prospective jurors, Finesilver asked if anyone had prejudged any of the allegations that had been made in public against plant operators. Peck didn't respond. In their report and proposed indictment, jurors included sections on the illegal use of one of the incinerators; matters Norton ignored on the settlement he reached with Rockwell.

In response to a question from Finesilver about whether prospective jurors had any personal connections to the

plant, Peck told the judge only that his late father had worked there for about ten years. He said it would not affect his impartiality.

Jurors interviewed by *Westword* said they didn't know that Peck had worked against the incinerator trial burns. They say they wish he had told them, although they also say it wouldn't have made any difference in their deliberations.

All the jurors maintain, however, that Peck offered invaluable service to the jury. As a lawyer his advice was critical in drafting the proposed indictment and report. And they respected his attention to the evidence. "He wasn't just pulling stuff out of the air," one says.

"He knew the ropes," says another. "I couldn't see through the eyes of the prosecutors to see what they were really thinking. Ken could. None of the prosecutors liked him."

Another key juror was Paul Herzfeldt of Greeley, who jurors say was a good questioner, a good thinker and someone who provided a lot of leadership.

All the jurors signed the proposed indictment and the report, but there was dissent throughout the deliberations. One juror says the panel "argued big time." Another says she thinks some jurors were "brainwashed" by McKinley, Peck and Herzfeldt.

"Those three were drawing the whole thing out a lot further than it was worth," this juror says. "They liked to hear themselves talk, and they took everything way too personally. It was like they were playing for TV cameras."

This juror also contends that some sections of the jury's report were "made up." Nevertheless, this juror says she signed the report because, as a whole, it was on target. She also believes the report should be released, and agrees with her fellow jurors that energy department and Rockwell employees should be indicted for what happened at Rocky Flats.

Most of the jurors—even those who still firmly support the jury's proposed indictment and the report—acknowledge having doubts throughout their deliberations about whether they were doing the right thing. As jurors were completing work on their report, one passed a note to foreman McKinley. "I wonder how true and factual this really is," she wrote.

McKinley reassured her. "So true," he wrote back, "it makes my stomach jump."—**Abas**

### WE THE JURY

Like members of all federal grand juries, those on Special Grand Jury 89-2 were selected randomly from voter registration and driver's license records. One seat that became vacant late last year remained unfilled.

Listed in alphabetical order, the Rocky Flats grand jurors were:

Jim Bain of Littleton, swimming coach at the University of Denver.

Gary Boettcher of Colorado Springs, a computer systems analyst with a manufacturing firm.

Debbie Chesonis of Fort Collins, a computer science major at Colorado State University.

Scott Cless of Hayden, a maintenance technician at a property management firm.

Judith Edwards, a secretary at the Lutheran Medical Center in Wheat Ridge.

Tina Hall of Denver, a bartender who joined the jury in 1991 to fill a vacancy.

Paul Herzfeldt of Greeley, who helps manufacture equipment for a nationwide chain of photo developing stores.

Jerry Joyner of Divide, a retired deputy sheriff for El Paso County.

Ernest Konnerup of Morrison, a retired service station operator.

Shirley Kyle of Flagler, who jurors say operated a hairstyling salon.

Howard McCracken of Loveland, a general contractor.

Wesley McKinley of Walsh, a rancher and the jury foreman.

Connie Modecker of Wheat Ridge.

Ken Peck of Arvada, a Denver lawyer.

Audrey Poppe of Fort Collins, who jurors say worked at Foothills Mall.

Lori Riedre of Johnstown, an elementary school teacher.

Jerry Sandoval of Denver, an RTD bus driver.

Tom Stegall of Northglenn, a U.S. Postal Service mailman.

Joyce Smith of La Junta, who has since moved to Idaho.

Jim Vaughn of Fort Collins.

Rebecca Walker of Glade Park.

Carol Widener of Fort Morgan, who jurors say is a hairstylist.

## Rocky Flats
### Continued from page 16

transcript of a presentation to the jury by Norton's assistants, a copy of Judge Finesilver's written directions to the grand jury and grand jury correspondence.

'Judge Finesilver didn't respond to a request for comment for this article. Norton and Ken Fimberg, his chief assistant on the Rocky Flats case, refused to comment on any grand jury matter, noting that the secrecy rules that apply to jurors apply to them as well. Barry Hartman, the former acting assistant attorney general for the justice department's environment and natural resources division, couldn't be reached for comment. Hartman was above Norton in the department's chain of command at the time the Rocky Flats case was settled.

Meanwhile, the Bush administration is stonewalling the congressional subcommittee that's looking into the justice department's handling of the case. Unidentified senior justice department officials have directed Norton, members of his staff and the FBI agents who worked the case to refuse to answer questions about the department's decisions on Rocky Flats. Committee members last week decided to write President Bush to ask him to direct members of his administration to answer their questions.

But to get the right answers, the congressional subcommittee has to ask the right questions. And the committee's lead staffer told *Westword* the committee will not be asking about grand jury matters.

Those are secret, she explained.

Somewhere, Jim Stone is smiling. He was Stone, a Rocky Flats engineer laid off in 1986, who triggered the investigation of criminal violations of environmental laws at the plant. He says he was fired for complaining about unsafe working conditions.

Stone considered federal regulators a part of the problem, so at the suggestion of a friend, he approached the FBI. There his complaint made its way to agent Jon Lipsky, who, as it happened, had training in how to investigate environmental crimes.

Federal and state regulators had known for years about violations of environmental laws at Rocky Flats, but they'd considered the violations civil—not criminal—matters. Sometimes they imposed fines. More often they simply worked with plant managers to try to bring Rocky Flats into compliance.

Lipsky saw the violations differently, in part because Stone showed him an energy department memo indicating that bureaucrats at the highest levels knew they were violating environmental laws. Along with an investigator from the criminal enforcement division of the EPA, Lipsky launched an undercover investigation that culminated in the June 1989 raid. It was the first time one branch of the federal government had conducted a secret probe of suspected environmental crimes committed by another branch.

The scope of the Rocky Flats investigation was staggering. Just sorting through the documents would require extensive resources. Rather than ask grand juries with other items on their agenda to consider the Rocky Flats case, Norton requested that Judge Finesilver impanel a special grand jury. Finesilver agreed to do so, appointing the members of Special Grand Jury 89-2 in August 1989 (see related story page 16).

The trouble between the jurors and the prosecutors began in the fall of 1991. By that time, jurors had heard from most of the witnesses brought in by Norton's assistants, and from the FBI and EPA agents who'd worked the investigation. Jurors were prepared to start sifting through the evidence.

At this point Fimberg, the assistant prosecutor leading the legal work on the government's Rocky Flats team, announced his preliminary opinion that there was sufficient evidence to indict about ten Rockwell employees. But indictments against employees of the Department of Energy, which owns the Rocky Flats plant, weren't called for, he said, because their illegal conduct had been endorsed by the department as a whole. DOE officials had, for example, directed Rockwell to begin using an incinerator in 1988, even though Rockwell didn't have the requisite permit. The energy department "as an institution was so extensively involved in and approved of this practice, that criminal prosecution [of individual employees]...in our view is not appropriate," Fimberg told the jury, according to a transcript.

The grand jurors weren't swayed by Fimberg's argument. In their view, if DOE supervisors had approved the illegal conduct, then they should be indicted, too. Jurors did, in fact, eventually recommend that charges be brought against three supervisors in the energy department's Albuquerque office who had authority over Rocky Flats. "We wanted to indict everyone who committed a crime," one juror says. "We didn't care who they were or how high up the chain of command they were."

What particularly irked jurors was that



**Federal Judge Sherman Finesilver refuses to release the jury's report.**

Rockwell and DOE employees were "indistinguishable co-conspirators" in the criminal acts at the plant, each group protecting the other. As jurors noted in their report, sometimes Rockwell employees would keep evidence of illegal activity from their superiors at DOE. At other times, energy department officials were told of and agreed to tolerate the activity, believing that as federal employees they were immune from criminal charges.

That was another assertion rejected by the grand jurors. "Criminal conduct should never be a part of a government employee's work," they wrote. "If the government's employees do not obey the law, we cease to be one nation under the law."

The disagreement between jurors and prosecutors escalated when Norton entered the picture. Jurors say that during a November 1991 visit, Norton brusquely announced that he had no intention of signing any indictment he hadn't drafted and that he wouldn't draft any indictment naming any energy department or Rockwell employee. A preliminary version of the jury's report says Norton also told jurors it would be "inadvisable" for them to meet again or write a report.

"He wasn't real happy with us," one juror recalls. "He felt we were trying to run the show, and he was telling us we weren't the ones in charge of the investigation."

Jurors say Norton offered no explanation for his position, other than to say, "That's the way it's done."

"He said he'd never heard of it being any other way," one juror recalls. "Well, we hadn't heard of any investigation like this,

either, so it didn't bother us."

Then one day in December, Fimberg announced that the government had concluded presenting evidence to the jury. "The prosecutors just got up and walked out," one juror recalls. "No instructions, no advice, no nothing. I was stunned."

Jurors were unsure how to proceed, or even if they could proceed. Federal prosecutors are supposed to assist and advise grand juries, bring witnesses in to testify, and draft indictments for jurors to consider. But Norton, Fimberg and Peter Murtha, the D.C. lawyer from the justice department's environmental section who was working the Rocky Flats case, stopped attending grand jury sessions. Jurors were on their own.

Abandoned by their advisers, the grand jurors turned to Judge Finesilver for help. They passed a message through court clerk Jim Manspeaker that they wanted to meet with the judge. They also submitted a list of questions—questions that go to the heart of the grand jury system: Could an indictment be issued without the signature of the U.S. attorney? Would it be valid? Could jurors compel the U.S. attorney to sign an indictment they had approved? Could they proceed without the help of the U.S. attorney? Could they issue a report? Would it be made public? Just what is the difference between an indictment and a presentment, a document mentioned in the Fifth Amendment to the U.S. Constitution? Would a presentment be made public?

Jurors have different views on whether Finesilver was helpful. Some say he did everything he could. Others say they suspect he was siding with Norton.

All agree Finesilver didn't say much. He told jurors an indictment had to have the signature of the U.S. attorney to be valid, but beyond that he simply referred jurors to the 21 pages of written instructions he had given them in 1989. Those instructions say that jurors may issue a presentment accusing people of criminal conduct, and they may issue it over the objection of the U.S. attorney. They may also issue a report describing noncriminal misconduct, malfeasance or misfeasance by public employees. "Through this vehicle," Finesilver's instructions say, "the public may be assisted in learning of the facts as they relate to Rocky Flats."

But then, jurors say, Finesilver seemed to discourage them from continuing. He sent jurors a note shortly before Christmas that one juror paraphrases as saying,



# LEARN TO DIVE
# $99 SCUBA CLASSES

For any classes purchase & paid in full in October. Valid for classes between October 1st & December 31st, 1992. Does not include student Kit. Please present ad at time of sign up.

## Underwater Phantaseas

Where you learn does make a difference
160 S. Union Blvd. Lakewood (7 blks. S. of 6th Ave.)
CERTIFIED TRAINING AVAILABLE

PADI
5 STAR
TRAINING
FACILITY

# 988-6725

Sales • Rentals • Repairs • Ocean Resort Trips • Indoor Heated Pool



## Rocky Flats

### Continued from page 18

"Thank you for your work. You can go home now. Have a Merry Christmas."

The jurors decided to hang tough. On December 30 foreman Wesley McKinley sent clerk Manspeaker a request. "In the month of August 1989," McKinley wrote, "Judge Finesilver gave Special Grand Jury 89-2 an obligation. Special Grand Jury 89-2 was instructed to look out for the best interests of the people of Colorado and the national interest. Special Grand Jury 89-2 is very serious about fulfilling this obligation, and fully intends to complete the duty it was given responsibility for.

"In order for Special Grand Jury 89-2 to complete the duty...it is necessary for 89-2 to be in session January 21-24, 1992. So please schedule a session."

The jurors got their wish. During those January meetings they began drafting three documents:

• An indictment charging certain energy department and Rockwell employees with specific crimes. Jurors knew that Norton would have to sign this document in order for it to be valid, but they drafted it anyway in hopes that another prosecutor would be appointed.

• A presentment, with content almost identical to their proposed indictment. Jurors drafted it because they wanted to make a statement about who they thought should have been charged. They hoped Finesilver would eventually release it.

• A report of the noncriminal conduct of Rockwell and DOE employees and state and federal regulators, which jurors felt the public should know about. This report wouldn't name names.

Without any government lawyers or secretaries to help them, jurors were forced to fend for themselves. They relied in part on word processors at juror Ken Peck's downtown Denver office, where they worked into the night. Later they asked clerk Manspeaker for clerical help. An employee of Judge Finesilver's staff was made available to help process the documents.

Jurors completed their indictment, presentment and report in February. Nineteen of them gathered to sign the documents and place them, as well as their notes, in a courthouse vault they'd been directed to use. Jurors weren't allowed to keep copies for themselves.

As they drafted and voted on their list of criminal charges, jurors say, there was remarkably little disagreement. The votes on whom they wanted to indict all passed by wide margins. One juror says there was only one consistent "no" vote.

Jurors wanted charges brought against three energy department employees: Ray Romatowski, until his 1988 retirement manager of the department's Albuquerque field office, which had supervisory authority over Rocky Flats; Bruce Twining, who succeeded Romatowski and still holds the post today; and Albert Whiteman, Rocky Flats area office manager from 1985 to 1989, who today is director of the weapons quality division in the Albuquerque field office.

Westword was unable to learn the specific criminal acts Twining or Romatowski were accused of in the proposed indictment. Jurors wanted to hold them criminally liable for alleged violations of hazardous waste disposal laws at Rocky Flats that they directed, knew about or should have known about, including the use of the incinerator

in Building 771 from 1988 to 1990 without the required permit. The incinerator was in operation until 1990, when a federal judge ruled in a suit brought by the Sierra Club that its use was illegal.

Among the jury charges against Whiteman are that he made a false statement in 1988 when he signed a letter—drafted for him by a Rockwell employee—asserting that no waste had been deposited in any of the evaporation ponds at the plant during the previous twelve months, and that he made a series of false statements in the reports he signed that were the basis for awarding Rockwell bonuses for its management of the plant.

Jurors say they also recommended indictments against five Rockwell employees: Ed Naimon, director of waste operations; William Weston, director of plutonium operations and supervisor of environmental compliance programs; and midlevel plant managers Kirk McKinley, Jack Erford and George Campbell.

According to jurors, Naimon made a false statement in 1988 when he told a state health department inspector that no federally regulated hazardous wastes had been deposited in the plant's evaporation ponds during the previous twelve months. In fact, plant managers had regularly deposited hazardous materials there since 1986, grand jurors charged.

McKinley was alleged to have signed a statement concealing the dumpings and to have drafted the letter DOE plant manager Whiteman signed also lying about the dumpings. Weston and McKinley were charged with allegedly directing the storage of radioactive contaminated wastes at

the plant without obtaining a federal per[mit]

Westword was unable to identify the s[pe]cific charges against Campbell and Erf[ord] but jurors say they wanted to hold th[em] liable for their roles in crimes ju[ro]operating the Building 771 incinerator w[ith]out a permit from 1988 to 1990 and mak[ing] false statements about what was bei[ng] burned.

None of these charges was a part of [the] settlement Norton reached with Rockw[ell.] In a motion filed in support of the sett[le]ment, Norton said no one was indicted [for] the illegal use of the Building 771 incin[era]tor because energy department offici[als] knew of and directed its use. He didn't [ex]why he didn't hold those officials accou[nt]able for their decisions.

### Continued on page 20



Photos by John Mueller

# Thome Scholz AT:

## L'HOMME

**HIGH-FASHION EUROPEAN DESIGNERS**

3rd & St. Paul • Cherry Creek North • Denver, Colorado 80206 • 320-0360  FAX 320-0383

THE DIAMOND LASTS FOREVER... THE BILL SHOULDN'T

Buying a diamond is scary business... our customers tell us horror stories. We know we have the best value...we assure you we have the best prices...we guarantee you won't be ripped off. Ask around...shop around. Then visit us.

Affordable quality from your engagement ring specialists

LAUREN DIAMONDS LTD.
JEWELERS

HOURS:
TUES-FRI 10AM-5PM
SAT 12PM-3PM

410 17TH STREET
SUITE 425
DENVER, CO 80202
623-7977

Futon
FURNITURE STORE

25 Styles of Frames
300 Designer Covers
Many Clearance Items

M-F 11-7, Sat. 10-5, Sun. 12-4
880 S. HAVANA
(2 blocks North of Mississippi)
363-0062

## Rocky Flats

Continued from page 19

In an interview with *Westword* last week, Norton added that there was "a paucity" of evidence about what was burned in the incinerator and that there had been a disagreement among regulators about whether federal hazardous waste disposal laws applied to the incinerator. "We simply didn't think we had a criminal case we could prove beyond a reasonable doubt against anybody at the department or Rockwell," he said.

The jury also proposed to indict EG&G, which took over as plant operator in 1990 after Rockwell was forced out in the wake of the FBI raid. According to jurors, EG&G's crimes included storing, treating and disposing of hazardous wastes without the requisite federal permits and allegedly failing to install and operate a groundwater monitoring system consistent with the requirements of the federal Clean Water Act. Internal memos reveal that DOE supervisors knew as early as 1986 that the monitoring system was illegally deficient. Even though this is one of the plant's most serious problems because of the threat of contamination to drinking water supplies for Broomfield and Westminster, little has been done to improve the system, jurors charged.

Transcripts show that prosecutor Fimberg dismissed the groundwater violations as technical disagreements between experts over matters such as where monitoring equipment should be located.

---

As irritated as they were by Rockwell's conduct, jurors reserved their strongest comments for the noncriminal actions of DOE managers at Rocky Flats and the state and federal regulators whose job was to monitor environmental compliance at the plant. In their report, jurors:

• blame what they call a pattern of "extensive illegal conduct" on DOE administrators' "attitude of indifference toward environmental laws" and on their "conscious and ongoing effort to evade" them. Energy department personnel consistently downplayed the significance of environmental concerns by failing to provide Rockwell with adequate sums to finance improvements or monitoring, jurors charged, and by failing to make Rockwell's bonuses contingent in any significant way in performance on environmental matters.

• accuse Colorado state health department and federal EPA regulators of "lax and ineffective" enforcement. The report cites as typical what happened when state officials learned Rockwell was spraying treated wastewater onto trenches on the east side of the plant without the requisite permit, even though the effluent contained hazardous and radioactive wastes that may have seeped into groundwater. Health officials wrote letters to Rockwell and decided to discuss the matter later. They made no on-site inspections, they took no ground water samples. Jurors say the appropriate response would have included seeking a court order to stop the spraying and filing criminal charges.

• conclude that there has been no significant improvement in the regulation of Rocky Flats since the 1989 FBI raid. Jurors note that the Bush administration continues to oppose legislation giving state regulators the authority to levy fines against energy department contractors, legislation approved earlier this month by a congressional conference committee and now awaiting final action. It continues to negotiate "compliance agreements" with state and EPA regulators that jurors say are designed to thwart any serious enforcement efforts. DOE administrators continue to "direct and endorse this course of illegal activity in violation of applicable environmental laws and in the name of political expediency," jurors charge. As a result, jurors call for the closure of Rocky Flats.

**"WHEN NORTON TOLD US HE WAS ACTING ON HIS OWN, I KNEW THAT WAS A BALD-FACED LIE."**

*Westword* compared the grand jury's accusations with public records on the enforcement of environmental laws at the nuclear weapons plant. This review showed that either the jury accurately described what is happening or that the inconsistencies are inconsequential. For example jurors wrote that EG&G still did not have hazardous waste disposal permits for most of its waste storage, treatment and disposal operations at the time they wrote their report, and did not even have interim approval from regulators for what they were doing. In fact, although the firm doesn't have most of the required permits, most of its operations do have interim approval from regulators. However, that approval was obtained by simply notifying regulators of the hazardous waste activities, many of which are still not in compliance with federal laws.

The jurors take the same view of this failure as the federal agents who launched the original investigation of Rocky Flats: Without permits—mandated by the government to regulate the industry and safeguard the public—laws are being broken and criminal charges should be brought.

EPA and state health regulators have generally taken a different view. They argue that because of a forty-year accumulation of hazardous wastes at the plant, because of the lack of appropriate storage facilities or treatment equipment, and in some cases because of the absence of appropriate storage technology, it will be years before Rocky Flats can treat, store and dispose all of its wastes legally. In the interim, they say, what counts is that progress is being made and that any spills or accidents are addressed appropriately to protect public health. The regulators contend that's just what they've tried to do.

But one consequence of their lenient approach is that violations continue to accumulate. In June, after the grand jury completed its report, state health officials announced they'd cited EG&G for violating hazardous waste disposal laws 56 times in 22 months. They characterized the violations as "serious." Three months later they're still trying to decide what to do about them. State regulators say settlement talks are under way and penalties have been proposed. They won't say whether they've made any referral for criminal action.

Members of the Rocky Flats grand jury also point out that federal law provides the energy department a way to circumvent its troubles. If DOE regulators feel violations can't be corrected without jeopardizing national security, or can't be corrected at all with available technology, they may apply to the president for an exemption. Yet they have never sought one.

Jurors suspect that's for political reasons. It would look bad if President Bush, who's proclaimed himself the "environmental president," gave his energy department the authority to violate hazardous waste laws.

As it is, the Bush administration is under fire for allegedly lax enforcement of environmental laws. Earlier this month a congressional committee issued a report citing twenty instances in which EPA regulators felt they had strong cases for prosecution, only to be thwarted by justice department lawyers. One Democratic congressman concluded that the cases represent "a pattern of disinterest, delay and dismissal."

---

Grand juries, introduced in England centuries ago, were intended in part as a check on prosecutorial power. The idea was to require the king or queen to get the consent of a group of citizens before being able to publicly accuse someone of a crime.

The most common problem with the system in the United States—where aggressive prosecutors act the part of the monarch—is that jurors end up as pawns. What do they know about the law? What evidence do they see except what the prosecutor provides? The joke in legal circles is that a skillful prosecutor can get a grand jury to indict a ham sandwich.

But the Rocky Flats case turned the grand jury/prosecutor relationship on its ear. Here the jury—not the prosecutor—was being aggressive. After 203 years, the U.S. judicial system still isn't sure how to handle that.

When Finesilver and Norton told the jurors that any indictment they approved would be meaningless without Norton's signature, jurors say they spoke as though the law were clear on this point. It isn't. According to Duke University law professor Sara Beale, co-author of the most definitive legal text on the grand jury, the U.S. Supreme Court has never addressed the question. Nor did Beale know of any case on the issue in the 10th circuit, the federal appeals court that covers Colorado.

The federal rules of criminal procedure state that an indictment returned by a grand jury "shall" be signed by a U.S. Attorney. The question is whether that statement means that such a signature is required to make the indictment valid or whether it directs U.S. attorneys to sign any and all indictments issued by a grand jury, even those they disagree with.

Continued on page 22

# Are You Missing One Or More Teeth? Now You Can Have Them Back!

Today, dental implants are tested and reliable tooth replacements. This remarkable procedure is revolutionizing dentistry.

In years past pulling a tooth was the only way to take care of a bad tooth. Even today many teeth cannot be saved due to gum disease. Every time a person has a tooth pulled they lose a little bit of themselves. They feel a little older. In the past dentists could only replace those teeth by hanging false teeth onto other teeth, or even worse with full dentures. People would ask: If we could put a man on the moon can't we find a better way to replace teeth? Dentistry can now answer with a resounding YES!!

Dental implants are the answer. Implants are "bionic" teeth. These small titanium cylinders function as artificial tooth roots and anchor your dentures and bridgework giving you back many of life's simple pleasures. They can eliminate bothersome gaps and troublesome dentures. They can make you feel like a whole person again.

So if you want to restore chewing function and eliminate those loose dentures or bridgework call The BAROTZ Group for an appointment today. You can enjoy the simple pleasures of eating and more importantly, improve the quality of your life by making this important decision now. Mention this ad and receive a $50 credit towards treatment if you call before 10/14/92

WHAT DENTAL IMPLANTS CAN DO FOR YOU:
• Provide a method for anchoring your lower or upper denture.
• Provide a method for replacing your partial or full denture with fixed bridgework.
• Provide a method for replacing a single tooth.
• Improve your quality of life by removing many frustrations associated with using dentures or removable bridgework.
• Improve your chewing function and restore the feeling of natural tooth function.

## THE BAROTZ GROUP
### Quality Dental Care

Preventive Dentistry & Dental Cosmetics
Experts In Bonding, Bleaching, Implants & Braces
216 Sixteenth Street Mall, Suite 860
(On The Mall Near Broadway)

## 595-4994

Charles S. Barotz, D.D.S. & Associates
*Offer good for new patients only. Offer Expires 10/14/92
Coupon only valid with full payment at time of service. Not valid with cleaning only.
*Treatment will be financed over 48 months. Call for details.
State law prohibits using for insurance deductible or co-payments.

## Rocky Flats
### Continued from page 20

The case most similar to the Rocky Flats impasse was considered in 1965 by the federal appeals court that covers Louisiana. Under orders from Attorney General Nicholas Katzenbach, the U.S. attorney for Louisiana had refused to sign an indictment issued by a grand jury. A district court judge ordered the prosecutor to sign and found him in contempt when he refused. The prosecutor and Katzenbach appealed.

The circuit judges split two ways. A majority of four of the seven judges ruled that federal prosecutors cannot be required to prosecute cases they don't believe in. The authority to decide whom to prosecute for violations of federal laws rests entirely with the U.S. attorneys and the attorney general, they held.

In a blistering dissent, three judges argued that the majority had effectively emasculated grand juries. They noted there was no legal authority for the conclusion that the signature requirement is designed to give prosecutors the power to block indictments. It's more likely, the minority argued, that the requirement is there simply to require the U.S. attorney to attest that a grand jury has issued an indictment. "The U.S. attorney cannot, except in an advisory capacity, inquire into the merits of whether indictments should be found and returned," the judges wrote. "...Only the grand jurors themselves have that power. It would be grossly wrong for it to be usurped."

If prosecutors disagree with an indictment, the proper course is to ask a judge to dismiss it, the minority judges argued. One advantage of going that route is that the dismissal occurs in open court, where the actions of both jury and prosecutor can be evaluated publicly. Another is that if the judge determines that the prosecutor's refusal to sign is based on bad faith or irrational action, he can appoint a special prosecutor to take the case. If a prosecutor can keep a proposed grand jury indictment secret by refusing to sign it, there's no way for the public to know if the prosecutor is acting reasonably or if, for example, he's getting a bribe from the would-be defendant.

The option of appointing a special prosecutor is one that Federal District Court Judge John Kane told *Westword* he would consider if he were faced with a grand jury and a U.S. attorney at loggerheads. Kane has been vigilant in defense of grand juries. "The U.S. attorney functions as the agent of the jury, not the master," Kane says. "I don't have the right to substitute my judgment for that of Congress if I disagree with a law, and a U.S. attorney can't substitute his judgment for a grand jury's if he disagrees with what it wants to do, either. If the U.S. attorney won't prosecute an indictment issued by a grand jury, let somebody else do it."

Norton's refusal to sign the Rocky Flats grand jury draft an indictment ran counter to one of the rulings in the Louisiana case. Four of the seven judges held that even if a U.S. attorney disagrees with an indictment a jury wants to issue, he must help the jury draft it. That Norton refused to do.

Norton's behavior so angered members of the Rocky Flats jury that they toyed with the idea of hiring a lawyer to advise them, and to determine whether it was appropriate to have Norton investigated. What

fueled their interest in going after Norton was the widespread belief among jurors that Norton's refusal to indict DOE and Rockwell employees had little to do with justice and everything to do with politics.

"When Norton told us he was acting on his own and that his higher-ups in the justice department had nothing to do with his decision, I knew that was a bald-faced lie," one juror says. "Why would they have changed their minds about indicting individual Rockwell employees if they hadn't all of a sudden gotten orders from above?"

One juror says Fimberg hinted that he and Norton were getting direction from the justice department. "He said several times that he'd just gotten back from D.C. and that there were things going on at the upper levels that he wasn't at liberty to discuss," this juror recalls.

Members of the congressional subcommittee looking into the Rocky Flats case apparently have unearthed evidence the FBI was directed by someone in the justice department to stop investigating energy department and Rockwell employees. News reports indicate that questions about that directive were among those committee members wanted to ask agent Lipsky last week. No other information about the directive was released by the panel.

Some grand jurors are so convinced that politics dictated Norton's actions that they say he should be investigated for obstructing their work. They charge that Norton or members of his staff:
• refused to help jurors draft an indictment they wanted to issue.
• refused to allow jurors to subpoena a witness they wanted to question again.
• directed a witness not to answer questions posed by jurors.
• tried to intimidate jurors by telling them it would be "inadvisable" for them to meet again.
• entered into settlement talks with Rockwell in late 1991 without telling the jurors, prematurely ending their ability to take additional testimony from Rockwell employees and get straight answers.
• made false statements to them, including telling them that it would be improper for them to write a report (federal law explicitly gives them that right, as Finesilver noted in his instructions) and that if they did, it had to be signed by all members (federal law requires only a simple majority).

Some jury members say they suspect Norton also thwarted their work by violating the secrecy of the grand jury. They suspect he disclosed their intentions to higher-ups in the justice department, to find out what his superiors were willing to accept.

They suspect he leaked grand jury information to Rockwell officers and lawyers to induce them to accept the plea bargain he wanted to use to head off the grand jury. These disclosures also undercut their efforts to get testimony, jurors argue.

Members of Congress could call hearings into the matter, subpoena grand jury members to testify and offer them immunity. But they would be motivated to do so only if they had an inkling of what happened behind the closed doors of the jury room. They don't, and because of the grand jury secrecy rules, they're not inclined to ask.

On March 24, 1992, the jurors filed into a second-floor courtroom in the federal building. They weren't sure what was going to
### Continued on page 24



ARE YOU TIRED OF BEING SCREWED?

Finally A Mechanic You Can Trust

**Euromotive**
Complete service for Porsche, Audi,
Volkswagen and other European imports.

4102 E. Virginia Ave.
Denver, CO 80222      **329-9951**



DON'T BE VICTIMIZED

**CAR ALARM SALE!**
$199.00*
Installed
Remote Control Alarm w/ 2 transmitters

Status/Warning
Red Light (LED)      Radar Sensor*

Remote Trunk                    Glass Break Sensor*
Release*                                       Starter Kill

Super Siren
120db

Impact Shock            Flashing Parking
Sensor        Panic    Door Entry    Power Door    Lights*
              Feature  Protection    Lock/Unlock*  *optional

**Associated**    1501 W. Alameda    **722-2191**



**Reserve Your Tickets Today!**

Channel Six Presents

An Evening With — —

James Burke

Creator/Host:
"The Day the Universe
Changed" and "Connections"

**ALL NEW TOPIC**
"1 + 1 = 3"
Summing up the
Information Age

THE JOSEPH & GOULD FAMILY
**PARAMOUNT**
Call 303-534-8336

**SIX**
KRMA-TV·Denver

**TICKET/MASTER**
SOUND WAREHOUSE
BUDGET TAPES & CD's · DISC JOCKEY
CALL-FOR-TIX [303] 290-TIXS

**Paramount Theatre**
Thursday, October 8, 7:00 p.m.
Tickets: $15, $20, $25

Channel Six Members Receive a $5 Discount

## Rocky Flats
**Continued from page 22**

happen. When Norton and his assistants entered, jurors braced for the worst. "It was pretty tense," one recalls.

Norton started by criticizing their report. In some cases, he said, there wasn't enough evidence to support their conclusions; in others, the conclusions drawn were incorrect.

Norton's comments angered many jurors, because he wasn't supposed to have a copy of their report. Jurors had been told to place all copies in their vault and were led to believe that only Finesilver could view them. Foreman McKinley asked Norton how he got a copy. From a grand juror, Norton said. Which one? He wouldn't say.

Jurors say they don't believe him. They suspect the leak came from a member of the court clerk's or Finesilver's staff. Either way, the secrecy of their work had been breached.

It was particularly galling for jurors to have to listen to Norton pick apart their report because he had refused to help them. If it was legally deficient, that was at least partly because they were left to their own devices. McKinley eventually cut Norton off and told him the jury had heard enough of his criticisms. (One juror, however, told *Westword* that after hearing Norton's critique, he decided he no longer supported the report.)

Then Norton asked jurors to approve an indictment he had drafted accusing Rockwell of ten violations of federal hazardous waste and clean water laws. Jurors retired to consider it and decided it was woefully inadequate. One juror remembers the vote being almost unanimous. Another says the vote was roughly split among the sixteen members present that day, but still short the twelve needed for approval.

Jurors then filed back into the courtroom to be polled. "It was pretty quiet in there," one recalls. "It got a lot quieter after the vote."

At noon a court staffer took jurors' orders for lunch, something that had never happened before. Jurors were usually sent out on their own during lunch hour. This time Finesilver apparently wanted them to stay put. Jurors say they had long joked about what their "Last Supper" would be like.

"Is this it?" one asked.

"Baby, this is it," one juror replied.

After lunch, they filed back into the courtroom. Judge Finesilver entered, thanked them for their work and asked them whether they wanted to be dismissed. One juror says the vote was 11 to 5 for dismissal. That was short of the minimum 12 votes required, but Finesilver dismissed the panel anyway. Another juror says the vote to disband was nearly unanimous.

One juror swears he saw Norton assistants Fimberg and Murtha shake their heads, as if to signal them to hang in there a while longer. Jurors say they had long considered Fimberg and Murtha potential allies in their fight with Norton. They had hoped to convert them to their side. That never happened, but they suspected that to the end the assistant attorneys were doing what they had been ordered to do, not what they believed was right.

But by March the time for fighting had passed, jurors say. They felt they'd done all they could. They'd completed their job. They wanted to go home. "Everyone was so angry," one recalls. "We were sick of the whole mess."

Two days later Norton held a press con-

ference to announce the settlement with Rockwell. It was identical to the indictment jurors had rejected. Anticipating that rejection, Norton had drafted a statement of charges he wanted Rockwell to plead guilty to. The company executives could have insisted upon an indictment, but they waived their right to one and agreed to plead to the charges.

U.S. Attorney General William Barr proclaimed victory. "By painstakingly developing solid criminal cases such as this...the Department of Justice is making it quite clear that environmental crimes do not pay," he said in a press release issued that day. Barr also praised the work of the grand jury.

Critics quickly attacked the settlement as inadequate. For one thing, the energy department got off scot free. "The lesson is that the government is happy to let the contractor take the fall," commented Melinda Kassen of the Environmental Defense Fund in Boulder.

The *Denver Post* noted the fine amounted to only 3 percent of Rockwell's corporate profits for 1991. It was about $3.8 million less than the bonuses Rockwell had won during the time it was, by its own admission, knowingly breaking federal environmental laws. For Rockwell, crime paid.

Norton said the fine was the maximum allowed by law. Not so. Four of the ten convictions were for violations that continued every day for periods of up to nearly two years. Instead of imposing the $50,000-per-day fine allowed by law for every day of violation, Norton settled for a payment covering a few, randomly selected days of violations. Transcripts indicate that Fimberg acknowledged to jurors that in some cases the days selected were "arbitrary."

Had Norton demanded the fine for every day of violation, the total would have been about $86 million, *Westword's* calculations show— more than four times what Norton settled for.

When *Westword* asked Norton last week about his statement that the fine was the maximum allowable, he didn't explain his reasoning but did reiterate that the fine was the largest ever collected for violations of hazardous waste laws. He also noted that it was larger than the bonuses Rockwell received (unless you count the bonus Rockwell was given for avoiding major mistakes). The fine was large enough, Norton added, to serve as a deterrent to others.

Colorado Governor Roy Romer and Colorado Attorney General Gale Norton were among those supporting the settlement. Romer said he was "pleased" that "an unfortunate" episode was coming to a close, and he called the proposed fine "appropriate."

In court papers filed in support of the settlement, Rockwell claimed vindication. The salacious charges of midnight dumpings had been proved wrong, they noted. Either they blamed the violations they acknowledged on the energy department's refusal to provide more funds for environmental compliance or they noted that department officials knew of and approved their actions.

Prosecutors Hartman, Norton, Fimberg and Murtha filed papers most noteworthy for their pious praise of the grand jury for its "extraordinary attention, patience and vigilance."

Judge Finesilver approved the settlement in June but not before rejecting a request to release any report the jury may have writ-

Continued on page 26

**Rocky Flats**

**Continued from page 24**

ten. The request came from lawyer Adam Babich, who has represented the Sierra Club on matters involving Rocky Flats. Of course, Babich didn't ask for release of the presentment, the jury's findings of criminal conduct. He didn't know one had been adopted.

Federal statutes do not address whether presentments should be released to the public, but jurors say their impression was that presentments exist precisely to trigger public debate over a prosecutor's decision not to prosecute. Presentments don't accomplish anything if they're kept secret, jurors say.

There *is* a federal law covering the release of special grand jury reports. It allows judges to release those reports if they find they are supported by a preponderance of the evidence and meet certain other legal requirements. Finesilver has twice been asked to release the report. Twice he has refused.

Most of the Rocky Flats grand jurors believe Finesilver will keep their work secret—forever. "One of the prosecutors told us when we went our own way that none of what we were doing would ever see the light of day," one says. "They're certainly doing their best to make that come true."

And that leaves some jurors angry. "A lot of people gave of their hearts, their lives and their time, and they were treated rather shabbily by the whole system," one says. "If they had just told us the case was too complex, that they were going to reach an accommodation with the targets and cut their losses...But they didn't. They never clued us in on what was going on."

Others are depressed. "I keep waiting for something to happen," one says. "But nothing's happening. The whole thing was a waste of time. Nothing came of it. I don't think it's asking too much to release our report. We weren't headhunters. We were told to investigate. We investigated...and now no one knows what we found."

Still others take a philosophical approach. "I've mellowed a lot since March," one says. "Everything stays the same. You can't fight the federal government. You have to be God yourself to get past them, and I don't think that's going to happen anytime soon." ☐

# Proposed Constitutional Amendments and Laws Referred and Initiated

## LETTER A

I, Natalie Meyer, Secretary of State of the State of Colorado, do hereby give notice that at the General Election to be held on the Third day of November, 1992 there will be submitted to the registered electors of the State of Colorado the question of amending the constitution of said state.

The authority for submitting such question is found in Section One (1) of Article V of the Constitution of the State of Colorado and in Resolution No. 1003 of the fifty-eighth General Assembly, first regular session which is in words and following viz:

**HOUSE CONCURRENT RESOLUTION NO. 91-1003**

**SUBMITTING TO THE REGISTERED ELECTORS OF THE STATE OF COLORADO AN AMENDMENT TO ARTICLE II OF THE CONSTITUTION OF THE STATE OF COLORADO, CONCERNING THE RIGHTS OF CRIME VICTIMS.**

**Be It Resolved by the House of Representatives of the Fifty-eighth General Assembly of the State of Colorado, the Senate concurring herein:**

SECTION 1. At the next general election for members of the general assembly, there shall be submitted to the registered electors of the state of Colorado, for their approval or rejection, the following amendment to the constitution of the state of Colorado, to wit:

Article II of the constitution of the state of Colorado is amended BY THE ADDITION OF A NEW SECTION to read:

Section 16a. Rights of crime victims. ANY PERSON WHO IS A VICTIM OF A CRIMINAL ACT, OR SUCH PERSON'S DESIGNEE, LEGAL GUARDIAN, OR SURVIVING IMMEDIATE FAMILY MEMBERS IF SUCH PERSON IS DECEASED, SHALL HAVE THE RIGHT TO BE HEARD WHEN RELEVANT, INFORMED, AND PRESENT AT ALL CRITICAL STAGES OF THE CRIMINAL JUSTICE PROCESS. ALL TERMINOLOGY, INCLUDING THE TERM "CRITICAL STAGES", SHALL BE DEFINED BY THE GENERAL ASSEMBLY.

SECTION 2. Each elector voting at said election and desirous of voting for or against said amendment shall cast a vote as provided by law either "yes" or "no" on the proposition: "An amendment to article II of the constitution of the state of Colorado, concerning the rights of crime victims."

SECTION 3. The votes cast for the adoption or rejection of said amendment shall be canvassed and the result determined in the manner provided by law for the canvassing of votes for representatives in Congress, and if a majority of the electors voting on the question shall have voted "Yes", the said amendment shall become a part of the state constitution.

| "AN AMENDMENT TO ARTICLE II OF THE CONSTITUTION OF THE STATE OF COLORADO, CONCERNING THE RIGHTS OF CRIME VICTIMS." | YES |
| --- | --- |
| | NO |

In Witness Whereof, I have hereunto set my hand and affixed the Great Seal of the State of Colorado, at the City of Denver, Colorado this 14th day of September, 1992.
(SEAL)
Natalie Meyer
Secretary of State

## LETTER B

I, Natalie Meyer, Secretary of State of the State of Colorado, do hereby give notice that at the General Election to be held on the Third day of November, 1992 there will be submitted to the registered electors of the State of Colorado the question of amending the constitution of said state.

The authority for submitting such question is found in Section One (1) of Article V of the Constitution of the State of Colorado and in Resolution No. 1003 of the fifty-eighth General Assembly, second regular session which is in words and following viz:

**HOUSE CONCURRENT RESOLUTION NO. 92-1003**

**SUBMITTING TO THE REGISTERED ELECTORS OF THE STATE OF COLORADO AN AMENDMENT TO ARTICLES VII, IX, XI, AND XII OF THE CONSTITUTION OF THE STATE OF COLORADO, CONCERNING THE REPEAL OF OBSOLETE CONSTITUTIONAL PROVISIONS.**

**Be It Resolved by the House of Representatives of the Fifty-eighth General Assembly of the State of Colorado, the Senate concurring herein:**

SECTION 1. At the next general election for members of the general assembly, there shall be submitted to the registered electors of the state of Colorado, for their approval or rejection, the following amendment to the constitution of the state of Colorado, to wit:

Section 7 of article VII of the constitution of the state of Colorado is amended to read:

Section 7. General election. The general election shall be held on the first Tuesday ~~of October, in the years of our Lord eighteen hundred and seventy six, eighteen hundred and seventy-seven, and eighteen hundred and seventy eight, and annually thereafter on such day as may be prescribed by law.~~

Section 1 of article IX of the constitution of the state of Colorado is amended to read:

Section 1. Supervision of schools - board of education. (1) The general supervision of the public schools of the state shall be vested in a board of education whose powers and duties shall be as now or hereafter prescribed by law. Said board shall consist of a member from each congressional district of the state and, if the total number of such congressional districts ~~be~~ IS an even number, one additional member, and said members shall be elected as hereinafter provided. The members of said board shall be elected by the ~~qualified~~ REGISTERED electors of the state, voting at general elections, in such manner and for such terms as may be by law prescribed; provided, that provisions may be made by law for election of a member from each Congressional district of the state by the electors of such district; and provided, further, that each member from a congressional district of the state shall be a qualified elector of such district. If the total number of congressional districts of the state ~~be~~ IS an even number, the additional member of said board shall be elected from the state at large. The members of said board shall serve without compensation, but THEY shall be reimbursed for any necessary expenses incurred by them in performing their duties as members of said board.

(2) ~~From and after the general election of 1948, the office of superintendent of public instruction shall be known as~~ The office of commissioner of education ~~and from and after the expiration of the two year term of that office next following said general election, such commissioner~~ shall be appointed by ~~said~~ THE board of education and shall not be included in the classified civil service of the state.

(3) The qualifications, tenure, compensation, powers, and duties of said commissioner shall be as prescribed by law, subject to the supervision of said board.

Section 9 of article IX of the constitution of the state of Colorado is amended to read:

Section 9. State board of land commissioners. (1) The state board of land commissioners shall be composed of three (3) persons to be appointed by the governor, with the consent of the senate, who shall have the direction, control, and disposition of the public lands of the state under such regulations as are and may be prescribed by law, one of which persons shall at the time of his appointment be designated as president of the board and ~~whose office shall expire on the second Tuesday of January, 1917;~~ one of which persons shall at the time of his appointment be designated as register of the board, ~~and whose term of office shall expire on the second Tuesday of January, 1915, and~~ The third member of said board shall at the time of his appointment be designated as the engineer of the board and shall always be professionally a civil engineer, who, for at least five (5) years, has been actively engaged in the practice of ~~his profession~~ ~~and whose term of office shall expire on the second Tuesday of January, 1918; and~~ CIVIL ENGINEERING. The successor and successors of the first members of the board shall each be appointed for the terms of six (6) years.

~~On the adoption of this amendment by the electors of this state, it shall not go into full force and effect until the second Tuesday of January, 1911.~~

(2) The members of the board shall each receive a salary of three thousand dollars ~~($3,000)~~ per annum until otherwise provided by law, but the salary of each member of this board is to be paid out of the income of the said state board of land commissioners.

Section 3 of article XI of the constitution of the state of Colorado is amended to read:

Section 3. Public debt of state - limitations. The state shall not contract any debt by loan in any form, except to provide for casual deficiencies of revenue, erect public buildings for the use of the state, suppress insurrection, defend the state, or, in time of war, assist in defending the United States, and the amount of debt contracted in any one year to provide for deficiencies of revenue shall not exceed one-fourth of a mill on each dollar of valuation of taxable property within the state, and the aggregate amount of such debt shall not at any time exceed three-fourths of a mill on each dollar of said valuation, until the valuation shall equal one hundred millions of dollars, and thereafter such debt shall not exceed one hundred thousand dollars; and the debt incurred in any one year for erection of public buildings shall not exceed one-half mill on each dollar of said valuation; and the aggregate amount of such debt shall never at any time exceed the sum of fifty thousand dollars (except as provided in section five 5 of this article), and in all cases the valuation in this section mentioned shall be that of the assessment last preceding the creation of said debt.

~~Provided, that in addition to the amount of debt that may be incurred as above, the state may contract a debt by loan for the purpose of paying the principal and accrued interest of all the outstanding warrants issued by this state during and for the years 1887, 1888, 1889, 1892, 1893, 1894 and 1897, said debt to be evidenced by registered coupon interest bearing funding bonds to an amount not exceeding $2,115,000.00, or so much thereof as may be necessary to pay said warrants and interest thereon;~~

~~Said funding bonds shall be dated December 1, 1910, shall be payable at the option of the state of Colorado at any time after ten years from their date; shall be absolutely due and payable fifty (50) years after their date, and shall be of the denomination of one hundred dollars ($100.00) each, or any multiple thereof. The interest on said bonds shall be payable semi annually at the rate of three percent per annum at the office of the state treasurer, or at some place in the city of New York, U.S.A., and the principal of said bonds shall be payable at the office of the state treasurer.~~

~~No such bonds shall be issued except at par and accrued interest, and upon the contemporaneous surrender and cancellation of a like amount of principal and interest of said warrants.~~

~~Said bonds to an amount equalling the principal of said warrants now held by the public school fund shall be registered by the state auditor and state treasurer in the name and for the benefit of and payable only to the said fund, and shall not be transferable.~~

~~And all such bonds to an amount equalling the interest on said warrants now held in the school fund shall be sold by the state treasurer at not less than par and accrued interest, and the proceeds thereof paid into the school fund and distributed to the several counties and school districts of the state for school purposes, in the proportions and in the manner required by law.~~

~~And provided further, that, in addition to the amount of debt that may be incurred as above, the state may contract a debt by loan for the purpose of creating a fund to be expended as provided by law by the state highway commission for the construction and improvement of public highways in the state of Colorado, said debt to be evidenced by registered coupon interest bearing bonds to an amount not exceeding five million dollars.~~

~~Said bonds, to an extent not exceeding two million dollars, shall be dated June first, 1921; not exceeding three million dollars, dated June first, 1922; and said bonds shall be payable at the option of the state of Colorado at any time after ten years from their respective dates, and shall be of the denomination of fifty dollars ($50.00) each or any multiple thereof. The interest on said bonds shall be payable semi-annually at the rate of five percent (5%) per annum, at the office of the state treasurer, or at some place in the city of New York, U.S.A., and the principal of said bonds shall be payable at the office of the state treasurer.~~

~~No such bonds shall be issued except at par and accrued interest.~~

~~Fifty percent of the proceeds from the sales of said bonds shall be divided among the various counties of the state according to the mileage of state routes and state highways within said counties, and the remaining fifty percent of the proceeds from the sale of said bonds shall be used by the state highway commission only to meet and accept federal aid awarded to the state of Colorado by United States congressional acts.~~

~~And provided further, that, in addition to the amount of debt that may be incurred as above, the state may contract a debt by loan for the purpose of creating a fund to be expended as provided by law, by the state highway department, for the construction and improvement of public highways in the state of Colorado, said debt to be evidenced by registered coupon interest bearing bonds to an amount not exceeding six million dollars.~~

~~Said bonds to an extent not exceeding one million five hundred thousand dollars, shall be dated June first, 1923; not exceeding one million five hundred thousand dollars shall be dated June first, 1924; not exceeding one million five hundred thousand dollars shall be dated June first, 1925; not exceeding one million five hundred thousand dollars shall be dated June first, 1926; said bonds shall be issued payable serially. The last maturing series of each issue shall be absolutely due and payable not exceeding twenty (20) years from and after the date thereof, and shall be of the denomination of one hundred dollars ($100.00) each, or any multiple thereof. The interest on said bonds shall be payable semi annually, at the rate of five percent (5%) per annum, at the office of the state treasurer, or at some place in the city of New York, U.S.A., and the principal of said bonds shall be payable at the office of the state treasurer.~~

~~No such bonds shall be issued except at par and accrued interest.~~

~~The moneys, or so much thereof as shall be necessary, payable to the credit and account of the state highway fund from the proceeds of motor vehicle registration license fees, under chapter one hundred sixty one (161) of the Session Laws of Colorado of the year 1919, and all acts amendatory or in substitution thereof, shall be applied to the payment of interest and principal of the bonds of the six million dollar authorized issue herein; but the revenues provided by said chapter to be credited to the account of the state highway fund shall never be diminished until all bonds issued by virtue of this amendment shall have been paid off and redeemed; nothing herein however shall be construed to prevent the enactment of laws whereby the amount of revenue derivable from motor vehicle registration license fees and payable into the said fund shall be increased.~~

~~The general assembly shall, as by law provided, enact all such laws as may be necessary with reference to said bonds and with reference to carrying out the projects and purposes herein specified.~~

Section 15 (1) (d) of article XII of the constitution of the state of Colorado is amended to read:

Section 15. Veterans' preference. (1) (d) Five points shall be added to the passing grade of any candidate of each such examination, except any promotional examination, who is the ~~unremarried widow~~ SURVIVING SPOUSE of any person who was or would have been entitled to additional points under paragraph (b) or (c) of this subsection (1) or of any person who died during such service or as a result of service-connected cause while on active duty in any such branch, other than for training purposes.

SECTION 2. Each elector voting at said election and desirous of voting for or against said amendment shall cast a vote as provided by law either "Yes" or "No" on the proposition: "An amendment to articles VII, IX, XI, and XII of the constitution of the state of Colorado, concerning the repeal of obsolete constitutional provisions."

SECTION 3. The votes cast for the adoption or rejection of said amendment shall be canvassed and the result determined in the manner provided by law for the canvassing of votes for representatives in Congress, and if a majority of the electors voting on the question shall have voted "Yes", the said amendment shall become a part of the state constitution.

| "AN AMENDMENT TO ARTICLES VII, IX, XI, AND XII OF THE CONSTITUTION OF THE STATE OF COLORADO, CONCERNING THE REPEAL OF OBSOLETE CONSTITUTIONAL PROVISIONS." | YES |
| --- | --- |
| | NO |

In Witness Whereof, I have hereunto set my hand and affixed the Great Seal of the State of Colorado, at the City of Denver, Colorado this 14th day of September, 1992.
(SEAL)
Natalie Meyer
Secretary of State

## LETTER C

I, Natalie Meyer, Secretary of State of the State of Colorado, do hereby give notice that at the General Election to be held on the Third day of November, 1992 there will be submitted to the registered electors of the State of Colorado the question of amending the constitution of said state.

The authority for submitting such question is found in Section One (1) of Article V of the Constitution of the State of Colorado and in Senate Concurrent Resolution No. 92-3 of the fifty-eighth General Assembly, second regular session which is in words and following viz:

SENATE CONCURRENT RESOLUTION 92-3.

SUBMITTING TO THE REGISTERED ELECTORS OF THE STATE OF COLORADO AN AMENDMENT TO SECTION 9 OF ARTICLE XVIII OF THE CONSTITUTION OF THE STATE OF COLORADO, STATING THAT IN ANY CITY, TOWN, OR COUNTY WHICH HAS BEEN GRANTED CONSTITUTIONAL AUTHORITY ON OR AFTER NOVEMBER 3, 1992, FOR LIMITED GAMING WITHIN ITS BOUNDARIES, SUCH LIMITED GAMING SHALL NOT BE LAWFUL UNLESS FIRST APPROVED BY AN AFFIRMATIVE VOTE OF THE ELECTORATE OF SUCH CITY, TOWN, OR UNINCORPORATED PORTION OF A COUNTY, AND ADDING A NEW SECTION 10 TO ARTICLE XVIII TO PROVIDE FOR THE SEVERABILITY OF CONSTITUTIONAL PROVISIONS.

Be It Resolved by the Senate of the Fifty-eighth General Assembly of the State of Colorado, the House of Representatives concurring herein:

SECTION 1. At the next general election for members of the general assembly, there shall be submitted to the registered electors of the state of Colorado, for their approval or rejection, the following amendment to the constitution of the state of Colorado, to wit.

Section 9 of article XVIII of the constitution of the state of Colorado is amended BY THE ADDITION OF A NEW SUBSECTION to read:

Section 9. Limited gaming permitted. (6) Local vote on legality of limited gaming - election required. (a) EXCEPT AS PROVIDED IN PARAGRAPH (e) OF THIS SUBSECTION (6), LIMITED GAMING SHALL NOT BE LAWFUL WITHIN ANY CITY, TOWN, OR UNINCORPORATED PORTION OF A COUNTY WHICH HAS BEEN GRANTED CONSTITUTIONAL AUTHORITY FOR LIMITED GAMING WITHIN ITS BOUNDARIES UNLESS FIRST APPROVED BY AN AFFIRMATIVE VOTE OF A MAJORITY OF THE ELECTORS OF SUCH CITY, TOWN, OR COUNTY VOTING THEREON. THE QUESTION SHALL FIRST BE SUBMITTED TO THE ELECTORS AT A GENERAL, REGULAR, OR SPECIAL ELECTION HELD WITHIN THIRTEEN MONTHS AFTER THE EFFECTIVE DATE OF THE AMENDMENT WHICH FIRST ADDS SUCH CITY, COUNTY, OR TOWN TO THOSE AUTHORIZED FOR LIMITED GAMING PURSUANT TO THIS CONSTITUTION AND SAID ELECTION SHALL BE CONDUCTED PURSUANT TO APPLICABLE STATE OR LOCAL GOVERNMENT ELECTION LAWS.

(b) IF APPROVAL OF LIMITED GAMING IS NOT OBTAINED WHEN THE QUESTION IS FIRST SUBMITTED TO THE ELECTORS, THE QUESTION MAY BE SUBMITTED AT SUBSEQUENT ELECTIONS HELD IN ACCORDANCE WITH PARAGRAPH (d) OF THIS SUBSECTION (6), EXCEPT THAT, ONCE APPROVAL IS OBTAINED, LIMITED GAMING SHALL THEREAFTER BE LAWFUL WITHIN THE SAID CITY, TOWN, OR UNINCORPORATED PORTION OF A COUNTY SO LONG AS THE CITY, TOWN, OR COUNTY REMAINS AMONG THOSE WITH CONSTITUTIONAL AUTHORITY FOR LIMITED GAMING WITHIN THEIR BOUNDARIES.

(c) NOTHING CONTAINED IN THIS SUBSECTION (6) SHALL BE CONSTRUED TO LIMIT THE ABILITY OF A CITY, TOWN, OR COUNTY TO REGULATE THE CONDUCT OF LIMITED GAMING AS OTHERWISE AUTHORIZED BY STATUTE OR BY THIS CONSTITUTION.

(d) (I) THE QUESTION SUBMITTED TO THE ELECTORS AT ANY ELECTION HELD PURSUANT TO THIS SUBSECTION (6) SHALL BE PHRASED IN SUBSTANTIALLY THE FOLLOWING FORM: "SHALL LIMITED GAMING BE LAWFUL WITHIN _____?"

(II) THE FAILURE TO ACQUIRE APPROVAL OF LIMITED GAMING IN THE UNINCORPORATED PORTION OF A COUNTY SHALL NOT PREVENT LAWFUL LIMITED GAMING WITHIN A CITY OR TOWN LOCATED IN SUCH COUNTY WHERE SUCH APPROVAL IS ACQUIRED IN A CITY OR TOWN ELECTION, AND FAILURE TO ACQUIRE SUCH APPROVAL IN A CITY OR TOWN ELECTION SHALL NOT PREVENT LAWFUL LIMITED GAMING WITHIN THE UNINCORPORATED AREA OF THE COUNTY IN WHICH SUCH CITY OR TOWN IS LOCATED WHERE SUCH APPROVAL IS ACQUIRED IN AN ELECTION IN THE UNINCORPORATED AREA OF A COUNTY.

(III) IF APPROVAL OF LIMITED GAMING IS NOT ACQUIRED WHEN THE QUESTION IS FIRST SUBMITTED IN ACCORDANCE WITH THIS SUBSECTION (6), THE QUESTION MAY BE SUBMITTED AT SUBSEQUENT ELECTIONS SO LONG AS AT LEAST FOUR YEARS HAVE ELAPSED SINCE ANY PREVIOUS ELECTION AT WHICH THE QUESTION WAS SUBMITTED.

(e) NOTHING CONTAINED IN THIS SUBSECTION (6) SHALL BE CONSTRUED TO AFFECT THE AUTHORITY GRANTED UPON THE INITIAL ADOPTION OF THIS SECTION AT THE 1990 GENERAL ELECTION, OR THE CONDUCT AND REGULATION OF GAMING ON INDIAN RESERVATIONS PURSUANT TO FEDERAL LAW.

(f) FOR PURPOSES OF THIS SUBSECTION (6), A "CITY, TOWN, OR COUNTY" INCLUDES ALL LAND AND BUILDINGS LOCATED WITHIN, OR OWNED AND CONTROLLED BY, SUCH CITY, TOWN, OR COUNTY OR ANY POLITICAL SUBDIVISION THEREOF. "CITY, TOWN, OR COUNTY" ALSO INCLUDES THE CITY AND COUNTY OF DENVER.

ARTICLE XVIII of the constitution of the state of Colorado is amended BY THE ADDITION OF A NEW SECTION to read:

SECTION 10. Severability of constitutional provisions. IF ANY PROVISION OF ANY SECTION OF ANY ARTICLE IN THIS CONSTITUTION IS FOUND BY A COURT OF COMPETENT JURISDICTION TO BE UNCONSTITUTIONAL, THE REMAINING PROVISIONS ARE VALID UNLESS THE COURT HOLDS THAT THE VALID PROVISIONS ARE SO ESSENTIALLY AND INSEPARABLY CONNECTED WITH, AND SO DEPENDENT UPON, THE VOID PROVISION THAT IT CANNOT BE PRESUMED THE ENACTMENT OF THE VALID PROVISIONS WOULD HAVE OCCURRED WITHOUT THE VOID ONE; OR UNLESS THE COURT DETERMINES THAT THE VALID PROVISIONS, STANDING ALONE, ARE INCOMPLETE AND NOT CAPABLE OF BEING EXECUTED.

SECTION 2. Each elector voting at said election and desirous of voting for or against said amendment shall cast a vote as provided by law either "Yes" or "No" on the proposition: "An amendment to section 9 of article XVIII of the constitution of the state of Colorado, stating that in any city, town, or county which has been granted constitutional authority on or after November 3, 1992, for limited gaming within its boundaries, such limited gaming shall not be lawful unless first approved by an affirmative vote of the electorate of such city, town, or unincorporated portion of a county, and adding a new section 10 to article XVIII to provide for the severability of constitutional provisions."

SECTION 3. The votes cast for the adoption or rejection of said amendment shall be canvassed and the result determined in the manner provided by law for the canvassing of votes for representatives in Congress, and if a majority of the electors voting on the question shall have voted "Yes", the said amendment shall become a part of the state constitution.

| "AN AMENDMENT TO SECTION 9 OF ARTICLE XVIII OF THE CONSTITUTION OF THE STATE OF COLORADO, STATING THAT IN ANY CITY, TOWN, OR COUNTY WHICH HAS BEEN GRANTED CONSTITUTIONAL AUTHORITY ON OR AFTER NOVEMBER 3, 1992, FOR LIMITED GAMING WITHIN ITS BOUNDARIES, SUCH LIMITED GAMING SHALL NOT BE LAWFUL UNLESS FIRST APPROVED BY AN AFFIRMATIVE VOTE OF THE ELECTORATE OF SUCH CITY, TOWN, OR UNINCORPORATED PORTION OF A COUNTY, AND ADDING A NEW SECTION 10 TO ARTICLE XVIII TO PROVIDE FOR THE SEVERABILITY OF CONSTITUTIONAL PROVISIONS." | YES |
| --- | --- |
| | NO |

In Witness Whereof, I have hereunto set my hand and affixed the Great Seal of the State of Colorado, at the City of Denver, Colorado this 14th day of September, 1992.
(SEAL)
Natalie Meyer
Secretary of State



# Rocky Mountain News

September 26, 1992    **DENVER, COLORADO**    134th year, No. 157

## SATURDAY

**SPORTS**

**Hawkeyes come to Boulder**

The undefeated Colorado Buffaloes face the challenge of the Iowa Hawkeyes at 1:30 p.m. today in sold-out Folsom Field. The game will be shown on KUSA-Channel 9 and broadcast on KOA (850-AM). *Page 79*

**Connors beats Navratilova**

Jimmy Connors beats Martina Navratilova 7-5, 6-2 in workmanlike fashion as Martina's serve deserts her before a sellout crowd of 13,832 outdoors at Caesar's Palace in Las Vegas. *Page 80*

**Reeves reverses field**

Contradicting statements he made on Thursday, Dan Reeves says the Denver Broncos are exploring the possibility of signing free agents Keith Jackson and Webster Slaughter. *Page 79*

**BUSINESS**

**Women seek to influence media**

The International Women's Forum leadership conference opened in Denver Friday with a call for women to assume positions of influence in the media to keep their stories on the front pages. *Page 58*

**AUTO**

**The Corolla grows a notch**



Liftout follows page 54

Toyota redesigns the popular Corolla in 1993, boosting it from a subcompact to a compact, giving it the sculpted looks of the flagship Camry and raising the price in the process. It's a smoother, quieter car. *Page 1A*

**FINAL MARKETS**

| | | | |
|---|---|---|---|
| Dow Jones | -37.55 | NASDAQ | -8.73 |
| AMEX | -2.45 | S&P 500 | -4.12 |
| Gold | +0.20 | Oil | -0.11 |

### INSIDE

| | | | |
|---|---|---|---|
| Business | 55 | Movies | 69 |
| Classified | 3A | Obituaries | 99 |
| Comics | 102 | People | 106 |
| Dear Abby | 73 | Religion | 99 |
| Editorials | 67 | Sports | 79 |
| Entertainment | 68 | Stocks | 59 |
| Garden | 77 | TV listings | 76 |
| Lifestyles | 68 | Weather | 107 |

**Colorado's best-selling newspaper**
365,480 daily   434,177 Sunday

For circulation information, call 892-6397

For classified information, call 892-7111

For all other information, call 892-5000

Keno: 1, 2, 5, 6, 14, 20, 26, 29, 32, 34, 35, 41, 44, 47, 48, 49, 50, 55, 56, 58



REUSE THE NEWS
This Newspaper Uses Recycled Newsprint

# Scathing report on Flats squelched

Judge won't release grand jury report alleging crimes at weapons plant. **Page**

## Boy gets 'divorce' from his parents



Gregory Kingsley, 12, smiles as he testifies Friday afternoon in Orlando, Fla. The youngster was all smiles later, too, when a judge granted him a "divorce" from his biological parents so he could be adopted by his foster parents. **Page 2**

### Jewelers in fear after string of heists in state

FBI tracks band of patient robbers who watch, wait for opportunity; diamond dealers carrying guns after latest smash-grab theft at Neiman Marcus. **Page 6**

### Home sales in Denver set another record

Falling mortgage rates, an improving economy and affordable prices are driving the market in the best September ever, real estate sources say. **Page 55**

### Aztec empire rises again as show opens



AZTEC DENVER

300 artifacts from ancient civilization go on display in Denver today. **Page 7**

## U.S. to turn polluted arsenal into wildlife refuge. Page 7

# Judge won't release Rocky Flats report

## Sources say document alleges criminal acts by officials at the plant

**By Sue Lindsay**
*Rocky Mountain News Staff Writer*

The chief judge of the U.S. District Court in Denver on Friday refused to release a grand jury report that reportedly alleges criminal acts by federal officials involved with managing the Rocky Flats nuclear weapons plant.

Judge Sherman Finesilver's action comes days after Colorado U.S. Attorney Mike Norton's refusal to testify about the Rocky Flats case before a subcommittee of the U.S. House of Representatives.

The grand jury was empaneled

in 1989 to review evidence gathered by FBI agents and the Environmental Protection Agency during a raid of the nuclear weapons plant that July.

Ninety agents carted away truckloads of records in their probe of suspected illegal disposal of hazardous waste. The radioactive waste was produced in the manufacturing of plutonium triggers for nuclear bombs. The plant no longer produces nuclear weapons parts.

Sources close to the investigation say the grand jury wanted to indict officials in the U.S. Department of Energy, which oversaw operation of Rocky Flats by Rockwell Inc. Norton's office refused, sources say.

The grand jury then wrote a report accusing the Department of Energy of conspiring with Rock-

---

**SILENT FIGHT**
■ Justice Department won't talk to House on probe/25

---

well to commit and hide a number of environmental crimes, sources claiming immunity.

Although the grand jury investigation is over, the judge is still holding jurors to their oath of secrecy. Jurors contacted by the *Rocky Mountain News* said they wanted to talk about the investigation but feared being cited for contempt of court. Some jurors who want to speak out are hiring lawyers to represent them.

The relationship between grand jurors and prosecutors deteriorated as the investigation continued, sources said. At one point, jurors held a sit-in to protest handling of the case. At another, a prosecutor became so frustrated that he

said. Until Friday, court and government officials had refused to acknowledge that such a report existed.

Sources told the *Rocky Mountain News* the report details how federal officials and the operators of Rocky Flats conspired to violate environmental laws in the storage and treatment of radioactive and other hazardous wastes.

A three-year investigation by the 23-member grand jury ended when the government announced a plea bargain last June in which Rockwell agreed to pay $18.5 million in fines for environmental

crimes.

That plea bargain was the subject of hearings this week by an investigative subcommittee of Congress. Norton and FBI agents refused to answer questions, claiming immunity.

slammed down his books and stormed out of the grand jury room.

"The grand jury literally functioned the way it was supposed to and then was told, 'You weren't supposed to do that,' " one juror said.

Special grand juries can issue reports on their investigations, but their public release is up to the judge.

"The court is not satisfied that the report of the Rocky Flats special grand jury meets the statutory standard for release to public record," Finesilver wrote Friday in a four-page order sealing the report.

The judge's order came in response to a request by the *Rocky Mountain News* to see the grand

See FLATS on 25

Sat., Sept. 26, 1992    Rocky Mountain News

# Justice hinders House review of Flats probe

By John Brinkley

*News Washington Bureau*

WASHINGTON — A House subcommittee that has been examining the Justice Department's investigation of environmental crimes at the Rocky Flats nuclear weapons plant has asked President Bush to intervene on its behalf.

In a Sept. 24 letter, subcommittee Chairman Howard Wolpe, D-Mich., asked Bush to rule on the Justice Department's contention that it was protected from having to answer the subcommittee's questions.

The Investigations and Oversight Subcommittee of the House Science, Space and Technology Committee last month subpoenaed Denver-based U.S. Attorney Mike Norton and several FBI agents to compel them to answer questions about the Rocky Flats investigation.

The officials have appeared before the subcommittee in a series of closed sessions and have refused to answer most questions on the ground that the Justice Department officials enjoyed special protection from having to discuss their internal deliberations.

The subcommittee, supported by a legal opinion from the House of Representatives' general counsel, said only the president could claim such protection from congressional scrutiny.

In his letter to Bush, Wolpe said, "The subcommittee asks that you decide whether to claim the 'deliberative process' privilege" on the Justice Department's behalf. "If you do not decide to claim privilege, we trust that you will take the appropriate steps to inform immediately the Department of Justice, which will cease instructing its employees not to answer the subcommittee's questions on 'deliberative process' grounds."

The White House had not responded Friday afternoon.

Wolpe's subcommittee has been examining several aspects of the Rocky Flats case, which culminated in Rockwell Inc. pleading guilty in June to five felonies and five misdemeanors and agreeing to pay $18.5 million in fines.

Rockwell used to run the plant under a contract from the U.S. Energy Department.

Among other things, the panel wants to know why only the corporation itself was held accountable. No charges have been brought against any of its employees or any DOE officials.

## Judge seals grand jury report after criticizing it

FLATS from 7

jury report.

"Many of the recitals in the report are not relevant to the issue of federal environmental crimes and were outside the subject matter of the special grand jury's inquiry," the judge wrote. "In addition, many factual allegations on important matters are not supported by a preponderance of the evidence. At times no evidence was presented in areas where the grand jury provided considerable comment.

"The report is ordered sealed and it shall not be filed as a public record."

Although Finesilver didn't specifically address the grand jury's desire to file charges, he said that the court "defers" to the U.S. attorney in deciding such matters.

"We believe that the United States attorney's legal analysis and conclusions regarding the viability of filing criminal charges and the applicability of various defenses is entitled to considerable deference," Finesilver wrote.

Norton refused to discuss it. "The order speaks for itself," he said.

1892 — CENTENNIAL YEAR — 1992

# HE SUNDAY DENVER POST

*Voice of the Rocky Mountain Empire*

★ Final Edition / 75 cents
$1.00 / $1.25 in Designated Areas

POST

⊃ THE
AGAIN

shman relief
rner, throws
s in the sec-
10th-ranked
ry over Iowa.



t / Kent Meireis
y to pass in

**EBOARD**
14
ico 32
n 10
- 24
7
ke Forest 7
ston 7
'urdue 0
isiana Tech 0
incinnati 0
laryland 13
San Diego St 7
n 28
rizona St. 24
lemson 16
nississippi 11
n Jose St. 13
**'N DIES**
her in a hot
'ent stroke.
f, 1C

ortrait of the
atched beau-
resources.
AZINE



ssociated Press
iks No. 3.
on Hinwai's
heck the ex-
s Travel sec-

CORNER
hollow si-
oil of a dear
old.
f, 1C
rning 30 —
rone

## THE MOCTEZUMA MARCH

The Denver Post / Dave Buresh

Alejandra Martinez, 7, joins about 500 children and adults who marched yesterday from the south entrance of City Park to the Denver Museum of Natural History as part of opening ceremonies for "Aztec: The World of Moctezuma," the long-awaited exhibit of artifacts from Mexico. **STORIES, 2C, 1E**

# Ross Perot's last stand

## Bush, Clinton send teams to Dallas to avert his re-entry

**By Robin Toner**
The New York Times

DALLAS — Tomorrow promises to be a day like no other in American politics — top aides of the president and his Democratic rival flying to the headquarters of a sometimes-challenger to defend their proposals before him and his supporters.

Afterward, Ross Perot's people will meet with their man, then he will go on national television and, presumably, give some indication of whether he will re-enter the presidential race.

■ **CAMPAIGN:** Special section takes a look at the state of the campaign with only five weeks left./**21-26A**

Perot's re-emergence at this late stage of the campaign would be, in many ways, a major headache for both parties.

Before Perot left the race in July, he showed strength among voters who form the bases for both major candidates, and the prospect of his re-entry has sent both campaigns back to an anxious reassessment of the states.

Bill Clinton, as the front-runner in national polls, but a very nervous one, obviously has the greatest interest in maintaining the status quo in the race.

Some analysts suggest that President Bush is so stalled at the moment that he could profit from a scrambled race that forced voters to think anew, and perhaps splintered the anti-Bush sentiment. But Democrats argue, with some evidence in state-by-state polling, that

Please see PEROT on 17A

# Agent muzzled in Flats hearing

## Justice Dept. limits investigator's testimony

Denver Post Staff and Wire Reports

An FBI agent who spent nearly five years investigating environmental crimes at the Rocky Flats nuclear weapons plant told a congressional subcommittee last week he knows why no individuals were prosecuted, but the Justice Department has blocked him from explaining.

The House subcommittee in Washington is investigating why more charges were not brought against Rockwell International, which ran the plant, and why no one at the Department of Energy, which owns the plant and was supposedly supervising its contractor, was charged.

In a related matter, a federal judge in Denver has tightened the veil of secrecy surrounding a special grand jury probe of Rocky Flats by sealing a report said to contain allegations that plant managers ignored environmental laws.

Chief U.S. District Judge Sherman Finesilver, who took the action Friday, effectively blocked

Please see FLATS on 17A

# Colorado: gay-rights battlefield

**By Michael Booth**
Denver Post Staff Writer

The campaign has run rather quietly through Colorado this year, but feelings for and against gay rights run deep.

Fought primarily in church gatherings and town meetings, the push for Amendment 2 — to ban civil rights protections for homosexuals — inevitably sparks catcalls, hisses, virulent anti-gay remarks and charges of blatant distortions from both sides.

Colorado for Family Values, which sponsors Amendment 2, calls homosexuals a danger to society, an abomination against God, deviants and child molesters.

Opponents of Amendment 2, which would bar the state or any governmental subdivision from outlawing discrimination against gays, call the family-

Please see GAY on 7A



**GAY RIGHTS**

*With today's newspaper, The Denver Post starts a new facet of 1992 campaign coverage by focusing on various topics each week for the next five weeks.*

New top cop
poised to do



*Flush*

Sunday, September 27, 1992

THE DENVER POST

# Agent says he has answers to Flats questions

**FLATS** from Page 1A

publication of the grand jury report, even as a congressional subcommittee probes the Justice Department's handling of its Rocky Flats investigation.

The New York Times reported yesterday that the Justice Department, after months of resisting the committee's requests for information and witnesses, finally allowed an FBI agent, who had investigated the case for nearly five years, and Colorado U.S. Attorney Mike Norton to comply with subpoenas to testify.

But the department instructed them not to answer questions regarding "internal advice, opinions, or recommendations in connection with this matter," according to The Times.

During the hearings, the FBI agent, Jon Lipsky, repeatedly was asked why the prosecution was not

broader. He responded that he has pertinent information but is forbidden to answer.

Among the questions were:

■ Why no one was charged for claiming falsely to be in compliance with environmental requirements.

■ Why additional charges were not brought for violating laws meant to protect underground water supplies.

■ Whether he was pleased or disappointed with the outcome of the prosecution.

Finesilver's action also means the grand jury report cannot be presented to the congressional panel.

The special grand jury was impaneled in August 1989 to investigate allegations of improper handling and disposal of nuclear and hazardous wastes at the atomic weapons plant. The investigation began after a massive June 1989

raid on Rocky Flats by the FBI and Environmental Protection Agency.

The grand jury was discharged March 24, 1992. Rockwell later pleaded guilty to several environmental crimes carrying a $18.5 million fine. The settlement was criticized as being too lenient.

An investigative subcommittee of the House Science, Space and Technology Committee last week focused on why the grand jury indicted Rockwell but not employees of the company and the Department of Energy. Lipsky and Norton testified for 6½ hours but refused to answer certain questions, citing Justice Department orders.

Reached yesterday, Norton declined to give specific details about the questions asked by the subcommittee, noting the hearings are private.

Sources say the special grand jury prepared an indictment charg-

ing employees of Rockwell and the Energy Department with environmental crimes, but that Norton and the Department of Justice refused to sign the indictment. When asked about that allegation, Norton cited rules that prohibit him from talking about the grand jury.

Federal grand jurors are sworn to secrecy and may not divulge what transpires during jury sessions. Finesilver noted in his order that federal law allows "an exception to the rule of secrecy" when a grand jury submits to the court a report "regarding organized crime conditions in the district."

The court ultimately determines if the report should be released, according to Finesilver.

"Upon careful review and study, the court is not satisfied that the report of the Rocky Flats special grand jury meets the statutory standard for release as a public record," Finesilver wrote.

# Was Rocky Flats plea-bargain simply organized crime?

In shadowy criminal circles, they call it *omerta* — the code of silence. Among federal employees, it is called simply following orders. Of course, there is a vast difference between la cosa nostra and the U.S. Justice Department, the main one being that DeNiro doesn't do movies about government goodfelas.

They do seem to operate on one strikingly similar principle. Silence is golden — particularly when something threatens to cost assessingly as the truth threatens to cost assessingly as the truth threatens to cost assessingly as the truth threatens people. This is how we end up with an FBI agent, one who spent five years investigating environmental crimes at Rocky Flats, eager to spill the ground questions of a House swearing the pointed questions of a House subcommittee.

Meanwhile, the $18.5 million plea-bar-



**KEVIN SIMPSON**

gained settlement between the feds and Rockwell International looks less and less like the crown jewel of prosecutorial vigilance and more and more like the U.S. Attorney Mike Norton's pet rock. Norton, too, has been mostly mum since the House panel started probing disturbing stories about the propriety of the plea-bargain that oozed into the public com-

sciousness like toxic waste from disintegrating concrete blocks.

The rumblings intimate that a grand jury had prepared an indictment charging Rockwell employees and their Energy Department honchos with environmental crimes but that Norton, who as a prosecutor has always made a pretty good politician, and the Justice Department refused to sign it.

INSTEAD, THE Energy Department, Rockwell's supervisor, escaped unscathed and Rockwell itself suffered only a love-tap, a fine less than the preposterous performance bonuses accrued despite 10 acknowledged crimes and misdemeanors. It doesn't take an Oswaldian conspiracy theorist to imagine the worst.

The feds protected their own. And, of course, they couldn't go upsetting Rock-

well, which remains an important megabucks defense contractor. Put it all together and maybe, just maybe, you explain a minuscule levy that could be billed as the largest hazardous waste fine in history while not interfering with the normal sleazy state of affairs.

Naturally, the accuracy of this scenario can't be verified without breaking yet another code of silence — the one that, by law, surrounds grand jury proceedings. A federal judge has ruled that this code shall remain unbroken. The only other folks who could put the plea-bargain in perspective come under the auspices of the department that so ironically calls itself Justice.

And Justice has lost its voice.

The congressional subcommittee voted to ask President Bush to order Justice's cooperation. Of course, a man fearful of

a face-to-face campaign debate isn't likely, a month before the election, to make his employees come clean about their legal deal-making with criminals.

IF ONLY THERE were a loophole through which the public might gain some insight — like, for instance, the exception to the grand jury secrecy rule that applies when the panel's report addresses organized crime.

If the rumblings are true, crime doesn't get more organized than this. We could be talking about consummate cooperation between the public and private sectors. The only difference is when you strip away *omerta*, you're not dealing with some guy named Rocco.

Just Rockwell.

Kevin Simpson's column appears in Denver & The West on Tuesday, Thursday and Sunday.

# Panel asks Flats probe cooperation

By Kelly Richmond
States News Service

WASHINGTON — A congressional committee asked President Bush yesterday to cooperate with its probe into the U.S. Justice Department investigation and settlement of environmental-crimes charges at the Rocky Flats nuclear weapons complex.

In a March plea bargain with the Justice Department's U.S. Attorney Mike Norton, Rockwell International, which formerly operated the plant for the U.S. Department of Energy, pleaded guilty to five felonies and five misdemeanors and paid an $18.5 million fine.

Critics charged that the fine was only a tiny fraction of the company's profits at Rocky Flats and questioned why no action was taken against the plant managers who authorized illegal toxic waste dumping.

The House Science, Space and Technology Committee's investigations subcommittee is examining the settlement but has been stymied by the Justice Department's refusal to cooperate. Norton and the FBI agent on the case, Jon Lipsky at the Denver, were ordered not to answer key questions about the inner workings of the Flats investigation.

The questions Lipsky was prohibited from answering "go to the heart of our investigation," subcommittee Chairman

7/26/92

Please see FLATS on 6B

---

## Panel seeks cooperation with Flats settlement probe

FLATS from Page 13

Howard Wolpe said in a letter to Bush. The same is true of similar questions not answered, pursuant to instructions, by Mr. Norton."

Congress generally has wide latitude to quiz administration officials as part of its government oversight. But Bush and previous presidents have asserted that "executive privilege" permits them to conceal information about deliberations within the executive branch.

The subcommittee's complaint is that the privilege is being claimed by low-level officials, and the president thus far has stayed quiet.

"Only you can decide whether to claim the privilege," Wolpe wrote Bush. "If you claim privilege, it will then be a question for the sub-

> 'Only you can decide whether to claim the privilege.'
>
> Subcommittee Chairman
> Howard Wolpe,
> in letter to President Bush

committee how it will resolve this claim.

If Bush does not want to assert the privilege, the letter said, "we trust that you will take the appropriate steps to inform immediately the Department of Justice, which will cease instructing its employees not to answer the subcommittee's questions."

White House officials had no comment on the request.

---

9/29/92 DENVER POST

## Stonewalling on Rocky Flats

BECAUSE THE full story has yet to come out, one can only speculate at this point about the reasons why the Bush administration has so adamantly refused to answer questions about its handling of the toxic-waste case at Rocky Flats.

It may be, for instance, that the Justice Department is simply trying to keep some promises it made as part of the deal under which Rockwell International agreed last March to plead guilty to five felony charges and pay a fine of $18.5 million.

The company, after all, might well have chosen to settle the case this way rather than face a public trial in which evidence of even more serious wrongdoing might have been disclosed.

On the other hand, the stonewalling by the prosecutor and the chief investigator, U.S. Attorney Mike Norton and FBI Agent Jon Lipsky, may be part of a less-defensible attempt to cover up a botched grand jury investigation, go easy on a major defense contractor or conceal some outright malfeasance on the part of the federal officials involved.

In any case, the House panel that's been looking into this matter — the investigations subcommittee of the Science, Space and

Technology Committee — is right to have asked President Bush to lift the veil of secrecy by dropping the claim of executive privilege.

As Rep. Howard Wolpe, the Michigan Democrat who chairs the subcommittee, has clearly recognized, this is not a question of national security, which might be justified on silence in the past. Rather, it appears to be purely a case of corporate disregard for the nation's primary environmental laws and bureaucratic laxity in enforcing them.

Moreover, the penalty — while it may be the largest ever imposed for such violations — seems almost modest compared to the hundreds of millions it will cost the taxpayers to clean up the mess left by Rockwell and its predecessors.

In short, the whole affair smacks of the same kind of collusion between industry and government that led to the savings and loan scandal. It calls for a thorough and open airing before Congress, with the full cooperation of the executive branch.

Now that the nuclear arms race has been called off, there's no longer any legitimate reason to keep the public in the dark about Rocky Flats.

# Rocky Mountain News

September 29, 1992 **DENVER, COLORADO** 134th year, No. 160                    35¢

## TUESDAY



**Dodge Intrepid: one of Chrysler's LH cars.**

### BUSINESS TUESDAY
**Coming to a showroom near you**

Auto editor Dick Williamson takes a peek at the 1993 offerings, including Chrysler's much-publicized LH series. *Page 57*

### SPORTS
**Chiefs keep Raiders winless**

Quarterback Dave Krieg runs for two touchdowns in Kansas City's 27-7 victory, sending 0-4 Los Angeles to its worst start in 28 years. *Page 40*

### DUSTY SAUNDERS
**There's a word for fall TV: lurid**



Women get no respect on TV this fall: Husbands cheat on them, lovers blackmail them, and they work as strippers. Columnist Dusty Saunders looks at the plethora of sleazy "women in jeopardy" shows. *Page 33*

**Saunders**

### LIFESTYLES
**Back to basics on worker safety**

Back belts move into the workplace as employers try to reduce worker injuries from lifting and pulling. *Page 30*

### FINAL MARKETS

| Dow Jones | +26.94 | NASDAQ | -1.86 |
|---|---|---|---|
| AMEX | -1.24 | S&P 500 | +2.27 |
| Gold | -1.45 | Oil | -0.11 |

## INSIDE

| | | | |
|---|---|---|---|
| Break Time | 129 | Movies | 34 |
| Business | 57 | Obituaries | 134 |
| Classified | 54 | People | 18 |
| Comics | 130 | Science | 18 |
| Community | 126 | Sports | 40 |
| Dear Abby | 31 | Stocks | 73 |
| Editorials | 28 | Suburbs | 20 |
| Entertainment | 33 | TV listings | 38 |
| Lifestyles | 30 | Weather | 135 |

**Colorado's best-selling newspaper**
365,480 daily   434,177 Sunday

For circulation information, call 892-6397
For classified information, call 892-7111
For all other information, call 892-5000
Keno: 3, 5, 9, 11, 12, 15, 16, 18, 32, 33, 34, 38, 41, 43, 47, 48, 49, 50, 55, 58


REUSE THE NEWS / Recycle This Newspaper

# Suspected arson claims firefighter

Blaze traps Denver fireman in debris in second story of building on South Broadway; officials won't reveal evidence of crime. **Page 6**





**Mark W. Langvardt**

"It's part of the hazard, although none of us likes to think it will happen to us. And it's tough coming to grips with reality."

**Richard Gonzales**
**fire chief**


Fire Chief Richard Gonzales, left, and Mayor Wellington Webb conduct a news conference on the death of firefighter Mark W. Langvardt, 39, Monday. "They tried everything they could to extricate him," Gonzales said, his voice wavering. Webb, distraught, ordered flags at half-staff.

*George Kochaniec Jr./Rocky Mountain News*

## Perot sets his own deadline about re-entering campaign

**CAMPAIGN '92**

■ Texas billionaire, after meeting with Bush, Clinton staffs, says he'll give verdict by Thursday. **Page 2**

■ Quayle prescribes private-market cure for ailing health-care system during Springs stop. **Page 10**

■ Campbell refuses to dodge draft issue, attacks Considine's deferment during Vietnam War. **Page 13**

■ President plugged into cable industry, says Gore, who attacks Bush for threatening veto. **Page 59**

## Stonewalling on Rocky Flats draws rebuke

Key congressman warned U.S. Attorney Mike Norton that he could face contempt charges for refusal to answer questions on environmental crimes at the weapons plant, transcript shows. **Page 7**

## U.S. agency charges area brokers took bribes. Page 57

Tues., Sept. 29, 1992    Rocky Mountain News

# Congressman warned Norton

Silence on Flats investigation could lead to contempt charge, subcommittee chairman says

**By John Brinkley**
*News Washington Bureau*

WASHINGTON — The chairman of a House investigative subcommittee told U.S. Attorney Mike Norton of Denver last week that he could face criminal contempt proceedings for refusing to cooperate with the panel's investigation of environmental crimes at the Rocky Flats nuclear weapons plant.

Rep. Howard Wolpe's exchange with Norton is in a partial transcript made public Monday, illuminating the Justice



**Norton**

Department's unwillingness to cooperate.

Under questioning Wednesday by Wolpe, D-Mich., chairman of the Investigations and Oversight Subcommittee of the Science, Space and Technology Committee, Norton claimed immunity on virtually every question.

He repeatedly said he could not answer "without describing or discussing the internal deliberative process."

After Norton had refused to answer several questions, Wolpe asked him, "You are aware . . . that your refusal to testify will expose you to contempt of Congress that could result in criminal fines and imprisonment regardless of

whether you are doing this from instructions of someone else?"

"I am now aware of that from your admonition," Norton answered. "I still decline to answer."

Wolpe also asked Norton, to no avail, if he had considered "the possibility of developing a conspiracy case or even a (racketeering) case as part of the investigation."

Norton could not be reached for comment Monday.

The exchange between the chairman and Norton came two days before Chief Denver U.S. District Judge Sherman Finesilver sealed a grand jury report that reportedly accuses specific federal officials and Rockwell employees of crimes

*See NORTON on 13*

---

# House panel pushes president to rule

**NORTON** *from 7*

at Rocky Flats.

The corporation used to run Rocky Flats, 16 miles northwest of downtown Denver, under a contract with from the U.S. the Department of Energy.

The congressional panel sent the transcript of the hearing in which Norton testified to the White House. The subcommittee has asked President Bush to force Justice Department officials to testify about the way the department handled the investigation.

The subcommittee asked Bush last week to rule on the Justice Department's claim that its officials didn't have to provide information that might expose their decision-making processes.

Subcommittee counsel Edith Holleman said the panel has asked for an answer from Bush by Wednesday.

The subcommittee has been examining the Justice Department's handling of the investigation that led to Rockwell's guilty plea last June to five misdemeanors and five felonies. Rockwell agreed to pay $18.5 million in fines.

As illustrated by Wolpe's line of questioning, the subcommittee wants to know why only the corporation itself was held accountable and why no charges were brought against any of its employees or DOE officials.





HEALTH §25-15-309

(c) The impact upon or the threat to the public health or the environment as a result of the violation;

(d) The degree, if any, or recalcitrance or recidivism upon the part of the violator;

(e) The economic benefit realized by the violator as a result of the violation;

(f) The voluntary and complete disclosure by the violator of such violation in a timely fashion after discovery and prior to the department's knowledge of the violation, provided that all reports required pursuant to state environmental law have been submitted as and when otherwise required;

(g) Full and prompt cooperation by the violator following disclosure of a violation, including, when appropriate, entering into in good faith and implementing a legally enforceable agreement to undertake compliance and remedial efforts;

The existence of a regularized and comprehensive environmental compliance program ... or an environmental audit program that was adopted in a timely and good faith manner and that includes sufficient measures to identify and prevent future noncompliance; and

(i) Any other aggravating or mitigating circumstances.

(4) Notwithstanding the provisions of subsection (3) of this section, the department may enter into settlement agreements regarding any penalty or claim resolved pursuant to this part 3. Any settlement agreement may include but is not necessarily limited to the payment or contribution of moneys to state or local agencies or for other environmentally beneficial purposes.

Repealed and reenacted by Laws 1992, S.B.92-116, § 11, eff. Aug. 1, 1992.

### Historical and Statutory Notes

Section 32 of Laws 1992, S.B.92-116, provides:
"Effective date.—Applicability. Section 5 of this act shall take effect upon passage. The

remainder of this act shall take effect August 1, 1992, and shall apply to violations committed on or after said date."

## § 25-15-310. Criminal offenses—penalties

(1) On or after the date specified in section 25-15-102(3), no person shall:

*[See main volume for text of (a) and (b)]*

(c) Omit any material information or make any false material statement or representation in any application, label, manifest, record, report, permit, or other document filed, maintained, or used for purposes of compliance with this article or with the federal act or regulations promulgated under this article or the federal act; or

(d) Destroy, alter, or conceal any record required to be maintained or fail to file any record required to be filed under regulations promulgated by the commission under this part 3 or pursuant to the federal act.

*[See main volume for text of (e)]*

(2) Except as provided in section 29-22-108, 18-13-112, or 40-2-1-106, C.R.S., any person acting with criminal negligence as defined in section 18-1-501(3), C.R.S., who violates any of the provisions of paragraph (a), (b), (c), or (d) of subsection (1) of this section is guilty of a misdemeanor and, upon conviction thereof, shall be punished by a fine of not more than twenty-five thousand dollars for each day of violation, or by imprisonment, or by both such fine and imprisonment. If said conviction is for a violation committed after a previous conviction under this subsection (2), the maximum fine shall be doubled.

(3) Any person knowingly, as defined in section 18-1-501(6), C.R.S., violates any of the provisions of paragraph (a), (b), (c), or (d) of subsection (1) of this section is guilty of a felony and, upon conviction thereof, shall be punished by a fine of not more than fifty thousand dollars for each day of violation, or by imprisonment not to exceed four years, or by both such fine and imprisonment. If said conviction is for a violation committed after a previous conviction under this subsection (3), the maximum punishment shall be doubled with respect to both fine and imprisonment.

---

HEALTH §25-15-314

(4)(a) Deleted by Laws 1992, S.B.92-116, § 12, eff. Aug. 1, 1992.

*[See main volume for text of (b)]*

(5) The court shall consider the factors contained in paragraphs (a) to (f) of this subsection (5) in determining the amount of any criminal sanction to be imposed pursuant to this article. The factors contained in paragraphs (f), (g), and (h) of this subsection (5) shall be mitigating factors and may be applied, together with other factors, to reduce or eliminate sanctions or penalties. Such factors are:

(a) The seriousness of the violation;

(b) Whether the violation was intentional, reckless, or negligent;

(c) The impact upon or the threat to the public health or the environment as a result of the violation;

(d) The degree, if any, of recalcitrance or recidivism upon the part of the violator;

(e) The economic benefit realized by the violator as a result of the violation;

(f) The voluntary and complete disclosure by the violator of such violation in a timely fashion after discovery and prior to the department's knowledge of the violation, provided that all reports required pursuant to state environmental law have been submitted as and when otherwise required;

(g) Full and prompt cooperation by the violator following disclosure of a violation, including, when appropriate, entering into in good faith and implementing a legally enforceable agreement to undertake compliance and remedial efforts;

(h) The existence of a regularized and comprehensive environmental compliance program or an environmental audit program that was adopted in a timely and good faith manner and that includes sufficient measures to identify and prevent future noncompliance; and

(i) Any other aggravating or mitigating circumstances.

Amended by Laws 1992, S.B.92-116, § 12, eff. Aug. 1, 1992.

### Historical and Statutory Notes

Section 32 of Laws 1992, S.B.92-116, provides:
"Effective date.—Applicability. Section 5 of this act shall take effect upon passage. The

remainder of this act shall take effect August 1, 1992, and shall apply to violations committed on or after said date."

## § 25-15-311. Hazardous waste commission fee

(1) The commission is hereby authorized to promulgate rules regarding the following:

(a) The establishment of a commission fee. The establishment of the reasonable costs actually associated with the operation of this commission. Such fees may be imposed upon generators and transporters of hazardous wastes and upon facilities that treat, store, or dispose of hazardous wastes. Such fees may be based upon a consideration of the quantity of hazardous wastes which is generated, transported, treated, stored, or disposed and the impact on small businesses.

(b) The establishment of a nominal filing fee to help defray reasonable administrative costs actually associated with processing petitions for interpretive rulings pursuant to sections 25-15-205 and 25-15-308. No filing fee established pursuant to the provisions of this paragraph (b) shall exceed one hundred dollars.

(2) All moneys collected pursuant to the provisions of this section by the commission shall be transmitted to the state treasurer, who shall credit the same to the hazardous waste commission fund created pursuant to section 25-15-315.

Added by Laws 1992, S.B.92-116, § 13, eff. Aug. 1, 1992.

Colorado Shakedow

RCRA — Parallel Fed.

Provision exists

FILED
U.S. DISTRICT COURT
DISTRICT OF COLORADO   F

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

2007 JUN 26   P12: 31

Criminal Case No. $92-CR-107$

GREGORY C. LANGHAM, CLERK
BY ___ CC ___ DEP CLK

**UNITED STATES OF AMERICA,**

    Plaintiff,

v.

**ROCKWELL INTERNATIONAL CORPORATION,**

    Defendant.

---

### PLAINTIFF'S SENTENCING MEMORANDUM

---

Plaintiff UNITED STATES OF AMERICA respectfully submits this Sentencing Memorandum to aid the Court in assessing the parties' plea agreement and proposed sentence.

### I. INTRODUCTION

The United States Department of Energy's Rocky Flats Nuclear Weapons Plant ("Rocky Flats" or the "Plant") is an old, generally antiquated facility.  During most of the 1980s, Rocky Flats' owner, the Department of Energy ("DOE"), and the Plant's operator, ROCK-WELL INTERNATIONAL CORPORATION ("ROCKWELL"), opposed regulatory scrutiny and resisted the application of this country's environmental laws to the Plant's activities.  Rocky Flats' prevailing "culture," which DOE established and continually fostered, was that nuclear weapons production was the first and principal priority, and environmental compliance was down the list.  DOE oversight at

Rocky Flats was generally poor, and ROCKWELL, for all intents and purposes, ran the Plant.

Rocky Flats has been continually beset by environmental problems and safety violations for many years. Various reports, panels and studies have confirmed Rocky Flats' poor performance in these important areas, with limited (and often inadequate) corrective action until mid-1989 and thereafter, when DOE's Secretary Watkins personally committed to changing how DOE does business.[1]/ DOE sanctions or disciplinary actions were either minor or nonexistent.

In 1988, the United States Department of Justice (including the United States Attorney's Office in Denver, Colorado, and the Environment and Natural Resources Division in Washington, D.C.) (the "Justice Department"), the United States Environmental Protection Agency (including the Office of Criminal Investigations and the National Enforcement Investigations Center) (the "EPA"), the Federal Bureau of Investigation (the "FBI") and later the United States Department of Energy's Office of Inspector General, began investigating alleged environmental and related crimes at Rocky Flats. The investigation's early phase involved an extensive and detailed review of regulatory files and other available documents, limited off-site surveillance and discrete contact with a small number of individuals.

_____

[1]/ See, e.g., November 30, 1989 Report of the Advisory Committee on Nuclear Facility Safety (the "Ahearne Committee"); U.S. General Accounting Office ("GAO"), Summary of Major Problems at DOE's Rocky Flats Plant (October 1988); GAO, Alternatives for Relocating Rocky Flats Plant's Plutonium Operations (April 1987).

- 2 -

In June 1989, the Justice Department, EPA and the FBI exe-
cuted a federal search warrant at Rocky Flats, with the Secretary
of Energy's and DOE Inspector General's cooperation and assist-
ance.$^{2/}$   The extensive search for records and other documents in-
volved DOE's on-site offices, various ROCKWELL offices and numer-
ous Rocky Flats buildings.   The search also involved environmen-
tal sampling at various areas, including the sewage treatment
plant, a number of holding ponds and surface impoundments, a num-
ber of waste treatment and storage areas and various wastes.   At
the same time, a document search was also conducted at DOE's Al-
buquerque Operations Office, the DOE "regional office" which was
then responsible for overseeing Rocky Flats.   One hundred and
thirty-five boxes of documents were seized at Rocky Flats, and an
additional 49 boxes were collected in Albuquerque.

In August 1989, Chief Judge Sherman G. Finesilver empaneled
the District of Colorado's first ever special grand jury, "to in-
quire into criminal activity, if any, at the Rocky Flats Nuclear
Weapons Plant in Colorado."   By means of grand jury subpoenas and
other formal and informal requests, the investigation gathered more
than 760 additional boxes of documents and information, and the
investigation reviewed an estimated three and a half million pages

---

$^{2/}$   In early June 1989, a Memorandum of Understanding con-
cerning the search was executed by Attorney General Dick Thorn-
burgh, Secretary of Energy James D. Watkins, United States Attor-
ney Michael J. Norton, FBI Director William S. Sessions and EPA
Administrator William K. Reilly, concerning the investigation's
access to the Plant, security clearances, classified information
and other matters.   The search was not disclosed in advance to any
DOE component at Rocky Flats.

of documents. On August 21, 1990, the grand jury took an all-day "view" or tour of Rocky Flats, including various waste storage areas, the solar ponds and other facilities. The investigation interviewed more than 800 witnesses, both inside and outside government. Approximately 110 witnesses -- from senior DOE officials to ROCKWELL blue-collar workers -- appeared before the grand jury, and many appeared more than once.

Today, on March 26, 1992, ROCKWELL -- which managed and operated Rocky Flats on DOE's behalf from 1975 to 1989 -- pled guilty to ten criminal violations of this country's principal hazardous waste and water pollution laws, the Resource Conservation and Recovery Act and the Clean Water Act. The charges -- involving the illegal treatment and storage of hazardous wastes and various Clean Water Act violations -- represent the most serious environmental violations for which sufficient evidence exists to support a successful prosecution and conviction, based upon criminal and environmental law and the rules of evidence, beyond a reasonable doubt. The hazardous waste fines proposed by the Justice Department -- if imposed -- will be the largest hazardous waste fines ever imposed in this country. The Clean Water fines -- here in semi-arid, land-locked Colorado -- will be the third largest Clean Water fines in U.S. history.

The UNITED STATES wishes to publicly thank and commend the special grand jury for its extraordinary attention, patience and vigilance over many months of active service. The difficult investigation -- leading to these charges and this disposition --

would not have been possible without the grand jury.   It has ren-
dered to the UNITED STATES, and to the citizens of Colorado, an
invaluable public service.

## II. **FACTUAL BACKGROUND OF THE CASE**

The Plea Agreement and Statement of Factual Basis sets forth
the elements of the various charges and the fundamental evidence
which the UNITED STATES and ROCKWELL agree supports the charges,
and is incorporated herein by reference.   The UNITED STATES sub-
mits this Sentencing Memorandum to provide a more detailed reci-
tation of the facts which the UNITED STATES would demonstrate at
trial, to further assist the Court in assessing the proffered plea
agreement and sentence.[3/]

### A.   The Department of Energy

DOE is a department and agency of the United States Govern-
ment.   Prior to DOE's formation, the Atomic Energy Act of 1954
("AEA"), 42 U.S.C. §§ 2140 et seq., established the Atomic Energy
Commission ("AEC") and made it responsible for manufacturing nu-
clear material for defense programs.   Under the AEA, the AEC had
regulatory control over nuclear weapons facilities and the materi-
als generated there.   The Energy Reorganization Act of 1974, 42
U.S.C. § 5801 et seq., abolished the AEC and established the Energy

---

[3/]   While the Plea Agreement and Statement of Factual Basis
is an "agreed to" document -- in the sense that both the UNITED
STATES and ROCKWELL have agreed and stipulated to its content, this
Sentencing Memorandum advocates the UNITED STATES' position, which
ROCKWELL may not agree with.   This memorandum is based on substan-
tial evidence corroborated by multiple sources.

the environment. This lesson will be particularly important to those members of the regulated community which engage in government contracts and who may have assumed that the importance of their work (or their close dealings with the government) insulated them from potential criminal liability.

The general public's awareness of environmental laws will also be promoted. The $14.5 million RCRA component of the fine is, by nearly a factor of four, the largest hazardous waste criminal fine ever assessed (and not suspended). The $4 million Clean Water Act fine stands behind only Exxon and U.S. v. Allied Chemical (E.D. Va. 1976), as the third largest criminal fine for violating a federal water pollution statute.[100] A fine of this magnitude will certainly make it clear that the environmental laws are seriously enforced.

## D. The Need of the Sentence to Provide Just Punishment for the Offense (§ 3553(a)(2)(A)).

The magnitude of the fine is warranted in view of the seriousness of ROCKWELL's conduct, ROCKWELL's substantial size, and the amount of profits ROCKWELL made at Rocky Flats.

---

[100] In Allied Chemical, the defendants were fined a total of $8.8 million for CWA and Refuse Act violations in connection with the willful discharge of a pesticide, kepone, into the James River, essentially destroying the fishery in the river.

Only two other CWA cases have resulted in fines of $1 million or more. In United States v. Ashland Oil Corp. (W.D. Pa. 1989), the company was fined $2.25 million under the CWA and the Refuse Act in connection with the negligent spill of approximately a half million gallons of diesel fuel from a collapsed storage tank into the Ohio River near Pittsburgh.

- 116 -

ROCKWELL is a large Fortune 500 company with substantial assets and income. It is one of the largest corporations ever to be subject to a federal criminal environmental fine.

During the investigative period -- that is, fiscal years 1987 through 1989, ROCKWELL received the following compensation from DOE:

| Year | Base Fee | Award Fee | GAO |
|------|----------|-----------|-----|
| 1987 (2d half) | $1,138,950 | $4,359,411 | $540,000 |
| 1988 | $1,564,800 | $9,548,317 | 0 |
| 1989 | $758,000 | $3,958,228 | 0 |
| TOTAL | $3,461,750 | $17,865,956 | $540,000 |

While the base fee was paid regardless of ROCKWELL's performance, the award fee was linked to DOE's evaluation of ROCKWELL's perform-ance in a number of areas, including production, cost management and environmental management.

The criminal fine of $18.5 million recaptures the total award fees of $17.8 million paid to ROCKWELL during the period of the charged conduct, commencing with the second half of the 1987 fis-cal year (April 1, 1987) and continuing to the end of the 1989 fiscal year (September 30, 1989). This fine is sufficiently pun-itive, considering that ROCKWELL's failures in the waste manage-ment and environmental areas will cause it to lose all of its Rocky Flats award fee profits -- including those it made by successfully meeting its plutonium production requirements, an area in which ROCKWELL consistently received top grades.

- 117 -

Importantly, the UNITED STATES has insisted, and ROCKWELL has agreed, that the total criminal fines of $18.5 million will not be indemnified or reimbursed by DOE. This will be the first time ever that a DOE contractor has paid any sort of penalty that DOE has not in fact paid or reimbursed. On approximately nineteen occasions since 1984, various DOE contractors have been administratively or civilly penalized by EPA or state agencies for environmental viola-tions. Two of these involved ROCKWELL violations at Rocky Flats -- in 1987, the EPA penalized ROCKWELL $75,000 for PCB violations, and in 1989, CDH penalized ROCKWELL $93,000 for RCRA violations.[101]/ DOE either paid or reimbursed both fines. In all seventeen of the other instances, DOE likewise paid the penalty or reimbursed the contractor. That will not happen here.

The crimes here were institutional crimes -- committed by one institution call ROCKWELL and fostered, in a significant sense, by another institution called DOE. They were not crimes by a few "rogue" individuals, but rather were the result of a culture, sub-stantially encouraged and nurtured by DOE, where environmental com-pliance was a much lower priority than the production or recovery of plutonium and the manufacture of nuclear "triggers." For these reasons, the UNITED STATES believes that it is more appropriate to charge ROCKWELL, as an organization, with this collective, institu-tional conduct. While DOE, as a governmental entity, cannot be charged, this document serves in part to make government officials

---

[101]/ Prior to this case, the $93,000 penalty was the largest environmental penalty ever paid concerning Rocky Flats.

and the general public aware of the Energy Department's serious environmental failures in most of the 1980s.

## E. The Need of the Sentence to Afford Adequate Deterrence to Criminal Conduct (§ 3553(a)(2)(B)).

Criminal violations of environmental statutes have the potential to, and often do, result in enormous injury. Therefore, adequate deterrence is essential to future avoidance. The Justice Department believes that the sentence proposed in this case will, if approved, send a strong message to potential violators of our environmental laws.

Imposition of statutory fines on a "per count" rather than a "per day of violation" basis would amount to no more than $375,000, and would fail to send that message.

For this reason, the Justice Department believes that fining ROCKWELL on the proposed maximum fine per day of violation basis, in the amount of $18.5 million, is wholly appropriate.

## F.   DOE Improvements

At Secretary Watkins' direction, DOE has taken a variety of important actions since the search warrant to help ensure that Rocky Flats, and other DOE facilities, will comply with all applicable environmental laws and will take all appropriate action to ensure environmental clean-up.

Even as the search warrant was being executed, Secretary Watkins directed that an independent team comprised of DOE and outside technical and compliance experts (the so-called "Tiger Team"), none of whom was affiliated with the RFAO or ALO, conduct

- 119 -

It will be a long and difficult task, but the process has begun.

Respectfully submitted this March 26, 1992.

MICHAEL J. NORTON
United States Attorney
District of Colorado
U.S. Department of Justice

BARRY M. HARTMAN
Acting Asst. Attorney General
Environment and Natural
  Resources Division
U.S. Department of Justice

KENNETH R. FIMBERG
Assistant U.S. Attorney
District of Colorado
U.S. Department of Justice

PETER J. MURTHA
Trial Attorney
Environmental Crimes Section
Environment and Natural
  Resources Division
U.S. Department of Justice

ATTORNEYS FOR PLAINTIFF UNITED STATES OF AMERICA

Source: FBI, Denver

## ROCKWELL FEES
## ROCKY FLATS NUCLEAR WEAPONS PLANT

| CPAF Period | Base Fee | Award Fee | PRMP/PROVE | GAOs |
|---|---|---|---|---|
| 4/1/87 to 9/30/87 | $1,138,950 | $4,359,411 | $0 | $540,000 |
| 10/1/87 to 3/31/88 | $782,400 | $4,758,244 | $0 | $0 |
| 4/1/88 to 9/30/88 | $782,400 | $4,790,073 | $0 | $0 |
| 10/1/88 to 3/31/89 | $379,000 | $2,716,624 | $186,591 | $0 |
| 4/1/89 to 9/30/89 | $379,000 | $1,241,604 | $338,035 | $0 |
| TOTALS | $3,461,750 | $17,865,956 | $524,626 | $540,000 |

## AWARD FEES IN
## RELEVANT PERFORMANCE AREAS
## MULTIPLIED BY 3

| | 4/87 - 9/87 | 10/87 - 3/88 | 4/88 - 9/88 | 10/88 - 3/89 | 4/89 - 9/89 | Total | X 3 |
|---|---|---|---|---|---|---|---|
| Actual Award Fee Earned | $4,359,441 | $4,758,244 | $4,709,073 | $2,716,624 | $1,241,604 | $17,784,986 | - |
| General Management | 25% | 25% | 25% | 25% | 25% | 25% | |
| % of Award Fees Earned (by 1/3) | $363,287 | $396,520 | $392,423 | $226,385 | $103,467 | $1,482,082 | $4,446,246 |
| Industrial Safety & Health Protection | 15% | - | - | - | - | 15% | |
| % of Award Fees Earned | $653,916 | | | | | $653,916 | $1,961,748 |
| Waste Management | 15% | 10% | | | | 11.7% | |
| % of Award Fees Earned | $653,916 | $475,824 | | | | $1,129,740 | $3,389,220 |
| Environment, Safety & Health | - | 20% | 20% | 20% | 20% | 20% | |
| % of Award Fees Earned | - | $951,648 | $941,814 | $543,324 | $248,320 | $2,685,106 | $8,055,318 |

Total $5,950,844   $17,852,532

Source: ER, Denver

ORIGINAL

FILED
JAN  8 1991
U.S. CLAIMS COURT

UNITED STATES CLAIMS COURT

ROCKWELL INTERNATIONAL )
CORPORATION, )
 ) No. 91-25
        Plaintiff, )
 )
        v. )
 ) COMPLAINT
UNITED STATES OF AMERICA, )
 )
        Defendant. )
_____ )

        Plaintiff ROCKWELL INTERNATIONAL CORPORATION

("Rockwell"), by its attorneys, as and for its complaint herein,

alleges as follows:

        1.  Rockwell is a corporation duly organized and

existing under the laws of the State of Delaware and has its

principal place of business in the State of California.

        2.  United States of America ("United States") is the

sovereign government of the United States of America.

                    JURISDICTION

        3.  On January 8, 1975, Rockwell and the United States,

acting through a predecessor agency to the Department of Energy

("DOE"), entered into Contract No. AT(29-2)-3533, effective

1

June 30, 1975, under which Rockwell agreed to manage and operate a government-owned facility known as the Rocky Flats Plant (the "Plant") located near Golden, Colorado.  The Plant produces components for nuclear weapons.

4.   Contract No. AT(29-2)-3533 has been periodically modified and renewed, most recently by Contract No. DE-AC04-76DP03533, as amended, effective January 1, 1989 (the "Contract").

5.   The Contract provides for the payment of allowable costs and base and award fees.  On October 2, 1990, Rockwell mailed a claim in writing to the Contract's Contracting Officer seeking additional award fees in the amount of $6,516,102. Rockwell's claim relates to the Contract.

6.   By letter dated December 5, 1990, the Contracting Officer responded in writing to Rockwell's claim letter of October 2, 1990.  The Contracting Officer decided that "Rockwell should [not] receive any additional award fee payments, for the reasons described below . . . ."  The Contracting Officer added, nonetheless, that "this letter . . . does not constitute a Contracting Officer's decision as provided for under either the Disputes clause or the [Contract Disputes] Act."  Despite the Contracting Officer's statement to the contrary, his December 5, 1990 letter is a final decision denying Rockwell's claim or, at the very least, should be deemed to be a final decision denying Rockwell's claim under 41 U.S.C. § 605(c)(5).  Rockwell has received no other response to its October 2, 1990 claim.

2

7.  This action is brought on Rockwell's claim and on appeal of the Contracting Officer's December 5, 1990 final decision, or deemed decision, denying Rockwell's claim.

8.  The Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1491(a) and the Contract Disputes Act of 1978, as amended, 41 U.S.C. §§ 601-613.

### FACTUAL BACKGROUND

9.  According to the Contract, award fees "provide an incentive . . . sufficient to encourage the attainment of, and to reward the Contractor for, increased proficiency in the performance of the contract." Contract, Appendix D, ¶ 1. Award fees are determined every six months and may range in amount from zero to a maximum sum set forth in the Contract.

10.  The Contract explicitly provides that the "award fee shall be determined subjectively by the Award Fee Determination Official based on the Contractor's performance in accordance with the Awa:. 'ee Plan set forth in Appendix D." Contract, Clause 54, subparagraph (b)(2). The Award Fee Determination Official ("AFDO") is defined in the Contract as the Manager of DOE's Albuquerque Operations.

11.  Despite clear Contract provisions that Rockwell's award fees were to be determined by the AFDO, the Manager of DOE's Albuquerque Operations, DOE unilaterally changed the rules in 1989, thereby breaching the Contract, and required award fees to be determined by top DOE officials in Washington, D.C.

3

Accordingly, Rockwell's award fees for the six-month periods of October 1, 1988 through March 31, 1989 and April 1, 1989 through September 30, 1989 were not the subjective determinations of the AFDO, as plainly provided for in the Contract, but rather were the decisions of the AFDO's superiors, top DOE officials in Washington, D.C.

### The Award-Fee Determination for the Period
### October 1, 1988 through March 31, 1989

12. Shortly following the completion of the October 1, 1988 through March 31, 1989 award-fee period, Rockwell representatives met with DOE representatives from DOE's Rocky Flats Office to discuss Rockwell's performance during the just-completed award-fee period. The DOE representatives favorably reviewed Rockwell's performance.

13. Thereafter, on April 28, 1989, Rockwell contacted the AFDO's office to check on the progress of the award-fee determination. Rockwell was informed that the Performance Evaluation Review Board had met and that the Performance Evaluation Report evaluating Rockwell's performance under the Contract was in the AFDO's office awaiting the AFDO's approval.

14. In May 1989, Claude Barkmier, Chief of the Administrative Branch of DOE's Rocky Flats Office, informed a Rockwell representative that a final award-fee determination was not as imminent as Rockwell had been led to believe. Mr. Barkmier stated that the AFDO had determined an award-fee grade of about 89 percent for the plant and had sent his

4

determination to Washington, D.C. for approval by his DOE superiors as part of a new policy directive issued by Admiral James D. Watkins, ret., Secretary of DOE. With an award-fee grade for the plant of 89 percent, Rockwell would have received under the Contract's Award Fee Plan a total award fee of $5,494,061.

15. Mr. Barkmier's statement was corroborated on May 15, 1989, when Rockwell was informed by the AFDO's office that the AFDO had completed his award-fee determination, but had forwarded his determination to DOE's Assistant Secretary for Defense Programs in Washington, D.C. for concurrence. Rockwell was told that final approval of the award fee was expected at any moment.

16. Despite these assurances (and the Contract provision requiring notification of final award-fee determinations within 35 working days after the end of an evaluation period, or May 19, 1989), Rockwell heard nothing further until its Chairman received a letter dated September 20, 1989 from Secretary Watkins. Secretary Watkins stated that "the Department has had under advisement the question of the proper award fee . . . ." The Secretary referred to the importance of the Plant's mission and the "environmental sensitivity" of the Plant's activities and stated that "at my direction the Department has considered with special care the proper fee for this period, particularly as it reflects Rockwell's performance in environment, safety and health." (Emphasis supplied.) The

5

Secretary concluded that "[a]fter this thorough review, the
Department has concluded that an award fee for this period that
reflects approximately 40% of the total possible award fee is the
proper determination in this instance." (Emphasis supplied.)

      17.  Thereafter, on September 28, 1989, Rockwell
received a purported award-fee determination, consisting of (a) a
letter dated September 27, 1989 from the AFDO to Rockwell ("AFDO
Letter"), (b) a Performance Evaluation Report and (c) a September
20, 1989 Memorandum to the AFDO from John Meinhardt, DOE's Acting
Assistant Secretary for Defense Programs ("DOE Memo").

      18.  In the DOE Memo, the Assistant Secretary refers to
the AFDO's earlier award-fee determination of August 8, 1989 and
revises downward the AFDO's determination.  The Assistant
Secretary states that while DOE "is essentially in concurrence
with [the AFDO's] recommendations," "an additional downward
adjustment" must be made "in the area of Environment, Safety and
Health (ES&H)."  The Assistant Secretary states that "[mly office
has concluded that the 'moderately good' numerical grade of 79
given [by the AFDO] to [Rockwell] for its performance under the
ES&H category be downgraded to a numerical grade of 65.25.  Since
ES&H carries an evaluation weight of 20 percent, the overall
rating for the period drops from 87 to 84.25." (Emphasis
supplied.)  The Assistant Secretary cautions the AFDO that
"Admiral Watkins concurs in this recommendation." (Emphasis
supplied.)

19.  The Assistant Secretary adds in the DOE Memo that
"[i]n order to facilitate the dissemination of this information
to [Rockwell] and coordinate it with the letter from Admiral
Watkins to [Rockwell's] Chairman Beall of today's date, we have
attached a copy of your draft letter to [Rockwell] which reflects
our concerns in the ES&H area."

20.  In short, the AFDO's award-fee determination was
drafted by the Assistant Secretary, with the concurrence of the
Secretary.

21.  In the AFDO Letter, the AFDO announces an award
fee of $2,903,215 and acknowledges that the award fee is based in
part on the "Memorandum from the Acting Assistant Secretary for
Defense Programs."  That award-fee amount is commensurate with
the overall grade of 84.25 as determined by the Assistant
Secretary.  And, as directed by the Assistant Secretary, the AFDO
reduced the ES&H grade to "Unsatisfactory."

The Award-Fee Determination for the Period
April 1, 1989 Through September 30, 1989

22.  As was the case with the prior award-fee period,
Rockwell representatives also met with representatives from DOE's
Rocky Flats Office shortly after the conclusion of the April 1,
1989 through September 30, 1989 award-fee period.  Again,
Rockwell received a favorable review.  Based on a written
appraisal provided to Rockwell by DOE's Rocky Flats Office,
Rockwell estimates that it should have received under the

Contract's Award Fee Plan a total award fee of $5,504,895 for this award-fee period.

23.   Throughout 1989, DOE officials were advising members of Congress and General Accounting Office investigators that DOE was making changes in the award-fee-determination process, including requiring DOE Operations Office Managers to obtain the concurrence of appropriate Assistant Secretaries before making award-fee determinations. DOE's unilateral change requiring an Assistant Secretary to approve the AFDO's award-fee determinations for Rockwell is a breach of the Contract.

24.   By letter dated February 26, 1990, Rockwell was advised that its award fee for the period April 1, 1989 through September 30, 1989 was $1,579,639. This letter was signed by the Manager of DOE's Rocky Flats Office and not by the AFDO, who was defined in the Contract as the Manager of DOE's Albuquerque Operations.

25.   By letter dated April 10, 1990, DOE admitted that "Fee Determination Official authority was delegated to . . . [the] Manager of the RFO [Rocky Flats Office], for the period April 1, 1989, through September 30, 1989." That delegation was contrary to the plain terms of the Contract.

26.   Upon information and belief, the award-fee determination of $1,579,639 for the period April 1, 1989 through September 30, 1989 was not made by the AFDO, as required by the Contract, or by the Manager of DOE's Rocky Flats Office. Rather,

the award fee was determined by top DOE officials in
Washington, D.C.

### FIRST CAUSE OF ACTION (THE OCTOBER 1, 1988 THROUGH MARCH 31, 1989 AWARD-FEE PERIOD)

27.  Rockwell repeats and realleges each and every
allegation contained in paragraphs 1 through 26 hereof as if
fully set forth herein.

28.  The Contract calls for award-fee determinations to
be made by the AFDO.  Rockwell was entitled under the Contract to
the AFDO's independent and uninfluenced award-fee determination.

29.  In determining Rockwell's award fee for the period
of October 1, 1988 through March 31, 1989, DOE removed
decision-making authority from the AFDO and placed it instead in
top DOE officials in Washington, D.C.  DOE officials other than
the AFDO either made, or improperly influenced or coerced, the
decision regarding Rockwell's award fee, thereby breaching the
Contract.

30.  The AFDO's purported award-fee determination of
September 27, 1989 for the October 1, 1988 through March 31, 1989
period was in plain contravention of the Contract's award-fee
provisions and contrary to law.  By abdicating his discretion to
make award-fee determinations to his DOE superiors in
Washington, D.C., the AFDO abused the discretion provided him
under the Contract in determining Rockwell's award fee.

31.  If the AFDO had made an independent and
uninfluenced award-fee determination for the October 1, 1988

through March 31, 1989 period, Rockwell believes that it would have received a total award fee of $5,494,061. Since top DOE officials determined that Rockwell should only receive an award fee of $2,903,215, Rockwell has been damaged in the amount of $2,590,846 plus interest.

### SECOND CAUSE OF ACTION (THE APRIL 1, 1989 THROUGH SEPTEMBER 30, 1989 AWARD-FEE PERIOD)

32. Rockwell repeats and realleges each and every allegation contained in paragraphs 1 through 26 and 28 hereof as if fully set forth herein.

33. In determining Rockwell's award fee for the period of April 1, 1989 through September 30, 1989, DOE removed decision-making authority from the AFDO and placed it instead in top DOE officials in Washington, D.C. DOE officials other than the AFDO either made, or improperly influenced or coerced, the decision regarding Rockwell's award fee, thereby breaching the Contract.

34. The Manager of DOE's Rocky Flats Office's purported award-fee determination of February 26, 1990 for the April 1, 1989 through September 30, 1989 period was in plain contravention of the Contract's award-fee provisions and contrary to law. By abdicating his discretion to make award-fee determinations to his DOE superiors in Washington, D.C. and to others, the AFDO abused the discretion provided him under the Contract in determining Rockwell's award fee.

35.   If the AFDO had made an independent and uninfluenced award-fee determination for the April 1, 1989 through September 30, 1989 period, Rockwell believes that it would have received a total award fee of $5,504,895.   Since top DOE officials determined that Rockwell should only receive an award fee of $1,579,639, Rockwell has been damaged in the amount of $3,925,256 plus interest.

WHEREFORE, Rockwell demands judgment against the United States:

(1)   with respect to the First Cause of Action, in the amount of $2,590,846 plus interest as allowed by law;

(2)   with respect to the Second Cause of Action, in the amount of $3,925,256 plus interest as allowed by law;

(3)   awarding Rockwell its costs, disbursements and attorneys' fees and such other and further relief as this Court may deem just and proper.

Dated:   January 7, 1991

Richard J. Ney
Attorney for Plaintiff Rockwell
   International Corporation
CHADBOURNE & PARKE
444 South Flower Street
6th Floor
Los Angeles, California   90017
(213) 486-0015
   - 592.1000

11

# ORIGINAL

IN THE UNITED STATES CLAIMS COURT

FILED

JAN 2 3 1991

U.S. CLAIMS COURT

ROCKWELL INTERNATIONAL
CORPORATION,

           Plaintiff,

      v.

THE UNITED STATES,

           Defendant.

)
)
)
)
)
)
)
)
)
)
)
)

No. 91-25C

## NOTICE OF APPEARANCE

To the Clerk:

Please enter the appearance of Allen D. Bruns as attorney of record for the United States. Service of all papers by opposing parties should be addressed as follows:

ALLEN D. BRUNS
Attorney
Commercial Litigation Branch
Civil Division
United States Department of Justice
Washington, D.C.  20530

Attention Classification Unit
2nd Floor, Todd Building

Dated:  January 22, 1991

ALLEN D. BRUNS
Commercial Litigation Branch
Civil Division
United States Department of Justice
Telephone:  (202) 307-6288

Case No. 1:96-y-00203-RPM  Document 137-7  filed 06/01/07  USDC Colorado  pg 61 of 83



Department of Energy
Albuquerque Operations Office
P. O. Box 5400
Albuquerque, New Mexico 87115

DEC 8 1988

Mr. Dominick J. Sanchini
President
Rocky Flats Plant
North American Space Operations
Rockwell International Corporation
P. O. Box 464
Golden, CO 80402

Dear Mr. Sanchini:

In accordance with Appendix D of Contract DE-AC04-76DP03533, I hereby determine
that Rockwell International Corporation has earned an award fee of $4,940,073.
The enclosed Performance Evaluation Report for the period April 1, 1988,
through September 30, 1988, provides the basis for my award fee determination.

However, in arriving at a net amount to be paid to Rockwell as an award fee
for this performance period, I have also taken into account the circumstances
attending the "model shop" investigation at the Rocky Flats Plant. During the
past fiscal year, there have been numerous congressional inquiries and hearings
legitimately examining this subject, an Inspector General's audit which con-
cluded that "improper charges" in the amount of at least $52,600 were incurred
at Rocky Flats, and the Department initiated substantial efforts to analyze the
impact of the model shop activities from the standpoint of fiscal integrity and
program management.

It is my conclusion that these events could have been avoided or substantially
diminished if Rockwell had performed a more thorough general management over-
sight of this activity. Accordingly, I hereby make a downward adjustment in
the award fee payable to Rockwell in the amount of $150,000.

As specified in the contract, you may, within five working days after receipt
of this letter, request an opportunity to present to me, or my designee, an
analysis of your performance under the contract. Otherwise, you may withdraw
funds as a net award fee in the amount of $4,790,073 from your Special Bank
Account.

Mr. Dominick J. Sanchini          — 2 —          DEC 8 1988

I recognize that the operation of the Rocky Flats Plant has presented complex management challenges during this performance period. This is particularly true in the case of environment, safety and health issues. As stated in the enclosed evaluation report, the initiatives you have undertaken have my full support, and appear to be responsive to the needs of the plant. It is evident that a full response to these issues will require a sustained long-term effort by Rockwell management.

If you wish to meet with me, or my designee, please contact the Rocky Flats Area Office who will coordinate those arrangements for you.

                              Sincerely,


                         .  Original Signed By


                            Bruce G. Twining
                            Manager

Enclosure (2)

cc w/Enclosure:
A. E. Whiteman, Area Manager, RFAO

CONCUR
RTG. SY
. . . . . . . .
INITIALS
. . . . . . . . .
DATE
RTG. SY:
. . . . . . . .
INITIALS/
. . . . . . . .
DATE
RTG. SY:
. . . . . . . .
INITIALS/:
. . . . . . . .
DATE
RTG. SYM
. . . . . . . .
INITIALS/S
. . . . . . . .
DATE
RTG. SYM
. . . . . . . .
INITIALS/S
. . . . . . . . .
DATE
RTG. SYME
. . . . . . . . .
INITIALS/SI(
. . . . . . . .
DATE
RTG. SYMB
. . . . . . . . .
INITIALS/SI(
. . . . . . . .
DATE
RTG. SYMK
. . . . . . . . .
INITIALS/SIG.
. . . . . . . . .
DATE
RTG. SYM30
. . . . . . . . .
INITIALS/SIG.
. . . . . . . .
DATE

PERFORMANCE EVALUATION
ROCKWELL INTERNATIONAL CORPORATION
FOR THE PERIOD APRIL 1, 1988 - SEPTEMBER 30, 1988
CONTRACT NO. DE-AC04-76DP03533

The overall performance of Rockwell International Corporation (Rockwell) has been maintained at least at a level of "Satisfactory" during the period April 1, 1988, through September 30, 1988.

The following is an evaluation of the performance of Rockwell, relative to the management and operation of the Rocky Flats Plant, in the Functional Performance Areas (FPA's) selected for award fee evaluation.

The selected FPA's have been evaluated in accordance with the contract Award Fee Plan, and the following discussion of each FPA and the resulting award fee earned reflects an integrated assessment of all factors.

GENERAL MANAGEMENT: Rockwell maintained delivery performance at a level of 100% (the highest ever) for FY88. Other achievements included the successful implementation of the Terrain Responsive Atmospheric Code in the Emergency Operations Center, completion of the Office of Security Evaluation audit with very favorable results, development of an Equipment Replacement Model, design of an Integrated Maintenance Planning/Scheduling System, and development of an excellent training course for managers/supervisors regarding the Rockwell/ Steelworkers labor agreement. Additionally, Rockwell has been successful in reducing the use of Chlorinated Hydrocarbon Solvents in plant operations. Finally, Rockwell has responded to the Department of Energy (DOE) concerns about safety performance with an aggressive improvement program.

Inadequate process engineering controls have created concerns regarding overall performance in the area of pondcrete operations.

Rockwell has taken several positive steps to enhance their overall management and to develop appropriate plans and programs in the areas of Environment, Safety, and Health (ES&H). These efforts include the conduct of an internal Pre-Technical Safety Appraisal, the establishment of corporate and plant level internal safety oversight groups, enhancements in ES&H management staffing, and an enhanced level of communication regarding safety and health initiatives between management and labor.

Significant improvements remain to be accomplished in overall safety performance, including further establishment of line management responsibility and accountability for safety performance.

ENVIRONMENT, SAFETY, AND HEALTH: During the performance period, Rockwell submitted many technically extensive environmental documents in a timely manner to meet compliance agreement deadlines with the Environmental Protection Agency (EPA) and the State of Colorado. Injury performance indices for

1

the plant and protective forces have continued to improve, and actions in
response to the February 1988 Technical Safety Appraisal (TSA) have been
very intensive and have resulted in correction of many weaknesses. As noted
above, Rockwell has initiated many new activities to seek to achieve a fully
adequate program. However, a significant amount of improvement is required
to make the safety and health program at Rocky Flats adequate to today's
standards.

A few areas of specific concern include weaknesses in the quality of
laboratory analyses in support of environmental data for RCRA and CERCLA
programs. NPDES permit violations have occurred in four consecutive months.
Greater improvement also needs to be shown in terms of historical trends for
the Health Physics parameters of airborne releases within buildings. Rock-
well needs to assure that adequate staff is available in key areas in their
ES&H organization. Finally, Rockwell needs to continue to pursue its
agressive program for conducting safety inspections aimed at identifying
industrial safety hazards.

PRODUCTION OPERATIONS: All areas that support production operations have
performed in an outstanding manner during the performance period. In
addition, a good attitude with a desire for continuous improvement is
apparent. Rockwell has been very effective in responding to DOE with
regard to Make-vs-Buy decisions by establishing comprehensive procedures
and a Capabilities Maintenance Plan. Rockwell has also been successful in
developing an integrated scheduling initiative for manufacturing operations
in Buildings 460 and 707. Finally, an improved approach for safe shutdown
procedures has been developed and implemented for Building 707 and 777
equipment.

QUALITY: Rockwell has met or exceeded all quality performance goals
established for the period, including significant reductions in deviations
and scrap. Additionally, DOE has noted significant improvements in manage-
ment systems and in planning as it relates to the War Reserve (WR) Quality
Program. The Rockwell Quality Acceptance Program has improved to the point
that a DOE Quality Assurance (QA) Review Team has recommended that Rockwell
be delegated authority to accept and stamp WR product. A significant amount
of effort remains for Rockwell to achieve full plant-wide implementation of
NQA-1. Plans and accomplishments to date have been outstanding.

CHEMICAL OPERATIONS: Rockwell has become increasingly responsive to
significant issues facing its chemical recovery operations by providing more
stable line management and by effective utilization of available technical
expertise from other sites through the Plutonium Technology Committee and the
technical exchange group of the Materials Management Executive Committee
(MMEC).

An area of concern is that costs for activities associated with the Pluto-
nium Recovery Option Verifications Exercise (PROVE) Project have overrun the
estimated costs of these activities. Also, overall metal production in the
various recovery processes did not satisfy Master Nuclear Schedule commit-
ments. Fundamental change is still necessary within all of the organizations
that contribute to the recovery mission. Problem areas which require improve-
ment are: Adequacy of defined direction; a strong commitment towards technical
excellence; and effective utilization of site resources.

COST MANAGEMENT: Rockwell's overall performance continued at a very high level
throughout FY88. The contractor was successful in completing the year under
plan and under headcount ceiling despite the fact that significant resources
were required in support of the TSA, unplanned security requirements, and
prebuys for FY89. Rockwell developed an effective plan, including extensive
application of limited plant resources, to address the problem created by a
lack of DOE support for the FY89 Accelerated Residue Recovery line item.
Finally, Rockwell continued to provide excellent support to the Albuquerque
Operations Office (AL) indirect cost initiative.

Areas of concern which need improvement are: Adhering to construction project
authorization procedures; construction project advance planning; and construc-
tion project definition. Rockwell needs to develop means to incorporate all
requirements into budgeting requests prior to obtaining funds.

3



**Department of Energy**
Albuquerque Operations Office
P. O. Box 5400
Albuquerque, New Mexico 87115

REFER TO
_____ Area Mgr.
_____ AAMC
_____ AAMO
_____ Counsel
_____ CH. Admin. Br.
_____ CH. FM Br.
_____ CH. Opr Br.
_____ CH. QA Br.
_____ CH. S&EE Br.
_____ CH. S&EF Br.
_____ CH. S&S Br.
_____ Proj. Mgr. PRMP
_____ Duane Cadell

SEP 27 1989

Mr. Dominick J. Sanchini
President
Rocky Flats Plant
North American Space Operations
Rockwell International Corporation
P. O. Box 464
Golden, CO  80402

Dear Mr. Sanchini:

In accordance with Appendix D of Contract DE-AC04-76DP03533, the Department of Energy (DOE) hereby determines that Rockwell International Corporation (Rockwell) has earned an award fee of $2,716,624 for Plant and $186,591 for PRMP/PROVE, for a total of $2,903,215. The enclosed Performance Evaluation Report for the period October 1, 1988 through March 31, 1989, and a Memorandum from the Acting Assistant Secretary for Defense Programs, provide the basis for the DOE award fee determination.

The award fee approved by the DOE for payment to Rockwell was pursuant to an award fee plan previously developed to cover the period October 1, 1988 to March 31, 1989. This was prior to the institution by the DOE of stronger and tougher award fee plans to reward improvements in environment, safety, and health (ES&H) and substantially increase the proportion of the fee attributable to ES&H performance. Under the old contract provisions, however, the DOE was constrained as to the weight that might be given to ES&H performance in setting the fee for the six month period covered.

In the old award fee plan, which includes this period, up to 20% of the total amount of fee paid could be attributable to performance in the ES&H area. By reducing the award fee for ES&H to "Unsatisfactory," the DOE is indicating to Rockwell that your ES&H performance is unacceptable. Under the new plan, effective for performance after October 1, 1989, failure in any important area critical to contract performance may result in the payment of no award fee.

As specified in the Contract, you may, within five working days after receipt of this letter, request an opportunity to present to the DOE an analysis of your performance under the Contract. Otherwise, you may withdraw funds as a net award fee in the above amount from your Special Bank Account.

Dominick J. Sanchini                    - 2 -              SEP 27 1989

If you wish to meet with the DOE, please contact the Rocky Flats Office which
will coordinate those arrangements for you.

                              Sincerely,

                              Bruce G. Twining
                              Manager

Enclosures

cc w/enclosures:
David P. Simonson, Area Manager, RFO

Case No. 1:96-y-00203-RPM   Document 137-7   filed 06/01/07   USDC Colorado   pg 68 of 83



## Department of Energy
Washington, DC 20585

September 20, 1989

MEMORANDUM FOR    Bruce G. Twining
                  Manager
                  Albuquerque Operations Office

SUBJECT:          Award Fee Determination for the Period October 1, 1988
                  through March 31, 1989, Rockwell International Corporation
                  (RI).

Reference is made to your memorandum to me dated August 8, 1989, on this same
subject. This Office has carefully reviewed all of the documentation provided
by your Office regarding the Award Fee Determination for the period in
question. The Office is essentially in concurrence with your recommendations,
with an additional downward adjustment in the area of Environment, Safety and
Health (ES&H).

The additional downward adjustment to ES&H reflects several concerns.
Operations in Building 771 had to be stopped during October 1988 due to
inadequate safety procedures and radiological safety margins in the building.
Although RI pursued a very aggressive corrections effort after the fact, the
mere existence of this situation demonstrated less than satisfactory
attitudes, procedures, and awareness of safety issues on its part. Out of 230
safety concerns documented by external reviews and an internal RI review done
prior to the award fee period, 91 were not addressed during the period. This
further evidences a lack of priority attention paid to ES&H. During the
period, 32 new safety concerns, including six classified as Type 2 (serious),
were identified. Finally, the release of chromic acid from Building 444 into
the plant's holding ponds could have resulted in a major environmental
incident. An inoperable alarm system and deficient operator vigilance
contributed significantly to the seriousness of this incident. Overall, there
is strong evidence that throughout the award fee period there was a continuing
pattern of lax attitudes, inadequate procedures, and lack of consideration of
ES&H issues.

My Office has concluded that the "moderately good" numerical grade of 79 given
to RI for its performance under the ES&H category be downgraded to a numerical
grade of 65.25. Since ES&H carries an evaluation weight of 20 percent, the
overall rating for the period drops from 87 to 84.25. This equates to an
award fee of $2,716,307 for the Plant. We have not changed the award fee of
$186,591 for PRMP/PROVE. Therefore, the total fee is $2,902,898. Admiral
Watkins concurs in this recommendation.

09/21/89    09:31        FORSTL        NO. 007        007

-2-

In order to facilitate the dissemination of this information to RI and
coordinate it with the letter from Admiral Watkins to Chairman Beall of
today's date, we have attached a copy of your draft letter to RI which
reflects our concerns in the ES&H area.

John L. Meinhardt
Acting Assistant Secretary
   for Defense Programs

Attachment

PERFORMANCE EVALUATION
ROCKWELL INTERNATIONAL CORPORATION
CONTRACT NO. DE-AC04-76DP03533
FOR THE PERIOD OCTOBER 1, 1988 - MARCH 31, 1989

The overall performance of Rockwell International Corporation (Rockwell)
has been maintained at least at a level of "Satisfactory" during the period
October 1, 1988, through March 31, 1989.

The following is an evaluation of the performance of Rockwell, relative
to the management and operation of the Rocky Flats Plant, including the
performance for the Plutonium Recovery Modification Project (PRMP)/Plutonium
Recovery Option Verification Exercise (PROVE), in the Functional Performance
Areas (FPA's) selected for award fee evaluation. The first section covers
Plant operations while the second section covers PRMP/PROVE. The General
Management FPA was evaluated considering performance for both areas.

The selected FPA's for Plant operations have been evaluated in accordance with
the contract Award Fee Plan, and the following discussion of each FPA and
resulting award fee earned reflects an integrated assessment of all factors.

## PLANT

GENERAL MANAGEMENT: There was a rapid resolution to the problem of obtaining
United States Department of Transportation (DOT) approval for using a modified
ATMX railcar for making the first shipment of Transuranic mixed waste in 1989.
Interplant schedule compliance continued at 100% for the third consecutive
rating period. The Emergency Preparedness organization has a well-planned
and effective program, is involved in Albuquerque Operations Office (AL)-wide
coordination activities, and continues to make improvements. In less than four
years, Rockwell has exceeded a ten-year Energy Conservation Goal.

Rockwell has not made adequate progress to prepare for utilization of the
TRUPACT II container when it becomes available. The identification and timely
resolution of problems by Rockwell is often slow. Rockwell has recently vio-
lated DOT regulations on two shipments to the Nevada Test Site. Despite the
knowledge that nitrate concentrations on the 750 pad have increased, little
action has been taken to contain saltcrete after precipitation events.
Rockwell is still not placing sufficient emphasis on the timely establishment
of the Rocky Flats Institute. Inadequate project staffing for the PRMP
continues to influence Rockwell's performance.

COST MANAGEMENT: Good data and narratives provided by Rockwell to define
Department of Energy (DOE) unfunded Environment, Safety, and Health require-
ments in an FY89 supplemental budget request were also used to support DOE
requests to Congress for additional FY90 funding. Rockwell has done an
extraordinary job of tracking information and preparing responses to a large
variety of budget information requests and of maintaining the current status
of its requirements.' In addition, construction project data sheets and con-
ceptual design reports supporting Capital Budget requests were both of high
quality and ahead of schedule. Budget narratives were improved and expanded
and were helpful in DOE's analysis of Rockwell's resource requirements.

1

QUALITY:  Non-Weapons Quality Assurance activities conducted during the Building 771 restart have resulted in an improved quality program to be used in the operation of the building. For War Reserve Quality Assurance, Rockwell is implementing Phase 2 of the Quality Improvement Plan which will continue a new culture in quality practices and should lead to further improvement in the Quality Assurance program.

Rockwell failed to establish or make the necessary progress towards the establishment of a new standard of excellence and attendant requirements, procedures, and practices in nuclear facility operations. In addition, three incidents came to DOE's attention where Rockwell failed to provide the necessary measures to adequately control nonconforming product material.

CHEMICAL OPERATIONS: Noteworthy progress has been made towards the implementation of the Operational Readiness Review (ORR) program as demonstrated through ORR's in Building 771 and elsewhere. Rockwell has also successfully completed the development of a new extractant compound for use in the Molton Salt Extraction process. Both of these accomplishments will yield safer and more controlled production processes while maintaining or improving production performance.

PRODUCTION OPERATIONS: Significant progress has been made in the development of a Nuclear Facility Operations Manual. Rockwell has been supportive of the AL effort to develop an Operational Surety Program. Rockwell has taken several steps to reduce work in process inventories and process times by, among other things, reduced planned process times in Building 460, reduced pit assembly process time in Building 707, and reduced lot sizes on the 3T bodies.

ENVIRONMENT, SAFETY, AND HEALTH: Throughout the appraisal period, there was strong evidence of a continuing pattern of lax attitude, inadequate procedures, and lack of priority for ES&H activities. The operations in Building 771 were ceased in October 1988 due to inadequate safety procedures and radiological safety margins in the Building. Although Rockwell pursued a very aggressive corrections effort after the fact, the existence of this situation indicated a less than satisfactory attitude, procedures, and awareness for safety on the part of Rockwell. Ninety-one out of 230 safety concerns documented by external reviews (as well as by an internal Rockwell review) remained open during the period. Again, this indicates that a lack of priority attention was being paid to safety and health by Rockwell. During the period, 32 new safety concerns, including six classified as Type 2 (serious), were identified. A major environmental incident occurred during the period when chromic acid was released from Building 444 and contaminated the Plant's holding ponds. An inoperable alarm system and deficient operator vigilance contributed significantly to the seriousness of this incident.

2

PRMP/PROVE

PROJECT MANAGEMENT: Rockwell has given PROVE renewed emphasis by separating responsibility for PROVE from that of the PRMP and placing it under a full-time project manager. The recently implemented "Precursor Plan" represents an improvement in direction for the entire project and was implemented with professionalism and enthusiasm.

Overall PRMP management attention to project technical, cost, schedule, and manpower need was inadequate. In addition, inadequate project staffing continues to influence Rockwell's performance.

COST MANAGEMENT: Cost development and baselining of costs for the "Precursor Plan" have been handled with the highest degree of quality. Rockwell's redirection of J. A. Jones' manpower planning on PROVE resulted in reduced costs and apparent increas.' construction productivity.

PROVE continues to demonstrate cost growth. PRMP cost planning far exceeded available project funding allocations.

SCHEDULE PERFORMANCE: Rockwell has successfully resolved several problems which were impacting schedule in the PROVE area. The diligent effort by Rockwell, Bechtel, and J. A. Jones in the joint development of the Precursor planning has resulted in a comprehensive schedule that should provide a smooth transition from PROVE to the receipt of capital funding for PRMP.

The PROVE schedule has deteriorated during the reporting period, extending the PROVE·end date from 1/90 to 8/90.

SUBCONTRACT MANAGEMENT: Rockwell, consistent with project technical needs and evolved cost and schedules, has provided rapid and effective subcontract redirection of Bechtel. Rockwell subcontract management of J. A. Jones has ensured J. A. Jones' participation in construction planning. Rockwell has been successful in obtaining active participation and commitment from the National Laboratories and other Rockwell organizations on the PRMP Precursor Program.

The subcontract work with the PROVE glovebox manufacturer has resulted in the need for significant rework to the glovebox piping and piping penetration welds. Line Item and cost/schedule activities over the balance of the FY89 demand that Rockwell provide continuous site representation at Bechtel.

DESIGN QUALITY: The Precursor Program, geared toward improving PRMP design quality, has been initiated with broad based involvement. Use of the Configuration Control System for PROVE has been greatly improved.

The quality of the existing PROVE engineering has been poor, and change orders to correct poor initial design quality are reflected in cost growth.

TECHNICAL PRODUCT QUALITY: PROVE activities in addressing and rectifying glovebox welding problems are directed towards, and should significantly improve, technical product quality.

Welding problems recently surfacing on the PROVE glovebox indicate a significant lack of technical product quality success.

3



Department of Energy

ROCKY FLATS OFFICE
P.O. BOX 928
GOLDEN, COLORADO 80402-0928

February 23, 1990

Mr. Dominick J. Sanchini
Vice President, Major Programs
Rockwell International Corporation
Department 001, Mail Code D-37
2230 East Imperial Highway
El Segundo, CA  90245

Dear Mr. Sanchini:

In accordance with Appendix D of Contract DE-AC04-76DP03533, the
Department of Energy (DOE) hereby determines that Rockwell Inter-
national Corporation (Rockwell) has earned an award fee of $1,241,604
for Plant and $338,035 for PRMP/PROVE, for a total of $1,579,639. The
enclosed Performance Evaluation Report for the period April 1, 1989
through September 30, 1989, and a Memorandum from the Under Secretary,
provide the basis for the DOE award fee determination.

The award fee approved by the DOE for payment to Rockwell is pursuant
to an award fee plan previously developed to cover the period April 1,
1989 to September 30, 1989. This was prior to the institution by the
DOE of stronger and tougher award fee plans to reward improvements in
environment, safety, and health (ES&H) and substantially increase the
proportion of the fee attributable to ES&H performance. Under the old
contract provisions, however, the DOE was constrained as to the weight
that might be given to ES&H performance in setting the fee for the six
month period covered.

In the old award fee plan, which includes this period, up to 20% of
the total amount of fee paid could be attributable to performance in
the ES&H area. By reducing the award fee rating for ES&H to
"Unsatisfactory," the DOE is indicating to Rockwell that its ES&H
performance was unacceptable. In addition, by reducing the award fee
rating for general management to "Marginal," the DOE is indicating to
Rockwell that its general management performance was deficient.

As specified in the Contract, you may, within five working days after
receipt of this letter, request an opportunity to present to the DOE
an analysis of your performance under the Contract. Otherwise, after
this period we will provide you the award fee amount.

2

If you wish to meet with the DOE, please contact this office in order
to coordinate those arrangements for you.

Sincerely,


Robert M. Nelson, Jr.
Manager

Enclosures

PERFORMANCE EVALUATION REPORT
ROCKWELL INTERNATIONAL CORPORATION
CONTRACT NO. DE-AC04-76DP03533
FOR THE PERIOD APRIL 1 - SEPTEMBER 30, 1989

The overall performance of Rockwell International Corporation (Rockwell) was maintained at least at the level of "Satisfactory" during the period April 1 through September 30, 1989.

The following are separate evaluations of the performance of Rockwell relative to the management and operation of the Rocky Flats Plant and the performance for the Plutonium Recovery Modification Project (PRMP)/Plutonium Recovery Option Verification Exercise (PROVE), in the selected Functional Performance Areas (FPA's). The first section covers Plant operations while the second section covers PRMP/PROVE. The General Management FPA was evaluated considering performance for both areas.

The selected FPA's have been evaluated in accordance with the contract Award Fee Plan, and the following summary of each FPA and resulting award fee earned reflects an integrated assessment of all factors.

### PLANT

GENERAL MANAGEMENT: There was considerable evidence of Rockwell management's inability to effectively manage this facility, and this was seen by DOE to be a serious, major deficiency. This deficiency was manifested in lack of progress in integrating safety responsibility and accountability at all working levels and also by deficient lines of responsibility, procedures, discipline/work ethic, training, on-floor supervision, and problem investigation/resolution. Numerous incidents provide evidence of the above deficiencies. A continuing lack of priority attention to safety and health, as evidenced by the open status of many of the safety concerns documented during the period, was a clear indication of poor management. Additionally, despite an increase in nitrate concentrations on the 750 Pad, little action was taken to contain saltcrete after precipitation events. The preparation for the annual DOE inventory of Special Nuclear Material at Rocky Flats was unsatisfactory.

ENVIRONMENT, SAFETY & HEALTH: Long term understaffing in the Health, Safety and Environment organization resulted in less than adequate attention applied to several essential projects and safety functions. Rockwell was unsuccessful in reaching their Plant Performance Goal for recordable injuries and in reducing the total number of workplace contamination incidents. Rockwell continued to have problems in the construction safety area. Rockwell failed to exercise an acceptable level of program management in the development of official recommendations for restart of the Building 374 evaporator. A criticality safety assessment performed in August 1989, noted many aspects of the criticality safety program which needed improvement. Rockwell failed to exercise an acceptable level of program management in dealing with pondcrete and saltcrete. Rockwell's oversight of the environmental subcontractors performing routine environmental monitoring was deficient. As identified in the DOE-HQ assessment team report, deficiencies in the RFP effluent air monitoring program may adversely affect determination of radioactive materials released to the atmosphere. Waste shipments to Idaho and Nevada were marked by errors in manifests and contamination on waste packages, which jeopardized the future of offsite disposal plans.

1

QUALITY: The plant-wide implementation of DOE non-weapons quality assurance requirements did not progress at the accelerated rate expected.

The Rockwell Final Product Acceptance group performed effectively after only one year of having the responsibility for most product acceptance. Lot rejects and Final Product Acceptance observations decreased during the second half of FY89.

COST MANAGEMENT: Rockwell provided excellent support to both the Environmental Restoration and Waste Management Five-Year Plan and to the Modernization Study. Rockwell did an extraordinary job of collecting information, categorizing and documenting the large number of new funding requirements created by the FBI/EPA investigation, the DOE Tiger teams, and the DOE/CDH Agreement. All validated construction line item projects were included in the Department's 1991 budget request.

PRODUCTION OPERATIONS: The processing of procured finished machined products was consolidated within Building 460 to reduce overall process times and decrease costs. Rockwell was effective in reducing halogenated solvent usage, and continued to make progress with its new scheduling philosophy which was designed to minimize work-in-process inventories by managing bottlenecks.

The self-appraisal program instituted in all Production Operations buildings, an adaptation of the Building 771 Restart Criteria, did not receive sufficient management attention or "ownership" and was ineffective.

CHEMICAL OPERATIONS: Plutonium Recovery Operations and Production Operations worked in conjunction to develop the Nuclear Facility Operation Manual, which was to establish the standard of excellence for operations of Rocky Flats facilities. As a result of the deliverables that Rockwell had to complete before Building 771 restart approval was granted, a number of procedures were changed or developed and implemented. This implementation was successful, and the building management team continued to develop and implement improvements to those procedures.

Rockwell's management controls and directives in areas such as recovery operations planning, work breakdown structure and scheduling systems, and cost control systems result in implementation/installation/operation delays and other problems. There continued to be a failure to establish performance goals for process operations and to measure process performance; therefore, operations were not baselined to provide for improved performance.

PRMP/PROVE

PROJECT MANAGEMENT: Rockwell took an active role in establishing Los Alamos National Laboratory technical personnel as a part of the PRMP structure. Provisional agreement was reached by the Senior Management Review Board on the baseline PRMP process technologies.

Rockwell did not provide an adequate system to produce timely and accurate project control information. Integration of an essential, computerized, three-dimensional Plant Configuration Model into the overall PRMP design strategy has been slow.

2

COST MANAGEMENT: Rockwell took positive action to reduce the cost of A-E services, including reducing overhead, requiring the A-E to meet commitments, and upgrading control measures over the scope of A-E work.

The Cost and Schedule Reduction Precursor activity incurred over $100,000 cost without any visible or deliverable product, which indicates an unacceptable lack of cost controls.

SCHEDULE PERFORMANCE: The PROVE test schedule was prepared as an integrated effort between Plutonium Operations and PROVE engineering. Detailed schedules were developed for activities preliminary to PRMP construction to provide a base for performance measurement.

Schedule reports were not provided in a form which ensured timely reporting and accuracy to the overall project schedules.

SUBCONTRACT MANAGEMENT: Rockwell took positive action to develop an A-E Statement of Work which provided for their required services at an appropriate level of detail.

Inadequate Quality Assurance/Quality Control oversight of the glovebox subcontractor resulted in extra costs and delivery delays to the Government.

DESIGN QUALITY: PRMP Technical Baseline documentation was of unacceptable quality and behind schedule.

TECHNICAL PRODUCT QUALITY: Rockwell did not require periodic, independent audit of NQA-1 compliance and Non-Conformance Report actions to ensure that quality actions were completed without prejudice. A QA plan for PRMP, required prior to start of the full design effort and Title I activities, was not completed.

3

AILY CAMERA — Tuesday, February 27, 1990

C-90-02-975

C-90-02-07

# ad reviews cost Rockwell $6.2 million in Flats bonuses

L. SCANLON
a Staff Writer

former operator at Rocky Flats
.2 million in awards from April
h September because of bad
on management, health, safety
e environment, the Department
rgy announced Monday.
deficiency: the air monitor sys-
annot be relied on to determine
much radioactivity is released
e atmosphere.
well International, which oper-

ated the nuclear weapons plant eight
miles south of Boulder from 1975 to
1989, received just 25 percent of the
maximum possible award for the peri-
od from April through September — $2
million of a possible $8.2 million. The
previous three years it had received
$26.8 million in bonuses, 81 percent of
the maximum award.

Also Monday, DOE Secretary James
Watkins told the nation's governors
that a new supercompactor, combined
with waste reduction efforts, will keep

Rocky Flats from reaching its legal ra-
dioactive waste storage limit until
1991, perhaps late fall of that year.

That will buy more time for the
opening of the permanent waste dis-
posal site: the Waste Isolation Pilot
Plant in Carlsbad, N.M.

The supercompactor will crunch four
barrels of radioactive waste into one;
waste generation has shrunk from 140
cubic yards per month to 70.

Rockwell managers demonstrated an
"inability to effectively manage"

Rocky Flats, DOE plant manager Rob-
ert M. Nelson Jr. said. They had not
made employees accountable for safe-
ty, and there was a lack of discipline
and work ethic and supervision.

According to the DOE, Rockwell
didn't properly oversee the subcontrac-
tors doing environmental monitoring
and jeopardized the chances of ship-
ping waste off-site in the future be-
cause shipments to Idaho and Nevada
had contamination on packaging and
errors on manifests.

## Convert Flats plant

Editor:

What we need to do is to deal with Rocky Flats now,
not in 20 years when the plant may or may not be moved,
not in 10 years when we discover that health hazards are
far more severe than once thought, not in several month
when the plutonium operation resumes and we are once
again cranking out bombs like Mrs. Fields' cookies.

The Social Action Committee of the Unitarian-Univer-
salist Church of Boulder is intrigued with Josie Heath's
proposal to immediately convert Rocky Flats into a toxic

waste clean-up, research and resource facility. As con-
taminants are being removed from soil, air and water,
waste handlers and transporters would simultaneously
be trained in the state-of-the-art disposal of these wastes
and in source reduction strategies.

This dual approach would not only maintain the cur-
rent level of employment at Rocky Flats, but would also
serve as a model to other communities throughout the
nation. Boulder has been a leader in a number of fields,
including Eco-Cycle and smoking bans. Let's go for the
big one.

CAROL SEIDEMAN for the
Social Action Committee
4105 Moorhead Ave.

*The Denver Post - 2/27/90*

C90-02-085

C90-02-086

# Rockwell gets bonus despite 'unsatisfactory' record

**By Beth Frerking**
*Denver Post Washington Bureau Chief*

WASHINGTON — Rockwell International earned an "unsatisfactory" rating for environmental, safety and health operations at Rocky Flats nuclear weapons plant last year, but it still managed to pull in $1.6 million in bonuses from the Department of Energy.

Federal energy officials announced yesterday that the agency would pay Rockwell $3 million in

fixed and award fees for operating the plant from April through September 1989.

Rockwell lost its contract to manage Rocky Flats last September after federal officials raided the plant to investigate alleged violations of environmental laws.

The $3 million fee consists of $432,000 in fixed operating fees and $1.6 million in bonuses for performance in several categories, including general management, cost management and production.

Energy officials emphasized that they are required to pay the award fees under the old contract with Rockwell. Under that rating system, environmental and safety performance counted for only 20 percent of the appraisal total. That has since been bumped up to 51 percent.

If a contractor fails under today's guidelines in environmental and safety performance, the company risks losing its entire award fee, said department spokeswom-

an Catherine Kaliniak. But under the old contract, she said, "we didn't have that kind of flexibility."

Rockwell could have received $3.2 million for the six-month period, but energy officials downgraded the fee because of a 64 rating (of a possible 100) on environmental, safety and health issues, and a 69 — or marginal — on general mangement issues.

# Cleanup, not production hike, needed at Flats, citizens say

**By Tom Graf**
*Denver Post Environmental Writer*

BOULDER — The federal government should spend its money cleaning up the Rocky Flats nuclear weapons plant instead of planning to increase production there, several citizens said last night.

"Rocky Flats is definitely a threat to public health," environmental activist Eugene DeMayo told the Defense Nuclear Facility

Safety Board during a public meeting in Boulder last night. "If we are to reduce that risk to an acceptable level we need to start cleaning up the plant right away."

DeMayo and other speakers criticized the Department of Energy's plan to spend more than $500 million to build a new plutonium processing facility at the plant.

"We need to deal with the problems we have instead of creating

new ones," said DeMayo, chairman of the Colorado Chapter of the Sierra Club.

The safety board yesterday began a five-day tour and inspection of the Jefferson County plant to determine if it is safe for plutonium operations at Rocky Flats to resume.

Those operations were suspended Dec. 1 by Energy Secretary James Watkins. The primary mission of Rocky Flats is to manufacture plutonium triggers for nuclear warheads.

Most of the speakers last night said they were opposed to resum-

ing plutonium operations, but others said they would like a full environmental assessment done at the plant before the operations resume.

John Conway, chairman of the five-member board, promised to give Rocky Flats operations a full review before recommending whether plutonium operations should begin again.

"That's what we're here for, to look at the entire operations," Conway said. "If Secretary Watkins doesn't act on our recommendation, then we can go directly to the president."

Ken says this is the core of real proof that the gov't has made illegal pymts to Locky. Flts – stuff that G.J. hasn't been told & they haven't needed the media.

MAR-31-92 TUE 10:21    DOE ADMIN.        FAX NO. 303 988 3321       P. 02

**FEES PAID TO ROCKWELL INTERNATIONAL**
**UNDER DOE CONTRACT DE-AC04-76DP03533**
**FOR FY 1987 THROUGH FY 1989**

| FROM | TO | BASE FEE | "PLANT" AWARD FEE | "PRMP/PROVE" AWARD FEE | GOAL ACHIEVEMENT OBJECTIVES | TOTAL FEES |
|---|---|---|---|---|---|---|
| 10/1/86 | 3/31/87 | $1,138,950 | $4,184,053 | | | $5,323,003 |
| 4/1/87 | 9/30/87 | $1,138,950 | $4,359,441 | | $540,000 | $6,038,391 |
| 10/1/87 | 3/31/88 | $782,400 | $4,758,244 | | | $5,540,644 |
| 4/1/88 | 9/30/88 | $782,400 | $4,790,073 | | | $5,572,473 |
| 10/1/88 | 3/31/89 | $432,850 | $2,716,624 | $186,591 | | $3,336,065 |
| 4/1/89 | 9/30/89 | $432,850 | $1,241,604 | $338,035 | | $2,012,489 |
| TOTAL FEES PAID, FY 1987 THROUGH FY 1989 | | | | | | $27,823,065 |

OIER                          TEL              505 846 8206 Dec 21.65 14:42   P.02

## FEES PAID TO ROCKWELL INTERNATIONAL

| FISCAL YEAR | BASE FEE | AWARD FEE | TOTAL |
|---|---|---|---|
| 1981 – 1ST | $  908,525 | $1,266,478 | $2,175,003 |
| – 2ND | 908,525 | 1,150,550 | 2,059,075 |
| 1982 – 1ST | 1,058,220 | 1,405,832 | 2,464,052 |
| – 2ND | 1,058,220 | 1,272,335 | 2,330,555 |
| 1983 – 1ST | 1,067,915 | 1,502,769 | 2,570,684 |
| – 2ND | 1,067,915 | 1,728,314 | 2,796,229 |
| 1984 – 1ST | 1,330,000 | 1,619,940 | 2,949,940 |
| – 2ND | 1,330,000 | 1,965,208 | 3,295,208 |
| 1985 – 1ST | 1,338,500 | 2,851,808 | 4,190,308 |
| – 2ND | 1,338,500 | 2,940,149 | 4,278,649 |
| 1986 – 1ST | 1,453,800 | 3,203,010 | 4,656,810 |
| – 2ND | 1,453,800 | 3,347,342 | 4,801,142 |
| 1987 – 1ST | 138,950 | 4,184,043 | 5,322,993 |
| – 2ND | 138,950 | 4,359,441 | 5,498,391 |
| 1988 – 1ST | 782,400 | 4,758,244 | 5,540,644 |
| – 2ND | 782,400 | To be determined by 11-18-88 | |

HISTORY OF AWARD FEE PAYMENTS

| PERIOD | BASE FEE | AWARD FEE PAID | AF NOT AWARDED | POTENTIAL AF | TTL FEE PAID | POTENTIAL TTL FEE | % AF AWD | % TTL AWD |
|---|---|---|---|---|---|---|---|---|
| 04/01/79 - 09/30/79 | $583,990 | $751,421 | $204,199 | $955,620 | $1,335,411 | $1,539,610 | 79% | 87% |
| 10/01/79 - 03/31/80 | $829,685 | $1,258,797 | $400,573 | $1,659,370 | $2,088,482 | $2,489,055 | 76% | 84% |
| 04/01/80 - 09/30/80 | $829,685 | $1,342,761 | $316,609 | $1,659,370 | $2,172,416 | $2,489,055 | 81% | 87% |
| 10/01/80 - 03/31/81 | $908,525 | $1,266,470 | $550,572 | $1,817,050 | $2,175,003 | $2,725,575 | 70% | 80% |
| 04/01/81 - 09/30/81 | $908,525 | $1,150,550 | $666,500 | $1,817,050 | $2,059,075 | $2,725,575 | 63% | 76% |
| 10/01/81 - 03/31/82 | $1,058,220 | $1,405,832 | $710,608 | $2,116,440 | $2,464,052 | $3,174,660 | 66% | 78% |
| 04/01/82 - 09/30/82 | $1,058,220 | $1,272,335 | $844,105 | $2,116,440 | $2,330,555 | $3,174,660 | 60% | 73% |
| 10/01/82 - 03/31/83 | $1,067,915 | $1,502,769 | $633,061 | $2,135,830 | $2,570,684 | $3,203,745 | 70% | 80% |
| 04/01/83 - 09/30/83 | $1,067,915 | $1,728,314 | $407,516 | $2,135,830 | $2,796,229 | $3,203,745 | 81% | 87% |
| 10/01/83 - 03/31/84 | $1,330,000 | $1,619,940 | $1,040,060 | $2,660,000 | $2,949,940 | $3,990,000 | 61% | 74% |
| 04/01/84 - 09/30/84 | $1,330,000 | $1,965,200 | $694,792 | $2,660,000 | $3,295,208 | $3,990,000 | 74% | 74% |
| 10/01/84 - 03/31/85 | $1,338,500 | $2,651,800 | $1,163,692 | $4,015,500 | $4,190,308 | $5,354,000 | 73% | 78% |
| 04/01/85 - 09/30/85 | $1,338,500 | $2,940,149 | $1,075,351 | $4,015,500 | $4,278,649 | $5,354,000 | 73% | 80% |
| 10/01/85 - 03/31/86 | $1,453,800 | $3,174,225 | $1,187,175 | $4,361,400 | $4,628,025 | $5,815,200 | 79% | 82% |
| 04/01/86 - 09/30/86 | $1,453,800 | $3,337,512 | $1,024,058 | $4,361,400 | $4,791,312 | $5,815,200 | 77% | 85% |
| 10/01/86 - 03/31/87 | $1,138,950 | $4,184,053 | $1,131,047 | $5,315,100 | $5,323,003 | $6,454,050 | 82% | 95% |
| 04/01/87 - 09/30/87 | $1,138,950 | $4,359,941 | $955,659 | $5,315,100 | $5,498,391 | $6,454,050 | 82% | 85% |
| 10/01/87 - 03/31/88 | $782,400 | $4,758,244 | $1,500,956 | $6,259,200 | $5,540,614 | $7,041,600 | 76% | 79% |
| 04/01/88 - 09/30/88 | $782,400 | $4,790,073 | $1,469,127 | $6,259,200 | $5,572,473 | $7,041,600 | 77% | 79% |
| 10/01/88 - 03/31/89 | $432,850 | $2,903,215 | $4,888,085 | $7,791,300 | $3,336,065 | $8,224,150 | 37% | 41% |
| TOTALS | $20,399,900 | $45,659,740 | $15,975,660 | $61,635,400 | $66,059,720 | $82,035,380 | 74% | 81% |

ATTACHMENT 6