# THE PROSECUTION OF ENVIRONMENTAL CRIMES AT THE DEPARTMENT OF ENERGY'S ROCKY FLATS FACILITY

January 4, 1993

**Rep. Howard Wolpe**
Chairman
Subcommittee on
Investigations and Oversight
House Committee on Science, Space and Technology

000123

# TABLE OF CONTENTS

LETTER OF TRANSMITTAL ........................................ 4

KEY PARTICIPANTS IN THE ROCKY FLATS PROSECUTION ............. 6

I.      INTRODUCTION ........................................... 9

II.     SUMMARY OF FINDINGS .................................... 12

III.    RECOMMENDATIONS ....................................... 16

IV.     THE ROLE OF THE JUSTICE DEPARTMENT .................... 20

V.      THE PLEA AGREEMENT .................................... 33

        A.   Background ........................................ 33
        B.   Rockwell Settlement Demands ....................... 36

             1.   Individual Indictments:  Evidentiary Bases ................. 39
             2.   Charges with Offsite Implications ........................ 66
             3.   False Statement, Fraud and Conspiracy Charges ........... 78
             4.   Nolo Contendere Pleas ................................. 80
             5.   Indemnification ...................................... 82
             6.   Debarment ........................................... 87
             7.   Global Settlement ..................................... 88
             8.   Public Statements ..................................... 89
             9.   Grand Jury Report .................................... 99
             10.  Summary ............................................ 100

VI.     THE FINE .............................................. 102
        A.   Early Prosecution Discussion ....................... 102
        B.   Rationales for Low and High Bottom Lines .......... 103
        C.   Settling on $15.5 Million and Inching Up ........... 105
        D.   Conclusion ........................................ 106

VII.    LACK OF INDICTMENTS OF DOE PERSONNEL ................. 108

VIII.   THE ROLE OF THE DEPARTMENT OF ENERGY ............... 112

IX.     THE SPECIAL GRAND JURY REPORT ....................... 121

X.      THE EFFECTS OF THE PROSECUTION ...................... 141

ENDNOTE ...................................................... 144

GEORGE E. BROWN, JR., California, CHAIRMAN

JAMES H. SCHEUER, New York
MARILYN LLOYD, Tennessee
DAN GLICKMAN, Kansas
HAROLD L. VOLKMER, Missouri
HOWARD WOLPE, Michigan
RALPH M. HALL, Texas
DAVE McCURDY, Oklahoma
NORMAN Y. MINETA, California
TIM VALENTINE, North Carolina
ROBERT G. TORRICELLI, New Jersey
RICK BOUCHER, Virginia
TERRY L. BRUCE, Illinois
RICHARD H. STALLINGS, Idaho
JAMES A. TRAFICANT, Jr., Ohio
HENRY J. NOWAK, New York
CARL C. PERKINS, Kentucky
TOM McMILLEN, Maryland
DAVID R. NAGLE, Iowa
JIMMY HAYES, Louisiana
JERRY F. COSTELLO, Illinois
JOHN TANNER, Tennessee
GLEN BROWDER, Alabama
PETE GEREN, Texas
RAY THORNTON, Arkansas
JIM BACCHUS, Florida
TIM ROEMER, Indiana
BUD CRAMER, Alabama
DICK SWETT, New Hampshire
MICHAEL J. KOPETSKI, Oregon
JOAN KELLY HORN, Missouri
ELIOT L. ENGEL, New York
JOHN W. OLVER, Massachusetts

ROBERT S. WALKER, Pennsylvania
F. JAMES SENSENBRENNER, Jr., Wisconsin
SHERWOOD L. BOEHLERT, New York
TOM LEWIS, Florida
DON RITTER, Pennsylvania
SID MORRISON, Washington
RON PACKARD, California
PAUL B. HENRY, Michigan
HARRIS W. FAWELL, Illinois
LAMAR SMITH, Texas
CONSTANCE A. MORELLA, Maryland
DANA ROHRABACHER, California
STEVEN H. SCHIFF, New Mexico
TOM CAMPBELL, California
JOHN J. RHODES, III, Arizona
JOE BARTON, Texas
DICK ZIMMER, New Jersey
WAYNE T. GILCHREST, Maryland
SAM JOHNSON, Texas
GEORGE ALLEN, Virginia

RADFORD BYERLY, Jr.
Chief of Staff
MICHAEL RODEMEYER
Chief Counsel
CAROLYN C. GREENFELD
Chief Clerk
DAVID D. CLEMENT
Republican Chief of Staff

## U.S. HOUSE OF REPRESENTATIVES

# COMMITTEE ON SCIENCE, SPACE, AND TECHNOLOGY

### SUITE 2320 RAYBURN HOUSE OFFICE BUILDING
### WASHINGTON, DC 20515-6301
### (202) 225-6371

January 4, 1993

The Hon. George E. Brown, Jr.
Chairman
Committee on Science, Space
 and Technology

Dear Mr. Chairman:

Since of June 1992, the Subcommittee on Investigations and Oversight has been reviewing the settlement of the Federal Government's investigation and prosecution of environmental crimes by Rockwell Inc. at the Department of Energy's (DOE) Rocky Flats nuclear weapons facility. The enclosed report summarizes what we have learned to date and makes recommendations for the 103rd Congress.

This has not been an easy investigation due to the lack of cooperation of the U.S. Department of Justice. As you know, the Subcommittee was forced to issue subpoenas to compel the testimony of Department of Justice attorneys and agents of the Federal Bureau of Investigation involved in this case.

Even when the Subcommittee received testimony under oath in closed sessions from four of these individuals pursuant to the subpoenas that were issued, the witnesses, under orders from Justice lawyers, refused to answer questions about their agency's internal deliberations. The Subcommittee was able to resolve this dispute only in the closing days of this session of Congress, which allowed the continuation of this investigation during the recess.

At that time, I stated that I would provide you with a personal report of results of the Subcommittee's work before the new Congress convened. The report speaks for itself, but I would like to briefly highlight a few points that I consider particularly important.

First, our investigation revealed a very troubling lack of public accountability in the Federal Government. Serious environmental crimes were committed, but no individuals were held responsible. The crimes were attributed to a "culture" at DOE -- not the actions of responsible individuals. This is the white collar equivalent of blaming an armed robbery on "society" -- not the individual holding the gun.

The Hon. George Brown
January 4, 1993
Page 2

Second, it should be noted that the most important thing that Federal prosecutors bargained
away in negotiations with Rockwell was the truth. By entering into this plea agreement, the
prosecutors bargained away the right to fully and accurately inform the American people and
the Congress about the conditions, activities, and crimes at the Rocky Flats facility.
Conditions that, I might add, continue to this day even though Rockwell has been replaced
as the facility's contractor. And these conditions are not unique to Rocky Flats; they can be
found throughout the DOE complex. By papering over the situation at Rocky Flats, the
prosecutors forfeited the opportunity to focus National attention on the crimes committed
at Rocky Flats; attention that is necessary to create the political momentum for meaningful
reform throughout the DOE complex.

Third, I would like to indicate my sympathy for the courageous individuals who served on
the Rocky Flats grand jury. I do not condone the violation of Federal law. But these
citizens were so offended by the plea agreement with Rockwell that they have placed
themselves in legal jeopardy by publicly discussing the settlement.   Justice is actively
investigating grand jury leaks, in an effort to make a decision in the near future on indicting
members of the grand jury. In my view, it would be both ironic and outrageous if the
Department of Justice prosecutes the grand jurors themselves with more vigor than they
demonstrated in prosecuting Rockwell for serious environmental crimes.

Rather than prosecuting these individuals, I think that it would be only fitting if President
Bush were to extend pardons to them for any violations of law that they may have
committed for speaking their consciences about the Rocky Flats settlement.   If Casper
Weinberger can be pardoned for crimes resulting from withholding vital information from
the Congress and the public, I don't see why these citizens should be prosecuted for
providing vital information to the Congress and the public.

This report is not the final word on the Rocky Flats prosecution. There are numerous leads
that should be pursued before final conclusions can be reached. However, I am confident
that this report will help the American people better understand the numerous and complex
factors that influenced how their government handled this matter.

Sincerely,

Howard Wolpe, Chairman
Subcommittee on Investigations
and Oversight

## KEY PARTICIPANTS IN THE ROCKY FLATS PROSECUTION

Justice Department (Headquarters)

Joseph (Jerry) Block
> Chief, Environmental Crimes Section,
> Until July 1991

Kenneth Buck
> Assistant U.S. Attorney, Colorado
> Briefly worked on Rocky Flats case

Donald Carr
> Acting Assistant Attorney General
> Environment and Natural Resources Division,
> From February 1989 to August 1989;
> Approved search warrant executed on June 6, 1989

Neil Cartusciello
> Chief, Environmental Crimes Section,
> From May 1991 to present

Charles (Chuck) De Monaco
> Assistant chief, Environmental Crimes Section,
> February 1989 to present

Barry Hartman
> Deputy Assistant Attorney General,
> Environment and Natural Resources Division,
> From October 1989 to July 1991;

> Acting Assistant Attorney General,
> Environment and Natural Resources Division,
> From July 1991 to June 1992

William Hassler
> Trial attorney, Environmental Crimes Section,
> From March 1990 tq April 1991,
> Assigned to Rocky Flats case

Peter Murtha
> Trial attorney, Environmental Crimes Section,
> From 1986 to present;
> Primary headquarters attorney assigned to Rocky Flats case

## KEY PARTICIPANTS IN THE ROCKY FLATS PROSECUTION (Cont.)

Criselda Ortiz
>Trial attorney/supervisory trial attorney,
Environmental Crimes Section,
From February 1989 to April 1991, and August 1992 to present

Richard Stewart
>Assistant Attorney General,
Environment and Natural Resources Division,
From August 1989 to July 1991

Robert E. Mueller, III
>Assistant Attorney General,
Criminal Division,
From September 1990 to present

John C. Keeney
>Principal Deputy Assistant Attorney General,
Criminal Division

Paul Coffey
>Deputy chief, Organized Crime and Racketeering Section,
From October 1988 to July 9, 1990;

>Acting chief to July 1991;
Chief, July 1991 to present

United States Attorney's Office, District of Colorado

Michael Norton
>U.S. Attorney, Colorado,
March 13, 1988 to present

Kenneth Fimberg
>Assistant U.S. Attorney, Colorado,
January 1986 to present
Chief, White Collar Crime Section
Lead prosecutor, Rocky Flats case

000128

## KEY PARTICIPANTS IN THE ROCKY FLATS PROSECUTION (Cont.)

Federal Bureau of Investigation

Jon Lipsky
   Lead agent on Rocky Flats case;
   Began developing case in 1987

Environmental Protection Agency

William F. Smith
   Special agent, Office of Criminal Investigation,
   Lead EPA agent on Rocky Flats case

Attorneys Representing Rockwell International Corporation

Lee Foreman
   Foreman, Haddon and Morgan
   Denver, Colorado

Harold Haddon
   Foreman, Haddon and Morgan
   Denver, Colorado

Bryan Morgan
   Foreman, Haddon and Morgan
   Denver, Colorado

Vincent Fuller
   Williams & Connolly
   Washington, D.C.

## SUBCOMMITTEE MAJORITY STAFF INVOLVED IN THE ROCKY FLATS INVESTIGATION

Edith Holleman
Counsel

Bob Roach
Chief Investigator

# I. INTRODUCTION

Since June of 1992, the Subcommittee has been reviewing the government's investigation and prosecution of allegations that Rockwell International Corporation (RIC), its employees, and the Department of Energy (DOE) and its personnel committed environmental crimes at the DOE's Rocky Flats nuclear weapons plant in Colorado. These allegations resulted from Rockwell's activities as the management and operating contractor of the Rocky Flats facility.

On June 1, 1992, the U.S. Federal Court for the District of Colorado accepted a plea bargain between the U.S. Department of Justice and Rockwell International Corporation for criminal violations of environmental laws committed by Rockwell during 1987-1989. Unlike the Exxon Valdez case, the judge did not attempt to change the settlement agreement in any way. Perhaps to forestall the emerging criticism, the judge stated:

> . . . [T]he Court is limited to consideration of the charges that have actually been filed by the Government. Those charges are, in turn, confined to specific violations involving the illegal storage of pondcrete and saltcrete and the improper handling of certain pollutant discharges between May of 1987 and June of 1989. The court has no authority to take any action with respect to any other violations that may or may not have occurred at the Rocky Flats Plant during its forty-year history of operation. The Court notes that the decision about what charges should be filed in a particular case lies solely within the discretion of the Executive Branch. See, e.g., United States v. Williams, 112 S.Ct. 1735 (1992).[1]

The settlement was the culmination of a five-year investigation conducted by a joint government task force after years of allegations of environmental mismanagement at Rocky Flats.[2] The Federal Bureau of Investigation (FBI), the Department of Justice (DOJ), the U.S. Attorney's Office for the District of Colorado, the Environmental Protection Agency (EPA) and its National Enforcement Investigations Center, and, to a limited extent, the Inspector General of DOE all participated in the task force.

In June 1989, after two years of preliminary investigative work involving the agencies listed

---

[1] Memorandum of Sentencing Hearing and Report of Statement of Reasons, U.S. v. Rockwell International Corporation, Civ. No. 92-CR-107 (June 1, 1992), p. 2.

[2] The cost of the clean-up of Rocky Flats, which will be paid by the American taxpayer, is currently estimated at over $1 billion.

above, a contingent of approximately 75 FBI and EPA agents executed a search warrant on the plant. Over the next three years, thousands of documents from DOE, the EPA and Rockwell were reviewed. Hundreds of witnesses were interviewed by FBI and EPA agents. A special federal grand jury was empaneled in the summer of 1989. It reviewed documents and interviewed witnesses through the late part of 1991.

Under the plea agreement, Rockwell pled guilty to ten criminal counts under two environmental laws: four felony counts under the Resource Conservation and Recovery Act (RCRA); and one felony count and five misdemeanors under the Clean Water Act (CWA). It paid a criminal fine of \$18.5 million, \$16.5 million of which went to the federal government and \$2 million of which went to the State of Colorado.[3]

Even before the federal district court in Colorado accepted the settlement agreement, the Subcommittee received allegations that legitimate charges against both the company and individual Rockwell and DOE employees had not been pursued. Allegations were also made that the fine, although large, served no punitive purpose as it did not even represent the profits and fees paid to Rockwell in excess of its costs for operating the plant during the three years for which environmental violations had been charged.

The Subcommittee's investigation began slowly due to an extreme lack of cooperation by the Department of Justice. The Subcommittee was forced to subpoena the FBI and the Justice Department in order to conduct interviews and examine requested documents.[4] Even when the Subcommittee received testimony under oath in closed sessions from four of these individuals pursuant to the subpoenas, the witnesses, under orders from Justice headquarters lawyers,[5] refused to answer questions about their agency's internal deliberations. The Subcommittee was able to resolve this dispute only in the closing days of this session of Congress, a resolution that allowed the continuation of this investigation during the recess.

---

[3]The state was not involved in the federal prosecution, but the payment was in exchange for the state's agreement that it would not independently prosecute Rockwell for its environmental crimes. (See discussion, infra, Section V, 7. .

[4]See "Meetings: To Subpoena Appearance of Employees of the Department of Justice and the FBI and to Subpoena Production of Documents from Rockwell International Corporation," Meetings before the Subcommittee on Investigations and Oversight of the Committee on Science, Space, and Technology, U.S. House of Representatives, July 30 and August 12, 1992 (102nd Congress, 2d session), No. 146.

[5]Subsequent mentions of "Main Justice" or "Justice headquarters" refer to Justice Department personnel located in Washington.

The investigation has encompassed 12 days of sworn testimony[6], numerous informal interviews and the review of approximately 25 boxes of documents from the Department of Justice, the Federal Bureau of Investigation, the Department of Energy, the Environmental Protection Agency, the General Accounting Office (GAO) and a number of citizen and environmental organizations.[7]

The Denver prosecution team is to be commended for having the vision and audacity to begin and doggedly pursue the first criminal environmental case against a federal weapons facility, "sacred cows" which had previously been almost immune from environmental enforcement. The law and the fact patterns were complex and difficult, and systemic violations are always more difficult to prove than one-time events.

However, there was evidence of troubling behavior and attitudes in the manner with which Justice Department headquarters viewed environmental crimes cases, particularly those which result from systemic defiance of environmental laws and regulations. When it was clear that a trial could be avoided through a settlement, both main Justice and the U.S. Attorney's office too quickly gave up on collateral issues that had broad policy implications, such as the indemnification of much of Rockwell's attorney's fees and costs and the right of other agencies to prosecute Rockwell civilly. There is some indication that the failure to assist the grand jury in the preparation and publication of a report may have been an attempt to protect the efforts of DOE to create the perception of a new "culture" at the Department.

These concerns are highlighted in the Summary of Findings. A more detailed discussion of the findings follows the summary.

---

[6] The Subcommittee held seven days of hearings in executive session in September 1992. These hearings have been published in a two volume set entitled "Environmental Crimes at the Rocky Flats Nuclear Weapons Facility," Hearings before the Subcommittee on Investigations and Oversight, Committee on Science, Space, and Technology, U.S. House of Representatives, September 10, 11,, 17-18, 23-25, 30, 1992, October 2 and 5, 1992 (102nd Congress, 2d session), No. 163, hereafter referred to as "Subcommittee Hearings." The Subcommittee staff subsequently conducted five days of sworn interviews which, at the insistence of the Justice Department, are not publicly available. The transcripts of these sworn interviews will hereafter be referred to as "Sworn Interviews."

[7] The Justice Department has provided many documents that have been requested. It has, however, used an extremely broad definition of information deemed protected by the grand jury secrecy provision of the Federal Rules of Criminal Procedure (hereafter "Rule 6(e)" and deleted the names of all individuals investigated under a privacy exemption to the Freedom of Information Act. Congress is not subject to this exemption, and it was not imposed by other agencies.

# II. SUMMARY OF FINDINGS

## A. THE ROLE OF DEPARTMENT OF JUSTICE HEADQUARTERS

1. The "culture" at DOE has been cited as a critical factor in this case, but the "culture" at DOJ was just as significant. The extreme conservatism and lack of aggressiveness of Justice headquarters was a major -- perhaps the overriding -- factor which influenced both the strategies adopted throughout the course of the investigation and, ultimately, the outcome of the case.

2. The requirement in the U.S. Attorney's Manual that all indictments for environmental crimes be approved by main Justice allowed less-experienced headquarters personnel to continually second-guess and raise questions about the handling of the case by the Denver prosecutors.

3. Main Justice officials who ultimately signed off on the agreement appeared to place little value on environmental crimes and continually downplayed the value to Rockwell of settling the case and giving up individual indictments and other significant charges. This added pressure on the U.S. Attorney to settle for a fine that may have been lower than could have been achieved.

## B. THE SETTLEMENT

4. To settle the case, the prosecutors met almost all of Rockwell's core demands concerning type of charges, global scope of settlement and public statements.

5. Although the plea bargain secured a respectable fine that the taxpayer did not have to reimburse, significant charges were not pled to and -- most importantly -- the prosecutors bargained away their right to fully and accurately inform the public about the conditions, crimes and activities at the Rocky Flats plant.

6. The prosecution agreed to a "global settlement" which eliminated the right of other federal and state agencies to prosecute Rockwell and its employees civilly or administratively. This concession was potentially worth millions of dollars. Moreover, once a decision was made to achieve a global settlement on all of the issues associated with Rockwell's operation of the facility, the prosecution team often served as Rockwell's broker to secure approval from other agencies and

divisions within Justice. It appears that the desire to complete the settlement overrode, or caused prosecutors to lose sight of, the public policy impact of provisions of the settlement. This was most evident in the negotiations regarding indemnification, debarment and matters that might increase Rockwell's exposure to civil liability, such as statements about offsite impacts and the grand jury report.

7. Several areas in which the prosecutors had collected indictable evidence showed that there had been off-site releases of pollutants. None of those offsite releases were included in the plea. This coincided with Rockwell's demand that such charges be excluded from the plea or rewritten as permit violations because of its fear that they would increase Rockwell's potential exposure to civil litigation and liability.

8. The judge promised, but apparently failed to create, an independent panel to review the settlement before he finally approved it.

## C. LACK OF INDIVIDUAL INDICTMENTS

9. The denials of Justice Department officials notwithstanding, the combination of the documentary evidence reviewed by the Subcommittee, conflicting testimony offered by government personnel and in the Plaintiff's Sentencing Memorandum written by the prosecution team strongly suggest that DOJ was willing to trade a number of significant charges, including individual indictments and violations that involved offsite impacts, in order to secure a plea bargain with Rockwell.

10. Although the prosecution collected significant evidence of criminal wrongdoing on the part of high-level Rockwell officials, they did not indict them on either felony or misdemeanor charges. In fact, before they had even directed their investigators to finally compile the evidence that had been collected against individuals, and before they had formally reviewed that evidence, the prosecutors had established a "bottom line" for settlement purposes that there would be "no individual felony indictments." Only one prosecutor continued to promote misdemeanor pleas, and he received little or no support from either main Justice or the U.S. attorney.

## D. THE ROLE OF DOE

11. The prosecution pointed to a "DOE culture" that stressed weapons production over the environment and human health to rationalize and excuse the misconduct and possible criminal behavior of DOE officials. This created a situation in which

no governmental official could be held culpable because the entire agency encouraged noncompliance with environmental laws. The result was a double standard in the administration of justice, where a governmental agency and its individual employees were allowed lesser standards of conduct than ordinary citizens.

12. DOE's attempt to influence the Justice Department to accept nolo contendere pleas from Rockwell, and the perfunctory debarment review it conducted, demonstrated that it had two primary concerns: (1) protecting the interests of Rockwell; and (2) reducing its own exposure to future liability.

13. DOE's historical practice of fully indemnifying its contractors for the costs of government or private enforcement actions was a significant impediment to the prosecutors' attempts to resolve the case on terms more favorable to the government. The prospect that the government would be forced to repay Rockwell for the criminal fines the company paid in this case significantly increased the leverage that Rockwell had in settlement negotiations. It served to bring added pressure on the prosecutors to agree to Rockwell's terms for settlement, in exchange for the corporation's agreement not to seek reimbursement for the criminal fines it paid. To date Rockwell has requested reimbursement from DOE -- and the public -- for $7.9 million in attorney's fees and costs related to this prosecution.

14. It appears that the prosecutors made a very early decision not to pursue charges that involved government officials. As a result, investigatory leads were ignored, and there never was a full investigation of the actions of DOE officials, even though there is strong evidence to suggest that DOE personnel had knowledge of at least one problem to which Rockwell ultimately pleaded guilty.

## D. THE GRAND JURY REPORT

15. Evidence shows that the grand jury had been prepared by both prosecutors and the judge in this case to write a report on Rocky Flats. However, Justice headquarters, in an effort to block the issuance of a report, forced the prosecutors to refrain from assisting the jurors in their work.

16. The judge in this case could have instructed the prosecutors to provide assistance or given jurors the outside support necessary to meet his legal standards; he chose to do neither. When the jurors, in carrying out what they had been told

would be their sworn duty, delivered a report, the judge chose to seal it -- - ruling that it failed to meet his interpretation of legal standards for release. This placed jurors in the moral quandary of choosing between adherence to their oath of secrecy or surreptitiously releasing their work to the press to carry out what they saw as their charge to serve the public good.

000136

## III.  RECOMMENDATIONS

A.  The Committee should take testimony from key present and former Justice Department officials who were involved in the decision to block the special grand jury report to determine if that decision was based in whole or in part on a desire to protect the current administration from evidence that it had not changed a "DOE culture" that has encouraged rampant and continuing environmental violations.

The Criminal Division of the Justice Department, which must certify every request for a special grand jury, knew that one of the reasons cited by the prosecution team for a special grand jury was the jury's ability to write a report on its work.  It was no secret that this report would be focused upon the actions of the Department of Energy.  Yet, when the time came to approve the preparation of the report, the Criminal Division took the position that the grand jury could not write a report, in part because there was no "continuing and pervasive criminal activity in the district collectively undertaken that cannot be cured by indictments."   A finding of "continuing and pervasive criminal activity" by the Criminal Division would have directly challenged the stewardship of the current Secretary of Energy who had made numerous statements that there was a new environment at DOE.

Concern about the motives of main Justice in blocking the grand jury report was fueled by an internal letter from the head of DOJ's Environment and Natural Resources (E&NR) Division to the Attorney General recommending approval of the final agreement, indicating that he had tried to convince the U.S. Attorney to reflect a positive view of the stance of the current Secretary of Energy as opposed to "prior" attitudes.  The E&NR head was adamantly opposed to a grand jury report.

B.  The Committee should work with other committees with appropriate jurisdiction to determine if it could or should be arranged for members of the Rocky Flats special grand jury who wish to appear before a Congressional panel to do so with some protection or immunity from prosecution.  In particular, the grand jury could provide information on the evidence it received concerning alleged criminal misconduct of DOE officials.

In September of 1992, some of the members of the special grand jury which took evidence on the allegations of criminal misconduct at the Rocky Flats plant provided a Denver newspaper -- and subsequently other media -- with a draft of their report and a "presentment" of charges that they drafted as a substitute for the negotiated information prepared by the U.S. Attorney.  Their charges allegedly named five Rockwell and three DOE officials.  Individual members of the grand jury have also made allegations of

misconduct by the U.S. Attorney. It is almost unprecedented for grand jurors to risk criminal contempt of court for violating their official oath of secrecy under Rule 6(e) of the Federal Rules of Criminal Procedure. Early in the course of the investigation, the Subcommittee staff contacted the Office of the General Counsel of the U.S. House of Representatives to see if some type of immunity could be given to the grand jurors to receive their testimony. The Subcommittee was advised at that time to continue its investigation of the prosecution through the more traditional routes being pursued. It is now appropriate to revisit that issue.

C. Congress should request that the General Accounting Office closely monitor the DOE decision process regarding Rockwell's request for indemnification of $7.9 million in fees and costs associated with the Rocky Flats case, and determine if the decision ultimately made complies with the standards of the DOE Acquisition Regulations and the terms of the contract with Rockwell. On the basis of that review, and its past work on contracting issues, GAO should provide Congress with an assessment of whether current government contracting regulations regarding indemnification - particularly those applied by DOE - are adequate to protect the taxpayer from wasteful and inappropriate expenditures. The study should identify changes that should be made to afford greater protection for the taxpayers and the government.

D. It is also time for Congress to undertake a thorough review of the tools available to hold Federal contractors accountable, and institute fundamental changes in the current approach to government contracting and administration. Effective and efficient contracting requires both a sound regulatory framework and effective administration of those regulations.

Over the past two years, this Subcommittee closely scrutinized the management and administrative practices of NASA and DOE - two agencies that annually pay billions of dollars to private contractors. The results of that oversight indicate that while their most critical missions, and most of their annual budgets, are entrusted to private contractors, those agencies suffer inherent problems of "agency capture" and poor contract administration. The result has been an abdication of the government's responsibility and control private contractors, and an absence of accountability by either the contractors or the agencies. Our government and its citizens can no longer afford the waste, fraud and abuse that accompanies such management failure.

With respect to the Department of Energy in particular, Congress and the public have faced a recurring problem -- the total inability of DOE to control its contractors and manage its facilities in a manner that protects the taxpayers and the health and safety of workers at its

facilities and citizens in the surrounding communities. The Rocky Flats case is one of the many -- albeit one of the more egregious -- manifestations of that problem. Many of the issues that surfaced in that case -- the Department's historical indemnification practices, its cynical implementation very ambiguous debarment regulations, and the absence of enforceable worker safety and health standards at DOE facilities - dramatically revealed a lack of sound regulations and ineffective administration of the regulations that did exist.

It is time to face that fact that the Department has been so completely captured by the interests that it was established to manage that there is no real prospect that the Department -- with its traditional contracting practices and a least interference/limited accountability approach to its management and operating contractors -- will ever be able to reform itself or efficiently complete its assigned missions. Fundamental changes must be made in the Department's contracting practices, and it is time for Congress to embark on that task.

E.   The Congress should seriously consider severing the weapons development and production mission from the DOE and placing it in a more appropriate agency such as the Department of Defense. Locating that mission in DOE as opposed to DOD does not provide any greater assurance of civilian control of that essential mission.

It is a fiction to pretend that the Department of Defense, which is run by a civilian employee, is more susceptible to the entreaties of the military industrial complex than a program in the DOE that is run by current or former high-level military officers, is coordinated with DOD offices, and whose annual mission is determined by a strategic stockpile memorandum that is drafted by DOD.

The weapons program has diverted DOE's attention and resources from the development and implementation of policies and programs to ensure the energy security of this Nation. When two-thirds of the agency's budget is devoted to activities unrelated to energy security, it is unrealistic to expect the agency to give adequate attention to the lesser-funded mission. The dismal record of DOE in the addressing the Nation's energy problems confirms this.

F.   Congress should reconsider the wisdom of entrusting to such an agency the responsibility for the management and administration of a $150 billion program to clean up the weapons complex. The cleanup program is a costly, complex undertaking which will have significant impacts on the environment and the health and safety of workers and citizens in the communities surrounding these plants.

As recounted time and again, and as dramatically underscored in the Rocky Flats investigation, DOE does not have a strong track record in managing programs of that nature. Moreover, a 1992 Intergovernmental Agency Task Force Review of the DOE's Environmental Restoration Program has pointed out that the program already is suffering from the same management problems and weaknesses that characterized the weapons production program. It is time to remove this critical mission from the DOE and establish it in a new agency where it will receive the necessary management and administrative attention required to ensure its success. When Congress passed the savings and loan bail-out bill, it created the Resolution Trust Corporation -- a temporary agency -- to clean up the mess, rather than entrusting the job to the agency that contributed to the mess in the first place. That approach should be adopted in this instance as well.

The new Administration should establish a panel to follow up on the Intergovernmental Agency Task Force Report and provide Congress with some recommendations on how the clean up of the weapons facilities should proceed, and where best to locate the responsibility and authority for that program.

**G. The Congress must firmly hold agencies accountable for management of programs and projects.** The problems at Rocky Flats did not begin with the prosecution of this case. The General Accounting Office, the DOE Office of the Inspector General and numerous Congressional investigations have chronicled the severe management problems and the lack of environmental and health and safety compliance at government weapons facilities.

In addition to the failures of the Executive Branch, Congress, as a body, has failed to move aggressively to address these serious problems. Often, this is due to Congressional support for an underlying project or facility which creates a reluctance to highlight problems or insist upon reforms. In fact, Congress has exempted programs and projects from the very laws it has established to protect taxpayers, public health and safety and the environment. But such action has only encouraged greater abuses. Therefore, Congress must share the blame for the deplorable conditions which now exist at these facilities. With the large, expensive programs under the jurisdiction of this Committee, it has a unique opportunity to hold agencies and contractors accountable for the public money they have been charged with using for public benefit.

## IV.  THE ROLE OF THE JUSTICE DEPARTMENT

Ironically, while the Department of Justice rationalized the lack of prosecution of DOE officials in good part to an omnipresent "culture" at DOE, this case also revealed a "culture" of extreme conservatism in the prosecution of environmental crime within the Department of Justice.   Indeed, the extreme conservatism and lack of aggressiveness of Justice Headquarters was a significant -- perhaps the overriding -- factor which influenced the strategies adopted throughout the course of the investigation, and ultimately, the outcome of the case. That culture was most conspicuously manifested in the following aspects of the case:

> Justice headquarters directly overrode the strong advice of the U.S. Attorney and the lead trial attorneys that the grand jury be allowed to issue a report on the investigation.

> Main Justice officials consistently underestimated the value of the case and the size of the fine that could have been obtained.  The attorneys from, and officials at, main Justice were much more conservative -- indeed sometimes negative -- about the value of the case and what the government could and should try to achieve.  Consequently, they were generally ready to propose and agree to terms that were much more favorable to Rockwell than those advocated by their counterparts in the U.S. Attorney's office.  It was only the persistent efforts of the lead trial attorney in the case -- who actually secured a final settlement higher than the official offer made by Justice -- that worked the fine up to the final disposition of $18.5 million.

> Headquarters manifested an overall reluctance early on to pursue individual indictments of Rockwell personnel.  Indictments of DOE officials received almost no consideration.  As a result of the hearings, interviews and document review, it is difficult to understand how no individuals could be prosecuted in this case.  Moreover, there is conflicting information about how the members of the prosecution\investigative team felt about the sufficiency of the evidence available to prosecute individuals.

> The U.S. Attorney's Office took steps early to keep as much control of the case as possible because of concerns that headquarters that interfered with environmental cases in other districts.

The section analyzing the Plea Agreement will discuss in detail the processes and specific decisions within the Justice Department that influenced the positions taken by the government and the ultimate outcome of the case.

As early as December 1990/January 1991, the prosecution team had determined that the case should be settled rather than tried if an acceptable settlement could be achieved. However, there were significant differences over what would constitute an acceptable settlement -- specifically, the size of the fine and whether to charge individual Rockwell officials with crimes.

Indeed, as Justice was about to enter into the first round of plea discussions with Rockwell in January 1991, headquarters personnel involved in the case wrote to Barry Hartman, the deputy assistant attorney general for Environment and Natural Resources, that:

> We thought it would be appropriate to bring to your attention what may potentially be a substantial disagreement between the United States Attorney's Office and the Environmental Crimes Section about what an appropriate plea agreement would include.  Because both the U.S. Attorney's Office and ECS believe that a disposition involving only the corporation (with the understanding there would be no individual defendants) could be appropriate, the crux of the potential issue is what this case is worth.[8]

This actually understated the differences between the offices, and misrepresented the position of at least one attorney in the Denver office. Main Justice attorneys were willing to settle for $1 - $6 million. One actually said that the government should pay Rockwell. Not only was the lead trial attorney in Denver pushing for a larger settlement -- on the order of $20 million to $30 million -- but he advocated that the Department should press for at least misdemeanor pleas from individuals.  He continued to do so until a final decision was made to surrender that position as part of the plea negotiations in July 1991. In a January, 1991 memorandum he wrote:

> Any corporate disposition, with or without individuals, must involve a very substantial fine.  This is much more the case if individuals are not prosecuted, in which case the fine must be a very big number.

---

[8] Dec. 28, 1990 memorandum entitled "Re: Plea Negotiations" from Jerry Block and Peter Murtha to Barry Hartman.

> I favor a bottom-line corporate fine -- separate and apart from remediation
> or clean-up -- of $20,907,372. . . . This figure also happens to approximate
> 1% of Rockwell's net corporate income over the same period
> ($20,582,000).
>
> Apart from its acceptability to Rockwell, I believe that a total fine of 1%
> to 2% of a company's net income is neither inappropriate nor unusual. A
> fine must, by definition, be punitive. It must hurt. A fine of $3 or $4
> million is petty cash to Rockwell. Consider applying a similar approach on
> a personal level: if you were faced with being prosecuted for multiple
> felonies, and for some reason, couldn't go to jail, would a fine of 1% of
> your net income really be much of an "ouch"? Mind you, I'd rather spend
> it on something else, but I think I'd be pretty tickled to resolve multiple
> felony charges for 1% of my net income. That's less than one month's
> mortgage payment.

He also stated that misdemeanor pleas from "a number of individuals" were not "impossible
or even terribly unlikely," although there might be a view that "it's not worth the additional
difficulties, etc."[9]

The U.S Attorney initially set $52 million as the settlement figure in the government's first
offer to Rockwell in February 1991. Yet, when the next submission from the prosecutors
was made to Rockwell in July of 1991, the number dropped to $15.5 million. That was a
significant drop in the government's position, and a critical move which defined more than
anything else what the ultimate settlement figure might be.

> MR. ROACH. Okay, the question, though, was not so much why was there
> this gap as to what was the rationale going from 52 down to 15? That
> seemed to be quite a drop.
>
> MR. FIMBERG. I think that is what Mr. Norton and Mr. Hartman
> thought the case was worth.[10]

---

[9]Jan. 18, 1991, memorandum entitled "Rockwell Settlement Discussions" from Kenneth Fimberg to
Michael Norton and Joseph Block.

[10]Testimony of Kenneth Fimberg, Hearings, supra, Sept. 30, 1992, pp. 1606-1607. Mr. Fimberg later
informed the Subcommittee: "I have been told -- I want to be clear for the record, I have not heard him
say this with my own ears, but I have been told that Mr. Hartman would have settled the case for four or

This figure was very close to an offer that had been made earlier by Rockwell.[11]   Such an offer by the defendants should have been seen as an indication that the government could have achieved more than was being offered.  The government's counter was made despite strong pleas from Mr. Fimberg that a higher number was very achievable, especially in light of Rockwell's earlier offer.

> While I am not wed to anything like $52 million, I have real concern that $15 million is low, in terms of political, public and judicial acceptability. We will have to be able to explain the number and why it's significant/acceptable.  I think a 'sellable' number is something like $27 million - which is Rockwell's profit for running Rocky Flats in the years 1987 - 1989 (the likely period of our charges).  In addition, and to play this out, Rockwell (as part of a global settlement) would have to agree to dismiss its Court of Claims suit to recover the award fees withheld in 1989.

> While even $27 million is not a huge figure to a company like Rockwell, I think we can make a pretty reasonable argument to the court, public and politicos that we disgorged all of Rockwell's profit for the years in question.

> If [Rockwell attorney] Foreman is mentioning $15 million, I think that's pretty close to putting $15 million on the table.  If they're at $15 now, I think we should shoot for $25 to $27.

> I also want to mention that we should continue hanging back on the individuals.  Leave them to one side for now, and don't make any commitments.  Some pleas are not out of the question.[12]

---

five million dollars." Sworn Interview of Kenneth Fimberg, Oct. 21, 1992, p. 257.

[11]In a June 27, 1991 letter to Mr. Norton, Rockwell's attorneys conveyed an offer to pay $5 million in criminal fines and $5 million in civil assessments and/or contributions. June 27, 1991, letter from Harold Haddon and Vincent Fuller to Michael Norton.Mr. Fimberg testified that around the time that DOJ had settled on the $15.5 million figure, Rockwell offered $12 million. Testimony of Kenneth Fimberg, Hearings, supra, Sept. 30, 1992, pp. 1607-1608.  Rockwell committed the $12 million figure to writing in a July 16, 1991 communication to Michael Norton from Harold Haddon and Vincent Fuller.

[12]Undated Memo from Kenneth Fimberg to Michael Norton re: Rockwell settlement.

The fact that the number put forth by the government -- $15.5 million -- was lower than the final amount is a good indication that a higher fine could have been achieved, but was opposed by the conservatism of the Justice decision makers.

> MR. ROACH. Did you ever believe the government could settle for more than $18.5?

> MR. FIMBERG. Did I ever believe that? Yes. In July of 1991 I was very doubtful.

> MR. ROACH. Why was that?

> MR. FIMBERG. Because we had already said $15.5.

> MR. ROACH. In your experience as a prosecutor--

> MR. FIMBERG. Let me say, Mr. Roach, in all my -- I have been practicing law both in civil and criminal practice for a long time, and negotiate a lot of settlements, and I think this is the only time I have had to negotiate a number up rather then coming down.[13]

As indicated in the above, throughout the process, the lead prosecutor, who had more trial experience than any of the other key decision makers associated with the case, and more experience with environmental crimes in particular, consistently advocated the most aggressive position. Often, he was initially supported by the U.S. Attorney, and opposed by the personnel from main Justice.

This was also true regarding the decision whether to prosecute individuals. As noted above, headquarters personnel very early in the case were willing to abandon individual indictments because they did not believe that there was sufficient evidence to prosecute. As of early January 1991, all of the headquarters personnel had expressed their opinion that the DOJ bottom line position in the negotiations should be to agree to no individual indictments.

While expressing to the Subcommittee the opinion that the cases against individuals may have been marginal, and that he didn't have any fundamental disagreements with the way

[13]Testimony of Kenneth Fimberg, Hearings, supra, Sept. 30, 1992, p. 1592.

Case No. 1:96-y-00203-RPM   Document 137-8   filed 06/01/07   USDC Colorado   pg 24 of 143

the case was ultimately resolved in terms of individual indictments, the lead prosecutor admitted that he continued to aggressively promote the consideration of individual charges.[14] He continued to promote a solution that would bridge the gap between no actions on individuals and indictment on felonies -- that is, to secure misdemeanor pleas with some individuals.[15] Although the U.S. Attorney did not express a final position on the matter for some time, in July 1991, he too determined that individual charges would be dropped as part of the plea agreement.

Although the attorneys who testified before the Subcommittee maintained that evidence continued to be collected against individuals throughout the investigation, it is quite apparent that the U.S. Attorney's decision in July was a significant turning point that affected the strategies and allocation of resources for the remainder of the investigation, and made it even less likely that the decision to forego individual prosecutions would or could be reversed.[16]

---

[14]   I think, as I have said repeatedly, I think I more than anybody else continued to aggressively promote the consideration of individual charges. I did, as I have said.

The other reason I'm having problems with combining that answer with the things I have said repeatedly now, both in the first session and this session, is I thought the cases were marginal. I thought they were a close call. I thought there were serious fairness issues involved. I thought we were looking at a very favorable settlement with the company.

And when you look at all those, in the last analysis, you know, I had no quarrel with the decisions that were made. And it's hard for me, I guess I just have a hard time getting way from that. That was the final call. (Emphasis added)

Sworn Interview of Kenneth Fimberg, Oct. 21, 1992, pp. 249-250.

[15]"... And I was probably more aggressive than most in suggesting that maybe misdemeanor dispositions were sort of a middle ground. If people didn't feel completely comfortable with the sufficiency of the evidence and the fairness of those total package of considerations in terms of a full-blown felony prosecution, that maybe some misdemeanor prosecutions were a middle ground." Sworn Interview of Kenneth Fimberg, Oct. 21, 1992, p. 246.

[16]Whether the lead investigator was directly or indirectly ordered to cease the collection of evidence against individuals, it is very clear that the nature of his efforts changed after DOJ made the decision in July 1991 not to indict individuals. Mr. Lipsky testified to the subcommittee that as a result of being informed that the plea agreement would not include individual indictments, he stopped looking for individuals who could be indicted:

MR. PEARSON*.  So between say, October and November of 1988, after you had met with or briefed Norton in March 1992, was there ever a time in there when you stopped looking for individuals, human beings, who could be charged with crimes?
MR. LIPSKY.  Yes.
MR. PEARSON. When was that?

000146

Although prosecutors deny any knowledge that any specific orders were given to stop collecting evidence against individuals, the lead prosecutor admits that after the July decision, it is likely that he intimated to the investigators that their time might be more productively spent on other endeavors:

> It would not have been unusual or surprising for me to have said to John [sic] one day in that context, you know, look, this is the way things appear to be going. I think there is going to be a disposition with Rockwell. Everyone has been working their butt off for the last three years. You may not want to - - don't spin your wheels unnecessarily, but in terms of a decree from on high, instruction, don't do this anymore, I don't remember anything like that, no.[17]

He also admitted that this lessened the likelihood that more evidence would be collected so as to change the basic position to forego individual indictments.[18]

---

MR. LIPSKY. About July of 1991.
MR. PEARSON. Okay. Is that the result of plea discussions that were in progress?
MR. LIPSKY. Yes.

*Subcommittee Minority Staff

Testimony of Jon Lipsky, Hearings, supra, Sept. 11, 1991, p. 551.

REP. TANNER. So in July of 1991, you were told orally that no individual would be charged and that your efforts should cease in regard to looking for individuals responsibility; is that correct?
MR. LIPSKY. Yes, sir.

Id., p. 556.

[17]Testimony of Kenneth Fimberg, Hearings, supra, Sept. 30, 1992, p. 1592.

[18]   MS. HOLLEMAN: But in July Mr. Lipsky was told to stop investigating individuals, so it was going to be pretty hard to get back on the trial track if your chief investigator wasn't working on it anymore.
MR. FIMBERG: As I have said all morning, it was pretty clear by mid-July or August of '91 that individuals were probably not going to get prosecuted.
MS. HOLLEMAN: So you weren't going to have any more evidence in December than you had in July?
MR. FIMBERG: Probably not . . ."

Sworn Interview of Kenneth Fimberg, Oct. 21, 1992, p. 92.

000147

The U.S. Attorney's Office was aware of the reputation of main Justice for interfering with environmental prosecutions to the detriment of the ultimate settlements. Their concern that headquarters might dampen or weaken the end result was reflected the insistence -- sometimes successful and sometimes not -- of the U.S. Attorney that he control the case. Mr. Norton told the Subcommittee staff:

> . . . [T]hroughout my tenure as United States Attorney there have been suggestions that are, so far as I know, nothing more than unsubstantiated rumors from other districts of the involvement, a sort of bureaucratic involvement of the Lands Division or Environment and Natural Resources Division in environmental cases, directing results and directions and activities that perhaps the U.S. Attorney's Office may not have concurred with.

> That simply didn't happen in this case. But I was attuned to that area of concern and that's why I wanted to be sure that it didn't happen in this case."[19]

In addition, as the case proceeded, one attorney in the case expressed the concern that "I just don't think Main Justice has the same 'fire in the belly' that we do, and I get concerned that they will give up too much just to 'get it done.'"[20]

Mr. Norton's statement that there was no interference in his case was not accurate, however. Headquarters management was responsible for the decision to oppose the issuance of a grand jury report over Mr. Norton's strong objection. In October and November of 1991, the entire prosecution team from both the U.S. Attorney's Office and headquarters vehemently argued that the grand jury be allowed to issue a report crafted with their assistance. However, this recommendation was opposed by Acting Assistant Attorney General Hartman. Mr. Norton personally argued his case before Mr. Hartman and the Criminal Division officials who were charged with the responsibility of making rulings on whether the prosecutors can prepare grand jury reports. Ultimately, the prosecutors were instructed not to support a grand jury report.

---

[19]Sworn Interview of Michael Norton, Nov. 12, 1992, p. 22.

[20]Aug. 29, 1991, memorandum entitled "PERSONAL AND CONFIDENTIAL" from Kenneth Fimberg to Michael Norton.                                                    000148

Consequently, the members of the grand jury drafted a report on their own, without any guidance or support from the Justice Department or the judge in the case. In subsequent proceedings to consider the release of the report, main Justice and the judge in the case opposed the report's release, because it purportedly does not comply with the statutory guidelines established for such reports.

Indeed, the level of disagreement over this matter can be seen in the actions taken by main Justice and the U.S Attorney's Office in the most recent court consideration of a request to make the grand jury report public. It was main Justice, not the U.S. Attorney's Office, that filed a brief urging the court not to release the report.[21] It is the ultimate cynical act that the very officials who were in a position to provide the grand jurors with the guidance they needed to properly craft a report, and denied such assistance, are now objecting to the report on the basis that it does not comply with Justice's view of standards for such reports.

Mr. Hartman also instructed one attorney to tone down his draft of the sentencing memorandum, and there was a conscious effort by Mr. Hartman to ensure that even though DOE would be taken to task for its old culture, the American public would read that the current administration had turned things around.

> In lieu of the [grand jury] report, a rather lengthy sentencing memorandum will be filed by the United States. It includes some discussion of the role of various Department of Energy officials. We have tried to convince the USA to accurately reflect the fact that DOE failures were the result of attitudes prior to Admiral Watkins becoming Secretary."[22]

Events at the Department and weapons plants over the past few years paint a different picture than the rhetoric of an "improved culture." (This is reviewed more fully in Sections VIII and X.)

Headquarters' lack of aggressiveness and low estimation of what the case meant and was worth is most dramatically manifested in a memorandum from Mr. Hartman -- a key decisionmaker in the case -- to Attorney General Barr just before the plea agreement was

[21]"Government's Memorandum of Law in Response to Order to Show Cause," filed by Paul E. Coffey, Chief, Organized Crime and Racketeering Section, U.S. Department of Justice, in In Re Grand Jury Proceedings, Special Grand Jury 89-2 (Rocky Flats Grand Jury), Oct. 28, 1992.

[22]March 25, 1992, letter entitled "In re: The Rocky Flats Nuclear Weapons Plant" from Barry Hartman to Attorney General William Barr.

presented to the court. In concluding his account of the case and the plea bargain, Mr. Hartman wrote:

> Virtually none of the allegations contained in the search warrant were borne out after a full investigation. For example, the most celebrated allegation -- that of midnight burning of hazardous wastes -- was based on aerial infra-red monitoring of the site. As it turned out, the monitoring equipment was defective. . . .
>
> If the level of the fine and number of guilty pleas are an appropriate measure, I can assure you the result we have reached by plea agreement is considerably better than what we could have expected had we indicted the company and various individuals, and gone to trial. There were no "high level" officials involved who had sufficient knowledge to be charged and convicted of knowing violations. Additionally, the company had some quite persuasive defenses to many of the corporate charges to which they are nonetheless pleading guilty. Quite frankly, although we can meet standards under the Principles of Federal Prosecution, had we known at the time of the warrant what we now know, it is likely this matter would have been resolved civilly. That is primarily because of the marginal evidence of criminal intentional misconduct, and the lack of any significant environmental harm."[23]

Mr. Norton diplomatically testified that "Mr. Hartman always had a somewhat softer view of the criminality which we were pursuing than we in Colorado did." But Mr. Norton disagreed with many of Mr. Hartman's assessments. After seeing Mr. Hartman's memo, he said:

> I don't agree with it, that we either would have or should have proceeded civilly. . . It's not an accurate assessment, in my view . . . There was a

___

[23]Id. Mr. Hartman had made similar belittling -- and inaccurate -- remarks about the prosecution to Attorney General Barr in an earlier review of the settlement. For example, in a December 12, 1991, memorandum, he stated that there was "little or no environmentally adverse result" of Rockwell's action when he knew no comprehensive studies had been done. Dec. 12, 1991, letter entitled "The Rocky Flats Nuclear Plant" from Barry Hartman to Attorney General William Barr also urging his approval of the final settlement package. (At one point, it was thought that settlement would be reached in December.)

Case No. 1:96-y-00203-RPM Document 137-8 filed 06/01/07 USDC Colorado pg 29 of 143

considerable history of civil -- attempts to proceed civilly against Rockwell -
- . . . And it was our view that they were extraordinarily unsuccessful for
many reasons.[24]

Mr. Norton also disputed Mr. Hartman's conclusion in his December letter that "[v]irtually
none of the allegations contained in the search warrant were borne out after a full
investigation."[25]  Allegations concerning spray irrigation, ground water, the chrome spill and
the sewage treatment plant operations all resulted in charges.  The allegation of improper
disposal of medical waste was proven, but not charged because the actual building it came
from could not be demonstrated. [26]

In interviews conducted by Subcommittee staff, other members of the prosecution team also
disagreed with a number of Mr. Hartman's characterizations.  Moreover, these statements
by Mr. Hartman are completely at odds with the statements made in Justice's Supplemental
Sentencing Memoranda, which was presumably endorsed by the Department.    That
memorandum, in part, stated:

> Rockwell chastises the United States for not accepting the returns from the
> company's own investigation following research, but many crimes would
> never be solved if prosecutors accepted the subject's initial story or
> explanation, and that was often true in this case.  For many months, for
> example, Rockwell witnesses denied any knowledge of a pondcrete problem
> before the May 1988 spill.  Improper use of solar ponds was also denied.
> The true facts were only learned after persistent investigations . . .
> Rockwell's crimes were hardly 'technical'.  The company's violations were
> pervasive and ran through entire areas of Rocky Flats waste operations and
> environmental activities.  In the area of liquid mixed waste, for instance, the

---

[24]Sworn Interview of Michael Norton, Nov. 12, 1992, pp. 168-70.  Mr. Hartman apparently had no
appreciation, as the prosecutors did, for the fact that years of civil enforcement had not encouraged the
weapons plant operators to comply with environmental laws.  This was one of the key reasons for initiating
a criminal action.  Jan. 10, 1989, memorandum entitled "Desert Glow": The Criminal Investigation at
DOE's Rocky Flats Plant" from Kenneth Fimberg, Michael Norton and Peter Murtha to Roger Marzulla
[former assistant attorney general, E&NR], Donald Carr and Edward Dennis [former assistant attorney
general, Criminal Division].

[25]March 25, 1992, letter entitled "In re: The Rocky Flats Nuclear Weapons Plant" from Mr. Hartman to
Mr. Barr.

[26]Sworn Interview of Michael Norton, Nov. 12, 1992, pp. 164-66.

illegalities are such that virtually every waste form involved in those processes - - from salt brine and saltcrete to vacuum filter sludge. Rocky Flats' surface-water system, from the sewage treatment plant to the holding ponds and spray irrigation, was out of control.

In short, Rockwell's crimes speak for themselves. They involve known potentially dangerous and concealed misconduct, and little point is served by calling them "sensational" or "nonsensational". Simply put, Rockwell has pleaded guilty to serious crimes involving 330 instances of known misconduct and 80 instances of criminal negligence from 1987 to 1989.[27]

It is very clear that judgmental decisions such as those described above are always subject to debate and second-guessing. However, there are two significant factors which suggest that the events in this case are not simply isolated incidents, but rather are indicative of a more broad-based, institutional condition.

First, very early in the case, the prosecutors from the U.S. Attorney's Office were left to try to push the rest of the prosecutorial team and main Justice toward a more equitable outcome. The attorneys in the field, particularly the lead trial attorney, almost always staked out the strongest positions on the issues. This is significant because he was the attorney with the most trial experience with environmental crimes. Despite the experience and expertise that served as the basis for his opinions and positions, he was constantly opposed by headquarters personnel who were more cautious than he. Any weight his superior wanted to give to his opinions in the final decisions was tempered by the DOJ requirement that all major decisions in environmental crimes cases be approved by headquarters.

Second, the Rocky Flats investigation is not an isolated case of aggressiveness by the field and conservatism at main Justice. The same disagreements have been manifested in numerous environmental cases that have been handled by Justice in the past few years. Many of these cases are the subjects of investigations currently being conducted by other subcommittees of the House of Representatives. Reports recently prepared and released by those Subcommittees have documented a number of cases where main Justice has declined to prosecute serious environmental crimes over the strong advice and protestations of U.S. Attorney's offices, EPA, state enforcement officials, and even, at times, other

---

[27]Plaintiff's Supplemental Sentencing Memorandum, May 28, 1992, pp. 3-5.

headquarters personnel.

When reviewed in that context, the pattern of decisions, the lack of vigor in pursuit of criminal conduct by individuals and the apparent willingness to excuse Department of Energy's and Rockwell's lawlessness on the basis of DOE's "culture", create serious concerns about the institutional commitment to vigorous enforcement and prosecution of environmental laws against corporations and their officials, and the officials of federal agencies.

## V. THE PLEA AGREEMENT

In the interest of settling the case, the prosecutors met almost all of Rockwell's core demands concerning type of charges, global scope of settlement and public statements.

### A. Background

Under the plea agreement, Rockwell pled guilty to ten criminal counts under two environmental laws: four felony counts under the Resource Conservation and Recovery Act (RCRA); and one felony count and five misdemeanors under the Clean Water Act (CWA). It paid a fine of $18.5 million, $16.5 million of which went to the federal government and $2 million of which went to the State of Colorado.

At first glance, this appears to be a fairly impressive agreement. However, the Subcommittee's review of the documents related to the investigation and settlement of this case raise some troubling issues.

The Department of Justice points to the plea agreement -- with $18.5 million in fines -- as the strongest piece of evidence that it was aggressive in its pursuit of justice in this case. However, it is important to place the fine in perspective. Clearly, it is the second largest environmental fine ever levied, next to the fine in the Exxon Valdez case. It is also important to note that, although its impacts were significant and widespread, the Exxon Valdez was more of a case of unforgivable negligence which did not involve corporate officials. The crimes at Rocky Flats were more egregious. The Rockwell officials responsible for the facility knowingly violated the law over prolonged periods of time and aggressively resisted all efforts to force them to comply with environmental standards. whereas the individuals at Rocky Flats intentionally violated laws for prolonged periods of time. The environmental damage and effects on the workers of the plant and citizens of the surrounding communities will not be made manifest for many years, long after the conclusion of this prosecution.

Additionally, the Exxon Valdez plea involved several factors that the Rocky Flats plea did not:

1. The plea bargain was reached <u>after</u> an indictment of five counts was voted by a grand jury and publicly released; Exxon pled to three of them

in exchange for the dismissal of the other two.

2. It was not a global settlement, but concerned only the charges specified. It also preserved the right of other federal agencies to take civil and administrative actions against Exxon relating to the charged conduct. Nor was the state required to sign away its prosecution rights.

3.Exxon's total fine was $150 million (the maximum under the sentencing guidelines), but $125 million was forgiven because of Exxon's acknowledgement of its responsibilities, its expenditure of over $2 billion for clean up of the oil spill and $300 million to injured claimants;[28] its cooperation in the criminal investigation; its contribution of $50 million to an industry oil response fund; its company-wide environmental expenditures, which included establishing a new environmental affairs group.[29]

Clearly, many of the concessions demanded by Rockwell were not part of the Exxon settlement.

The final figure in the Rocky Flats could likely have been bargained higher (as noted above), as it was far lower than the fine that could have been levied given the actual duration of the crimes that Rockwell admitted in the plea. Justice gave up millions of dollars in potential criminal and civil penalties. The $18.5 million penalty paid by Rockwell was a negotiated amount, and represented only the maximum fine allowed on the agreed-upon charges included in the plea. Indeed, in February 1991, the prosecution team evaluated the maximum fines based on the total days in violation attributable to many (but not all) of the charges that were ultimately included in the plea.

The total ranged between $68.85 million and $78.85 million, depending on how many days Rockwell was deemed to have been in non-compliance with the ground water monitoring provisions. Left out of that analysis were the fines associated with the disposal of hazardous

---

[28]Under its contract and current DOE policies, Rockwell and the other nuclear weapons plants contractors are not responsible for a penny of the clean-up costs at those sites.

[29]Plea Agreement, U.S. v. Exxon Corp. and Exxon Shipping Co., No. A90-015(CR) (D.Alaska, Sept. 26, 1991, Section III) pp. 5-8.

wastes in the solar ponds, which in the settlement itself yielded another $3.5 million.[30]

In addition, there were many violations that were not charged. One of the allegations the Subcommittee received (and was subsequently shown to be true) was that the parties initially agreed upon the amount of the fine, and then charged only enough daily violations of the particular counts to equal that amount. Hundreds of days of violations were not charged. Thus, millions of dollars in potential additional criminal and civil penalties on the listed -- and easily provable -- violations were given away. In addition, the plea agreement did not include all of the RCRA and CWA violations that the federal government was aware of at the time.[31]

The $18.5 million fine did not even match the $22.4 million in profits that Rockwell received from the government for operating Rocky Flats during the period in which the crimes were committed. Although the fine is often described as adding up to the total profit that Rockwell received between 1987 and 1989 at the plant, it actually represents only Rockwell's performance bonuses. The total amount that Rockwell received above its costs during that period was $22.4 million in fees, awards and bonuses. All of it was risk-free profit.

Other aspects of the settlement were even more troubling. Justice, EPA and the State of Colorado[32] -- in a move quite unlike the Exxon case -- gave up the right to charge the corporation criminally, civilly and administratively, and any individual Rockwell employees, for any other violations of RCRA, CWA, the Comprehensive Environmental Resource Compensation and Liability Act (CERCLA) or the Toxic Substances Control Act related to any environmental matters at Rocky Flats that were known through the date of the settlement, thus foregoing potentially millions of dollars in additional criminal and civil

---

[30] The analysis included the following violations and fine estimates: Pondcrete storage at 904 pad (RCRA), $30.75 million; pondcrete storage at 750 pad (RCRA), $18.95 million; spray irrigation (Clean Water Act), $0.85 million; chromic acid spill (CWA), $0.45 million; vacuum filter sludge storage (RCRA), $12.85 million; groundwater monitoring, $5 to $15 million. The analysis also included an estimate of mixed waste residue storage (RCRA) for the 771 incinerator at $39.95 million. This charge was not included in the final plea. Unsigned Memo entitled "Draft (2/21/91) Calculation of Potential Maximum Fines."

[31] Each day a facility covered under the Clean Water Act or the Resource Conservation and Recovery Act is in violation under those laws is a separate, chargeable offense. The ten counts comprising the information included 410 separate violations. Because of the continuing failure of the Rocky Flats facility to meet environmental laws, hundreds of additional days of violations were not charged.

[32] Of the total fine, $2 million went to the state. Plea Agreement, U.S. v. Rockwell International Corporation, No. 92-CR-107 (D.Colo. March 26, 1992), p. 2, para. 4.

000156

penalties.[33]

No individual Rockwell or DOE employees were charged with responsibility for the numerous environmental violations that occurred at Rocky Flats, despite strong evidence suggesting individual culpability. Justice sent "target letters" to several members of Rockwell's top management at Rocky Flats. Some of the allegations against them involved fraud and false statements.

While the agreement prohibits Rockwell from seeking reimbursement under its DOE contract for the $18.5 million criminal fine and some attorney's fees incurred after January 1, 1990, the plea bargain specifically allows Rockwell to seek indemnification for a significant amount of other costs and attorney's fees related to the criminal investigation. To date, Rockwell has filed claims for $7.9 million in fees and costs.

Although the grand jury took evidence in this case for over two years, no indictments or reports were issued. The charges were not brought by indictment, but by an information agreed to by both parties.

Finally, in the information accompanying the plea agreement, the Justice Department made a number of controversial public statements about the investigation and the impact of Rockwell's criminal activity. Apparently, the only purpose and value of those statements was to reduce the company's civil liability exposure.

These significant weaknesses in the settlement all reflect demands made by Rockwell as conditions for entering into the settlement.

## B. Rockwell Settlement Demands

> In the interest of settling the case, the prosecutors met almost all of Rockwell's core demands concerning type of charges, global scope of settlement and specified public statements. Most importantly, however, they plea bargained away the right to tell the truth.

---

[33]Plea Agreement, U.S. v. Rockwell International Corporation, No. 92-CR-107 (D.Colo. March 26, 1992), p. 2, para. 5.

In their negotiations with the prosecutors,[34] Rockwell's attorneys made it clear that there were certain "core interests" that had to be met before settlement could be agreed to.[35] These included no individual indictments,[36] no fraud, false statement or conspiracy charges; no charges which could lead to civil litigation for off-site consequences, including illegal incineration, worker health/safety violations and Clean Water Act violations which alleged off-site releases; indemnification by DOE for some or all of the costs of defending the criminal and related civil litigation; and a "global settlement" of related enforcement actions, including civil penalties and a pending qui tam suit;[37] no debarment; and public statements that there was no "midnight" burning or substantial   off-site health or environmental consequences from the charged conduct.[38]

The prosecutors decided in late 1990 or early 1991 that they wanted to settle the Rocky Flats case if possible. They viewed it as a tough case to take to trial because of the many complicated environmental laws and regulations, Rockwell's matrix management system which made it difficult to trace lines of authority, the complex fact situations involved, the large and sophisticated defense team assembled by Rockwell, and the time and resources it would take for a full-scale trial, which was not a small consideration.

The prosecutors had two "bottom line" issues: they would not allow any criminal fine to be paid with taxpayer dollars through indemnification by DOE; and they wanted a large enough

---

[34]The first meeting between Rockwell's attorneys and the prosecutors occurred in Denver on Dec. 17, 1990. Dec. 21, 1990, letter from Michael Norton to Lee Foreman. Negotiations did not really become active until late June of 1991 and continued until shortly before the proposed settlement was submitted to the court on March 26, 1992.

[35]See, e.g., Jan. 17, 1991, memorandum re Jan. 14, 1991, meeting with Rockwell; July 23, 1991, memorandum entitled "Note to Neil Cartusciello Re: Rocky Flats/Settlement Negotiations" from Peter Murtha to Neil Cartusciello (cc: Barry Hartman).

[36]Rockwell had originally asked for nolo contendere pleas to protect it from civil litigation and debarment. It warned the Department of Energy of its potential liability from future civil liability if nolo contendere pleas were not accepted. Although Rockwell had already agreed to plead to some felony charges by this time, on Sept. 4, 1991, DOE Deputy Secretary Henson Moore also weighed in with a letter in favor of nolo contendere pleas. Sept. 4, 1991 letter from Henson Moore to Michael Norton.

[37]Qui tam suits are brought by whistleblowers claiming a portion of moneys recovered or recoverable by the federal government because of fraud or other misconduct.

[38]Other issues of whether the charges would be felonies or misdemeanors and the amount of the fine were not deemed "core interests" or "deal breakers."

fine to show that it was a legitimate prosecution.[39]

In particular, main Justice[40] wanted to settle and encouraged agreement with most of Rockwell's terms. Of the key prosecution team of Mr. Norton, Mr. Fimberg and Mr. Murtha, Mr. Murtha consistently took the most negative view of the evidence in the case, an opinion of which he kept his superiors in main Justice well-apprised. He also brought to them his periodic fears that the Denver prosecutors were going to spoil the settlement by being too aggressive. These fears began immediately after the first overture by Rockwell and continued almost to the end of the case. The frequent opposition of main Justice to Denver's settlement strategies may have had the effect of limiting the concessions gained from Rockwell.[41]

In the end, Rockwell got almost everything it wanted -- an evaluation with which the prosecutors agreed. In a memorandum to Mr. Norton on August 5, 1991, Mr. Fimberg

---

[39]Feb. 12, 1991, notes of meeting with Rockwell attorneys attended by Bryan Morgan, Harold Haddon, Vincent Fuller, Lee Foreman, Michael Norton, Kenneth Fimberg, Peter Murtha and William Hassler. Mr. Fimberg's bottom line was more stringent. In a later memorandum addressed to Mr. Norton in the middle of negotiations, he said:

> I will continue in my designated role as pushing for the most aggressive settlement possible. I continue to be concerned that we be able to go to the court, to the people of Colorado, and to the Department with the best, most defensible settlement possible. To me, that means the largest number of serious counts that allows us to best tell our story with full effect and obtains the largest number of dollars achievable. It also means, to me, that we seriously limit the areas of Rockwell's reimbursement or indemnification. It's my view that Rockwell should not be indemnified not only for the charged conduct, but for any conduct in which the investigation showed substantial merit, even if not charged. (Emphasis added)

Aug. 5, 1991, memorandum from Kenneth Fimberg to Michael Norton marked "PERSONAL AND CONFIDENTIAL - NO COPIES OR OTHERWISE DISTRIBUTED."

[40]The U.S. Attorney's Office and the Environmental Crimes Section of Justice's Environment & Natural Resources Division (E&NR) were viewed as co-counsel on the case. Mr. Murtha and, briefly, Mr. Hassler, were E&NR's representatives on the trial team.

[41]Before the prosecutors' first meeting with Rockwell's attorneys, Mr. Murtha and Mr. Block wrote a memo to Mr. Hartman warning him of a "substantial dispute" among the attorneys over the value of the case. Mr. Fimberg had proposed $50 to $80 million and was getting some support from Mr. Norton; Mr. Murtha and Mr. Block thought $4 to $10 million was more appropriate. It was their view that Mr. Fimberg's position would "seriously impede any efforts to settle the case," and they proceeded to lay out all of their perceived problems with the case. Dec. 28, 1990, memorandum from Jerry Block and Peter Murtha to Barry Hartman.

wrote:

> It's my overall sense, Mike, that Rockwell's achieved its big ticket items:
> the dollars, while not insignificant, will hardly break the company, and no
> individuals will be charged.  Further, we've agreed to certain limited
> acknowledgements that are important to the company (no midnight burning
> and no imminent off-site health threats).  I therefore believe we should
> hang tough and finalize the settlement on the terms most advantageous to
> us.[42]

In return, the prosecutors, largely through the work of Mr. Fimberg and Mr. Norton, got a
respectable fine that the federal taxpayer did not reimburse based on a notable number of
felony and misdemeanor charges.  But they lost some of the more significant charges,
millions in attorneys' fees for meritorious charges not pled to, and -- most importantly -- they
lost their right to tell the public the full story.  And, to some extent, they agreed to mislead
the public with their statements.

In plea bargains, each side must lose something.  Not all charges, even meritorious ones, will
survive.  But in a criminal case of this magnitude and with this level of public interest and
health, environmental and policy issues, the prosecutors also have a duty to be honest about
the reasons certain charges or defendants were not pursued.

### 1. Individual Indictments

> Before they had even directed their investigators to compile the evidence
> they had against individuals, the prosecutors agreed that their "bottom line"
> for settlement purposes was "no individual felony indictments."  But the
> failure of U.S. Attorney Norton to support misdemeanor indictments led
> to the loss of all individual indictments.

> It appears that the prosecutors had indictable charges that could have been filed
> against individuals for knowing violations of environmental laws in the
> pondcrete/saltcrete, spray irrigation and possibly solar ponds areas.  Additionally,
> evidence of knowing false statements concerning the use of the 771 incinerator was
> not pursued.

---

[42]August 5, 1991, memorandum marked PERSONAL AND CONFIDENTIAL -NO COPIES OR
OTHERWISE DISTRIBUTED" from Kenneth Fimberg to Michael Norton.

The prosecution collected significant evidence of criminal wrongdoing on the part of high-level Rockwell officials, but agreed not to indict them on either felony or misdemeanor charges as part of the plea negotiations. This final decision was made before the investigation was complete and the formal, pre-indictment prosecution review of those charges. It was also done despite the proffer of corroborating evidence by lower-level targets.

In their desire to protect the plausibility of the plea agreement, the prosecutors were less than candid with the public and the Subcommittee about the role of the plea bargain in their prosecution decisions about individuals. It was not credible that, in a case of this size, a department that normally requires a formal prosecution memo and review process before signing off on any proposed indictment came to a conclusion through "an evolving process" about the viability of criminal action against several different individuals in a variety of subject areas involving different prosecutors, several investigators, numerous documents and witnesses.

Shortly after the U.S. Attorney's Office presented its plea agreement and sentencing memorandum to the court for approval, Mr. Fimberg was asked by the press why there were no individual indictments of Rockwell employees. He said that it was an issue of "fairness." The people who might have been prosecuted were "mid-level people who had not established the policy, but acted consistent with it." They were simply carrying out orders that allowed mismanagement of toxics. He didn't describe where the orders came from, and admitted that the settlement might not be "emotionally satisfying."[43]

Six months later, before the Subcommittee, the prosecutors attempted to tell a somewhat different story. First, they said the plant manager and highest official in Rockwell International Corporation, who was their prime target, had died in the middle of the investigation. Second, none of the surviving targets were "rogue" individuals, but part of a Rockwell corporate "culture."[44] Finally, the decision not to indict any of the other designated targets, which included several top-ranking company officials, was based on the

---

[43]The press described Mr. Fimberg as "ambivalent" about the results of the prosecution. Matthew Wald, "Nuclear Fingerprints All Over, but Try to Find the Hands," New York Times, June 7, 1992, 4:4. Mr. Murtha, in particular, had an unusual definition of "mid" and "low-level." He told the Subcommittee that building managers were "low-level" managers, and the manager of Waste Operations, who was operating at a level just below the top managers in the Rockwell hierarchy of 6,000 persons as a "mid level manager." Testimony of Peter Murtha, Hearings, supra, Sept. 24, 1992, pp. 1147-1148.

[44]Testimony of Michael Norton, Hearings, supra, Sept. 23, 1992, p. 16.

prosecutors' view that these were "marginal" cases.

What they did not tell the public, and tried to keep from the Subcommittee, was that before they had completed the investigation of individual targets, and as part of the settlement negotiations with Rockwell, Mr. Norton had decided he could give up individual pleas.[45] Although the prosecution team had earlier agreed they wanted to settle if possible and would be willing to give up individual indictments if they had to,[46] they continued to put together individual cases. The decision to give up those indictments appeared to be over the opposition of the chief prosecutor who had expressed the opinion that he had enough evidence to indict or at least get misdemeanor plea from three or four individuals.[47]

Although the pursuit of individual defendants was always a goal of the case,[48] day-to-day demands had made it a difficult task to address. In early December of 1990, Mr. Fimberg, in commenting on a schedule to bring the pre-indictment stage of the case to a conclusion in next 120-150 days, asked when the team was going to write indictments as the grand jury was taking up all of their time, and negotiations would take even more time away from finishing up investigations. Target letters were scheduled to be sent in December with the goal of returning indictments in April, but naming targets required management decisions, and the investigations were not yet complete. "I'm particularly concerned that we must negotiate from a position of maximum strength, which means that we have to be ready and willing to indict," he said.[49]

---

[45]Mr. Norton also maintained that there was not sufficient evidence to indict individuals. Sworn Interview of Michael Norton, Nov. 12, 1992, p. 44. Mr. Murtha and Mr. Fimberg were somewhat more positive, but all of the prosecutors, despite incriminating statements about individuals in the sentencing memorandum, tried to avoid any inference that individual indictments were given up for the plea bargain. As Mr. Fimberg cautioned Mr. Norton in July of 1991, "We have to be careful what we say, to avoid an allegation that we are holding the individuals hostage." July 1, 1991, memorandum entitled "June 27, 1991 Rockwell Settlement Offer" from Kenneth Fimberg to Michael Norton.

[46]Jan. 18, 1991 memorandum entitled "Settlement Outline (Rockwell International)" from Kenneth Fimberg to Jerry Block and Michael Norton.

[47]Jan. 18, 1991, memorandum entitled "Rockwell Settlement Discussions" from Kenneth Fimberg to Michael Norton and Jerry Block; Jan. 23, 1991, memorandum entitled "Rockwell Settlement Conference Call January 23, 1991"; July 1, 1991, memorandum entitled "June 27, 1991 Rockwell Settlement Offer" from Kenneth Fimberg to Michael Norton (cc: Neil Cartusciello, Peter Murtha).

[48]The prosecutors had apparently been inspired by the Aberdeen case and wanted to demonstrate that DOE officials could also be held responsible for their actions.

[49]Dec. 3, 1990, memorandum from Kenneth Fimberg to Michael Norton.

Mr. Lipsky described the status of the investigation at that time as follows:

> The picture was clearing up on what crimes there might be and identifying the workers that were involved in that type of process so that we could make a cut, prioritize which issues were more important . . . . [A]t that point in time there was not anyone in particular we were looking at, and we were not excluding anybody . . . .

> So, that was really, I would say the first overt discussion about individuals. We hadn't -- our investigation hadn't risen to that level yet."[50]

However, after the initial meeting with Rockwell attorneys on Jan. 14, 1991, Mr. Fimberg wrote, "Rockwell - no ind. charges (Mike encouraged this more than I'd like to)."[51]  In a second memorandum on the same meeting to Mr. Norton and Mr. Block, Mr. Fimberg gave his assessment:

> Individuals.  I believe that it would not be impossible or even terribly unlikely to obtain misdemeanor pleas from a number of individuals.  (I agree that felonies would almost certainly mean a trial, and would likely lead to the same result -- i.e., probation -- if we prevailed. Note Aberdeen.)  A policy or management decision is needed on whether misdemeanor prosecutions of individuals would deflect or lessen the likely criticism of a corporate-only disposition.  (emphasis added)[52]

The first response from the prosecutors was that they could give up individual indictments in favor of a settlement. A subsequent memorandum drafted by Mr. Fimberg which outlined the settlement options discussed, read, "3. No charges against Rockwell individuals. DOJ: No response (DOJ will not agree not to charge individuals).  Bottom Line: No Rockwell individuals will be charged, or misdemeanors only."[53]  By January 23, part of the team had

---

[50]Sworn Interview of Jon Lipsky, Oct. 20, 1992, pp. 28 and 40-41.

[51]Notes on Jan. 14, 1991 meeting with Lee Foreman, Harold Haddon and Bryan Morgan.

[52]Jan. 18, 1991 memorandum entitled "Rockwell Settlement Discussions" from Kenneth Fimberg to Michael Norton and Jerry Block.

[53]"Attached is a discussion outline concerning a possible settlement with Rockwell International. The dollar figure in Item 2 is blank since there's no consensus at this time." Jan. 18, 1991 memorandum by Kenneth Fimberg to Joseph Block and Michael Norton re "Settlement Outline (Rockwell International)." Copies were given to Mr. Murtha, William Hassler (a DOJ attorney who worked briefly on Rocky Flats), Kenneth Buck (another assistant U.S. attorney briefly assigned to Rocky Flats), and Criselda Ortiz, an

upped their bottom line at Mr. Fimberg's behest from "no individual indictments" to "no individual felony charges." However, in a conference call between Denver and main Justice to discuss Rockwell's offer, it was already clear that Mr. Fimberg wasn't getting his usual support from Mr. Norton on this issue. Notes of that call record the following discussion on Rockwell's demand for no individual indictments: "Bottomline: no individual felony charges. Norton: no misdemeanor charges either." (emphasis added)[54]

Mr. Fimberg, however, was pushing the investigators to complete their investigations on individuals as soon as possible to prepare for target letters and possible indictment.[55]  On April 4, 1991, Mr. Murtha provided a short summary of each of ten potential targets to Mr. Hartman and Mr. Block in preparation for an April 9 meeting on targets, mentioning that "there may be a diversity of opinion among the prosecutors."[56]  Ten days after the meeting, eight target letters were sent out offering the targets the opportunity to meet with the prosecutors.

Draft indictments and the draft prosecution memorandum written between April and June contained indictments of individual Rockwell officials for their illegal and improper storage of pondcrete and saltcrete, the run-off of pondcrete and saltcrete into Woman and Walnut Creeks, and their knowledge of and failure to keep the sewage treatment plant effluent dispersed through spray irrigation from going into Woman and Walnut Creeks. These drafts were described as including "only the strongest charges."[57]

By late June of 1991, Mr. Lipsky believed that the team had "a great deal of evidence against individuals," but Mr. Murtha told him "all of a sudden" and without further

---

Environmental Crimes Section attorney.

[54]Jan. 23, 1991, memorandum entitled "Rockwell Settlement Conference Call January 23, 1991". Mr. Murtha described Mr. Norton as the key decisionmaker, but stated that his views often reflected what Fimberg wanted. See, e.g., Sworn Interview of Peter Murtha, Nov. 3, 1992, p. 174. Mr. Fimberg described Mr. Norton as being "more open" to individual indictments than Mr. Murtha was. Sworn Interview of Kenneth Fimberg, Oct. 21, 1992, p. 35.

[55]Dec. 12, 1990, memorandum entitled "Individual Targets" from Kenneth Fimberg to Jon Lipsky and William Smith; Jan. 1, 1991 memorandum from Kenneth Fimberg to Jon Lipsky and William Smith.

[56]April 4, 1991, memorandum entitled "Pros Memo for Meeting on 4/9" from Peter Murtha to Barry Hartman and Jerry Block.

[57]June 3, 1991, Draft Prosecution Memorandum, p. 2 and p. 4 (Summary of Charges).

explanation that individuals would not be part of the plea agreement.[58] Mr. Lipsky went to his superiors at the FBI and asked them to find out the answer. He was told that Mr. Cartusciello said there was "insufficient evidence," and that he was to cease all of his efforts to obtain evidence on Rockwell officials.[59]

He then went to Mr. Fimberg, who had previously told him that he thought they had enough evidence to indict, among others, three of the top managers of Rockwell International.[60] Mr. Fimberg's level of confidence about these three, which was already high, had "increased immensely" because of recent proffers that had been made in settlement talks by some of

---

[58]Sworn Interview of Jon Lipsky, Oct. 20, 1992, pp. 80-81. Mr. Lipsky and the other investigators had earlier indications that individuals might not be prosecuted. Earlier, he had received a memorandum from Mr. Murtha which stated:

> I am disturbed to have learned that, apparently, there have already been some misunderstandings resulting from our meeting with Gary Johnson and the FBI task force agents this morning concerning the potential settlement of this case.
>
> To set the record straight:
>
> 1. Settlement is being pursued. One potential outcome of settlement is that no individuals would be charged. As I clearly stated, our current offer to Rockwell does not mention, and therefore does not include, individuals.
>
> 2. Assuming settlement does not occur and this case is indicted, no decisions have yet been made with respect to which individuals, if any, would be indicted, and on what charges they would be indicted. We have not yet received target memos on all issues nor have we met and thoughtfully discussed who should be charged. It should be manifest, however, that no decision to indict only the corporation has been made. Indeed, a great deal of time has been spent, and will continue to be expanded, on the issue of which individuals are appropriate for indictment.

March 7, 1991, memorandum to Jon Lipsky from Peter Murtha re individual targets (cc: all agents, Mr. Fimberg, Mr. Hassler, Mr. Buck. As discussed later, these "thoughtful" discussions never occurred.

[59]Sworn Interview of Jon Lipsky, Oct. 20, 1992, pp. 800-82; Testimony of Jon Lipsky, Hearings, supra, Sept. 11, 1992, pp. 550-565.

[60]Mr. Fimberg and Mr. Murtha initially attempted in their testimony to distinguish between the evidence necessary to indict and that necessary to prosecute and to convey the impression that they could not prepare an indictment just because they had enough evidence to convince the grand jury to indict. Subsequent statements from the Department made it quite clear that Justice Department lawyers do not recommend indictments under the Principles of Federal Prosecution unless they are reasonably sure they can succeed in a prosecution. This position was expounded very forcefully by Roger Cubbage, a long-time Justice Department Criminal Division lawyer, who appeared with Mr. Lipsky. Sworn Interview of Jon Lipsky, Oct. 20, 1992, p. 123.

the lower-level targets, and he had expressed that confidence to Mr. Lipsky.[61]  Mr. Lipsky
recalled that:

> I got him [Mr. Fimberg] alone and I asked him about the status of
> individuals and it was explained that he had been out voted. He tried. He
> relayed his beliefs and opinions and how he could prosecute the case and
> the tantamount reason was that he was out voted and there were other
> people involved in the decision.[62]

It is believed that the lack of support by Mr. Norton was key in this decision. The
prosecutors put an offer which included no individual indictments on the table in July of
1991. The linkage to a successful plea agreement was clear. Mr. Norton told Mr. Haddon
on July 17 that:

> "in return for pleading guilty to these charges [seven felonies], the United States will
> not bring conspiracy, fraud or false statement charges or other environmental
> charges against the company or its present or former officers, directors or
> employees." (emphasis added)[63]

Pressure on the individual targets also brought Rockwell to the bargaining table with more
concessions. In late June of 1991, after a letter was received from the lawyer for one of the
targets, Mr. Norton and Mr. Hartman had a telephone communication to discuss how to
handle the individual targets. Mr. Hartman noted on his copy of the letter that Mr. Norton
had met the day before with the attorney and had stated the following to Mr. Hartman:

> "If easy on these guys, they will pressure Rockwell. Told them to do what they
> want. We will proceed. 2 hrs later - 2 p.m. 6/25 [Lee] Foreman [attorney for
> Rockwell] met with Mike. RW [Rockwell] is moving. Talking 10 mil All
> Rockwell; no indemnification. Considering misdemeanors etc. What about CDH

---

[61]Sworn Interview of Jon Lipsky, Oct. 20, 1992, pp. 128-142.

[62]Sworn Interview of Jon Lipsky, Oct. 20, 1992, pp. 85-86. There was no obvious reason for Mr.
Fimberg not to be candid with Mr. Lipsky. They had a long-term working relationship, and he told Mr.
Lipsky when he believed there was insufficient evidence to indict a DOE official that Mr. Lipsky was
investigating. Id., p. 107.

[63]July 17, 1991, letter from Michael Norton to Harold Haddon re "Rockwell International
Corporation." The prosecutors maintained in front of the Subcommittee that there was no linkage
between the plea agreement and the dropping of individual charges.

6/27 - Foreman/Hadon [sic] to meet"[64]

This was done before the prosecutors had completed their investigation, prepared a final prosecution memorandum and had conducted a full-scale evidentiary review of the viability of individual charges that Mr. Murtha promised the investigators. Such a review would have been normal in a case of this size. Only a "fairly rough" draft of a prosecution memo dated June 3, 1991, had been circulated. However, the section on pondcrete/saltcrete -- the most significant area in terms of individual indictments -- was not completed, and may never have been circulated. The memo did not include all of the available evidence or who the potential witnesses would be, essential information for evaluating the strength of each case. Mr. Murtha later admitted it would have been "in the government's interest" to have such a document.[65]

Although there was a schedule which set a full-scale prosecution review of just such a document for the week of August 5, 1991, it never occurred.[66]   Mr. Murtha told the Subcommittee that after June of 1991 the focus was on the settlement negotiations, which did not favor pursuing indictment of individuals.[67]   This was borne out by the order given to Mr. Lipsky and Mr. Norton's letter to Rockwell's attorneys.

---

[64]June 26, 1991 letter from Michael Bender to Richard Stewart with handwritten notes from Barry Hartman.

[65]Prosecution Memo (draft) from Neil Cartusciello, Peter Murtha, Kenneth Fimberg and Charles DeMonaco to Richard Stewart and Michael Norton, June 3, 1991. Although Mr. Stewart and Mr. Norton were listed as the recipients, Mr. Murtha, who testified that he was the prime author, said it was never reviewed by anyone above Mr. Cartusciello. Sworn Interview of Peter Murtha, Nov. 17, 1992, p. 11.

[66]Undated (probably June of 1991) memorandum entitled "Proposed Timetable." The schedule read as follows:

> Week of 7/1 - settlement talks
> 7/8 - second round of proffer sessions
> 7/15 - pros memo - add. witness interviews . . .
>
> 7/26 - pros memo; draft to chief reviewer by 7/26
> 7/29 - revised draft to pros review group
> 8/5 - pros review - 8/7
> 8/12 - prep for final grand jury session
> 8/19 - same
> 8/26 - final grand jury session

[67]Sworn Interview of Peter Murtha, Nov. 17, 1992, p. 10.

However, every time there was a glitch in the negotiations, the prosecution would threaten individual indictments again.   In late September of 1991, because of prolonged disagreements over the scope of indemnification, Mr. Fimberg was again considering preparing individual indictments and going to trial, and Mr. Norton "threatened" Mr. Foreman with indictments in October or November.  Similar communications occurred in December.[68]

The lack of candor in the prosecutors' testimony before the Subcommittee about their alleged conclusion in July of 1991 of a lack of evidence against individuals and the lack of linkage between individual indictments and the plea agreement is nowhere more apparent than in the September 1991 memorandum from Mr. Murtha to Mr. Fimberg.

> At the risk of sounding like a broken record, I think it is absolutely critical that as soon as possible you revise the existing draft indictment into the indictment you will wish to proceed to trial on.
>
> This needs to be done for at least five reasons. First, no decisions have yet been made on what individual defendants, if any, will be recommended for indictment." (Emphasis added.)[69]

Shortly thereafter, an attorney for an individual target complained about Mr. Fimberg's expressed intention to indict his client.

> As we discussed on the telephone last week, it is understandable that government efforts have been spent attempting to reach a global settlement with Rockwell for the past 3 or so months. Now that settlement talks have apparently faltered it seems most unfair to indict individuals without giving each target's attorney an opportunity to advance arguments against indictment. . . . On behalf of the remaining individual targets, I therefore renew our request to extend the government indictment deadline.[70]

---

[68]Sept. 26, 1991, note from Peter Murtha to Kenneth Fimberg, re: "Draft Indictment." Mr. Murtha also mentioned the need for completing of the prosecution memo for the first time in months. Mr. Fimberg threatened grand jury indictments again in December. Dec. 13, 1991, letter from Lee Foreman to Michael Norton.

[69]Sept. 26, 1991, memorandum entitled "Re: Draft Indictment" from Peter Murtha to Kenneth Fimberg.

[70]Oct. 30, 1991, letter entitled "Rocky Flats Grand Jury Investigation and Indictment Deadline" from Michael Bender [attorney for one of the individual targets] to Kenneth Fimberg.

While drafting their sentencing memorandum, the prosecutors proposed a section that attempted to explain the lack of individual indictments as the result of a <u>corporate</u> culture which, not unlike the "DOE culture", absolved individual employees from any personal culpability.

> Finally, the size of the fine (and the absence of any Rockwell employees being individually prosecuted) reflects the fact that Rockwell's environmental wrongdoing was a collective corporate enterprise with a <u>substantial</u> number of individuals in various organizations including Plutonium Operations, Support Operations and Health, Safety and Environment, contributing in some fashion and in varying degrees to the violation of environmental laws. Further, given that these crimes were not committed by one or even several 'rogue' individuals, but rather were the result of a culture, substantially encouraged and nurtured by the DOE, where environmental compliance was of a much lower priority than the production of plutonium and nuclear "triggers". <u>For these reasons, the United States believes that it more appropriate to charge Rockwell, as an organization, with this collective criminal misconduct, than any one individual whose acts gave risk to violations of the environmental criminal laws</u>. (Emphasis added)[71]

The section in the final sentencing memorandum referred to "institutional crimes" by Rockwell, but deleted the references to the fine being related to the lack of individual indictments of the "substantial number" of Rockwell employees who contributed to violations of environmental law.[72]

### a. Pondcrete/Saltcrete

Everyone appearing before the Subcommittee agreed that the unpermitted, improper storage of pondcrete and saltcrete[73] on the 750 and 904 pads was the area in which the

---

[71]Feb. 12, 1992, draft of plaintiff's sentencing memorandum, pp. 63-64.

[72]Plaintiff's Sentencing Memorandum, March 26, 1992, pp. 118-19.

[73]Pondcrete is low-level mixed waste and cement combined in a process that was supposed to permanently harden and encapsulate the radioactive and toxic elements of the block. The waste originated as sludge in solar pond 207A, which Rockwell was attempting to clean out as part of a closure plan. Saltcrete was created in a similar manner, but the waste element was nitrate salt from the Building 374 evaporators. William F. Smith, Rocky Flats Task Force, "Report of Investigation - Pondcrete/Saltcrete,"

Case No. 1:96-y-00203-RPM   Document 137-8   filed 06/01/07   USDC Colorado   pg 48 of 143

evidence against individual Rockwell officials was the strongest. Numerous low-level Rockwell employees had told the investigators that they knew the blocks were improperly processed and stored in a manner that led to deterioration and leaking and had told their supervisors, the directors of waste and plutonium operations and the plant manager about these problems.[74] Several of them had related their experiences to the investigators. Some of the spilled material, which contained nitrates, chemicals, including cadmium, low-level radioactive waste and other materials had made its way into the surface water drainage system (Walnut Creek). Little or no action was taken by Rockwell to correct the problems even after a 1988 spill on the 904 pad, which was the first one reported to EPA and the Colorado Department of Health (CDH).

By late 1990, a vast array of documentary and testamentary evidence had been collected against the company and certain individuals. William F. Smith, the lead EPA investigator, had compiled a 78-page document on pondcrete/saltcrete.[75] Mr. Smith presented his report as evidence of knowing violations of RCRA, the Clean Water Act (CWA), the Comprehensive Environmental Response, Compensation and Liability Act (CERCLA) and a criminal conspiracy to defraud the government.[76]

The simplest charge was one of illegal storage under RCRA. EPA and CDH did not know of the existence of the 904 pad, and it was not permitted for storage of hazardous waste. Rockwell also did not meet interim storage regulations on either pad. According to Smith,

> The spill of pondcrete was due to the improper formulation and handling of pondcrete by Rockwell International. The spills were also due to a lack of inspections conducted at the 904 pad and a failure by Rockwell

---

Dec. 14, 1990, pp. 18 and 27.

[74]The investigators conducted a series of interviews with Rockwell employees in which the employees stated that they had informed and even met with the heads of Waste Operations and Plutonium Operations because of the workers' concern about the deterioration and leaking of the pondcrete/saltcrete boxes.See, e.g., Report of Interview of Howard Long, April 30, 1990; Report of Interview of Daniel S. Tallman, Feb. 6, 1990; Report of Interview with Lief Swenson, Nov. 1, 1990.

[75]William F. Smith, Rocky Flats Task Force, "Report of Investigation - Pondcrete/Saltcrete," Dec. 14, 1990. Subcommittee staff interviewed Mr. Smith. He was not able to remember his preparation of this document or his section of a later draft prosecution memo. His 1990 report was obtained from another source.

[76]Because portions of the report have been redacted to delete grand jury evidence, the theory behind the conspiracy allegation is not clear. It may be that Rockwell's failure to report its problems with pondcrete and saltcrete led DOE to pay Rockwell larger bonuses than it would otherwise have received.

> International employees to detect malfunctions and deterioration in the boxes. Employees also knew discharges, spills and leaks were occurring which led to the release of hazardous waste to the environment. Employees of Rockwell International made these problems known to upper level management at Rockwell International.

Mr. Smith specifically cited the directors of waste and plutonium operations as being aware that these were serious problems with pondcrete "well in advance of the May 23, 1988, spill."[77] He provided a long list of documents and some redacted grand jury testimony indicating that Rockwell officials knew since late 1986 of the potential for contamination from the pads caused in part by exposure of the blocks to precipitation and temperature change on the pads. For example, in October of 1987, an internal letter from Rockwell's Health Safety and Environment Division was sent to its Waste Operations manager telling him that "elevated Alpha and Beta readings from rainwater" were collected in the 750 parking lot.[78] CDH, in the 750 permit, told Rockwell to sample all runoff from the pad prior to discharge, but also warned Rockwell the pad was not suitable for long-term storage.[79] After the May 1988 spill, the Plutonium Operations director was informed that the ponded water and soil near the 904 pad was high in nitrates and gross Beta.

> The contamination is coming from the storage pondcrete. This water cannot be allowed to discharge off the pad. The asphalt berm impounds storm water and should be pumped before it overflows. The pump water should not be treated as sanitary waste. The bern was constructed as a temporary measure to contain run off water and it is now obvious that it is not adequate. It is recommended that a lined sump be constructed that

---

[77] William F. Smith, Rocky Flats Task Force, "Report of Investigation - Pondcrete/Saltcrete," Dec. 14, 1990, pp. 34-35.

[78] Rockwell, Feb. 8, 1991, Investigative Memorandum entitled "Debriefing of Ronald L. Henry," prepared by Alliance Services, p. 3. Rockwell's attorneys attempted to debrief every witness who appeared before the grand jury by having investigators wait outside of the grand jury room.

[79] The prosecutors maintained to the Subcommittee that DOE was not aware of the problems with saltcrete and pondcrete storage or that pondcrete was being stored at the unpermitted 904 pad. However, a Sept. 17, 1987 memo from William Rask, DOE's chief of the Operations Branch at Rocky Flats, to Frank Bigham of the Health Physics and Environmental Division at the Nevada Operations Office included an attachment that reported problems at both the 750 and the 904 pad. (See VII. for full discussion of actions related to DOE personnel.) A DOE audit report and Rocky Flats waste generation and certification operations conducted in late 1987 also noted sufficient damage to containers to require recertification. William F. Smith, Rocky Flats Task Force, "Report of Investigation - Pondcrete/Saltcrete," Dec. 14, 1990, pp. 42-3.

> will contain the run off from a design storm of event [sic]. This sump can then be pumped and the water treated.[80]

Nonetheless, Mr. Murtha, who was the attorney assigned to the pondcrete/saltcrete issue, worried that there was testamentary evidence, but not "any type of documentary chain" that linked the knowledge of mid-level managers of the problems to high-level managers.

There was also documentary and testamentary evidence that Rockwell management refused to consider anything but low-cost alternatives in their attempts to stop the leaking of contaminants from the pads.[81]

Another issue that was not pursued which would have surely involved individual defendants was that of false statements. On September 15, 1988, Rockwell's head of RCRA/CERCLA Program sent a letter to DOE's Rocky Flats area manager, stating that "[s]pills have only occurred to date at the 904 pad."[82]   Based on interview reports reviewed by the Subcommittee, it appears that spills had also occurred at the 750 pad.[83]   Interestingly, this same official made a similar false statement to DOE that no transfer of waste from Building 374 was made to the solar ponds which the prosecutors also decided not to charge. (See discussion, below.) There were also allegations of false statements in self-auditing reports and to the Nevada Test Site. This issue was raised as late as September of 1991, but quickly disappeared in the negotiation process.[84]

### b. Spray Irrigation

The prosecutors had evidence of the knowledge of Clean Water Act violations because of spray irrigation operations and of a resulting failure

---

[80] William F. Smith, Rocky Flats Task Force, "Report of Investigation - Pondcrete/Saltcrete," Dec. 14, 1990, pp. 54-55.

[81] See, e.g. William F. Smith, Rocky Flats Task Force, "Report of Investigation - Pondcrete/Saltcrete," Dec. 14, 1990, p. 59.

[82] William F. Smith, Rocky Flats Task Force, "Report of Investigation - Pondcrete/Saltcrete," Dec. 14, 1990, p. 55.

[83] Oct. 15, 1991, draft sentencing memorandum stated that there was high-level knowledge of leaks at 750 pad by 1987.

[84] Sept. 26, 1991, note from Peter Murtha to Kenneth Fimberg, re: "Pros memo/draft indictment."

> to act by the head of the Rockwell's Support Operations directorate. He
> was not charged.

In March of 1987, DOE and Rockwell employees witnessed run-off from the spray irrigation of effluent from the sewage treatment plant.[85] One witness characterized it as a "sheet flow." The Support Operations director (whose responsibilities included engineering, utilities, the sewage treatment plant and spray irrigation) received more than one report on this incident proposing solutions, and told DOE's area manager that Rockwell was looking for a new spray field.[86]

In early December, Rockwell received a study from the Colorado School of Mines which indicated neither alternate site for spray irrigation could absorb the water. The study concluded that there were not suitable spray irrigation sites at the plant. Applying treated water to any of the sites would only result in the water reaching public waterways through the slightly delayed route of percolating through the soil.[87]

Immediately thereafter, the Support Operations director was given a personal briefing on the study, which was followed up by an internal letter on December 7, 1987, repeating the same information.[88] The director -- who knew that the work on a new spray field had been halted because of the study[89] -- then sent an internal letter to the Rockwell's new director of communications stating that there were no suitable spray irrigation sites at Rocky Flats

---

[85]The water is supposed to both evaporate and be absorbed in the ground. Designed as a disposal method at a time when the plant generated much less waste water, by the mid-1980s, the fields could no longer absorb the water. A permitted alternative was to send the water to Pond B-3 for eventual discharge into Walnut and Woman Creeks drainage. These discharges required notification to EPA and sample testing. Rockwell and DOE disliked using the discharges as a disposal mechanism because of the adverse public response of the water users downstream.

[86]Rockwell, Feb. 8, 1991 investigative memorandum entitled "Debriefing of Ronald L. Henry," prepared by Alliance Services; Rockwell, March 21, 1991, investigative memorandum entitled "Interview with Greg W. Williams," prepared by Alliance Services.

[87]June 3, 1991, Draft Prosecution Memorandum, pp. 19-20. This study also used the very conservative figure of 15 million gallons of waste water annually, when the actual figure was closer to 80 million gallons. Rockwell, March 23, 1991, investigative memorandum entitled "Rick Lawton Grand Jury Briefing," prepared by Foster Private Investigations, Inc., p. 10.

[88]Rockwell, March 21, 1991, investigative memorandum entitled "Interview with Greg W. Williams," provided by Alliance Services, p. 6.

[89]Rockwell, April 18, 1991, investigative memorandum entitled "Interview with Russel Alan Applehans," prepared by Alliance Services, p. 6.

and mentioning the possibility of National Pollution Discharge Elimination System (NPDES) permit revision.  A subsequent recommendation from the Health, Safety and Environment directorate to pursue permit revision was apparently made at a meeting of a group of managers.[90]

Neither permit revision nor any other corrective action was pursued by this director or any other Rockwell manager.  By 1990, when EG&G arrived as the plant management and operating contractor, no one knew the status of permit revision.[91]  Spray irrigation, with its resulting run-off into the area creeks, had continued unabated under Rockwell regardless of the weather or the condition of the fields to absorb more water.  Effluent had even been spray-irrigated on the "East Trenches," a group of old disposal sites filled with uranium-, plutonium-, and solvent-contaminated wastes and known to involve groundwater contamination.[92]

This particular director apparently would not have had the defense that he did not read the documents that were addressed to him.  Grand jury witnesses described him as a "micro manager" who "was calling all the time" to ask detailed questions about all kinds of projects.  He often went outside of the chain of command to project engineers and others to obtain personal answers to his questions.[93]  Yet he was not indicted.

The grand jury also apparently considered evidence concerning the knowledge of spray irrigation problems by Rockwell's director of plutonium operations.[94]  The Subcommittee was not able to obtain other information on this aspect of the investigation.

---

[90]Rockwell, Dec. 11, 1987, viewgraphs entitled "Spray Irrigation at Rocky Flats" prepared by George H. Setlock, Health, Safety & Environment Directorate; Rockwell, March 21, 1991, investigative memorandum entitled "Interview with Greg W. Williams," provided by Alliance Services, pp. 4-7.

[91]EG&G, April 17, 1990, memorandum from G.W. Williams, Facilities Project Management, to F.D. Hobbs, Clean Water Act Division, p. 2.

[92]Plaintiff's Sentencing Memorandum, March 26, 1992, pp. 81-82.

[93]Rockwell, March 21, 1991, investigative memorandum entitled "Interview with Greg W. Williams," provided by Alliance Services, pp. 6-7; Rockwell, April 18, 1991, investigative memorandum entitled "Interview with Russel Alan Applehans", prepared by Alliance Services p. 2.

[94]Dec. 12, 1990 investigative memorandum entitled "Supplementary Interview with Ronald L. Henry," and prepared by Alliance Services for Rockwell, p. 5.  In a grand jury session, Mr. Henry was asked questions about a presentation made by the plutonium operations director in early 1989 which addressed spray irrigation.

### c. Incineration of Hazardous and Mixed Waste in the 771 Incinerator

One of the most controversial elements of the prosecution was the investigation of the use of the Building 771 incinerator. Federal regulators were never allowed in Building 771, based on Rockwell's statement that, as there was no waste treatment in Building 771, they had no reason to be in the building. However, it had been suspected for some time that Rockwell was incinerating both hazardous and mixed waste. Based on a 1987 Waste Stream Characterization document, the search warrant stated that there was probable cause to believe that the Building 771 incinerator had been incinerating a small quantity of hazardous waste and a "substantial quantity of mixed waste" without a RCRA permit or interim status.

Until April of 1989, plant officials maintained to EPA that the incinerator only recycled plutonium, did not treat or dispose of other hazardous and mixed wastes and therefore was not subject to RCRA, even though several hazardous and mixed waste streams were sent to it for "final disposal." The "incinerator as plutonium recovery unit" legal theory to exempt it from RCRA regulation apparently originated with Rockwell's on-site counsel after the AMC decision in 1987,[95] years after the incinerator went into use but at the time when DOE's opposition to RCRA was at its peak. It was endorsed by DOE's on-site counsel who then obtained the approval of the Albuquerque DOE office.[96]  In February of 1989, the Sierra Club filed a lawsuit against DOE and Rockwell charging that the incinerator was illegally disposing of hazardous waste.[97]  In its answer to the Sierra Club lawsuit, DOE admitted to incinerating mixed waste, but still claimed, along with Rockwell, that the incineration constituted a "plutonium-recovery operation" and was not RCRA-regulated.[98]

The Plaintiff's Sentencing Memo concluded that the 771 incinerator was in fact used, "with DOE's approval," to treat hazardous wastes without a RCRA permit or interim status in

---

[95]American Mining Congress v. EPA, 824 F.2d 1177 (D.C.Cir. 1987). This case held that materials recovered in a "continuous" process which would otherwise be RCRA wastes did not have to be disposed of as such.

[96]The prosecutors described DOE's counsel as "wed" to the "old culture' at DOE, which is to say that he attempted to resist the regulation of RFAO by environmental authorities." June 3, 1991, Draft Prosecution Memo, p. 6.

[97]Sierra Club v. U.S. Department of Energy and Rockwell International Corp., Civ. No. 89-B-181 (D-Colo.) [hereafter "Sierra Club"].

[98]Search Warrant Affidavit, supra, ¶¶ 7.4-.5, pp. 76-77.

addition to its alleged plutonium recovery activities. It further stated that investigation also revealed that the incinerator had not recovered any plutonium since at least 1980, contrary to DOE's and Rockwell's repeated statements that it was a "plutonium recovery" unit.[99] It was also determined that pure hazardous waste was used to fire up the incinerator so it could reach certain temperature levels at which point oxygen was added to further raise the temperatures before plutonium-contaminated waste was incinerated.[100]

According to the prosecutors, the "driving force" behind Rockwell/DOE's opposition to RCRA regulation and its questionable legal theory was its fear that the incinerator could not meet RCRA standards, and that upgrading -- plus the additional space required for RCRA storage -- would be expensive. This conclusion was based on their interviews.[101] Nonetheless, this illegal disposal was not charged as the RCRA violation it appeared to be because the practice "was endorsed and directed by DOE at a broad institutional level", and there were no "rogue DOE officials" behind its approval.[102]

Once again, the facts seem to be somewhat different. Several other reasons were given to the Subcommittee for this failure to prosecute, most of which seem to point to a mysterious lack of desire to prosecute. First, there were evidentiary shortcomings. Although Rockwell's 1987 Waste Stream Characterization document stated that at least nine hazardous and mixed waste streams went to the incinerator for final disposal, the investigators did not sample any of those waste streams. Rockwell/DOE did not have a comprehensible tracking system so that specific waste drums and their contents could be tracked from generation to incineration. Additionally, the investigators were not able to test the samples of any of the barrels ready for incineration to determine their exact contents.[103]

---

[99]Plaintiff's Sentencing Memorandum, March 26, 1992, pp. 107-08, fn. 93.

[100]"Hazardous waste" for the purpose of this section includes both pure hazardous waste and mixed waste with a plutonium content below the economic discard limit (EDL) which is not required to be held for plutonium recovery. According to Mr. Lipsky, there was evidence that the incinerator was also used to dispose of purely hazardous waste. Testimony of Jon Lipsky, Hearings, supra, Sept. 18, 1992, pp. 776-777 and 845-846.

[101]Testimony of Jon Lipsky, Hearings, supra, Sept. 18, 1992, pp. 857-856.

[102]Plaintiff's Sentencing Memo, supra, pp. 26-7, including footnotes.

[103]Determining the exact contents of mixed waste streams was a serious problem. The few labs which were equipped to test hazardous waste with a radioactive component were controlled by Rockwell or the Department of Energy. Private laboratories were not interested in contaminating their equipment with radioactive samples.

Second, the prosecutors placed a great deal of emphasis for their non-prosecution on the legal position advocated by Rockwell and DOE that the incinerator was exempt from RCRA as a "recovery" unit. But they inexplicably failed to pursue tantalizing leads that this legal position -- reiterated in Rockwell documents, Rockwell affidavits in the Sierra Club lawsuit and in formal DOE comments on proposed EPA regulations -- may have been knowingly false on the part of Rockwell and/or DOE officials.

By early 1991, the prosecutors knew that no plutonium had been recovered; they knew that hazardous wastes -- and some plutonium -- had been disposed of by incineration.[104] But they inexplicably did not attempt to find out who in Rockwell or DOE also knew that the incinerator could not recover plutonium, when they knew it and whether statements claiming plutonium recovery made by top Rockwell officials and in DOE documents provided to EPA were knowingly false.[105]

In late 1989, William Weston, Rockwell's director of plutonium operations, filed a sworn affidavit in that litigation describing the process, stating that it did recover plutonium, and that no below-EDL waste was disposed of in the incinerator, all of which were inaccurate.[106]   A second, confirming affidavit was filed by Mr. Weston in 1990.

---

[104]Rockwell did a economic discard limit (EDL) assay on the barrels of raw mixed waste to determine if they should be retained because of high plutonium content. After incinerator, a second EDL assay was done on the residue for the same purpose, which may indicate the loss of some plutonium to the environment during incineration.

[105]The Subcommittee is, of course, constrained by its inability to determine what occurred before the grand jury. According to Westword, a Denver weekly that interviewed numerous grand jurors, the grand jury wanted to indict at least two DOE officials who knew or should have known about the improper use of the incinerator. These statements may indicate that the prosecution undertook a more significant investigation that it told the Subcommittee. "The Secret Story of the Rocky Flats Grand Jury," Westword, Sept. 30 - Oct. 6, 1992 [hereafter "Rocky Flats Grand Jury"], p. 19.

[106]Testimony of Kenneth Fimberg, Hearings, supra, Sept. 30, 1992, p. 1547.

> "The decision whether to recover plutonium from plutonium-bearing materials is mandated by an "economic discard limit" ('EDL') established by DOE . . . Material with sufficient plutonium concentration, i.e., those above the EDL, are recovered. Materials below EDL, on the other hand, are managed as waste in accordance with DOE regulations and orders. Currently, pursuant to DOE's direction, these below-EDL materials are managed as radioactive mixed waste and regulated under both RCRA and the AEA . . ."
>
> 11. The primary purpose of the SNM Recovery Incinerator is the ongoing processing and recovery of plutonium rather than the disposal or discard of wastes.

Rockwell/DOE's representation was accepted as accurate and cited by the judge in the Sierra Club case in 1990[107] in an order DOJ was aware of, as it was referred to in its sentencing memo.[108] Both DOE and Rockwell also denied in discovery that the unit did not recover plutonium. DOE's position was taken by the headquarters lawyer assigned to the case after she received a packet of information from the Rockwell and DOE on-site attorneys. Similar statements had been made to EPA in 1988.[109]

However, in early 1990, the DOE headquarters attorney on the Sierra Club case visited the incinerator with the DOE, Rockwell and Justice lawyers assigned to the case. At that time, according to an FBI interview, she was told by "technical people" that the incinerator did not recover plutonium. She returned to Washington and immediately reversed DOE's position that the incinerator was a non-RCRA-regulated plutonium recovery unit.[110]

Despite the DOE lawyer's information, which was transmitted to the prosecutors in March of 1991, the prosecutors could not describe to the Subcommittee any follow-up to determine (1) whether Mr. Weston knew at the time he signed his affidavits that they were false; (2) whether Mr. Weston was provided false information for his affidavits, and who provided it; (3) whether DOE's plant manager was aware of these discrepancies and condoned both the incineration and knowingly false statements; and (4) whether the on-site lawyers had knowingly or unknowingly provided the false information to plant and Albuquerque DOE officials and to headquarters and Justice Department lawyers working on the case.

When questioned, the prosecutor in charge of the incinerator allegations at first indicated

---

Affidavit of William F. Weston, Dec. 21, 1989, filed in Sierra Club v. Rockwell International Corp. and U.S. Department of Energy, Civ. No. 89-8-B-181 (D.Colo).

[107]"Until recently this mixed waste was burned in building 771. Plutonium was then recovered from the ash. This mixed waste is now stored at the plant." (emphasis added) Memorandum Opinion and Order, April 12, 1990, Sierra Club", supra, p. 4. See also, pp. 8-9 and 14.

[108]Plaintiff's Sentencing Memo, supra, p. 27.

[109]Comments of Rocky Flats Plant on Docket No. F-87-SWRP-FFFF, Proposed Redefinition of Solid Waste, 53 Fed. Reg. 519 (January 8, 1988), signed by Patrick G. Currier, counsel, DOE/RFAO, and Robert Lerche, counsel, Rockwell. Testimony of Kenneth Fimberg, Hearings, supra, Sept. 30, 1992, pp. 1509-22.

[110]FBI Interview of Madelyn Creedon, March 20, 1991, Hearings, supra, pp. 1552-53. This change was reflected in the court's April 12, 1990 order which notes that "[r]ecently, DOE agreed to shut down the building 771 incinerator until the EPA or Colorado issues a final RCRA permit authorizing mixed waste incineration." Memorandum Order and Opinion, April 12, 1990, Sierra Club, supra, p. 4. Rockwell, on the other hand, never formally admitted it was not a recovery unit, but failed to deny a subsequent request for admissions, which had the same effect as an admission would have.

that he was not aware of the <u>Sierra Club</u> pleadings and affidavits.

> MR. MURTHA. . . . I have not combed through the Sierra Club pleadings, and I, frankly, don't know exactly what they all say, but what seems might have happened here is that there was some disconnect between people supplying the legal impetus on the one hand, Mr. Currier and Mr. Lerche, and the operations people on the other hand, who knew that we have all this plutonium from, or all this incinerator ash from which we have not extracted any plutonium in 10 years or so . . . .

He added that this was not a good case of "showing subterfuge or lack of good faith. Indeed, we probed people rather deeply on whether or not this was just some sham, and the answer we got back, on a general basis, was: We intend to recover it; we have an ongoing program to recover it; and we are taking some active steps to see that that happens."[111]

The next day he said he was aware of the pleadings and discovery filings, but that he was only attempting to determine if the DOE and Rockwell attorneys knew before they filed their answer in the <u>Sierra Club</u> case that there was no plutonium recovery and didn't "focus" on other filings in the case.

> REP. WOLPE. And you have Rockwell here, at least on a prima facie basis, lying about the activities in which they were engaged, making false statement?
>
> MR. MURTHA. It seems to be an inaccurate statement, yes.
>
> REP. WOLPE. Was this not factored in -- are you saying that you had no knowledge of this fact and therefore did not even factor this into your deliberations over the plea bargaining?
>
> MR. MURTHA. I don't think any of us had focused on these exact interrogatories. I know that there was no investigation that was directed towards the underlying facts of these interrogatories from the standpoint of charging a false statement or something like that against Rockwell, or the

---

[111]Testimony of Peter Murtha, Hearings, <u>supra</u>, Sept. 24, 1992, pp. 1177-78.

REP. WOLPE. Had you known of this, would you not have pursued this line of concern?

MR. MURTHA. If I had been specifically aware of it and had focused on it, I would have been interested in it, yes.

REP. WOLPE. I mean, this is a case that had taken place within the same District Court. As I recall, it was a rather significant case. It wasn't kind of a quiet little action. It was a pretty significant case, and I just want to make sure I understand you.

But you are saying, to your knowledge, neither you nor anyone else on the prosecution team ever focused upon the apparently false statements that were made in the course of this case?

MR. MURTHA. That is true.[112]

Mr. Fimberg claimed no more knowledge than Mr. Murtha. He also took the position that, because the "official policy" of DOE was to "endorse" incineration, neither DOE nor Rockwell officials could be indicted apparently even for knowingly false statements.[113]

The DOE attorney was interviewed in March of 1991. Plea negotiations were not active at that time; in fact, target letters were sent to about 10 individuals on April 4, 1991. The idea of individual indictments was not fully abandoned until about July of 1991.[114]

It does not appear that these allegations and investigative leads, which could have uncovered

---

[112]Testimony of Peter Murtha, Hearings, supra, Sept. 25, 1992, p. 1210.

[113]    MS. HOLLEMAN. Do you know if either Mr. Lerche or Mr. Currier knew that the incinerator had not recovered plutonium for, at this point, six or seven years?

    MR. FIMBERG. I don't know offhand.

    MS. HOLLEMAN: Did anyone investigate whether they knew this?

    MR. FIMBERG: I think they probably did, but counsel, you have now got me into an area that I did not do the investigation into . . . .

Testimony of Kenneth Fimberg, Hearings, supra, Sept. 30, 1992, pp. 1544-45.

[114]Testimony of Peter Murtha, Hearings, supra, pp. 1236-37.

serious misconduct and perhaps false statements by Rockwell and/or DOE officials, were properly or aggressively pursued by the prosecutors. It is baffling that federal prosecutors would not keep very close tabs on a civil case in the same court that involved one of the key allegations in their own case, but their lack of familiarity -- deliberate or otherwise -- with the documents of the Sierra Club case was evident in their testimony before the Subcommittee. Although the legal position taken by Rockwell/DOE was heavily relied on by the prosecution team as support for its conclusion that the recovery theory was an "institutional" one which negated prosecution, that provides no justification for ignoring possibly false representations by either Rockwell and/or DOE employees.[115]

### d. Solar Ponds

Another area where the evidence suggested a strong case for individual indictments involved the illegal storage and treatment of hazardous waste in solar pond 207C. Indeed, Rockwell pleaded guilty to a felony for illegal treatment and storage of hazardous waste (salt brine or concentrate from Building 374) in Solar Pond 207C without a RCRA permit or interim status, on at least 16 occasions between August 12, 1987 and April 13, 1988.

In fact, a strong case for individual indictments on this matter was actually made by the prosecution itself in the Plaintiff's Sentencing Memorandum. That document, which Mr. Murtha described as "the Government's articulation of what it would have been able to show at trial,"[116] recounts the following:

> . . . By the time Rockwell began operating Rocky Flats in 1975, it was well known that the ponds were leaking and contaminating the surrounding groundwater. . . .
>
> Amendments to RCRA in 1984 required that surface impoundments like Rocky Flats' solar ponds meet 'minimum technological standards' in order to be RCRA permitted, and included requirements that the waste ponds be double-lined and have a leachate collection system, to protect groundwater from contamination. Since Rocky Flats' solar ponds did not meet these requirements and it would have been very expensive to fix

---

[115]This may be another example of the DOE "culture" that protected both Rockwell and DOE employees from prosecution.

[116]Testimony of Peter Murtha, Hearings, supra, Sept. 24, 1992, p. 1166.

them, the plant decided to 'close' the ponds. Accordingly, Rockwell did not list the solar ponds on any RCRA Part A application after 1984, and the ponds did not have a RCRA permit to treat or store hazardous or mixed wastes. . . .

In February 1985, at the direction of Rockwell's environmental management, five signs were erected at the solar ponds informing Rocky Flats' workers: 'These Solar Ponds are closed. Contact Building 774 management for disposal of discardable liquids.' As part of the 1986 Compliance Agreement, DOE committed to EPA and CDH that the ponds would be closed and their contents removed, in accordance with RCRA procedure.

Despite this commitment - - which Rockwell was well aware of, Rockwell continued to use Pond 207C to treat and store a hazardous mixed waste known as 'salt brine' or 'concentrate', which was produced by liquid waste treatment processes in Building 374. . .

The investigation discovered that Rockwell from 1985 to April 8, 1988 knowingly transferred hazardous mixed wastes -- that is salt brine -- from Building 374 to Solar Pond 207C on at least 28 occasions, even though the pond did not have a RCRA permit or interim status. Each transfer usually ranged from 10,000 to 15,000 gallons, and was generally made by Rockwell supervisors in Buildings 374 and 774, with authorization from the two buildings' managers. The Rockwell managers, in turn, asked for and received permission from Rockwell's Manager of Waste Operations. . .

. . . DOE was not informed of these transfers and was not aware that new mixed wastes were being treated and stored in Solar Pond 207C without legal authority. On August 22, 1988, a Rockwell RCRA manager wrote to DOE that, except for intercepted groundwater being returned to the ponds, '[n]o other waste is accepted by the Solar Ponds, and has not been accepted for over a year,' since at least the summer of 1987. As recently as November 1991, DOE stated that 'Pond 207C has not received process wastes since 1986.' But in fact, Rockwell had used Pond 207C to treat and

store hazardous mixed wastes." (Emphasis added)[117]

Thus in its own sentencing memo, a document that laid out ".. the Government's articulation of what it would have been able to show at trial ", the prosecution implicated Rockwell supervisors, building managers and the Manager of Waste Operations in illegal storage and treatment of hazardous waste. In addition, another manager is implicated in making a false statement to the DOE.

Moreover, the FBI special agent who testified before the Subcommittee informed the panel that before any transfers were made, the manager of Waste Operations obtained approval from the director of Plutonium Operations, who "had to verbally approve" the transfers.[118] In fact, the agent testified that the manager of Waste Operations and the director of Plutonium Operations were involved in the decision on every transfer.[119]

It should be noted that one of the trial attorneys strongly disagreed with the agent's assertion that the Manager of Waste Operations would verbally communicate with the Director of Plutonium Operations on every occasion of the transfers. According to Mr. Murtha, the only evidence that the Director of Plutonium Operations was aware of the transfers was a one-sentence note in a routine weekly highlight memo the director received.[120]   However, according to the agent, more direct and detailed evidence was offered. A building manager involved in the transfers had informed prosecutors of the role that both the manager of Waste Operations and the director of Plutonium Operations had in the approval of each transfer.[121]   Nevertheless, regardless of the disagreement over the knowledge and involvement of the director of Plutonium Operations, it is clear that the Department of Justice possessed evidence that other senior level employees had knowledge of the transfers.

---

[117]Plaintiff's Sentencing Memorandum, March 26, 1992, pp. 53-56.

[118]Testimony of Jon Lipsky, Hearings, supra, Sept. 18, 1992, p. 917.

[119]Id.

[120]Sworn Interview of Peter Murtha, Nov. 17, 1992, pp. 349-350. .

[121]Agent Lipsky later informed the Subcommittee that a proffer -- a presentation to the prosecutors of information to which an individual could testify, which cannot then be used against that individual -- by one of the Building Managers involved in the transfers represented that both the Waste Operations Manager and the Director of Plutonium Operations were part of the approval process for the transfers. Sworn Interview of Jon Lipsky, Oct. 20, 1992, p. 133.

The Rocky Flats grand jury apparently was prepared to indict two Rockwell employees and one DOE employee for false statements resulting from their representations to the Colorado Department of Health (CDH) and EPA that no hazardous wastes had been deposited in any of the ponds for a twelve-month period between 1987 and 1988.[122]

Yet, despite the prosecution's own straightforward account of the complicity of individuals, the evidence collected by investigators, and the judgments reportedly reached by the grand jury, there were no individual indictments.

In hearings conducted by the subcommittee, prosecutors said the case was weak because Rockwell could offer mitigating evidence. Initially, they had received some conflicting evidence that DOE knew about the activity taking place. Ultimately, the prosecutors concluded DOE did not know.

The Subcommittee was also told that "an allusion to emergency use of the solar pond" was included in the closure plans submitted to EPA and CDH. Since the regulatory agencies never responded to DOE and Rockwell to say that such emergency use was not allowed, that notice of emergency use "might be considered a mitigating circumstance, and might be something that could even potentially result in a verdict of not guilty." [123]

Finally, the prosecutors referenced "another document that was filed with EPA that also would have put EPA on notice that this activity was taking place and, once again, EPA did not come back and protest or say Rockwell, you cannot be doing this. So that, again, struck [DOJ] as potential fodder for a defense attack."[124]  Those are rather weak arguments for the following reasons:

First, although it was resolved that DOE had no knowledge that Rockwell was illegally storing and treating hazardous waste in solar pond 207C, during the period in question, it is unclear why DOE knowledge would have served as an impediment to pursing guilty

---

[122]Bryan Abbas, "The Secret Story of the Rocky Flats Grand Jury," Westword, Sept.30-Oct. 6, 1992, p.19.

[123]Testimony of Peter Murtha, Hearings, supra, Sept. 24, 1992, p. 1157.

[124]Testimony of Peter Murtha, Hearings, supra, Sept. 24, 1992, p. 1157.

individuals, rather than as a cause to go after DOE individuals as well.[125]

Second, although Rockwell/DOE did note that the solar ponds might be used in an emergency situation, this does not afford an excuse for the actions engaged in by Rockwell. The solar ponds were never granted interim status. Indeed, Rockwell and DOE withdrew the RCRA Part A (Interim Status) application that had been submitted for the ponds, and committed to close the facilities in their 1985 RCRA Part B permit application. Under RCRA regulations, once the operators file notice of closure, the facilities are no longer allowed to receive additional waste. Therefore, after the 1985 submission, the ponds were not supposed to be receiving any additional waste. Any use of the ponds on an emergency basis required implementation of the facility's RCRA contingency plan. That plan required that notice be given to the regulatory agencies within 15 days of any emergency use of the ponds.[126] No such notification was ever provided to CDH or EPA.

This raises two issues. First, there are serious questions about whether the transfers really constituted an "emergency use" or were actions simply taken for operational convenience. They were not made to prevent an imminent threat to the environment. Rather, they were made to allow ongoing waste treatment operations to continue when the regular storage facilities reached capacity. One of the prosecutors noted that DOE/Rockwell had detailed in the Part A application to EPA (this is the other document filed with EPA that prosecutors told the Subcommittee might be used in Rockwell's defense) that the solar ponds "would be used to store quantities of salt brine concentrate when other storage capacity was not available on a periodic, non-routine basis. This caused the attorney to be "extremely concerned that by virtue of having informed EPA of this potential use of the pond, and not having EPA, so far as [the prosecutors] could discern, say one word in opposition, that [Justice] would be in a very difficult opposition to prosecute individuals", because the Part A application, although withdrawn, could be used as a defense that EPA tacitly approved

---

[125]Testimony of Peter Murtha, Hearings, supra, Sept. 24, 1992, p. 1157.

[126]    MR. LIPSKY. Okay. There was a caveat of sorts that the ponds could be used for
emergency purposes. The dispute was what constituted emergency purpose.
MR. ROACH. Was there some requirement that there be notification or permission given for
that?
MR. LIPSKY. That was not given up. The department did have to be notified.
MR. ROACH. All right. So if the department was not notified, then it would not fall
under that particular qualification?
MR. LIPSKY. That is what resolved the dispute, in our mind.

Testimony of Jon Lipsky, Hearings, supra, Sept. 18, 1992, p. 917.

ùÛÛ185

such use of the solar ponds.[127]

However, the Part A application was an attempt to establish the ponds as permitted waste storage facilities. The activities that could be approved for a permitted facility would be much different than the limited emergency uses allowed once a facility is under a closure plan. Therefore, there was no reason for the regulatory authorities to make a connection between the "periodic non-routine" storage of salt brine concentrate described in that permit application and the "emergency uses" noted in subsequent closure plans.

Second, no notice of the transfers was ever provided to EPA or CDH. The failure of Rockwell personnel to notify regulators of their "emergency" transfers denied the agencies the opportunity to review the transfers, determine if they were a legitimate emergency use, and possibly prohibit similar uses in the future.

Most significantly, in its Plaintiff's Supplemental Sentencing Memorandum filed with the court, the Department of Justice itself rejected the defense that there had been notice and tacit approval for the transfers:

> An important fact that Rockwell fails to mention is that Rocky Flats' solar ponds were being closed because they were known to be a major source of groundwater contamination. Placing additional hazardous mixed wastes in Pond 207C was not helpful to that process, and the United States found no evidence that DOE or CDH were aware of, much less approved the transfers. (Emphasis added)[128]

The decision not to pursue individuals in connection with the illegal use of the solar ponds is even more puzzling in light of Mr. Murtha's statement that the sentencing memo which, as noted above, clearly and unequivocally laid out illegal acts by individuals in connection with the solar ponds -- was the statement of facts that what the government "would have been able to show at trial." Obviously, in writing the Plaintiff's Sentencing Memorandum the Justice Department considered the mitigating circumstances outlined to the Subcommittee, yet it felt it could cite supervisors, the building managers and the manager of Waste Operations for illegal acts.

---

[127]Sworn Interview of Peter Murtha, Nov. 17, 1992, pp. 352-355.

[128]Plaintiff's Supplemental Sentencing Memorandum, May 28, 1992, p. 13.

Moreover, if the mitigating factors cited by Justice were sufficient to excuse individuals, it is not clear why Rockwell would not have employed the same defense to avoid pleading guilty to that activity in the plea agreement.    As Mr. Murtha explained to the Committee, "the factual basis is a statement indicating that Rockwell, in essence, conforms that these things did happen as set forth."[129]    Thus, Rockwell apparently did not believe that the mitigating factors cited by Justice provided a sufficient defense against the illegal treatment and storage of hazardous wastes in solar pond 207C.

In light of all of these factors, the decision to forego individual indictments in this matter was a very troubling judgment call by the Department.

### 2. Charges with Potential Offsite Consequences

Several areas in which the prosecutors had collected indictable evidence showed that there had been off-site releases of pollutants. All of those charges were dropped or revised into permit or storage violations because of Rockwell's fear that they would increase the potential of civil litigation and liability for the company.

In its "exculpatory submission" to the prosecutors in early April of 1991, Rockwell alleged that the government could not document a single instance of imminent off-site harm. The prosecutors' response was that:

"compliance with federal environmental laws is designed to prevent the threat of harm. Moreover, some of Rockwell's activities, such as failure to timely notify EPA or CDH that pondcrete was washing off its storage pads, prevented the regulators from conducting monitoring that could have determined whether harmful chemicals were entering into the waterways as a result of its activities."[130]

Additionally, the prosecutors, who could not charge the company with any violations for the discharge of radioactive materials because of various federal laws strictly limiting regulation, knew that each violation involved not only hazardous waste, but radioactive material. As the sentencing memorandum stated:

---

[129]Testimony of Peter Murtha, Hearings, supra, Sept. 24, 1992, p. 1166.

[130]April 24, 1991, memorandum entitled "A Response to Rockwell's Exculpatory Submission" from Jerry Block, Peter Murtha and Kenneth Fimberg to Richard Stewart and Michael Norton, Item 3.

"[I]t must be considered that the RCRA offenses all involved mixed waste, potentially more dangerous to human health and the environment than ordinary 'straight' hazardous waste. The appropriate degree of care to be exercised by Rockwell must be evaluated in the light of the possibility of the release of radionuclides. Thus, for example, Rockwell's failure to adhere to interim status standards at the 750 or 904 Pads, must be considered in the light of the possibility that such a violation could have, and did, release radionuclides to the environment."[131]

Nonetheless, over time and in the interest of the settlement, allegations that involved the off-site release of chemicals -- and radionuclides -- were either dropped or rewritten into a format that implied they were more "technical" violations of permit and other regulatory requirements.

### a. Clean Water Act

Rockwell expressed great reluctance to pleading to Clean Water Act (CWA) violations with its implications of off-site effects. For example, in a July 23, 1991, memorandum concerning plea negotiations, Mr. Murtha wrote that:

Rockwell remains extremely concerned about the potential civil suit consequences of pleading to any CWA charge, particularly a felony. To highlight this point, they suggested they might prefer to plead to a CERCLA felony regarding the chrome spill instead of a CWA misdemeanor, though I am concerned that we may not have a sufficient factual basis."[132]

Although the chrome charge ultimately pled to was a CWA misdemeanor, it did not include the off-site discharge of chromic acid to the public waterways, but alleged only that the acid had improperly entered the sewage treatment plant and Pond B-3 (a holding pond) and had been spray irrigated on the east spray field "contrary to good engineering practices."[133]

---

[131]Plaintiff's Sentencing Memorandum, March 26, 1992, p. 115. See, also, p. 61, fn. 53.

[132]July 23, 1991 memorandum from Peter Murtha entitled "Note to Neil Cartusciello" "Re: Rocky Flats/Settlement negotiations." A copy was sent to Barry Hartman.

[133]Count 10, Information, March 26, 1992. Spray irrigation run-off entered the B-5 pond which was ultimately discharged to Walnut Creek. Plaintiff's Sentencing Memorandum, pp. 98-105.

Case No. 1:96-y-00203-RPM   Document 137-8   filed 06/01/07   USDC Colorado   pg 67 of 143

Spray irrigation was not considered a "discharge." Nor did any of the charges concerning unpermitted levels of fecal coliform and biochemical oxygen demand in the discharge from the sewage treatment plant contain allegations of off-site discharge.

### i. Pondcrete/Saltcrete

In his memo detailing the evidence he had collected on pondcrete/saltcrete, Mr. Smith also stated that "it was well known" to Rockwell employees that run-off from the 750 and 904 pads was going into the B series ponds that ultimately discharged through Walnut Creek in violation of the NPDES or Clean Water Act permit Rockwell had at the site. One witness testified before the grand jury that the samples of 750 pad run-off were not taken from puddles near the pad, but from a central storm culvert to the east of the 750 pad, and that rainwater washing over the berm pushed the water into the storm drains. These samples were not tested for RCRA constituents.[134]

In June of 1991, in the final draft prosecution memo prepared before serious negotiations began, the prosecutors had included two CWA violations resulting from the run-off of effluent containing unpermitted and unmonitored chemicals, such as cadmium, into both Woman and Walnut Creek.[135] Furthermore, the memo stated that:

> It should be noted that dye studies and traces of the low from the 904 and 750 pads were conducted and both of these pads discharged their waste to the B-5 Pond. The B-5 Pond by the NPDES Permit is to handle surface water from precipitation events. These ponds were not designed to handle hazardous pollutants from storage facilities located at Rocky Flats. The monitoring requirements for the B-5 Pond were designed for precipitation run-off and not for the monitoring of these hazardous pollutants."[136]

These charges were later dropped, and only the RCRA permit and interim standards violation remained. However, the government's sentencing memorandum documented the evidence the government had obtained showing that this run-off had indeed reached the

---

[134]Rockwell, Feb. 8, 1991, Investigative Memorandum entitled "Debriefing of Ronald L. Henry," prepared by Alliance Services, p. 3.

[135]Counts 1 and 2, Draft Prosecution Memo, June 3, 1991, p. 4.

[136]William F. Smith, Rocky Flats Task Force, "Report of Investigation - Pondcrete/Saltcrete," Dec. 14, 1990, p. 50.

public waterways in violation of the facility's Clean Water Act permit.[137]

### ii. Spray Irrigation

Despite a great deal of documentary evidence pointing to knowledge throughout several directorates that spray irrigation caused run-off to public waterways, it was characterized as a failure to use "good engineering practices" resulting in the "bypass" of treatment facilities in the final information.

In the Affidavit and Application for Search Warrant, the prosecutors referred to thermal activity evidence indicating that liquid discharges were flowing from the Rocky Flats' sewage treatment plant to Woman Creek.[138] What it actually indicated was run-off from the spray fields used to dispose of the effluent from the sewage treatment plant into the public waterways, an egregious violation of the plant's NPDES permit that had been on-going for several years.

In June of 1991, the draft counts for indictment included nine charges that Rockwell had discharged spray irrigation effluent directly into Woman or Walnut Creek without a Clean Water Act permit.[139] The effluent came from the sewage treatment plant and was sprayed over open fields where it was supposed to evaporate or soak into the soil. Because of the run-off and frequent, unreported dumping of unpermitted industrial wastes into the plant, unknown substances clearly had reached the public waterways.[140]

The breakdown of the spray irrigation process had resulted from the DOE-initiated "zero discharge goal" for waste water; the failure of the reverse osmosis water treatment plant to work; the closing of the west spray field; an exponential increase in the amount of waste water the plant generated; and, most importantly, Rockwell's failure to implement any

---

[137]Plaintiff's Sentencing Memorandum, March 26, 1992, pp. 37-40; 49-50.

[138]June 6, 1991, Application and Affidavit for Search Warrant, p. 99.

[139]June 3, 1991 Draft Prosecution Memorandum, p. 4.

[140]According to Rockwell's 1987 "Waste Stream Identification and Characterization" report, at least 53 industrial or non-sanitary wastes were disposed of at the sewage treatment plant, including EP toxic photographic solutions, wastewater rinses, sump wastes, acid rinses and EP toxic cooling tower blowdown. Other building drains also dumped into the plant; one result was chromic acid in the sewage treatment plant. Plaintiff's Sentencing Memorandum, March 26, 1992, p. 70.

alternatives.[141]      The draft prosecution memorandum chronicled a long list of
documentation outlined below that indicated that Rockwell knew that its spray irrigation
practices were resulting in direct discharges into public waters and also might affect off-site
groundwater discharges.[142]    Rockwell also provided additional documentation to the
Subcommittee.

In late 1984, Rockwell reported to DOE surface water runoff from the spray fields to the
Walnut Creek drainage downstream from the Rocky Flats plant. The company noted that
this was a violation of the plant's NPDES permit and requested that EPA be notified. The
company also stated that "The step that will be taken to eliminate and prevent recurrence
of the accidental bypass [of the permitted discharge points] will include no spray irrigation
of the water after periods of heavy rainfall or snowfall." (Emphasis added.)[143] EPA was
notified, and Rockwell's preventive plan approved.[144] But, by late 1986, the manager of
the Health, Safety and Environment division wrote a memo warning that "area soils [and]
existing vegetation may not be able to accommodate the exiting water volumes without some
sheet surface flows" and "surface water applications may enhance groundwater flows in this
area." His report was made at the request of DOE because of concerns about the "excessive
water loading" onto the East Trenches, an adjoining former hazardous waste disposal area.
His recommendations to remedy the problem were not followed.

On March 2, 1987, Rocky Flats violated its NPDES permit again when surface runoff from
the south spray field discharged into Woman Creek downstream of C-2. It resulted from
spraying while there was "snow cover and concurrent snowmelt," in direct violation of the
plan filed with EPA. This violation was detected by DOE, not Rockwell, and reported to

---

[141]Jun 3, 1991, Draft Prosecution Memorandum, pp. 14-15.

[142]June 3, 1991, Draft Prosecution Memorandum, pp. 8-21.

[143]Oct. 31, 1984 memorandum entitled "ACCIDENTAL DIVERSION OR BYPASS OF
INTERCEPTED GROUNDWATER FROM THE SEEPAGE AREA NEAR THE SOLAR
EVAPORATION PONDS. NPDES PERMIT NO. C0-0001333" from Robert E. Yoder, director, Health,
Safety & Environment, to James R. Nicks, area manager, DOE/RFAO. When the ground was too wet to
spray irrigate, Rockwell was supposed to move the water from Pond B-3 to B-5 for ultimate discharge to
the waterways, and told DOE that it would do so. March 6, 1987, memorandum from George W.
Campbell, director, Health, Safety and Environment, to Albert Whiteman, area manager, DOE/RFAO.
However, EPA and downstream water users were also to be notified of those discharges. For whatever
reason, Rockwell did not want that to occur.

[144]Jan. 3, 1985, letter from Patrick Godsil, EPA chief, compliance branch, water management division,
to James Nicks, area manager, DOE/RFAO.

EPA. Both DOE and EPA witnesses have stated or testified that they understood this was a one-time problem, and were unaware that problems continued.[145]  This incident in particular prompted Rockwell to investigate alternate spray locations or different disposal options, which included modifying the NPDES to allow discharge of the water into the Walnut Creek drainage.[146]  However, none were implemented.

By late fall of 1987, Rockwell was warned by a consultant who modeled the impacts of spray irrigation that "One of the basic assumptions of the modeling analysis was that the water used for irrigation is capable of infiltrating and percolating to the water table", although geologic conditions could retard that.  The study said that the anticipated 80 million gallons could not be spray irrigated, and that there were "no suitable sites on plantsite to accept the water."  Permit revision was again recommended.[147]

The problems were widely known.  The prosecutors wrote, "By the period December 1987 to February 1988, three distinct Rockwell organizations with surface-water related responsibilities -- HS&E, Utilities and Waste Operations -- recognized that Rockwell's spray irrigation practices were sorely deficient and that spray irrigation at Rocky Flats, given the volume of water being applied, the plant's terrain, weather, soil conditions, etc., simply couldn't be done in accordance with good engineering practice."[148]  A December 1987 memorandum entitled "Spray Irrigation at Rocky Flats" by the HS&E manager listed problems from mid-1980s: a destabilized Dam B-5 in early 1980s which resulted in costly repairs; the source of last two NPDES violations; a current spray site proximate to RCRA sites (east trenches) which had "excessive" runoff into pond C-2 and Standley Lake; an "ineffective mechanism" for eliminating water during winter months.  He said the soils could not handle spray irrigation for more than a year without surface runoff problems in less than a year.  He then concluded:

---

[145]Rockwell said it would "discharge the treated sanitary sewage through Discharge Location 001 when weather conditions prevent proper spray irrigation."  March 6, 1987, memorandum from George W. Campbell, director, Health, Safety & Environment, to Albert Whiteman, area manager, DOE/RFAO.

[146]Rockwell International, "NPDES PERMIT VIOLATION, EAST SPRAY IRRIGATION FIELD, MARCH 2, 1987 BYPASS".  The Draft Prosecution Memorandum contained the following statement, "[This episode contains very good evidence, which will be outlined in future drafts.]"  June 3, 1991, draft prosecution memorandum, pp. 14-16.  The Subcommittee did not see any further discussion of this incident.  It was not charged, possibly because it had been reported to regulators.

[147]June 3, 1991, Draft Prosecution Memorandum, pp. 17-18, citing "Ground-water Modeling of Impacts of Proposed Spray Irrigation", S.S. Papadopulos & Associates, December 1987; also, Dec. 12, 1987 internal Rockwell letter entitled "ALTERNATE SPRAY IRRIGATION SITE" from G.W. Williams to C.P. Bader.

[148]June 3, 1991, Draft Prosecution Memorandum, pp. 17-18.

> Spray irrigation is not feasible water disposal method in RFP buffer zone
> due to the geology of the site. It is recommended that alternatives to spray
> irrigation be pursued. . . . Spray irrigation [should] be discontinued as soon
> as possible. Treated sanitary effluents [should] be discharged downstream
> (honest approach vs. subterfuge). Spray irrigation via best engineering
> practices not possible.

He then recommended that both DOE and EPA be notified of an intent to modify the
permit.[149] This was not done.

By December 7, 1987, Rockwell's top management also knew of the problems. As discussed
earlier, a member of Rockwell's Facilities Project Management group wrote an internal
letter to the Rockwell director in charge of the Support Operations directorate (which
included engineering, utilities, the sewage treatment plant, spray irrigation, etc.) He
enclosed a study from Colorado School of Mines which indicated that neither alternate site
for spray irrigation could absorb the water:

> Further, the model indicates that there are no suitable sites on plantsite to
> accept the water. (The existing site has been in violation of current permits
> several times in the recent past). Applying the treated water to any of
> these sites would, after a short period of absorption and percolation
> through soils, result in essentially discharging the treated effluent directly
> offsite, a direct violation of current permits." (Emphasis added)[150]

He recommended the following options: permit revision to allow effluent to go off-site;
construction of massive evaporative towers "at substantial cost;" revising plumbing and

---

[149]June 3, 1991, Draft Prosecution Memorandum, pp. 18-19; Rockwell International, Dec. 7, 1987, George H. Setlock, "Spray Irrigation at Rocky Flats". The full role and knowledge of DOE in the spray irrigation debacle is not known. In 1990, EG&G alleged to DOE that "DOE verbally instructed contractor personnel to continue spraying as long as the pipes and pumps operated properly" when they "requested permission to shut down spray irrigation during adverse weather conditions of late winter and early spring of 1989[sic]," and that DOE had previously allowed such practices. DOE denied the charge, stating that EG&G spray irrigated during a heavy snowstorm on March 6-7, 1990 against DOE guidelines and constructed a new spray field without telling its own Clean Water Act group. EG&G was told not to spray irrigate again until it had an irrigation plan coordinated with the CWA group, which it had not yet done. EG&G, undated memorandum entitled "COMMENTS ON REOPENING THE EG&G CRITIQUE ON SANITARY DISCHARGE" enclosing "Comments for Critique Report No. UE-90-0242" from J.M. Kersh, associate manager, environmental restoration and waste management, to Robert Nelson, area manager, DOE/RFAO.

[150]June 3, 1991, Draft Prosecution Memorandum, pp. 19-20.

installing new piping systems to reuse treated water onsite in toilets and other applications. He said they would pursue permit revision, which was most expedient and cost effective; and expected to resolve the problem by July of 1989. In the interim, since no field closure date had been established:

> "the effluent will continue to be discharged at the current site. Should the current spray irrigation site be closed at some time in the future, the effluent will be discharged directly off-site under a clause in the current permit which allows direct discharge in times of freezing temperatures or when 'adequate engineering practices' won't allow spray irrigation."

In February of 1988, a similar report came from Waste Operations. It also recommended that DOE and EPA be notified of intent to modify permit; that sanitary effluent be discharged directly downstream; spray irrigation be discontinued; water conservation efforts be increased; etc.[151]   Just before the search warrant was executed, Rockwell's manager of environment and health programs wrote one of Rockwell's directors to inform him that:

> "Compliance with the NPDES permit issued by the Environmental Protection agency (EPA) to regulate discharges of surface water from Rocky Flats Plant is an area of significant concern. In the past several years, NPDES technical violations are increasing at an alarming rate. As shown in the attached overheads from the 5/16/89, Executive Safety Review Board (ESRB) presentation, NPDES issues have detrimental impacts on dealings with EPA, political/public relations and [award fee] evaluations." (Emphasis added)[152]

---

[151]June 3, 1991, Draft Prosecution Memorandum, pp. 20-21.

[152]June 3, 1991, Draft Prosecution Memorandum, p. 13-14. Even after the search warrant was executed and Rockwell left as the plant operator, the problems continued. In April of 1990, an EG&G manager was assigned to look for new spray field locations. He reported the 1987 report which said spray irrigation was no longer a viable option, but could not "determine the status of the permit revision request. However, pursuing the permit revision may be a futile effort given the current political environment in surrounding communities, and because the plant has since committed to a 'zero discharge' initiative."

The manager concluded that, since a major zero discharge study was underway that would not be completed until June of 1991, "it is not possible at this time to propose solutions" to satisfy the concern. EG&G, April 17, 1990, memorandum entitled "ADDITIONAL ACTION ITEM #1, SPRAY IRRIGATION CRITIQUE (UE90-242) from G.W. Williams, Facilities Project Management, to F.D. Hobbs, Clean Water Act Division.

The charges, however, related only to the "general operation" of the spray irrigation system.[153]

### iii. Groundwater Monitoring

> Rockwell refused to plead to any violations involving the ground water monitoring system required by RCRA. Rockwell was so concerned about the off-site implications of this charge in pending and potential civil litigation that it offered instead to plead to a felony RCRA violation for illegally storing mixed-waste residues treated in the 771 incinerator, a bargain that was accepted by the prosecutors with full knowledge of the reasons.

Even before the search warrant was executed, the prosecutors were interested in pursuing the issue of groundwater monitoring compliance in this case.[154]    The Rocky Flats groundwater monitoring system had never met RCRA requirements, making it extremely difficult to track the extent, direction or movement of contaminants from the plant. In July of 1988, two years after a compliance agreement requiring an enhanced groundwater monitoring system, the Colorado Department of Health found that the system remained so deficient that it did "not adequately meet the interim status groundwater monitoring objective", and that the deficiencies were so serious, they could be considered RCRA violations. In December of 1988, DOE had ranked groundwater contamination at Rocky Flats the "single greatest environmental hazard" at all of DOE's nuclear weapons facilities. The affidavit in support of the search warrant alleged that there was "probable cause to believe that hazardous wastes have been illegally treated, stored and disposed of at Rocky Flats, in violation of material interim status groundwater monitoring requirements."[155]

By October of 1990, Rockwell attorneys believed the grand jury was going to be presented with an indictment concerning groundwater monitoring.[156] In December, Mr. Norton had

---

[153]June 3, 1991, Memorandum entitled "Draft Prosecution Memo" from Neil Cartusciello, Peter Murtha,Kenneth Fimberg and Chuck DeMonaco to Richard Stewart and Michael Norton.

[154]Dec. 12, 1988, memorandum entitled "Anticipated Search of Rocky Flats" from Peter Murtha to Donald Carr.

[155]Affidavit and Application for Search Warrant, June 6, 1989, pp. 115-16.

[156]Oct. 10, 1990, letter from Harold Haddon to Kenneth Fimberg.

listed groundwater monitoring as an area the investigation was focusing on.[157]   In March of 1991, failure to comply with groundwater monitoring requirements was listed as a specific area of investigation, and Rockwell was offered an opportunity to present exculpatory information to the grand jury.[158]   Even in its exculpatory submission on April 22, Rockwell provided no real defense to its groundwater monitoring deficiencies, except to say it was the same at other weapons facilities: "If the groundwater monitoring system at Rocky Flats is not in accordance with applicable federal standards, the situation is even worse at other DOE weapons facilities," it argued, citing the Brookhaven, N.Y., Mound, Ohio, Nevada Test Site and Savannah River facilities.[159]   Rockwell later claimed that DOE has reviewed environmental compliance matters, including groundwater monitoring "in varying levels of detail."[160]

The June 3, 1991 draft prosecution memo written by Mr. Murtha indicated that "non-compliance" with RCRA groundwater monitoring requirements was considered, but for reasons "not detailed in this memorandum, we have determined not to prosecute."[161]   However, the full prosecution team apparently believed there was a good reason to pursue these violations. In two July letters and a negotiation session, they proposed that Rockwell plead to four felony RCRA charges, including one for groundwater monitoring violations.[162]   Rockwell was so opposed to pleading to this charge, it offered a surprising substitute: it would plead guilty instead to illegally storing mixed waste residues to be treated in the 771 incinerator, despite the fact that it had maintained for years that these residues were not subject to RCRA.[163]

"This is probably an acceptable substitution," Mr. Murtha wrote to Mr. Cartusciello.

---

[157]Dec. 21, 1990, letter from Michael Norton to Lee Foreman.

[158]March 1, 1991, letter from Mr. Fimberg to Mr. Foreman.

[159]April 22, 1991, letter from Vincent Fuller and Harold Haddon to Richard Stewart (cc: Barry Hartman, Jerry Block, Neil Cartusciello, Michael Norton, Kenneth Fimberg, Peter Murtha), p. 20.

[160]June 13, 1991, letter from Vincent Fuller and Harold Haddon to Richard Stewart, p. 2.

[161]June 3, 1991, Draft Prosecution Memorandum, p. 2.

[162]The RCRA charges will include: . . . d. violation of RCRA ground water monitoring standards." July 9, 1991, letter from Michael Norton to Lee Foreman. This charge did not include the allegation that Rockwell and DOE had made a false statement in their 1985 groundwater certification. See, also, July 17, 1991, letter from Kenneth Fimberg and Michael Norton to Harold Haddon, p. 2.

[163]July 16, 1991, letter from Harold Haddon and Vincent Fuller to Michael Norton, p. 2.

"Groundwater monitoring is not readily provable conduct, and implies conduct that could be quite detrimental in subsequent civil suits. Residues, although providing Rockwell a charge in which they can more readily blame DOE, has the advantage of being a high visibility issue to the public, one of considerable interest to the grand jury, and one in which Rockwell spent considerable attorneys' fees defending."[164]

The prosecution team apparently agreed. However, they eventually lost the residue charge also. A federal court decision in late 1991 negating the "mixture and derived from" regulation under RCRA on procedural grounds cast a legal cloud over the application of RCRA to the residues,[165] and the charge was dropped.

The documentation and other evidence reviewed by the Subcommittee indicates that the RCRA charge alleging violation of groundwater monitoring standards was dropped primarily to achieve a plea bargain acceptable to Rockwell.

> b. Unpermitted Incineration under the Resource Conservation and Recovery Act

The prosecutors made a strategy decision that they would pursue only charges in which they could show that DOE had no knowledge of the underlying violations.   DOE's knowledge and approval of Rockwell's incineration of hazardous and mixed waste in the 771 incinerator; the prosecutors' failure to pursue evidence that individual employees may have made false statements concerning the capabilities of the incinerator; and a subsequent court decision allowing Rockwell to escape liability for the lesser charge of improperly storing the waste combined to make incineration a "no charge."

For at least 10 years, Rockwell had incinerated hazardous and mixed waste in the Building 771 incinerator in a "plutonium recovery" operation that had never recovered any plutonium. DOE and Rockwell had taken the legal position that the incinerator was not covered by RCRA, and Rockwell refused to plead to this illegal disposal of RCRA-regulated waste. A RCRA plea to unpermitted disposal would have had off-site implications because RCRA-

---

[164]July 23, 1991, memorandum entitled "Rocky Flats/Settlement Negotiations" from Peter Murtha to Neil Cartusciello (cc: Barry Hartman), fn. 1.

[165]Shell Oil Company v. EPA (D.C. Cir. 1991).

required air monitoring was not done.[166]

The prosecutors initially decided not to pursue the allegations -- not for lack of evidence, but because of a tactical decision not to propose any charges based on DOE's "controversial" readings of the law.[167] Evidence that Rockwell and DOE employees may have filed false statements concerning the capability of the incinerator to recover plutonium were never pursued as discussed earlier.

But as previously noted, during the summer of 1991 Rockwell offered to plead to the "technical" felony RCRA charge of unpermitted storage of the plutonium residues that were burned in the incinerator in exchange for dropping the RCRA groundwater monitoring violation.[168] The storage charge remained in the negotiated information until late 1991 when the Shell Oil decision negated certain EPA regulations on what constituted a RCRA waste. The government had not been able to sample and analyze the actual contents of the residue containers to determine if they were "characteristic" RCRA wastes, another category under which enforcement would have been possible. The testing was not done because, as Rockwell's lawyers told Mr. Fimberg: As you know, there were no tests or samples of the residues, because they were too radioactively contaminated."[169]

The prosecutors had no other regulations under which to support the charge that the residue was a RCRA waste and were forced to drop the charge at the very last minute. The sentencing memorandum contained no mention of this history except to state that the

---

[166]The incinerator's Clean Air Act permit restricted the incinerator to incineration of plutonium-contaminated plastic, paper, rubber, cloth, wood and other refuse. It did not address hazardous waste as Rockwell/DOE did not admit its inclusion in the incineration process. Affidavit and Application for Search Warrant, June 6, 1989, p. 74.

[167]"Interestingly, our evidence suggest that Rockwell, and not DOE, often was the primary entity pushing for aggressive, anti-regulatory postures, rather than playing the passive role this submission would have one believe. Ultimately, it is true, however, that DOE would approve or acquiesce in these legal positions." April 24, 1991, memorandum entitled "A Response to Rockwell's Exculpatory Submission" from Jerry Block, Peter Murtha and Kenneth Fimberg to Richard Stewart and Michael Norton. The prosecutors knew of DOE's legal position on the incinerator before the search warrant was executed. Affidavit and Application for Search Warrant, June 6, 1989, p. 76, fn. 15. It is not clear when or why they decided that DOE knowledge of illegalities voided charges.

[168]Storage violations were viewed as "technical" violations without any off-site impact.

[169]Rockwell also tried to get the pondcrete, saltcrete and vacuum filter sludge RCRA charges dropped under Shell with the same arguments, but apparently there was sufficient testing documentation of those wastes. Dec. 31, 1991, letter from Bryan Morgan to Kenneth Fimberg, p. 2.

incineration was not charged because it had been done "with DOE's approval."[170]

### c. Worker Health and Safety Violations

In the search warrant, the prosecutors indicated that one of their purposes was to determine if there were worker health and safety violations at Rocky Flats.[171]   Because of other federal laws, no worker health or safety laws apply at federal nuclear weapons facilities, but the prosecutors had hoped to use the DOE regulations mandated under the Atomic Energy Act as an enforcement tool.

As detailed in the sentencing memorandum, some time after the search warrant was executed, the prosecutors discovered that DOE had failed to properly promulgate its regulations under the Administration Procedures Act, and they therefore could not be enforced.[172]   As a result, the government was not able to pursue one of its key goals for its prosecution. Significantly, although DOE is alleged to have changed its "culture" some years ago, it has just begun to promulgate enforceable health and safety regulations.

### 3. False Statement, Fraud and Conspiracy Charges

> The prosecutors decided in January of 1991 that, if necessary, they would give up charges of false statements and fraud. There is some documentary evidence that broad conspiracy charges against Rockwell and perhaps DOE officials were considered early in the case, but the lack of discussion among the prosecution team indicates they were probably eliminated early.

As discussed above, many of the false statement charges would have involved individual defendants. At the beginning of the investigation, the investigators were pursuing allegations of false statements regarding the conditions of the pondcrete/saltcrete blocks to the Nevada Test Site; the false certification by top Rockwell and DOE officials in 1985 that the groundwater monitoring system was in compliance with RCRA requirements; and false statements made in self-audits and other communications to DOE that would have induced higher performance bonus awards. This would have led to fraud charges. Broad continuing conspiracy charges could be used to overcome five-year statute of limitations problems for

---

[170]Plaintiff's Sentencing Memorandum, March 26, 1992, p. 108, fn. 93.

[171]Application and Affidavit for Search Warrant, June 6, 1989, pp. 5-7 and 15.

[172]Plaintiff's Sentencing Memorandum, March 26, 1992, pp. 110-12.

both RCRA and the Clean Water Act.

By January of 1991, when Rockwell made its first settlement offer, the false groundwater certification statement filed with EPA -- which was prominently featured in the Affidavit and Application for Search Warrant -- had been dropped because the statute of limitations had run[173] -- not, as the sentencing memorandum stated, because EPA had sufficient contemporaneous information to know it was false.[174] But, as Mr. Fimberg later informed Rockwell, it still could have been used in various conspiracy, concealment and mail fraud charges, as well as continuing offenses.[175] The other allegations were still being pursued, and two additional ones, involving use of the solar ponds and representations about the 771 incinerator as a plutonium recycling unit would appear. Nonetheless, in their first discussion of how to respond to Rockwell's offer, the prosecutors agreed that their bottom line was "no fraud; no false statements. False statement charges were "probably a deal breaker" and would have had an impact on debarment. It was Mr. Murtha's view that giving them up would provide "some sweeteners" to encourage settlement.[176]

Settlement talks did not advance very quickly, however, and in early March, Mr. Fimberg informed Rockwell's attorneys that he was considering false statement charges in the areas of groundwater monitoring, pondcrete/saltcrete, solar ponds and spray irrigation.[177] The draft indictments prepared in April and May contained an allegation of a false statement made to DOE concerning the use of solar ponds for waste disposal.[178] By June 27, 1991,

---

[173]    "[T]here was a great deal of consideration about that particular charge in that the way the grand jury process works, is that the grand jury, had we indicted that count, ostensibly the grand jury would have had to shut down for the rest of the case . . . Another consideration was the sealing of indictment, and superseding at a later time to consolidating the rest of the charges. And the opinion was that could not be done. And the fact was that we knew at the beginning of this process there was a great deal of possibility that we would lose that count."

Testimony of Jon Lipsky, Hearings, supra, Sept. 18, 1992, pp. 859-60 and 900-01.

[174]Plaintiff's Sentencing Memorandum, March 26, 1992, pp. 109-10.

[175]March 1, 1991, letter from Kenneth Fimberg to Lee Foreman re: "Rocky Flats Investigation."

[176]Jan. 23, 1991 Justice memorandum entitled "Rockwell Settlement Conference Call January 23, 1991;" see also, Jan. 18, 1991, memorandum entitled "Settlement Outline (Rockwell International) from Kenneth Fimberg to Joseph Block and Michael Norton.

[177]March 1, 1991, letter from Kenneth Fimberg to Lee Foreman re: "Rocky Flats Investigation."

[178]See, e.g., April 18, 1991 (p.m.) draft indictment; June 4, 1991 draft indictment.

Rockwell was demanding that the prosecutors not only drop all false statements charges, but agree that they were not true. Mr. Norton agreed to drop fraud and false statement charges against both company and its employees on July 9, 1991, but not to make a public statement that the allegations were wrong.[179] On July 17, 1991, Mr. Norton made a direct link between these charges and a higher fine amount and felony charges. He told Mr. Haddon that the government would not bring conspiracy, fraud or false statement charges if the company would plead to seven other felony charges.[180]

In September of 1991, false statements in at least one area not included in the earlier draft indictments -- the representations concerning pondcrete/saltcrete to the Nevada Test Site and DOE -- were being considered for their viability by at least one of the prosecutors. Mr. Fimberg, according to a memorandum from Mr. Murtha, was considering drafting an indictment in that area.[181] This came to nought as the settlement talks began to move forward again.

### 4. Nolo Contendere Pleas

> Rockwell, backed up by the Department of Energy, demanded that they be allowed to submit nolo contendere pleas to limit their civil liability and debarment possibilities. The prosecutors refused to allow the case to end without "someone coming to court and saying they are guilty," and guilty pleas were negotiated.

Rockwell's original position was that the company be allowed to plead nolo contendere to multiple misdemeanors.[182] Nolo contendere is a plea in which the defendant does not contest the charges, but also does not admit guilt. Rockwell believed that such a plea would lessen its potential liability in civil litigation. The prosecutors' position from the beginning

---

[179]July 9, 1991, letter from Michael Norton to Lee Foreman, re: "Rockwell International Corporation."

[180]July 17, 1991, letter from Michael Norton to Harold Haddon re: "Rockwell International Corporation."

[181]Sept. 26, 1991, note from Peter Murtha to Kenneth Fimberg, re: "Pros memo/draft indictment."

[182]Jan. 18, 1991, memorandum entitled "Settlement Outline (Rockwell International)" from Kenneth Fimberg to Jerry Block and Michael Norton. See, also, June 27, 1991, letter from Harold Haddon and Vincent Fuller to Michael Norton; July 16, 1991 letter from Harold Haddon and Vincent Fuller to Michael Norton.

was that Rockwell must plead to felony charges.[183]   In July of 1991, this position was forcefully stated by Mr. Fimberg to Mr. Norton: "If Rockwell wants a lower dollar corporate settlement, someone is going to have to come to court and say 'guilty.'"   Mr. Fimberg, as head of the white collar crime section for the Colorado U.S. Attorney's Office, also was concerned about the precedent that nolo pleas would set; every "S&L officer, security promoter and corporate polluter" would want it if it was allowed in this case.[184]

Rockwell attempted to use the possibility that the government, through DOE, would ultimately pay for any damages in civil liability to further its argument for nolo pleas.  In a telephone conversation, Vincent Fuller of Williams & Connolly, one of Rockwell's attorneys, told Mr. Murtha that the prosecutors:

> had not adequately considered the consequences of guilty pleas by Rockwell upon the Department of Energy in future and pending civil litigation.  His stated concern was that guilty pleas, in contrast to pleas of nolo contendere, could in unforeseeable (and potentially long-term) ways adversely impact DOE in civil suits including or similar to the one currently pending against Rockwell at Rocky Flats. . . .

> These suits could potentially cost "the taxpayers" a great deal of money, he alleged.  Further, he felt that by asking for guilty pleas we were putting our client -- DOE -- in an untenable position.  (Although he did not state it as such, he seemed to intimate we were somehow in a "conflict" situation.)"  (Emphasis in original)[185]

The Department of Energy also attempted to convince the prosecutors that nolo pleas would be in the best interest of the entire government by reducing DOE's exposure in related civil litigation because contract provisions could allow Rockwell to obtain reimbursement for any fines resulting from such litigation.    The inability to obtain a guarantee of such reimbursement (or indemnification) from DOE held up the settlement negotiations for

---

[183]Jan. 18, 1991, memorandum entitled "Settlement Outline (Rockwell International)" from Kenneth Fimberg to Jerry Block and Michael Norton.

[184]July 1, 1991 memorandum entitled "June 27, 1991 Rockwell Settlement Offer" from Kenneth Fimberg to Michael Norton (cc: Neil Cartusciello, Peter Murtha); July 8, 1991 memorandum entitled "July 9, 1991, 2:30 p.m. Meeting with Rockwell Attorneys" from Michael Norton to Kenneth Fimberg and Peter Murtha (cc: Barry Hartman and Neil Cartusciello).

[185]July 26, 1991, note from Peter Murtha to Barry Hartman (cc: Neil Cartusciello).

several months in late 1991. In a letter from DOE's deputy secretary, Henson Moore, to Mr. Norton, Mr. Moore stated:

> "As to entertaining any proposal that Rockwell be permitted to enter a plea of <u>nolo contendere</u>, the inadmissibility of such a plea in any civil action subsequently brought against Rockwell would have the effect of reducing somewhat DOE's potential monetary exposure under our contract reimbursement obligations. Although, as the enclosed memorandum indicates in somewhat greater detail, the types of matters as to which Rockwell may admit guilt are not likely in and of themselves to provide a basis for subsequent civil liability, any plea by Rockwell, of course, could be thrown into the pot in a subsequent civil action to show that Rockwell was a bad actor."

Mr. Moore attached a memorandum from John Easton, then DOE's general counsel, regarding the effect of <u>nolo</u> pleas on the related issue of indemnification of Rockwell's costs in civil litigation by DOE. Mr. Easton stated that:

> "Were the U.S. Attorney to accept a Rockwell plea of <u>nolo contendere</u>, we probably could assure Rockwell that such a plea would not even be considered by the Contracting Officer if he is ever called upon to determine the allowability of some arguable related civil liability."[186]

The prosecutors maintained their position, however, and Rockwell ultimately pled guilty to both felony and misdemeanor counts.

### 5. Indemnification

> <u>Their desire to obtain a settlement in which they could point to the payment by Rockwell of a large criminal fine and the indemnification clause of the DOE/Rockwell contract led the prosecutors to give up taxpayer liability for millions of dollars in attorney's fees and costs attributed to the prosecution.</u>

---

[186]Sept. 4, 1991, letter from Henson Moore to Michael Norton, attaching legal memorandum by John Easton. Mr. Easton did state in a footnote, however, that under Colorado law, even <u>nolo contendere</u> pleas to a felony were admissible in civil actions. See, also, Aug. 5, 1991, memorandum entitled "PERSONAL AND CONFIDENTIAL - NO COPIES OR OTHERWISE DISTRIBUTED" from Kenneth Fimberg to Michael Norton. ". . . [O]ne of Rockwell's big pitches at the last meeting was to again bring DOE directly to the bargaining table."

Another selling point for the prosecutors was that the settlement saved the American taxpayer from bearing any costs of indemnifying Rockwell for its criminal fines. While the Department is to be commended for steadfastly maintaining the position that taxpayers' dollars would not be used to reimburse contractors for criminal fines, that aspect of the plea agreement seems to lose some of its luster in light of the fact that DOE had no precedent of reimbursing criminal fines and the attorney's fees and costs for which Rockwell was still allowed to seek reimbursement.

As noted above, while the plea agreement prohibits Rockwell from seeking reimbursement under its DOE contract for the $18.5 million criminal fine and the attorney's costs incurred after January 1, 1990[187] that are associated with the violations to which it pled guilty, it apparently allowed Rockwell to seek reimbursement from DOE for all attorneys' fees incurred before January 1, 1990, including work done on charges to which Rockwell ultimately pleaded guilty; attorneys' fees and costs incurred in providing legal representation to past and present Rockwell employees, which by necessity included work done on corporate charges to which Rockwell pled guilty; and costs concerning a document-tracking and retrieval computer system used in this case and for pending civil litigation.

According to the Department of Energy, by November of 1992 Rockwell has submitted claims totaling $7.9 million for the legal fees and other costs which the company claims remained allowable under the plea agreement and contract. While it has not been determined how much of those charges will be reimbursed by DOE, it is significant that the taxpayer exposure is so high in a settlement where a major selling point and rationale for the settlement itself is its limitation on taxpayer exposure.[188]

Moreover, it is questionable how significant the agreement of Rockwell not to seek reimbursement for its criminal fines and certain other related costs really was. As early as February, 1991, the Department of Energy assured the Department of Justice that it would refuse to indemnify Rockwell if it sought reimbursement for criminal fines.

However, the prosecuting attorneys argued that Justice should accept a compromise over

---

[187]The significance of this date appears to be that it is the same day that EG&G replaced Rockwell as the management and operating contractor at Rocky Flats.

[188]Justice's Civil Division wanted to maintain a right to void the indemnification provision "on the basis of public policy, in its qui tam litigation. I will continue to try to work this out though ultimately management may need to get involved." Oct. 8, 1991, memorandum entitled "Re: Rocky Flats/Indemnification Language" from Peter Murtha to Barry Hartman. "Management" did get involved, and Civil gave up its rights in the related qui tam litigation.

what may and may not be reimbursed because they believed that DOE was obligated to reimburse Rockwell even for criminal fines as a result of the indemnity provisions in its contract, and the history of DOE reimbursements under the contract.[189]   Yet, it is significant to note that all of the reimbursement to contractors for penalties had been for civil penalties. DOE has never been asked, and therefore has never repaid, any contractor for criminal fines.

The prospect that the settlement would still enable Rockwell to recover significant costs was not lost on the prosecution team:

> . . . Ken has agreed to Rockwell's request that they may seek from DOE attorneys' fees for all individuals (i.e., including targets). It is unclear what the financial impact of this conclusion is, although our conduct with the attorneys for the targets has been quite limited. We have had one or two lengthy proffer sessions with four of the targets, and several short meeting with the attorneys for the other targets. Nonetheless, it would not be surprising if the attorneys' fees were substantial... Though I am chagrined that we ever conceded any attorneys' fees, I do not have a major problem

---

[189]   Rockwell has stated in our settlement discussions that its desire to settle this case is contingent upon the Department of Energy clearly indicating that it will 'honor' the indemnification provisions in the contracts under which Rockwell operated the Rocky Flats Plant. Rockwell has already tentatively agreed not to seek indemnification for the criminal fine imposed in this matter and for the related attorneys fees and costs" (hereinafter 'fees'). Although from a policy standpoint we might strongly disagree with the desirability of any contractual provision indemnifying liabilities flowing from the disregard of environmental requirements, as will be explained below, these provisions and DOE's past administration of them leads us to believe there would be severe litigation risks if the government sought to simply deny reimbursement for such costs. Because Rockwell's concessions are not necessarily compelled by any statute, regulation or contractual provision, we view them as very substantial . . .

. . .There are undoubtedly very extensive fees outside of the areas covered by our potential plea agreement. However, the plea agreement includes all of our strongest charges. Given that the contract seems to provide Rockwell with quite viable arguments for the indemnification of attorneys' fees, and our belief that the Major Frauds Act does not alter this, we recommend that we accept the compromise under which Rockwell would not request indemnification for fees related to the conduct in the plea."

Aug. 28, 1991 memorandum from Peter Murtha and Kenneth Fimberg entitled re: "Indemnification of Rockwell by DOE as it Relates to the Settlement of the Rocky Flats Investigation" to Barry Hartman and Michael Norton.

with taking this additional step.[190]

Finally, in an effort to ensure that no other DOE policy positions would jeopardize the plea agreement, the prosecutors of the case assumed the role of encouraging the Department of Energy to provide assurances to Rockwell that it would be allowed to seek the reimbursement of certain costs from the Department. This occurred when the Department of Energy determined that it may be able to invoke the standards of a relatively new law -- the Major Frauds Act -- to deny Rockwell reimbursement of any fees and costs associated with criminal behavior.

As Messrs. Fimberg and Murtha wrote Messrs. Hartman and Norton:

If Rockwell has assurances that DOE will continue its historical practice of indemnifying its contractors concerning such matters, as it did concerning the Fernald, Ohio multi-million settlement), then Rockwell is (and will be) significantly more willing to settle the criminal case on terms and conditions generally more favorable to us . . . (Emphasis added) [191]

Not surprisingly, Rockwell viewed DOE's position as threatening its ability to collect reimbursements. Concerned that such a position by DOE would jeopardize the plea agreement, the prosecutors worked with their counterparts at DOE and asked top Justice officials to intervene with DOE officials to provide appropriate assurances to Rockwell. A Justice attorney even drafted a letter for DOE in response to Rockwell's inquiry on the matter.[192]

---

[190]Oct. 17, 1991, memorandum from Peter Murtha entitled Re: "Latest proposed offer to RIC" to Barry."

[191]Aug. 29, 1991, memorandum entitled "Re: Rockwell Settlement" from Kenneth Fimberg and Peter Murtha to Michael Norton and Barry Hartman, p. 3.

[192]   Although willing to compromise on the fine and attorneys' fees, Rockwell has expressed its strong concern that a guilty plea could leave it vulnerable to various other liabilities, including citizen suits, state civil and administrative penalties, remedial costs and qui tam actions, if DOE interprets its contractual provisions differently than it has in its past practice and refuses to indemnify them. According to Rockwell, DOE's former General Counsel, Steve Wakefield, indicated that he would anticipate indemnifying Rockwell for fees unrelated to the conduct actually pled guilty to in the plea agreement. (It is unclear whether this discussion went beyond attorneys' fees to other areas of potential liability.) Rockwell's subsequent contacts with DOE, after Wakefield's departure, have lead [sic] Rockwell to be concerned that DOE may be

Ultimately, the plea agreement specified what cost/fees Rockwell could still submit to DOE for reimbursement. DOE retains the authority to determine whether the costs submitted by Rockwell are reasonable and allowable. However, by specifically allowing Rockwell to seek reimbursement for those costs in the plea agreement, DOJ precluded DOE from using the Major Frauds Act as the basis for refusing to indemnify Rockwell.

While DOE's legal theory on the application of the Major Frauds Act was subject to dispute, and its motivation for advancing such a position may have been to avoid political criticism for reimbursing any of Rockwell's costs associated with the investigation, the prosecutors' actions put Justice in the position of being an advocate for the contractor before DOE and trying to influence that Department's policies in order to save a plea agreement.

---

considering not indemnifying Rockwell for fees for other areas of potential future liability . . . .

. . . Our contacts with DOE's Office of General Counsel indicated that Rockwell's fear may to some degree by justified. For example, one attorney has indicated that he has recommended to the Deputy Secretary that all of Rockwell's fees be considered non-indemnifiable, if it pleads guilty to any charge, ostensibly on the basis of the Major Frauds Act ('MFA'), enacted in late 1989. We have no reason to believe Rockwell is yet aware of this extreme, and perhaps untenable legal position. It highlights, however, the need for us to gain clarification from DOE on its intentions regarding each of the areas of Rockwell's potential future liability.

. . . To fail to gain an appropriate clarification will put our ability to settle this case at risk. . .

In the near future, we intend to prepare a proposed draft letter from DOE to Rockwell, which clarifies those areas for which Rockwell would be indemnified. We anticipate that this letter would be appropriate for incorporation into our plea agreement . . .

With respect to attorneys' fees, Rockwell seems likely to accept a compromise which would allow it to seek costs not directly relating to the subject areas of the plea . . . . Because these areas have been the main focus of our investigation for over a year, it can be expected that a substantial amount of Rockwell's attorneys' fees will have been spent in these areas. We will need to develop language further circumscribing these fees for incorporation into the plea agreement.

Aug. 29, 1991 memorandum entitled "Indemnification of Rockwell by DOE as it Relates to the Settlement of the Rocky Flats Investigation" from Peter Murtha and Kenneth Fimberg to Barry Hartman and Michael Norton.

6. Debarment

The prosecutors offered to act as "honest brokers" with other federal
agencies to protect Rockwell from debarment, but Rockwell did not need
their help.

Initially, Rockwell stated that its willingness to enter a plea agreement was conditioned on
the receipt of assurances by DOE, EPA and DOD that its plea would not result in its
debarment. Early on in the negotiations, attorneys in the prosecution team advocated that
DOJ act as "honest brokers" before the relevant agencies on Rockwell's behalf.[193]  In June
of 1991, it appeared as if the prosecutors were willing to be even more proactive in meeting
Rockwell's demand regarding protection from debarment. A June 27, 1991 plea offer made
by Rockwell's attorneys contained the following point:

> 5. The United States (including without limitation the Department of
> Justice, the Environmental Protection Agency('EPA'), and DOE) agrees
> that Rockwell will not be suspended or debarred from government
> contracts because of the plea agreement or for any reason pertaining to
> Rockwell's operation of Rocky Flats.[194]

In assessing Rockwell's offer, Mr. Fimberg wrote the following to Mr. Norton concerning
Rockwell's debarment demand: "At bottom, this is generally do-able, but I think it needs to
be couched in such a way that it can't be characterized as a government give-away."[195]

It is unclear how Mr. Fimberg believed DOJ could commit the government to not debarring
Rockwell, when such a decision must be made through a debarment review conducted by
an agency that contracted with the offender. But, subsequently,  Rockwell informed Justice
that the debarment question had been resolved, and it was no longer an issue for the plea
bargain. Nonetheless, it is somewhat disconcerting that DOJ would offer to act as a broker

---

[193]"We also think it is reasonable for DOJ to play the role of a neutral, honest broker in Rockwell's
discussions with relevant debarment officers." Jan. 18, 1991 memorandum from William Hassler and Peter
Murtha re: "Rocky Flats Investigation - Settlement Discussions" to Michael Norton and Joseph Block.
". . .Debarment:  no guarantee against, but DOJ act as 'honest broker,' will support 'acceptance of
responsibility.' No affirmative recommendations." Unsigned memorandum entitled "Rockwell Settlement
Conference Call," Jan. 23, 1991.

[194]June 27, 1991 letter from Harold Haddon and Vincent Fuller to Michael Norton.

[195]July 1, 1991 memorandum from Kenneth Fimberg to Michael Norton entitled "June 27, 1991
Rockwell Settlement Offer,"

(albeit an "honest" one ) on behalf of a criminal defendant in debarment decisions to further its own interests in a plea agreement.

### 7. Global Settlement

Rockwell demanded -- and obtained -- a "global settlement" that ended any possibility of corporate and individual liability for its 14 years of managements of the Rocky Flats plant.

As significant as the level of the fine is the multitude of other concessions made to Rockwell in the course of satisfying its demand for a "global settlement". In addition to simply settling the criminal action being brought by the Justice Department, Rockwell demanded that all pending legal issues associated with its operation of the Rocky Flats facility would also be taken care of in the settlement, and also wanted assurances that it would be shielded from any collateral civil litigation problems that might arise as a result of its settlement of this case.

The role played by Justice in the indemnification and debarment decisions have been discussed previously. Another important aspect of the global plea agreement to Rockwell was to ensure that it would not be further prosecuted either criminally or civilly for any other activities at Rocky Flats. Therefore, Justice brokered an arrangement involving Justice's Civil Division, EPA and the State of Colorado under which those divisions and agencies relinquished their right to charge the corporation and any individual Rockwell employees for any other violations of RCRA, CWA, the Comprehensive Environmental Resource Compensation and Liability Act (CERCLA) or the Toxic Substances Control Act related to any environmental matters at Rocky Flats that were known through the date of the settlement, thus foregoing potentially millions of dollars in additional criminal and civil penalties.

Once a final decision had been made to achieve a global settlement on all of the issues associated with Rockwell's operation of the facility, the prosecution team often took on the role of broker on Rockwell's behalf to secure sign offs from other agencies and divisions within Justice. At times, it appeared as if the desire to protect and complete the settlement being negotiated overrode, or caused prosecutors to lose sight of, the public policy impacts of the agreements that were being pushed as part of the settlement.

### 8. Public Statements

As part of the plea bargain, Rockwell obtained statements from the government that the evidence showed that the 771 incinerator was not operated contrary to the DOE-ordered shutdown in 1988, that the 776 incinerator had not been used to incinerate hazardous and/or mixed wastes, and that, based on evidence that Justice had gathered, Rockwell's conduct did not result in substantial physiological harm, or the imminent threat of such harm, and that Justice did not make a finding of wilful misconduct on the part of Rockwell. Some of these statements were correct; others left out significant pieces of information hidden from public view. Other Rockwell demands concerning statements about the disposal of medical waste, for example, were not met.

The government agreed to allow Rockwell to review the sentencing memorandum with the hope that it would represent a single statement about the case to the court and the press. Although Rockwell did review it and had some input into the final draft, it did not meet Rockwell's requirements, resulting in the filing of a separate document with the court by the company.

In their first meeting with the prosecutors, Rockwell's attorneys said they wanted "agreed-upon" statements concerning certain allegations in the search warrant that they considered to be "sensational" to be part of the plea agreement.[196] These allegations included (1) illegal burning of hazardous or mixed waste in the 771 and 776 incinerators (2) unpermitted disposal of medical waste into Walnut Creek.[197] These statements were later expanded to include allegations of off-site impact of Rockwell's actions and a mutually agreed upon prosecutor's statement of facts supporting the felony counts pled to.[198]

---

[196]Memorandum on Jan. 14, 1991 meeting between prosecutors and Rockwell attorneys; Jan. 18, 1991 memorandum entitled "Settlement Outline (Rockwell International) from Kenneth Fimberg to Jerry Block and Michael Norton; Jan. 21, 1991, memorandum entitled "Outline of Rockwell Settlement Proposal" from William Hassler and Peter Murtha to Jerry Block and Criselda Ortiz.

[197]Application and Affidavit for Search Warrant, June 6, 1989, pp. 77-84 and 97-99. In an April 9, 1991, meeting with the prosecutors, Rockwell's attorneys alleged that the medical waste discharge allegation was false. "Notes of meeting with Rockwell," April 9, 1991.

[198]July 8, 1991 memorandum entitled "July 9, 1991, 2:30 p.m. Meeting with Rockwell Attorneys" from Michael Norton to Kenneth Fimberg and Peter Murtha (cc: Barry Hartman and Neil Cartusciello).

By early July of 1991, U.S. Attorney Norton internally indicated his willingness to agree to many of these demands. In a memorandum to Mr. Fimberg and Mr. Murtha outlining the government's position prior to a July 9 meeting with Rockwell's attorneys to discuss their June 27, 1991, offer, Mr. Norton established the following parameters:

> Facts supporting felony counts to be developed and mutually agreed upon for inclusion of Prosecutor's Statement. . . .

> United States Attorney, in announcing settlement in joint news conference with Rockwell and/or its attorneys will outline Plea Agreement and penalties. Also, United States Attorney will advise that some of the more sensational (to be determined) allegations of search warrant affidavit did not bear out." (Emphasis added)[199]

In response, Mr. Fimberg argued against such a broad agreement. A mutually agreed upon prosecution statement, he said, was difficult to achieve and had some other problems. "They will want bare bones -- when do we get to tell our story? I wouldn't agree." He also recommended against any joint statement or press conference. "This will lend itself to characterizations of collusion, of a sweetheart deal. I would limit our agreement here to a few specific statements/acknowledgements that we agree to make." A subsequent negotiating session in late July included Rockwell's position that the government needed to "package" the press release properly to avoid response from Rockwell.[200] By August, the "sensational" charges that the government would admit had not been proven were listed as "no midnight burning and no imminent off-site health threats."[201]

The final agreement included agreed-upon statements about the 771 and 776 incinerators, the off-site physiological and environmental impact of Rockwell's actions and jointly approved facts to support the various counts. The 771 incinerator statement in the plea agreement --but not in the statement of facts supporting the indictment -- was carefully written to state that the incinerator was not operated during 1988 "contrary to the DOE ordered shutdown." It did not explain, however, that the parameters of the DOE-ordered

---

[199]July 8, 1991 memorandum entitled "July 9, 1991, 2:30 p.m. Meeting with Rockwell Attorneys" from Michael Norton to Kenneth Fimberg and Peter Murtha (cc: Barry Hartman and Neil Cartusciello).

[200]July 23, 1991, memorandum entitled "Note to Neil Cartusciello" from Peter Murtha (cc: Barry Hartman).

[201]Aug. 5, 1991, memorandum entitled "PERSONAL AND CONFIDENTIAL - NO COPIES OR OTHERWISE DISTRIBUTED" from Kenneth Fimberg to Michael Norton.

shutdown may have included operating the incinerator. The years of unpermitted burning of hazardous and mixed waste by Rockwell was relegated to a footnote and avoided any mention that the <u>Shell Oil</u> decision had negated that charge.[202]

### a. "Midnight" Burning

The Affidavit and Application for Search Warrant stated that there was probable cause to believe that the 771 incinerator was operating in December of 1988 during a time when the entire building was supposed to be shut down for safety concerns.[203] The precipitating event for the shutdown was the exposure of two DOE and one Rockwell safety inspector to a large dose of radioactivity while conducting an inspection in the building.[204]

The Plaintiff's Sentencing Memorandum contained the carefully couched language that "the UNITED STATES has concluded that the Building 771 incinerator was not operated contrary to the DOE ordered shutdown."[205] Contrary to public statements, the phrase was written in that manner because there was some evidence the incinerator was operated during that time. Indeed, documents and testimony before the Subcommittee indicate that the DOE shutdown was a phased-in shutdown over more than two months which would have

---

[202]Plaintiff's Sentencing Memorandum, March 26, 1992, pp. 107-08. FBI Agent Lipsky was responsible for adding the footnote.

[203]Affidavit and Application for Search Warrant, ¶ 7.1, p. 73. Under RCRA, 42 U.S.C. §6903 (34), "treatment" is defined as

> any method, technique, or process, including neutralization, designed to change the physical, chemical, or biological character or composition of any hazardous waste so as to neutralize such waste or so as to render such waste nonhazardous, safer for transport, amenable for recovery, amenable for storage, <u>or reduced in volume</u>. Such term includes any activity or processing designed to change the physical form or chemical composition of hazardous waste so as to render it non-hazardous. (emphasis added)

[204]The inspectors entered a "full face respirator" area through an entrance which had no warning sign. As they walked through, one operator put a sign up, and another put on a respirator. A few minutes later, an announcement was made that the entire process area was "on full face respirators." Report of J.L. Henderson to D.J. Sanchini re "Area Review of Building 771" on September 29, 1988 [hereafter "Henderson Report"], p. 1.

[205]Plaintiff's Sentencing Memo, <u>supra</u>, p. 108. The Plea Agreement contained the more expansive statement that "[t]he investigation has not revealed that hazardous or mixed wastes were burned in the Building 771 incinerator during the period October 1988 to January 1989." Plea Agreement and Statement of Factual Basis, March 26, 1992, <u>U.S.</u> v. <u>Rockwell International Corp.</u>, Crim. No. 92-CR-107 (D. Colo.) [hereafter "Plea Agreement"], p. 4.

000212

permitted incinerator operation.[206]

> MS. HOLLEMAN. The sentencing memo has a phrase in it when it describes why this allegation, which was in the affidavit, didn't result in charges. It states on page 108 that the incinerator was not operated contrary to the DOE ordered shutdown. Since we have already found that probably two-thirds of that building was operating during the shutdown, does that phrase mean that the incinerator could have been operating during the shutdown also?

> MR. LIPSKY. Yes.

> MS. HOLLEMAN. And is it your understanding that that is why that phrase is in there written in the way it is?

> MR. LIPSKY. But I did not submit that document, but its inferences is that that is the assumption.

> MS. HOLLEMAN. Did you have any evidence that DOE had specifically ordered the incinerator to run during this time?

> MR. LIPSKY. The answer to that question would require me to provide grand jury information protected by Rule 6(e) of the Federal Rules of Criminal Procedure.
>
> * * * *
>
> MS. HOLLEMAN. Do you know who in DOE, let's say, modified the shutdown order and told Rockwell, yes, you can shut down in this orderly fashion?

---

[206]  Rockwell received a letter from DOE stating that DOE felt Rockwell had lost control of the operation and to cease operations until further notice. At the time the letter was received, Building 771 was in full production. Upper management at Rockwell convinced DOE that it would be safer if Rockwell was allowed to run out all of the processing streams before Building 771 went to full shut down. This request was granted by DOE. The processing continued until about mid-December when Building 771 production areas went to full shutdown.

FBI Interview of William Richardson, June 7, 1989. See, also, Testimony of Jon Lipsky, Sept. 18, 1992, Hearings, supra, pp. 742-43. Mr. Lipsky also understood that Rockwell received permission to work off inventory, which included drums of waste. Testimony of Jon Lipsky, Hearings, supra, Sept. 18, 1992, p. 735.

> MR. LIPSKY. The answer to that question would require me to provide grand jury information protected by Rule 6(e) of the Federal Rules of Criminal Procedure.

Mr. Lipsky also testified that he had obtained some documentation of incineration during the shutdown period, but could not get a witness to corroborate it. The documentation included an oxygen log which showed a drop in the oxygen gauge of 30 inches on December 6, 1988. Only the incinerator used oxygen, and no one could explain the drop.[207] Rockwell's explanation that the person reading the gauge was "short" does not appear credible as no correction in the records was made on subsequent days.

Determining the specific parameters of the DOE-ordered shutdown was not possible because of claims that key information was protected by Rule 6(e) of the Federal Rules of Criminal Procedure.[208] An orderly shutdown of the type which proceeded the semi-annual, year-end inventory required that all plutonium-containing materials already in the building be processed. At the time of the shutdown order on October 8, 1988, there apparently was significant radioactive waste in the building waiting to be processed. Judy Henderson, one of DOE's inspectors, reported that, on September 29, the:

> process and support areas are heavily congested with radioactive waste containers, most of which were filled more than a month ago. Controls for storage of radioactive waste are less rigorous than those for hazardous waste. In some areas workers are forced by the congestion to lean against equipment and walls to get around. Several glovebox lines are surrounded by filled drums.[209]

According to testimony received by the Subcommittee, the investigation uncovered additional

---

[207]Testimony of Jon Lipsky, Hearings, supra, Sept. 18, 1992, pp.751-65.

[208]Rule 6(e) provides that members of the grand jury and those who attend the grand jury in its proceedings may not "disclose matters occurring before the grand jury, except as otherwise provides in these rules." Violations are punishable as contempt of court (Rule 6(e)(2)). The Justice Department has an extremely broad view of what information is protected by Rule 6(e), such as interviews conducted by the FBI pursuant to a grand jury request, but which are not so identified; draft indictments which were never given to the grand jury; pre-existing documents which happened to be later subpoenaed by the grand jury, etc. Most experts in the field limit the restriction to information which clearly defines activities of the grand jury. "Refusals to Disclose to Congress on the Basis of Rule 6(e) (Matters Occurring before the Grand Jury), American Law Division, Congressional Research Service, Aug. 28, 1992.

[209]Henderson Report, supra, p. 1.

evidence that the incinerator was operated during the shutdown period between October 1988 and January 1989.[210] Although all witnesses agreed the evidence was not sufficient to pursue an indictment, it clearly did not exonerate Rockwell or DOE, as the Plaintiff's Sentencing Memo and Plea Agreement attempt to do.[211] The responsible attorney said that it was not "impossible" that there was evidence somewhere of a "maintenance burn," although it wasn't his "recollection."[212]

---

[210]   MR. LIPSKY: ... There was a sheet that identified a drum that had -- that was intended for incineration, and we found those sheets [material balance accounts] without a signature. And I believe in one case, or in several cases, the employees would state that, well, if my signature is not there, then you can't say I did it. And the signed copies were destroyed after six months.

Again, this activity was not perceived to be a RCRA activity, and the three-year retention time was not maintained.

. . . .

MS. HOLLEMAN: And are you saying that you had unsigned Material Balance Accounts which indicated drums were doing into this incinerator but you had no signed copy?
MR. LIPSKY: Yes.
MS. HOLLEMAN: During the shutdown period?
MR. LIPSKY: Right.
MS. HOLLEMAN: Do employees normally keep two sheets, an unsigned copy and a signed copy?
MR. LIPSKY. My understanding is that the first sheet, the unsigned sheet, was like a work order that accompanied the drum and then maintained in that area, the second copy or another copy. But that was signed, accompanied the drum after it was reduced and went out --
MS HOLLEMAN. It was to show the process had occurred?
MR. LIPSKY. Had occurred. And it was a continuation process to the point of destination, and that the -- once it got there, the document was then destroyed.

Testimony of Jon Lipsky, Hearings, supra, Sept. 18, 1992, pp. 774-75. Most likely for this reason, Karen Pitts and Jacqueline Brever, two Rockwell employees who alleged that the incinerator had operated during the shutdown period, were not able to obtain signed Material Balance Accounts to document their allegations.

[211]Prosecutors also determined that no law or regulation had been violated because the shutdown statement had been made to the public, not to another government agency which relied on it. Additionally, it was not enforceable as a DOE order under the Atomic Energy Act, which has criminal provisions, because DOE had not properly promulgated its rules under the Administrative Procedures Act. Testimony of Jon Lipsky, Hearings, supra, Sept. 18, 1992, pp. 52-3; Testimony of Peter Murtha, Hearings, supra, Sept. 24, 1992, pp. 117-18.

[212]Testimony of Peter Murtha, Hearings, supra, Sept. 24, 1992, pp. 115-16. Mr. Murtha demonstrated a surprising lack of understanding about the Building 771 configuration and shutdown process. He did not seem to know that closing out the 771 processes during shutdown generated mixed waste for the

The irony of this allegation is that, even if true, the prosecutors could not have charged it as a false statement as it was made to the public, not to another government agency who relied on it.

### b. Imminent Harm

In the sentencing memorandum, Justice also agreed to a statement that:

> Based on the evidence gathered in this investigation, and to the best of the Justice Department's present knowledge and information, the conduct to which Rockwell has pled guilty did not result in substantial physiological harm, or the imminent threat of substantial physiological harm, to members of the public residing and working outside Rocky Flats' boundaries. The RCRA violations involved on-site treatment and storage of hazardous mixed wastes, and their environmental impacts appear to have been substantially limited to inside the Plant's boundaries.

The accompanying footnote put an important caveat on this statement: it admitted the government's criminal investigation looked into "discrete instances of potential criminal conduct." It "was not (and was never intended to be) a broad-based public health or environmental survey of Rocky Flats and all of the problems or issues associated with the site." (Emphasis added)[213]  Additionally, Clean Water Act charges which would have pointed to potential off-site impact had already been dropped.)  Nonetheless, it was sufficient to become one of the bases that DOE used for not debarring Rockwell.

The prosecutors maintained their position that there was evidence of improper disposal of medical waste as alleged in the search warrant.[214]   As a result, the sentencing memorandum included the following statement:

---

incinerator or that there was waste already in the building. He also stated that the prosecutors were most interested in finding out if Rockwell had incinerated mixed waste below the EDL during the shutdown period, indicating that "routine" disposal of below-EDL waste by incineration with DOE knowledge showed less criminal intent. Id., pp. 118-121.

[213]Plaintiff's Sentencing Memorandum, March 26, 1992, pp. 124-25.  Once again, the footnote was not included in the agreed-upon statement of facts.

[214]Sept. 23, 1991, memorandum from Kenneth Fimberg to Michael Norton entitled "Rockwell-DOE negotiations"; Draft Sentencing Memorandum, Feb. 2, 1992, p. 54.

> While the precise source of these chemicals and the circumstances
> surrounding their particular discharge could not be determined, the United
> States stands behind the search warrant allegations and the presence of
> such chemicals is consistent with the improper discharge of various waste
> streams, including laboratory wastes, to the sewage treatment plant . . .
> Handling and disposal of various laboratory chemicals was improved in
> 1989, shortly after the search warrant was executed.[215]

### c.    The Sentencing Memorandum

Negotiating a fully agreed-upon sentencing memorandum became a much more difficult
task.[216]  As noted above, Mr. Fimberg was adamantly against it, especially after there was
to be no independent grand jury report.  He saw it as the government's only chance to
present its case in full and did not want Rockwell to control it.  But as late as November of
1991, Rockwell put it on its list of requirements for "finality."[217]  Mr. Murtha, who did the
initial draft, worried that a strong memorandum would provoke an unpleasant response from
Rockwell, who did not have major problems with his draft. (Mr. Murtha's concern about
Rockwell's reaction is but another example of the DOJ "culture.") The debate over the
sentencing memorandum was a classic example of the conservative approach of main Justice
versus the more aggressive approach of the U.S. Attorney's Office.  Mr. Murtha's concerns
led him to appeal to Mr. DeMonaco and Mr. Cartusciello to get Mr. Hartman involved in
reviewing the draft.[218]

---

[215]Plaintiff's Sentencing Memorandum, March 26, 1992, pp. 108-09.

[216]After it was clear there would be no grand jury report to negotiate, the parties concentrated on the
sentencing memorandum.

[217]Nov. 27, 1991, letter from Lee Foreman to Kenneth Fimberg.

[218]Earlier, on March 8, 1992, Mr. Murtha sent a memorandum to Mr. DeMonaco outlining his
concerns.  He said that Mr. Fimberg was expanding Mr. Murtha's draft and working particularly on the
sections

apportioning blame to DOE and integrating appropriate themes from the grand jury report.  I am very
concerned that Ken's significant additions and rewriting may prompt significant responses from Barry (who
seemed relatively positive towards my draft,but had me "tone it down in several places), who has demanded
a final sign-off . . .

One positive note:  Rockwell has reviewed my draft and found only two major concerns (relating to
references to "top" or "high-ranking" officials and to potential off-site consequences for its CWA
violations), both on which we should be able to resolve without great difficulty.  However, Ken admits that
his more recent draft will likely prompt additional concerns.

> My greatest concern with Ken's draft is that I believe the tone is too harsh,
> and thus raises questions about (1) why no individuals were prosecuted, (2)
> how we can say that there appear to be no offsite environmental impacts
> and (3) whether $18M is sufficient in view of the extreme "seriousness" of
> the violations. Mike, on the other hand, seems to believe the tone is
> appropriate, based on his "preliminary review." I expect Mike's view to
> substantially undercut the possibility that Ken will incorporate many of my
> tone-oriented comments.

> I recommend that we ask Barry to review Ken's draft incorporating my
> comments (Barry's preliminary comments have already been considered by
> Ken), because if we wait for the final draft there will not be sufficient time
> to react to Barry's concerns if they are extensive. Please let me know what
> draft you wish me to provide Barry with.[219]

He also brought his "fundamental disagreement about what this document should attempt
to accomplish, and the tone necessary to do it" directly to Mr. Fimberg.

> I think this document was intended to: (1) convince the judge (and the
> public) that the interests of justice are served by the disposition, (2) report
> to the public what the investigation has revealed concerning public health
> concerns and the search warrant allegations, and (3) serve as a vehicle to
> let the grand jury express its concerns about DOE's failures and the plant.
> All of this must be tempered by the realization that we have to some
> degree given Rockwell "concurrence" authority on the memo, and, in any
> event, we do not wish to goad them into ongoing public debate via a reply
> memo.

> I am concerned that the harsh tone and the one-sided presentation of the
> evidence may compromise those goals. Specifically, my fundamental
> concerns are three fold: (1) the document does not attempt to be even-
> handed with Rockwell, and therefore invites either a rejection of the
> document (and plea agreement) or a responsive memo explaining its

---

March 8, 1992 memorandum from Peter Murtha entitled "Rocky Flats Update" to Chuck DeMonaco (cc: Neil Cartusciello).

[219]March 17, 1992, note from Peter Murtha entitled "Rocky Flats Update" to Neil Cartusciello.

000218

perspective, (2) it suggests egregious violations of the environmental laws, and therefore calls into question why no individuals are being prosecuted and why the fine is "only" 18M and (3) the presentation of the evidence concerning Rockwell's waste handling at the site suggests that large amounts of extremely toxic wastes (often with long, ominous names) were mishandled -- evidence seemingly at odds with our proclamation that we have no reason to believe there is any imminent danger of off-site physiological consequences.

We will learn over the next several days whether my first concern is merited. However, it is difficult to assess how the judge (perhaps as informed by the public) will react to the charges as presented in the memo. As you know, in Exxon the judge apparently took the public outcry to heart and rejected the plea. Here where the judge is once again faced by an "all or nothing" binding plea, it strikes me as possible that public pressure could result in a rejection of the plea. As regards the off-site health consequences, I think we can anticipate a barrage of inquiries about how the mishandling of all these terrible substances (radioactivity, beryllium, EP toxic everything, etc.), much of which ultimately made it to the holding ponds which were ultimately discharged to public drinking water supplies, had such a benign result. (I realize there are answers to many of the health-impact related questions, but I think we will become embroiled in a substantial debate.)

While I can fully appreciate, after three grueling years, the desire to present the violations in the light showing their greatest significance, I believe the current draft goes too far and may jeopardize all of the hard work we have poured into this investigation.

I recommend that we review the memo again with an eye towards excising those materials that are unnecessarily inflammatory or one-sided. (Emphasis added)"[220]

---

[220]March 18, 1992 note from Peter Murtha entitled "Comments on Sentencing Memo" to Kenneth Fimberg.

It is somewhat unclear what the resolution of this dispute was.[221]  Parts of the sentencing memorandum describing the evidence compiled in various subject areas were very strong and did raise questions about why no individuals were ever charged.  They also resulted in a full response by Rockwell.[222]   Mr. Murtha's discussion of those "terrible substances (radioactivity, beryllium, EP toxic everything, etc.), much of which ultimately made it to the holding ponds which were ultimately discharged to public drinking water supplies" and raised questions about the "benign result" of Rockwell's violations was clearly toned down.  The sentencing memorandum included the statement, completely in opposition to the prosecutors' admission elsewhere that they had done a criminal prosecution, not an environmental assessment, that "the environmental harm caused by the specific violations was generally limited to the proximate area where the violations occurred."[223]

### 9. Grand Jury Report

During the course of the plea negotiations, the U.S. Attorney appeared ready to guarantee Rockwell that DOJ would be willing to guide the grand jury report in order to ensure that the report would not further increase the company's civil liability exposure.  In a memo to the other prosecutors outlining what Justice's position would be to a plea offer from Rockwell, U.S. Attorney Norton wrote:

> Government will seek Special Grand Jury report.  However, report will incorporate facts and terms of Plea Agreement and will not expose Rockwell to further civil liability not subject to indemnification provisions of DOE/Rockwell Agreement.  Report will likely focus on what criminal investigation did not find (i.e. no 'sensational' matters) and systemic problems (i.e. no environmental concerns by DOE)."

> "Report can also discuss history of RCRA and other environmental law application

---

[221] The Subcommittee obtained access to a number of these documents either during or after most of the sworn testimony was taken.  As a result, without repeatedly bringing back the witnesses for follow-up sessions, it was not possible to question them on certain documents.

[222] Defendant's Sentencing Memorandum, (date), and Plaintiff's Supplemental Sentencing Memorandum, May 28, 1992.  It is interesting to note that this blistering response was not signed by Mr. Hartman.

[223] Plaintiff's Sentencing Memorandum, March 26, 1992, p. 115.

to Rocky Flats as way of mitigation to Rockwell's non-compliance."[224]

The Justice Department has subsequently redacted this portion of the 7/9/91 memo under the claim that it is 6(e) material.

Clearly, the law on grand jury reports is specific and limits what the grand jury may write. As described to the Subcommittee, it would proscribe the grand jury from writing about the crimes of specific individuals or anything but organized criminal conspiracies.

However, the language in the U.S. Attorney's memo appears to be more than just a statement of what Rockwell might expect in a grand jury report as a result of the legal constraints imposed on Grand Jury reports. It contains affirmative statements about what very specific items will be in the report that will be of benefit to Rockwell, such as the "report will likely focus on what criminal investigation did not find (i.e. no 'sensational' matters) and systemic problems (i.e. no environmental concerns by DOE); and conveys the notion that the report will discuss matters in a way that might identify mitigating factors to Rockwell's noncompliance. It is not clear how the U.S. Attorney believed that the prosecutors could guarantee such things in advance.

### 10. Summary

Perhaps one way to assess the plea bargain is to measure it against the key elements that Rockwell established early in the bargaining process. Rockwell didn't want to increase its civil liability exposure; didn't want to lose indemnification; didn't want to get debarred; and didn't want individuals indicted.[225]   Rockwell ended up securing all of that in the plea

---

[224]July 8, 1991 memorandum from Michael Norton re: "July 9, 1991, 2:30 p.m. Meeting with Rockwell Attorneys"to Kenneth Fimberg and Peter Murtha.

[225]. . .Rockwell offer: nolo pleas to multiple misdemeanors, no fraud, false statements; $1.5 million is largest RCRA fine (Rockwell doesn't want to be new record holder); all federal civil and administrative claims gone, including Ct/Claims dispute; government not to participate in Stone suit; no ind. indictments; agreed-upon public statement on SW allegations. Other info: DOE paying for Rockwell's defense to civil suits; also concerned about civil penalties being assessed for same conduct by another federal agency; avoiding debarment; Rockwell does not want to plead to any counts involving downstream pollution, illegal burning, worker danger/safety. "

Jan. 17, 1991 memorandum (unsigned) re: 1/14/91 meeting with Rockwell attorneys (Norton, Fimberg, Murtha and Hassler were present).

negotiations, and more. Whether by coincidence or not, even the charges in the final plea were those that minimized Rockwell's civil liability exposure.

# VI. ESTABLISHING THE FINE LEVEL

> Department of Justice attorneys consistently underestimated the "value" of the Rocky Flats case to Rockwell. This contains an important message about how main Justice views environmental crimes and placed pressure on the United States Attorney to settle for a fine that was lower than could have been achieved.

The Department of Justice points to the $18.5 million in fines in this case as the strongest piece of evidence that it was aggressive in the pursuit of justice. Next to the Exxon Valdez case, this is the largest environmental fine in history and set the record for a fine for RCRA violations. However, the potential fine that Rockwell would have faced at trial could have totaled nearly $100 million.[226]  Further, a public trial would likely have turned up information that would have exposed Rockwell to further civil suits with additional millions of dollars in potential penalties. So how did $18.5 million become the final figure?

## A. Early Prosecution Discussions on the Level of Fine

In December of 1990, Rockwell attorneys first suggested to the United States Attorney's office that they might be willing to negotiate a settlement of the case. This initial approach included a suggested fine in the range of $1 million. In response, prosecutors were forced to sit down and confront the question of what they thought this case was worth. Those evaluations shed light on the prevalent attitude at the Department of Justice regarding the worth of environmental crimes.

During December 1990 and continuing into January 1991, attorneys in Denver and headquarters discussed both what the government's opening offer should be and what the "bottom line" ought to be. When one looks at the "bottom line," a clear pattern of the United States Attorney's office pushing high numbers and headquarters pushing for lower numbers emerges; to put it another way, headquarters attorneys place a lower value of environmental crimes than did the prosecutors in the field.

In terms of an initial offer, Mr. Fimberg was on the outer edge of the scale; he believed the

---

[226]For example, in February 1991 the prosecution team evaluated the maximum fines attributable to many of the charges that were ultimately included in the plea. The total ranged between $68 and $78 million, depending upon how long a period Rockwell was deemed to be in non-compliance with ground water monitoring provisions. This analysis left out the potential penalties for the disposal of hazardous wastes in the solar ponds, which was worth millions more.

government should come back with a demand for $60 million. U.S. Attorney Norton was not too far behind with an initial position of $43.5 million. Among the headquarters people who weighed in, Mr. Block was close to Norton with a recommendation of $38 million. Then both Mr. Murtha ($16 million) and Mr. Hassler ($14 million) occupy the low end of the scale. In the wake of this discussion, Mr. Norton sent an offer to Rockwell that included a demand for $52 million (it appears that number was chosen by splitting the difference between Mr. Fimberg's and Mr. Norton's suggested opening number.)[227]

When you strip away the opening offer posturing you get the following recommendations: Fimberg thought the case was worth between approximately $21 million and $28 million, Norton thought $15 million, Mr. Murtha weighed in for about $6 million, Mr. Hassler thought $4 million would be a fair settlement, Mr. Hartman would apparently have settled for $4-$5 million, and Mr. Buck suggested that the case was worth $1 million. The rationales behind these differing assessments are interesting.[228]

B. The Rationales for the Low and High Bottom Lines

Those at the low end tended to justify their number in terms of the prior record for criminal environmental penalties ($2.5 million). For example, Murtha and Block prepared a memo for Hartman in December 1990 that laid out their thinking on a fair settlement. It reads, in part:

> "We believe $50 million is not at all a realistic figure for this case and will seriously impede any efforts to settle the case...
>
> "We tend to believe that a more realistic evaluation of the case is that it is worth somewhere between ECS' largest criminal fine to date ($2.5 million in the Ashland Oil spill case) and $10 million.
>
> "One reasonably principled way to arrive as such a figure would be to deprive Rockwell of any payment for its environmental performance during the period within the statute of limitations relevant to our case, i/e/, January 1986 through June 1988 [sic]. Probably the most straightforward way of doing this would be to simply deduct 20% from the roughly $24 million Rockwell made from award fees during this period, or approximately $5 million. Clearly, this amounts to punishment, and

---

[227]Sworn Interview of Kenneth Fimberg, Oct. 28, 1992.

[228]Sworn Interview of Kenneth Fimberg, Oct. 28, 1992.

CUU224

not simply restitution, because it would deprive Rockwell of money it received for
some things that it had done correctly in the environmental area...

"To this figure, we would add all of the funds expended by DOJ (including the
FBI), EPA and DOE/IG in pursuing this investigation, which probably amounts to
another couple of million dollars.  Finally, to the extent that environmental
restoration corresponding to Rockwell's criminal activity which could be the
legitimate subject of an indictment additional funds in the nature of restitution
would be appropriate.

"In summary, we would be hoping to achieve a criminal fine in the area of $5 -- $7
million with some additional funds for appropriate clean-up.  We wish to underscore
that this does not reflect we believe we have a weak case -- to the contrary the
settlement described herein would include by far the largest fine obtained by ECS
to date -- only that we appear to have substantial disagreement with the U.S.
Attorney's Office about what goal we should be negotiating towards."[229]

Those at the high end--Fimberg and Norton--tended to view a higher fine as a necessity for
the fine to be punitive.  In Fimberg's words, "A fine of $3 or $4 million is petty cash to
Rockwell."[230]  Fimberg wrote in the same January 1991 memo, responding to Murtha and
Block, that a final number of approximately $20 million should be the goal.  His claims of
calculating a fine level mirrored Murtha/Block's, but he used the concept of "doubling" to
get a higher number.  He wrote, in part:

"I favor a bottom-line corporate fine -- separate and apart from remediation or
clean-up --of $20,907,372.  I derive this figure by applying the doubling provisions
of the Alternative Fines Act to one-third of Rockwell's total profit from operating
Rocky Flats during the period 1986 to 1988 (2 X 410,453,686).  I believe that it's not
unreasonable to figure one-third of Rockwell's total Rocky Flats' profits as the gain
reasonably related to its environmental noncompliance."[231]

Fimberg also used that memorandum to warn his superiors that a high fine would be a
necessity if individuals were not charged.

---

[229]Dec. 28, 1990 memorandum from Block and Murtha re: Plea Negotiations to Hartman.

[230]Jan. 18, 1991 memorandum from Fimberg, Re: Rockwell Settlement, to Norton and Block.

[231]Jan. 18, 1991 memorandum from Fimberg, Re: Rockwell Settlement, to Norton and Block.

"Any corporate disposition, with or without individuals, must involve a very substantial fine. This is much more the case if individuals are not prosecuted, in which case the fine must be a very big number.

"While getting Rockwell to accept a fine of $20 million will clearly be tougher than getting them to agree to $5 million, I'm not prepared to say it's impossible. I think the arguments I've described above can be stated to Rockwell with some force, and I also believe that Rockwell has to understand that, for a number of "political" and other reasons, we simply can't accept a small number of dollars, especially if individuals aren't prosecuted."[232]

Ultimately, Norton and Fimberg each came to feel that a number somewhere in the range of Rockwell's bonuses and/or their award fees for the period of criminal violations would be fair.

## C. Settling on $15.5 Million (and then $18.5 million)

By the time that Fimberg composed his January 18, 1991 memo to Norton and Block, there had already been several discussions with Rockwell regarding a fine level. Rockwell was still suggesting something in the $1 million range while Norton had put forward the $52 million agreed on. The next step, from a negotiating point of view, was how to discover through a process of offer and counter-offer, just how much Rockwell was willing to pay. For example, in his January 18, 1991 memo, Fimberg recommends that the government's next offer be approximately $38 million. Due to the slow nature of negotiations, no counter-offer on dollars was required until July, 1991. However, on June 27, 1991 Rockwell made a formal offer of a $10 million fine. This offer was followed up by a meeting between Rockwell attorneys and prosecutors on July 9. In preparing for that meeting, Norton sent a memo to Fimberg and Murtha in which he seemed to settle on a bottom line number of $15.5 million:

"If Rockwell insist we 'barter' to $15.5 million, we will do so and demand $22.6 million in response to the $10 million June 27, 1991 'counter-offer'. But our bottom line is $15.5 million. Let's quit the haggling."

After receiving his July 8 memo, Fimberg pressed Norton to agree to a bottom-line number of at least $18.5 million (which represented all of Rockwell's award fees from the second half of the 1987 fiscal year through 1989). Further, he argued that the counter offer should

---

[232]Jan. 18, 1991 memorandum from Fimberg, Re: Rockwell Settlement, to Norton and Block.

be no less than $28 million."[233]

But apparently Mr. Norton had settled on his own bottom line. Rockwell appears to have
reacted very positively to the July 9 number and by the end of the month, this figure of
$15.5 million was agreed to. Could the United States Attorney have gotten more if he had
moved down from $52 million to $38 million or $28 million as he had been advised? Almost
certainly, for Mr. Fimberg, in the wake of Rockwell agreeing to the $15.5 million figure
successfully pushed them back up, first to $18 million and then to $18.5 million when the
State of Colorado indicated that they wanted a proportion of the fines. As Mr. Fimberg put
it to the Subcommittee:

> "I have been practicing law both in civil and criminal practice for a long time, and
> negotiate a lot of settlements, and I think this is the only time I have had to
> negotiate a number up rather than coming down."[234]

Though Norton may have made a tactical error in his negotiating approach, he is to be
credited for giving Fimberg the room to try to push for a higher number even after Rockwell
had agreed to the counter offer. Norton did this over the objections and warnings of some
at headquarters who feared that Fimberg's aggressive behavior was going to cause the entire
deal to fall apart.

In a sense, it is difficult to blame Norton for moving to his own bottom line of $15.5 million
and thereby reaching a quick agreement with Rockwell given that virtually every voice
coming out of Justice was telling him he would be lucky to get a settlement in the range of
$6 million. And of course the point is not that the government probably could have won a
few million dollars more from Rockwell -- though it probably could -- the point is that main
Justice was consistently pushing for a radically lower number throughout the period of
negotiations.

### D. Conclusion

It appears that main Justice never did view Rockwell's criminal behavior as particularly
noxious. In the early (December 1990-January 1991) debates on what would form an
equitable fine level, Murtha and Hassler rejected any comparison of Rockwell's crimes with
those of Allied Chemical which was fined $8 million in the 1970s for destroying the James

---

[233]July 9, 1991 memorandum from Fimberg Re: Comments Concerning July 8, to Norton.

Testimony of Kenneth Fimberg, Hearings, supra, Sept. 30, 1992, p. 199.

River fishery through massive discharges of kepone. They argued that a more appropriate comparison would be with "environmental cases involving relatively little direct environmental harm or risk (the largest RCRA fine paid to date is the $1.25 million agreed to in the Unichem case.)."[235] But this misses the point that the Allied fine (and the Exxon Valdez fine as well) were for acts of inexcusable negligence, whereas Rockwell had demonstrated an on-going pattern of wilful disregard for the law and the environmental (and health) effects of that behavior would take years to be revealed.[236]

Further, a small Rockwell fine would fail to serve as a warning to others, creating a condition in which a corporation could calculate if the benefits of polluting outweigh the risks of being caught; but of course that behavior could wreak severe and spectacular environmental damage as in the James River of Prince Williams Sound.  In a sense, Rockwell and the public got off lucky (at least in the short run) at Rocky Flats, but if the fine was insufficient, the next corporate polluter and surrounding community might not be so lucky. Main Justice never seemed to appreciate the need to have a fine that was not only punitive, but would send a signal to corporations that the cost of violating environmental laws would clearly outweigh potential savings.

Perhaps oddly, Rockwell and the Denver prosecutors both seemed to view a higher fine as a legitimate outcome (especially in return for Rockwell achieving its bottom line goals on individuals, the global settlement, debarment and protection against further civil exposure). While we may never know how much more the government could have won if they had pushed Rockwell harder, the truth is that if this case had been in the hands of main Justice, the case would have been settled for a mere four or five million dollars.

---

[235]Jan. 18, 1991 memorandum from Murtha and Hassler Re:  Rocky Flats Investigation--Settlement Discussions to Norton and Block.

[236]Jan. 18, 1991 memorandum from Fimberg, re: Rockwell Settlement Discussions, to Norton and Block.

# VII. LACK OF INDICTMENTS OF DOE PERSONNEL

> In the course of its investigation, the Subcommittee received only a limited
> amount of materials relating to the investigation of DOE personnel.
> Apparently, most of that inquiry was conducted within the grand jury.
> However, based upon the material that was made available, public
> statements made by Justice Department officials, and testimony received,
> it appears that the "DOE culture" and management style protected agency
> employees from prosecution.

First, DOJ apparently signaled DOE very early in the investigation that none of its
personnel would be indicted. On March 28, 1991, Stephen Wakefield, then DOE's general
counsel, informed Deputy Secretary Henson Moore, after a meeting with Rockwell's general
counsel, that "Rockwell expects that the company and up to twelve individuals will be
indicted, probably in April or May, if a settlement is not reached . . . [A]s you recall and
[Rockwell attorney] Harff apparently doesn't know, none of the likely indictees are DOE
employees." Wakefield based his statement on a meeting he had earlier with Mr. Norton
and the prosecution team.[237]   That statement was made before the investigation was
completed, or the prosecution had bargained away individual indictments.[238]

The two reasons cited most often by Justice for not indicting any DOE personnel were: (1)
the existence of a "DOE CULTURE" that stressed weapons production over environmental,
safety and health concerns; and (2) the lack of knowledge by DOE officials of the charged
conduct, due to their limited involvement in the day-to-day operations of the Rocky Flats
facility.

In the Plaintiff's Sentencing Memorandum prepared for this settlement, great emphasis is
placed on what the Justice Department refers to as the "DOE culture" as an explanation for
the criminal activity that occurred at Rocky Flats, and as a rationale for not indicting DOE
personnel. What has emerged in the course of this investigation is that in the eyes of the
Justice decisionmakers this "cultural" factor mitigated against indictment of DOE and
Rockwell personnel who in their view were simply products of the bureaucratic "culture" in
which they were operating. It is no secret that for years the Department of Energy had an
institutional policy that emphasized weapons production over environment, health, and safety

---

[237]March 28, 1991 memorandum entitled "Rocky Flats Grand Jury Investigation."

[238]The Wakefield memo was supplied to the Subcommittee after the interviews of the Justice
prosecutors were completed.

concerns. Because this attitude pervaded the agency for many years, the Department of Justice found it difficult to hold individual DOE personnel accountable for their acts. This is a very troubling notion, to say the least. The implication seems to be that when a government agency has long-standing policies or practices, even if they are in direct violation of statutory law, no individual within the agency would be indictable for a criminal offense.

Thus the "culture" of an agency becomes an appropriate defense or mitigating factor. If that is the case, it is difficult to understand how any accountability could ever be imposed upon the decision makers or anyone else in a "rogue" government agency.

> MR. FIMBERG. . . . .What I do have knowledge of is that this practice was endorsed by DOE institutionally. In my mind on all these issues there is a great distinction between if you have rogue DOE officials who are acting on their own, so to speak, or renegades within the agency who are out there doing bad things, that is one thing, and perhaps those are prosecutable offenses.

> It is quite another subject altogether to say that DOE, the official policy of the Government, the United States Government agency to be charged with implementing these programs took that position. In my view on this issue, on incineration of mixed waste, DOE on a broad institutional basis endorsed this position.

> REP. WOLPE. Could I just intervene here? Isn't the implication of that, as long as a Government agency takes a policy, even if it is in direct violation of statutory law, that no individual within the agency is at that point indictable for a criminal offense?

> MR. FIMBERG. I think in many cases, not in every case, but in many cases and in this case I think that is a correct proposition, yes.[239]

This signals a troubling double standard in the administration of justice. An agency and its individual employees are placed above the law. Unlike ordinary citizens who will be held accountable for their infractions, government personnel are apparently immune from prosecution if their conduct - no matter how egregious - has been sanctioned by the agency.

---

[239] Testimony of Kenneth Fimberg, Hearings, supra, Sept. 30, 1992, p. 1545.

Moreover, a culture is not an entity in itself. it is a set of individuals who are acting on the basis of certain values. If the justice system adopts the proposition that the individuals who propagate a culture that encourages illegal behavior cannot be held accountable to the laws of this country, it is difficult to understand how one can ever hope to change that culture.

The policies and practices that flowed from, or comprised, this culture, also apparently impeded this prosecution.    For example, the Subcommittee learned that Justice decisionmakers felt constrained because of DOE's long and deliberate battle to resist the regulatory mandates of RCRA. Once again, that attitude by Justice raises the question of how governmental personnel can ever be held responsible for adherence to statutory law if their resistance to its regulatory coverage serves as a shield from accountability.

One is filled with frustration and amazement that a government agency's own institutional lawlessness, regulatory resistance and sweetheart deals with its own contractors could be used to shield its personnel and those of its contractors from the effective application of the law.

Fundamentally, based upon the material that was available, it appears as if at least in one area -- pondcrete/saltcrete - - the prosecutors made erroneous statements about the lack of knowledge on the part of DOE personnel. The prosecutors maintained to the Subcommittee that DOE personnel were not aware of the problems with saltcrete and pondcrete storage or that pondcrete was being stored at the unpermitted 904 pad. However, in a September 17, 1987, William Rask, chief, operations branch, RFAO, sent a memo on pondcrete/saltcrete to Frank Bigham of the Health Physics and Environmental Division at the Nevada Operations Office prior to Mr.Bigham's meeting with EPA. An attachment to that memo reported problems at both the 750 and the 904 pads. It gives a clear indication that DOE knew both the condition of pondcrete/saltcrete and the reasons for it:

> Deformation of the pondcrete boxes and slumping of the stacks were caused by a combination of fiber board box degradation, inadequate process control, and inadequate inspection procedures. Box degradation resulted from rain, walter infiltration. Incorrect cement/sludge ratios in the pondcrete resulted. from inadequate process control varying solids, concentrations.  Also, a partially plugged star valve used to introduce cement to the mixture also contributed to the incorrect ratio. Finally, inspection of the waste boxes was inadequate to determine incorrect cement/sludge ratios. These incorrect ratios resulting a pondcrete which

did not cure beyond a putty consistency.  A preliminary survey indicates that approximately 2,000 of the nearly 7,000 boxes currently on the pads on [sic] infected."[240]

A DOE audit report on Rocky Flats waste generation and certification operations conducted in late 1987 also noted sufficient damage to containers to require recertification.[241]

---

[240]"Report of Investigation - Pondcrete/Saltcrete," prepared by William F. Smith, special agent, Office of Criminal Investigation, U.S. Environmental Protection Agency, Dec. 14, 1990, p. 42.  The Subcommittee received this document after its interviews were completed and was not able to ask if the implications of DOE knowledge of the problems and illegal storage of pondcrete had been pursued.

[241]Smith, Id.

## VIII. THE ROLE OF DOE

Aside from what this case reveals about the commitment to strong prosecution of
environmental crimes at the Department of Justice, the Subcommittee's review uncovered
additional information concerning the lack of management capability, agency capture by
contractors, environmental insensitivity and callousness toward worker and citizen safety that
pervade the Department of Energy. These significant problems have been documented at
length over the years through numerous Congressional hearings and reports, GAO reports,
and internal studies by the Department and its own contractors. Information collected in
the course of the Subcommittee's investigation, affirmed these serious institutional problems
and suggests that they still have not been remedied at the Department.

In the course of the Subcommittee's investigation, some of the strongest criticism leveled by
the prosecutors was toward the Department of Energy.   Time and time again, the
prosecutors faulted the Department for poor environmental policies, poor management, and
failure to effectively control the facilities that it owned.

Furthermore, in testimony before the Subcommittee and in reports and communications
developed throughout the investigation, the prosecution team painted a picture of an agency
that was completely at the mercy of its contractor.

At one of the hearings, the lead attorney on the case stated the following: ". . . What we
found, which was in some ways equally shocking, was that here was a nuclear defense facility
that for all intents and purposes the Government had abdicated to a private contractor.
Rockwell ran that plant, not DOE..."[242]

Several memos prepared by the prosecution team affirmed this judgement, in very harsh
language. The first, from Mr. De Monaco, Mr. Murtha and Mr. Fimberg, stated:

> The testimony in the investigation has very strongly shown that it was
> Rockwell, and not the Department of Energy, that was operating Rocky
> Flats. This manifested itself in many ways, some as revealing as Rockwell,
> rather than DOE, preparing all environmental compliance documents to be
> sent to EPA and CDH on DOE's behalf. The issues being proposed in the
> indictment are all at heart operational matters on which Rockwell had the

---

[242]Testimony of Kenneth Fimberg, Hearings, supra, Sept. 30, 1992, p. 178.

primary responsibility.[243]

Later, Mr. Murtha and Mr. Fimberg stated that,

> First, and for some of the reasons stated above, to say that DOE owned
> Rocky Flats and that its management oversaw Rocky Flats' operation is not
> to say that they were responsible for Rockwell's operational shortcomings.
> As outlined in other recent memoranda, the investigation shows that Rocky
> Flats, at an operational level, was a Rockwell, not a DOE, enterprise. It
> was largely a 'turn-key' operation -- DOE set broad policies and
> parameters, set delivery schedules, etc. and essentially told Rockwell to go
> forth and run the plant, in compliance with environmental and other laws.
> (We have focused our investigation on conduct and proposed theories
> where DOE's direct involvement was minimized, as opposed to other areas
> -- such as the Building 771 incinerator, where DOE more directly endorsed
> a particular regulatory position.) The investigation indicates that Rockwell,
> not DOE, made the decisions or took the actions (or failed to take the
> actions) for which the company is now proposed to be charged. That DOE
> was not a better policeman does not excuse Rockwell's crimes.[244]

The image conveyed by the Government prosecutors was of a federal agency completely
clueless as to the major issues and day-to-day operation of its own facility. In any situation,
such abdication of responsibility by a federal agency is unacceptable. When it happens at
a nuclear weapons production facility, it is a breach of the faith and trust the American
public has bestowed upon the government.

However, it is important to stress that while this description of the Department fits one that
has been revealed time and time again in congressional and GAO reviews of the DOE
weapons complex, it is not a legitimate reason to excuse the Department and its personnel

---

[243] April 26, 1991 memorandum from Charles DeMonaco, Peter Murtha and Kenneth Fimberg, re: "A
Response to Rockwell's 'Exculpatory Submission' Re: General Dynamics Investigation and Budgetary
Issues," to Richard Stewart and Michael Norton.

[244] * May 6, 1991 memorandum from Peter Murtha and Kenneth Fimberg, re: "Investigative Contact
with High-Level Past or Present U.S. Department of Energy Officials," to Barry Hartman and
Michael Norton.

from culpability in the crimes committed at the Rocky Flats facility. While the Department and its employees may have been only accessories to the crimes, rather than issuing the directives and orders, its personnel still received copies of documents, received reports, etc. In other words, they knew what was happening and condoned the situation. In effect, this portrait of the DOE doesn't exculpate the agency - it magnifies the shame. DOE was not in control of its own facility, and it didn't even have the will or commitment to put a stop to what are clear violations of the law. The Department clearly went along with and tacitly approved Rockwell's illegal activity.

Beyond poor management, the investigation revealed, and the prosecutors confirmed, hostility to law and a lack of environmental sensitivity on the part of the Department. Indeed, one need look no further than the DOJ's plaintiff's sentencing memorandum to see how the prosecutors felt about DOE's environmental sensitivity:

> "Because of DOE's (and its predecessors agencies') overriding concern for national security, DOE has often been covered by a shroud of secrecy. The effect of this secrecy has sometimes been negative, in that DOE showed general disdain for and hostility to outside regulation.

> "This culture was particularly evident concerning the environment. Throughout most of the 1980's, DOE strenuously resisted the application of federal and state environmental laws at its nuclear weapons facilities. According to Rockwell, DOE formed an institutional policy of active resistance to RCRA regulation and expected its contractors to support the same. Regulation and oversight by EPA and state environmental agencies was heavily contested and grudgingly given.

> "DOE's internal reviews of Rocky Flats mandated by Secretary Watkins after the criminal search warrant was initiated confirmed this view."[245]

Yet a further institutional question that presents itself from testimony received by the subcommittee is the exclusion of workers at DOE's weapons facilities from some of the fundamental health and safety protections available to most private sector employees.

Although the investigators discovered significant violations of health and safety standards, they were frustrated in their attempts to prosecute the infractions. The Department is

---

[245]Plaintiff's Sentencing Memorandum, pp. 9- 10.

exempt from regulations under the Occupational Health and Safety Act (OSHA).  In lieu of OSHA standards, DOE established its own set of worker health and safety orders. According to Agent Lipsky, the prosecution team then tried to prosecute for violation of those standards, using a section of the Atomic Energy Act (AEA) which makes it a felony offense to violate any DOE orders promulgated in conjunction with its nuclear mission. However, DOE's promulgation of its orders did not comply with the requirements of the Administrative Procedures Act.  Therefore its standards did not qualify as regulations covered by the sanctions established in the AEA, and could not be enforced.[246]  In a sense, the Department's disregard for legal process ended up serving as a shield for the lawlessness of its contractor.

As discussed in previous sections, DOE's historical practice of fully indemnifying its contractors presented a major hurdle to the prosecutors' attempts to resolve the case on terms most favorable to the government.  All of the prosecutors interviewed by the Subcommittee noted that a significant concern of the prosecution team was that Rockwell might employ the indemnification provisions of its contract with DOE to force the agency, and ultimately the taxpayer, to reimburse the company's criminal fines. This prospect undoubtedly increased the leverage that Rockwell had in settlement negotiations, serving to bring added pressure on the prosecutors to agree to Rockwell's terms for settlement in exchange for the corporation's agreement not to seek reimbursement for the criminal fines it paid.  Even under the limitations of the plea agreement, Rockwell has already applied to DOE for reimbursement of $7.9 million in fees and costs.

However, this investigation revealed more than institutional weaknesses at the Department of Energy.  It also showed that in the course of the investigation, DOE officials tried to protect its contractor who was under fire from the Department of Justice, and reduce its own potential exposure to future liability.

In a private communication, Deputy Secretary of Energy, Henson Moore, wrote the U.S. Attorney for the District of Colorado and requested that "Rockwell be permitted to enter a plea of nolo contendere," because "the inadmissibility of such a plea in any civil action subsequently brought against Rockwell would have the effect of reducing somewhat DOE's potential monetary exposure under [its] contract reimbursement obligations."[247]

---

[246]Testimony of Jon Lipsky, Hearings, supra, Sept. 17, 1992, p. 666 - 667.

[247]Sept. 4, 1991 letter from W. Henson Moore, Deputy Secretary of Energy to Michael J. Norton, U.S. Attorney for the District of Colorado.

The detrimental ramifications of the generous indemnification provisions contained in DOE's contract with Rockwell are once again manifested in this action taken by Deputy Secretary Moore. DOE was concerned that if Rockwell pleaded guilty to criminal activities, that plea could enhance the prospects of success of any civil actions brought against Rockwell related to its operation of Rocky Flats. However, DOE's contractual obligation to indemnify Rockwell for civil liabilities meant that it would be the federal government who would actually suffer the potentially large monetary exposure. Consequently, DOE took the wholly inappropriate action of injecting itself into criminal plea bargain negotiations on behalf of the defendant in an attempt to influence the prosecutors to accept a plea that would minimize the civil exposure of the defendant, and ultimately itself.

The process of determining whether a guilty plea by Rockwell should result in its debarment from bidding for government contracts was another instance that raised questions about whose interest DOE was representing. On September 19, 1991, representatives from Rockwell met with John Easton, the DOE General Counsel, to discuss a number of matters related to the plea agreement, including the issue of debarment. According to the General Counsel's notes of that meeting, Rockwell's representatives informed DOE that the corporation had already been assured by DOD that it would not be debarred or suspended from any work or bids with DOD because of its actions at Rocky Flats. Rockwell wanted similar assurances from DOE and EPA. Since Rockwell maintained that it had already received private assurances from Defense, and the statute on debarment allows one agency to be designated as the decision-maker for the entire government, the Rockwell attorneys requested that DOE defer to Defense for a debarment decision.

DOE granted Rockwell's request, and contacted DOD to see if it would accept a referral on the debarment issue. When DOD declined the referral, DOE attorneys worked with Rockwell to shape a debarment decision to minimize the impact it would have on Rockwell's work, if the company was debarred. Prosecution team notes of conversations with DOE representatives on this matter indicate that "DOE would be inclined to send a letter to Rockwell regarding debarment, along the lines of the draft suggested by Rockwell" [248]

There was additional evidence to suggest that early on in the plea negotiations, an apparent decision was made that Rockwell would not be debarred, even before a formal review had occurred. In a July, 1991 memo discussing various terms of the plea bargain, U.S. Attorney Norton noted that "Confidentially, it is not anticipated that Rockwell will, in fact, be

---

[248]Sept. 24, 1991 E mail from Peter Murtha, re: Rocky Flats/DOE Att'ny fees, to Barry Hartman.

debarred or suspended."[249]

If, as the documents suggest, both DOD and DOE officials offered private assurances, or sent signals to Rockwell that it would not be debarred, or any debarment action would be inconsequential, they engaged in highly questionable conduct and certainly violated both the letter and the spirit of the debarment process.

The Federal Acquisition Regulations (FAR) establish the policies and procedures to be applied in debarment reviews.[250] The standards are very informal, and provide a great deal of autonomy to the agency and debarring official. For example, the regulations specify that debarment proceedings should be as informal as possible, and that even "the existence of a cause for debarment, however, does not necessarily require that the contractor be debarred;"[251] In particular, they direct that debarment be imposed "only in the public interest for the Government's protection and not for purposes of punishment."[252]

Given such loose standards, the integrity of the debarment process is completely dependent upon good faith implementation by the agencies and debarring officials.

The debarment review conducted by DOE, and the decision that was rendered raise serious questions about the Department's commitment to responsibly protecting the interests of the public as well as the effectiveness of the current debarment regulations.

In support of their decision in this case, DOE officials relied heavily on the FAR directive that debarment be imposed only for the Government's protection and not for punitive purposes.[253] As they described it, their duty was to determine if Rockwell was currently a responsible party, and not to judge Rockwell on the basis of its actions at Rocky Flats.

---

[249]July 8, 1991 memorandum from Michael Norton re: "July 9, 1991, 2:30 PM Meeting with Rockwell Attorneys," to Kenneth Fimberg and Peter Murtha.

[250]Federal Acquisition Regulations, 9.400-9.407-3.

[251]9.406-3 (Procedures); 9.406-1 (General).

[252]FAR 9.402 (Policy).

[253] 3/24/91 "Memorandum for the Record" by Berton J. Roth, Deputy Director, Office of Procurement, Assistance and Program Management, re: "Potential Debarment of Rockwell International Corporation, as a Consequence of Plea Bargaining with the Department of Justice (DOJ)."

However, the review conducted by DOE was inadequate to make an objective determination of Rockwell's current environmental responsibility, and the justification provided for the record only addresses the matter in passing. Rather, most of the record is an attempt to offer rationales that would mitigate the criminal activity to which Rockwell pled guilty.

DOE debarment officials have assured the subcommittee that the entire document file has been provided to the subcommittee. Yet, other than a statement in the decision memorandum that the officials reviewed a DOE assessment of Rockwell's performance at a facility it operates for DOE in California, there is not one document to suggest that DOE's debarment review involved any independent assessment of Rockwell's current environmental performance. In an effort to assess the company, the DOE personnel met with representatives and officials from Rockwell to determine what reforms and institutional changes in Rockwell's environmental programs had been enacted since the raid at the Rocky Flats facility. No independent effort was made to verify that the information presented to DOE by Rockwell was accurate, nor did DOE check with other governmental agencies to assess Rockwell's environmental performance under other current contracts, even though Rockwell is a major contractor with both DOD and NASA. According to the file provided to the Subcommittee, the record used to make the Department's debarment decision consisted solely of material provided by the contractor that was under investigation, with no countervailing information. For example, although the debarment file contained a defense by Rockwell of its activities at Rocky Flats, including an attempt to minimize the crimes to which it pled, it does not contain the Plaintiff's Sentencing Memorandum, the document that represents the details of the Government's case against the contractor.

The rationale provided for the decision is just as troubling as the review process that was utilized, and reflects the fact that it was based upon limited and self-serving material provided by Rockwell. The first reason offered for not debarring Rockwell was that the company's "current ES&H corporate-wide policies and programs seem strong and realistic."[254]

Yet, as noted above, the Department did not conduct any type of independent review to determine the effectiveness of Rockwell's program.

Another reason given for not debarring Rockwell was the fact that "Rockwell did not operate as an 'independent' contractor at Rocky Flats, but, to a large degree, was subject

---

[254]March 24, 1991 memorandum for the Record by Berton J. Roth, Deputy Director, Office of Procurement, Assistance and Program Management, re: "Potential Debarment of Rockwell International Corporation, as a Consequence of Plea Bargaining with the Department of Justice (DOJ)."

to direct DOE control."[255] This mimics the defense provided to DOE by Rockwell.[256]
It is also the very same defense that had been offered by Rockwell throughout the
investigation of the Rocky Flats case, and had been strongly rejected by DOJ prosecutors,
as noted above. Indeed, in an internal memorandum, the prosecution team wrote:

> "Interestingly, our evidence suggest that Rockwell, and not DOE, often was the
> primary entity pushing for aggressive, anti-regulatory postures, rather than playing
> the passive role this submission would have one believe. Ultimately, it is true,
> however, that DOE would approve or acquiesce in these legal positions."

> "In short, all of the violations for which we would propose to indict involve the
> active knowledge of environmental wrongdoing by the corporation (or the specific
> individuals we would charge)."[257] (emphasis added)

Another DOE rationale for not debarring Rockwell was that "The Grand Jury met for over
2 years, but none of the sensational charges under which the U.S. Attorney and the FBI
entered Rocky Flats are included in the plea bargain."[258]  This, again, was the exact
statement made by Rockwell at the time of the Plea Agreement. Once again, DOE chose
to ignore DOJ's response:

> "...Rockwell's crimes speak for themselves.   They involve known potentially
> dangerous and concealed misconduct, and little point is served by calling them
> "sensational" or "nonsensational". Simply put, Rockwell has pleaded guilty to serious
> crimes involving 330 instances of known misconduct and 80 instances of criminal

---

[255]March 24, 1991 memorandum for the Record by Berton J. Roth, op. cit.

[256]March 6, 1992 letter from John D. Aldcock and Franklin D. Kramer (attorneys for Rockwell) to
Berton J. Roth and G.L. Allen.
    Two other justifications provided by DOE for not debarring Rockwell also adopted the
"Rockwell as victim" approach. They were: 1. "During the time period involved, DOE's focus was on
production and not on compliance with ES&H laws and regulations.", and 2. There were conflicting
obligations in that DOE was pressing for production of nuclear devices which, if Rockwell did not
accomplish, would be a breach of contract and they were in an impossible situation since there was no
place to ship low-level waste.  Therefore, there were conflicting DOE v. EPA/DOJ opinions." March 24,
1991 Memorandum for the Record by Berton J. Roth, op. cit.

[257]April 24, 1991 memorandum from Joseph Block, Peter Murtha and Kenneth Fimberg, re: A
Response to Rockwell's Exculpatory Submission, to Richard Stewart and Michael Norton.

[258]March 24, 1991 memorandum for the Record by Berton J. Roth, op. cit.

000240

negligence from 1987 to 1989."[259]

Perhaps the most outrageous -- and blatantly cynical -- justification for not debarring Rockwell was the following: "The employees involved in the infractions are no longer employees of Rockwell, but are now working for EG&G at Rocky Flats."[260]

First, the observation is incorrect; a few of the more senior individuals returned to Rockwell when EG&G took over the contract, including some who were knowingly and actively involved in the charges to which Rockwell pleaded guilty, and including some who were the recipients of target letters. Second, this begs the question of why the Department allowed EG&G to assume the contract with the same individuals remaining at the site, and what kind of performance the Department can expect of EG&G with those individuals in its employ.

The entire debarment process conducted by DOE on this matter and the rationale offered for its determination to take no action demonstrate the type of cynical, illogical mindset that has enabled DOE and its predecessors to tolerate and rationalize the unconscionable behavior of its contractors and employees for the last 45 years.

There has been a widespread concern that government agencies have never effectively used debarment as a means of protecting the government from irresponsible contractors, particularly when the companies under review have critical contracts, or are viewed as essential to certain government activities. The situation reviewed by this subcommittee only adds credence to those suspicions.

---

[259]Plaintiff's Supplemental Sentencing Memorandum, May 28, 1992, pp. 3-5.

[260]March 24, 1992 Roth memorandum for the Record, op.cit.

# IX.  THE SPECIAL GRAND JURY REPORT:
## THE ROLE OF THE JUSTICE DEPARTMENT AND CHIEF JUDGE

> The special grand jury had been prepared by both prosecutors and the judge in this case to write a report on Rocky Flats. However, for reasons that may have involved political considerations, Justice headquarters refused to allow the prosecutors to prepare a draft report for the grand jury and ordered them to refrain from assisting the citizen jurors in drafting their own report.  The judge in this case could have instructed the prosecutors to provide assistance or given jurors the legal support necessary to meet his standards for public release; he chose to do neither.  When the jurors, carrying out what they had been told would be their sworn duty, delivered a report, the judge chose to seal it.  This placed the jurors in the moral quandary of choosing between adherence to their oath of secrecy or surreptitiously releasing their work to the press to carry out what they saw as their charge to serve the public good.

In September 1992, the Denver-based newsweekly, "Westword", published a lengthy story on the Rocky Flats prosecution. The central focus of the story was the role of the special grand jury, with the highlight being the publication of excerpts from a draft of its report.[261] The report's existence had been rumored for months, but this represented the first actual confirmation.   In the weeks following the "Westword" article, the judge asked the Department of Justice to investigate the grand jurors for breach of their oath and the grand jurors called upon President-elect Clinton to appoint a special prosecutor to review the Department of Justice's conduct in the Rocky Flats case.

The Subcommittee's investigation revealed that, over the vehement opposition of the prosecution team and in a reversal of its earlier position, main Justice told the judge that a grand jury report could not be issued under the special grand jury statute and prohibited the prosecutors from working with the grand jury to write a legally sufficient report.

### A.  Report Expectations

When the U.S. Attorney first determined in 1989 that the Rocky Flats case might necessitate a special grand jury as provided for in 18 U.S.C. § 3331 et seq., he properly followed the directives of the U.S. Attorney's Manual: he went to the head of Justice's Criminal Division

---

[261]Bryan Abbas, "The Secret Story of the Rocky Flats Grand Jury," Westword, Sept.30-Oct. 6, 1992.

to obtain a certification of need which would then be presented in writing to the court for consideration.[262]  Mr. Norton gave two reasons to John C. Keeney, then acting assistant attorney general, Criminal Division, for empaneling the Colorado district's first special grand jury:

> (1) the possibility of a lengthy investigation that would require the "complete energies" of a grand jury; and

> (2) the possibility of a grand jury report on issues that did not lead to indictment.

In a later recounting of his discussions with main Justice, Mr. Norton said that:

> "one of the important reasons that I requested that a special grand jury be convened and the Chief Judge agreed was its statutory ability to issue a report. I believed this ability was critically appropriate in the investigation of a controversial government facility which, for many years, had been embroiled in public controversy. There was recognition, at an early time, that the investigation might disclose important matters which would not be appropriate for indictment, but nonetheless appropriate for public disclosure."[263]

Based on Mr. Norton's reasons, Mr. Keeney approved the certification.  The dual justification was then provided to Judge Sherman G. Finesilver as the basis for his concurrence and directive to the court clerk to empanel a special grand jury in "the interests of the people in the District of Colorado and the national interest. The judge went on to find that:

> "Fundamental fairness prompts that the matter be submitted to a special grand jury so that the various facets dealing with Rocky Flats may be presented in an orderly manner. There is a possibility of a lengthy investigation and the special grand jury will have to utilize its complete energies in pursuance of this directive. In the furtherance of the discharge of its duty, the Special Grand Jury -- with the

---

[262]U.S. Attorney's Manual, 9-11.310, 1989-2 Supplement, 28 C.F.R. §0.59 (assistant attorney general in charge of Criminal Division is designated to make certifications under 18 U.S.C. §3331). Although the manual is not a legally promulgated federal regulation and does not have the effect of law, its requirements are treated as such by Justice attorneys.

[263]Nov. 11, 1991, letter from Michael Norton to Barry Hartman Robert Mueller III.

> concurrence of the majority of its members -- may submit a report to the Court..."[264]

The judge informed the grand jurors of the possibility of a report in his 21-page charge of their duties, rights and responsibilities when they first convened on August 1, 1989. The language of the charge clearly indicated that it would be a public report.[265]

This charge to the grand jury was reinforced by the prosecutors, who admitted to the Subcommittee that they were open with the grand jury about the possibility, or even the necessity, of preparing a report.[266] This same point was made by prosecutors to Rockwell in several letters and oral communications. Not surprisingly, blocking a report became an important goal for Rockwell in its plea negotiations.

## B. Rockwell Attempts to Block a Grand Jury Report

The possibility of a grand jury report was apparently well enough known that, by late June 1991, Rockwell had proposed a settlement offer which included the stipulation that the grand jury not issue a report.[267] The prosecutors working in Denver already knew, however, that the members of the grand jury were strongly committed to writing such a report. In response to the offer from Rockwell, Mr. Fimberg commented to Mr. Norton:

---

[264]SGJ 1989-2, Order Regarding Empaneling Special Grand Jury, In the Matter of the Special Grand Jury (D.Col., June 28, 1989, pp. 1-2).

[265]    In the furtherance of the discharge of its duty, the special grand jury -- with the concurrence of the majority of its members -- may submit a report to the Court concerning noncriminal misconduct, malfeasance, or misfeasance in office involving organized criminal activity by an appointed public officer or employee as the basis for a recommendation or removal or disciplinary act. 18 U.S.C., Section 3331, et seq. Thus, through the vehicle of this special grand jury, the public may be assisted in learning of the facts as they relate to Rocky Flats. (Emphasis added)

SGJ 1989-2, Information to Special Grand Jury 89-2, In the Matter of the Special Grand Jury (D.Colo., Aug. 1, 1989), p. 7. The full text of 18 U.S.C. §3333(a), which is the section relating to special grand jury report also includes a broad authorization for the grand jury to report on "organized crime in the district." 18 U.S.C. §3333(a)(1). This is the provision the prosecutors intended to use. It does not require that the report serve as the basis for a removal or disciplinary recommendation.

[266]Mr. Murtha testified that the possibility of a grand jury report had been discussed from "time to time" with the grand jury. Sworn Interview of Peter Murtha, Nov. 3, 1992, p. 26.

[267]June 27, 1991 letter from Harold Haddon and Vincent Fuller to Michael Norton. This term was part of a broader position concerning specific public statements Rockwell wanted the government to issue. Id., p. 3.

'The last sentence requires us to agree not to issue a report, which I believe is
unacceptable to you and also the Grand Jury. The Grand Jury would lynch us if we
agreed to this."[268]

On July 9, 1991, Mr. Norton confirmed to Rockwell in writing that a grand jury report was
being contemplated, but said it would focus on "persons, organizations, and governmental
entities other than Rockwell."[269]  On July 16, 1991, Rockwell reiterated its demand of no
grand jury report.[270]

On July 17, 1991, Rockwell's attorneys sent a letter to Mr. Norton, Mr. Hartman and Mr.
Cartusciello, arguing that there was no authority for a report under 18 U.S.C. § 3333(a)
because there was no "organized criminal activity" at Rocky Flats "and that the grand jury
could not "opine" about any structural and managerial deficiencies that resulted in problems
at Rocky Flats, recommend changes or name, criticize or comment on Rockwell or its
officers, directors or employees." In response, Mr. Fimberg and Mr. Norton again assured
Mr. Haddon that the report would focus on persons, organizations and governmental entities
other than Rockwell.[271]

In October, Rockwell wanted to know the results of Justice's review of the authority of the
grand jury to issue a report.  Rockwell's attorneys wrote:

"We continue to have concerns about the issuance of a report.  When we last
discussed this matter in detail, it was our understanding that the Department of
Justice was reviewing applicable statutes and legislative history to determine
whether a report could legally issue under the circumstances of this case. We would
like to know the results of that review.  If the Department of Justice determines
that a report can and should be issued from this Grand Jury, Rockwell needs to be
free to object to all or any portion of it should Rockwell choose to do so."[272]

---

[268]July 1, 1991 memorandum from Kenneth Fimberg to Michael Norton.

[269]July 9, 1991, letter from Michael Norton to Harold Haddon and Vincent Fuller.

[270]July 16, 1991 letter from Harold Haddon and Vincent Fuller to Michael Norton. Letter referred to
meeting held on July 14.

[271]Letter dated July 17, 1991, from Kenneth Fimberg and Michael Norton to Harold Haddon.

[272]Oct. 9, 1991, letter from Harold Haddon to Kenneth Fimberg, p. 2.

From this communication, it is not clear that Rockwell knew the extent of the brewing dispute within the Justice Department (see discussion, below).

## C.  Main Justice Derails Report

By October of 1991, the issuance of a grand jury report was still being raised by Rockwell in the settlement negotiations.   While the prosecutors remained resolute that they anticipated that a report could be issued, an internal struggle at the Department of Justice was beginning to unfold.  Among all the legal, policy and procedural questions that arose in the course of the Rocky Flats case, this dispute over a grand jury report appears to have been the most heated one between the U.S. Attorney and main Justice.  The line-up, however, a different one than usual.  The entire prosecution team, including those from main Justice, wanted to write a report; Mr. Hartman -- and the same Criminal Division that had earlier encouraged Mr. Norton concerning a special grand jury report -- did not.

Mr. Hartman, who had not been in the Environment and Natural Resources Division at the time the special grand jury was requested, opposed a report, possibly because of his stated belief that the grand jury role was simply to either "hand up" or not "hand up" indictments. In Hartman's eyes, a grand jury was not to write reports, despite the provisions of the law. He also apparently believed that there was no statutory authority for the type of report the prosecutors wanted to write.  He particularly did not want the grand jury to be writing a report under its common law authority because that would create, in his words, "bad precedent."[273]

None of these objections appear to be sufficient to support the extremely strong position Mr. Hartman ultimately took in opposing the report. First, on Oct. 3, 1991, he approved -- along with Mr. Murtha, Mr. Fimberg and Mr. Norton -- the filing with the court of a memorandum prepared by the prosecution team which concluded that a grand jury report could be issued under either statutory or common law.[274]  Nor was Mr. Hartman a career government organized crime attorney with a vested interest in limiting the definition of organized crime.

However, a memorandum he sent to Attorney General Barr on the eve of the announcement of a plea agreement may shed some light on another factor that may have

---

[273]Sworn Interview of Peter Murtha, November 3, 1992, pp. 30-36.

[274]Nov. 11, 1991 memorandum entitled "Subject: Rockwell Investigation - Issuance of a Grand Jury Report" from Chuck DeMonaco to Barry Hartman. "If the Criminal Division wishes to take a contrary legal position, it must point out to the Court the errors of the Oct. 4, 1991 memorandum." Id.

affected Mr. Hartman's thinking:

> "In lieu of the Grand jury report, a rather lengthy sentencing memorandum will be
> filed by the United States. It includes some discussion of the role of various
> Department of Energy officials. We have tried to convince the USA to accurately
> reflect the fact that DOE failures were the result of attitudes prior to Admiral
> Watkins becoming Secretary [of Energy]."[275]

Clearly, a report about DOE that concerned the "ongoing criminal activities" that the
Criminal Division believed was necessary to justify issuance a report would indicate that the
attitudinal changes at DOE were not yet complete and reflect badly on the DOE
Secretary.[276]

At some point, Mr. Hartman brought the issue of a grand jury report to the Criminal
Division. The record is unclear as to whether he was seeking allies in the effort to derail
the report and hoped to find them in that division or whether he was still formulating his
position at the time and simply wanted another opinion within Justice.[277] While there was

---

[275]March 25, 1992, memorandum entitled "In re: The Rocky Flats Nuclear Weapons Plant" from Mr.
Hartman to Attorney General Barr (cc: George Terwilliger, deputy attorney general).

[276]The Subcommittee staff interviewed Mr. Hartman before the Justice Department provided
documents concerning the grand jury report to the Subcommittee for review. At that time, he was not
questioned concerning his role in stopping the grand jury report.

[277]It is not known whether this was done before Mr. Hartman formulated his position or after; his
position certainly mirrored the position of the Criminal Division, but the prosecutors do not remember
him as ever being in favor of a report. Testimony of Peter Murtha, November 3, 1992, p. 35. Mr.
Murtha's and Mr. Fimberg's legal memorandum on their interpretation of grand jury report authorization
two weeks was received before they were requested to provided their justification to the Criminal Division.
Oct. 3, 1991, memorandum entitled "Re: Grand Jury Report," from Kenneth Fimberg and Peter Murtha to
Michael Norton and Barry Hartman; Oct. 19, 1991 letter from Michael DeFeo, acting chief, Organized
Crime and Racketeering Section, to Mr. Norton reminding him of need for providing the proposed
content of, report to the Criminal Division "so the necessary approval from this Section can be secured in
an expeditious manner". It referred only to a letter from Mr. Norton to Judge Finesilver regarding the
extension of Rocky Flats grand jury term and noting the possibility of grand jury report.

The U.S. Attorney's Manual "requests" that U.S. Attorneys notify the chief of the Organized
Crime and Racketeering Section "promptly" when they learn that a special grand jury is considering the
issuance of a report and explain why an indictment

> cannot be found to obviate the issuance of a grand jury report. It should also be
> explained how the facts developed during a criminal investigation support one of the
> authorized types of reports. Before any draft report is furnished to the grand jury, it
> must be submitted to the Chief of the Organized Crime and Racketeering Section for

no requirement that the Criminal Division provide advance approval on the decision to prepare a grand jury report, there is a procedural requirement that actual drafts of a report be reviewed and approved by the Criminal Division before the prosecutors can submit a report to a grand jury for endorsement. Because the prosecutor usually prepares a grand jury report[278], this effectively hands veto power to the Criminal Division.

The response of the Criminal Division was one of intransigent opposition to the issuance of any Grand Jury report. This was the same Criminal Division that had originally approved the creation of a special grand jury at least partially for its potential to issue a report.[279] It had, however, a different head. Assistant Attorney General Robert E. Mueller III, who, along with Mr. Hartman, previously was a special assistant to Richard Thornburgh, the former attorney general, had taken over the criminal division in September of 1990.

Written communications with Rockwell and their own internal statements make it clear that the prosecutors planned to use the report to comment publicly on the unindicted behavior of the Department of Energy and its officials. Although most of the proposed topics were redacted from the documents provided to the Subcommittee, one document proposed discussing the continuing failure of DOE to promulgate enforceable health and safety regulations at the nuclear weapons plants, despite a clear directive in the Atomic Energy Act to do so. As a result, no violations involving health and safety deficiencies which may have "threatened or endangered plant workers (e.g., plutonium and beryllium dust in the plant's fine)" could be charged.[280]

In an effort to gain support for a report, the prosecutors recommended to Mr Hartman that the (a)(2) provision of 18 U.S.C. § 3333 be used to authorize the report. This provision

---

approval.

U.S. Attorney's Manual, 9-11.331.

[278]U.S. Attorney's Manual 9-11.331. Certainly the prosecutors in the Rocky Flats case expected to compose a report. See, for example, Kenneth Fimberg's November 1, 1991 "Talking Points for 11/5/91 SGJ Report Meeting" (probably prepared for Mr. Norton).

[279]U.S. Attorney's Manual, 9-11 .310, 1989-2 Supplement, 28 C.F.R. § 0.59 (assistant attorney general in charge of Criminal Division is designated to make certifications under 18 U.S.C. §3331).

[280]See, e.g., July 17, 1991 letter from Kenneth Fimberg and Michael Norton to Harold Haddon; Oct. 3, 1991 memorandum entitled "Re: Grand Jury Report" from Kenneth Fimberg and Peter Murtha to Michael Norton and Barry Hartman, p. 3 and p. 4, fn. 2, in which they state that one of the reasons for the report was to make the public aware of the actions of those in government. DOE has not yet promulgated enforceable regulations.

allows the grand jury to report on "organized crime conditions in the district" as opposed to recommending discipline or removal of individual public officials, which is the purpose of the (a)(1) provision cited in the court's empaneling order. Mr. Fimberg and Mr. Murtha viewed this as permitting the grand jury to make general observations without focusing attention on individuals. Under this approach, the only requirement for approval was that the court examine both the report and the jury's minutes, determine that the report specifically concerned organized crime conditions and be convinced that its findings are supported by a preponderance of the evidence.[281]  Barring approval for a grand jury report under statutory authority, the prosecutors also invoked common law authority, which they viewed as providing a more flexible approach.[282]

In their October 3, 1991, memorandum, the prosecutors also made a strong strategic argument -- which became more impassioned as the dispute with Mr. Hartman and the Criminal Division deepened -- that the grand jury had already "expressed its deep commitment to make a report", and that the jury might do so "whether the Department wants to or not. The Department may wish to be involved in (and exercise some control over) this process, rather than leave the grand jury to its own devices."[283]  A version of this memorandum was provided to Judge Finesilver in response to a request he made of prosecutors, so it is very likely that he too was aware of the grand jury's "strong desire[s]."[284]

In a November 1, 1991 note to Mr. Norton designed to prepare him for a showdown with headquarters, Mr. Fimberg described the problem with the grand jury in the starkest -- and most prescient -- terms:

> "You don't want to cite cases, or go into details of all the reasons why this will create problems with the grand jury. Nonetheless, Mueller and Hartman must know

---

[281]In his charge, however, Judge Finesilver mentioned only the more restrictive (a)(1)report. The prosecutors thought that the charge could be modified. Oct. 3, 1991 memorandum from Kenneth Fimberg and Peter Murtha to Michael Norton and Barry Hartman, pp. 22-23.

[282]Oct. 3, 1991 memorandum from Kenneth Fimberg and Peter Murtha to Michael Norton and Barry Hartman, pp. 22-23.

[283]Oct. 3, 1991 memorandum from Kenneth Fimberg and Peter Murtha to Michael Norton and Barry Hartman, p. 32, fn. 17.

[284]Oct. 4, 1991 letter from Kenneth Fimberg letter to Judge Finesilver, enclosing memorandum brief on grand jury reports as court requested. Because it was filed under seal, the brief was not provided to the Subcommittee.

in absolutely unequivocal terms, that not doing a report is..."[1 1/2 lines redacted.]

"The question is NOT whether the grand jury will do a report - they will.  The question is whether the Department wants to participate in and guide the process, or be a target of the process. (emphasis added)"[285]

The legal right of the grand jury to write a report was reiterated in a face-to-face meeting between the prosecutors and main Justice on November 5, 1991, which Mr. Murtha, Mr. Fimberg, Mr. Norton, Mr. Hartman, Mr. Cartusciello, Paul Coffey (chief, Organized Crime and Racketeering Section), Mr. Mueller and Dennis Saylor, Mr. Mueller's special counsel, attended.  In a planning memo for this meeting, the prosecutors argued that the grand jury had the legal right to do a report "with or without us," and warned that Justice's decision not to authorize a report "might become public even if grand jury does not issue one on its own --'environmental activist' might not honor secrecy regs."  They pointed out that the report would be "more likely to involve identifiable individuals if USAO doesn't control" it.  Such a report could also be used to reassure the public in a case of unusually high interest, providing a forum to explain why health and safety violations could not be prosecuted.[286]

## D.  Prosecution's Final Appeals Denied

The prosecutors were clearly unsuccessful at that meeting.  Mr. Murtha described the position of the participants as follows: he, Mr. Fimberg and Mr. Norton were for the report; Mr. Hartman and Mr. Coffey were against it; Mr. Mueller was "leaning" against it; and Mr. Cartusciello didn't have a view.[287]  Mr. Norton immediately fired off an impassioned letter arguing for the report.  He emphasized his "strong desire" that the grand jury receive Justice's

"full support and participation in preparing and issuing a report concerning its investigation of environmental crimes. . . . As anticipated, the investigation has revealed a number of matters which are not proper subjects for an indictment, especially in light of the current posture of the investigation, but which should be disclosed to the people of Colorado and the United States.  I believe that the investigation and the Justice Department itself will be severely criticized and

---

[285]Nov. 1, 1991, from Kenneth Fimberg to Michael Norton.

[286]Nov. 1, 1991 "Talking Points for 11/5/91 SGJ Report Meeting" (prepared by Kenneth Fimberg).

[287]Sworn Interview of Peter Murtha, Nov. 3, 1992, pp. 43-47.

<u>accused of not fully resolving the issues if we fail to do so...</u>

> We have every reason to believe that the special grand jury will, in fact, issue such a report with or without our involvement. Therefore, and insomuch as the United States Attorneys [sic] Manual requires your approval, I request that the department give its full support to my office and to the special grand jury, in completing the final part of this important investigation. (Emphasis added)"[288]

According to the Criminal Division, Mr. Norton had argued that the "acts of negligence described in his memorandum should be characterized . . . as 'organized crime.'" The Criminal Division disagreed with this definition.

> "[T]he misconduct at issue does not involve Title 18 fraud offenses, or bribery, or other such offenses traditionally associated with 'organized crime,' but involves regulatory offenses at one location that are <u>malem in se</u> [footnote redacted] and involved allegations of negligence and malfeasance that appear to be isolated. Nor do the allegations relate to 'conditions in the community.'"[289]

The Criminal Division did not acknowledge the fact that many Title 18 allegations, including those of false statements and conspiracy, had already been plea bargained away. The prosecutors could not deny that Rockwell had filed false statements or conspired jointly with DOE, for example, and then turn around and allege these criminal acts against DOE.

Moreover, according to the Criminal Division, conditions at Rocky Flats had improved:

> "Therefore, there is substantial doubt that the conditions pose a significant degree of continued unlawful or otherwise inappropriate conduct. . . . [I]f the allegations at issue here satisfy the requirement of 'organized criminal activity' or 'organized crime conditions,' it would be difficult to imagine misconduct which would not meet these requirements."[290]

The Criminal Division had also apparently argued that a special grand jury was much more

---

[288]Nov. 7, 1991, letter from Michael Norton to Barry Hartman and Robert Mueller III.

[289]Nov. 8, 1991, draft of memorandum on response to request for grand jury report from Paul Coffey to John C. Keeney and Robert Mueller III.

[290]Nov. 8, 1991, draft of memorandum on response to request for grand jury report from Paul Coffey to John C. Keeney and Robert Mueller III.

constrained in writing reports than even a regular grand jury was. Mr. Fimberg followed that up with a memo to Mr. Saylor arguing that " . . . [I]t seems unfair that we would now be disadvantaged in having convened a special, rather than a regular, grand jury, when we understood at the time, <u>with the Department's guidance</u>, that we were doing the right thing and that we (or the grand jury) would have the ability to make a report, <u>which was told to the grand jury, not only by us, but also by the Chief Judge</u>." (Emphasis added)[291]

Messrs. Fimberg, Murtha, DeMonaco and Norton continued to attempt to change Mr. Hartman's and the Criminal Division's opinion. Mr. Murtha and Mr. DeMonaco held another meeting with Mr. Coffey and Mr. Keeney, but were told that Criminal had concluded the special grand jury could not issue a report.[292] Mr. DeMonaco then went to Mr. Hartman one last time to ask him to request a reversal from the Criminal Division. Based on his review of the Fimberg-Murtha legal memo (which included a double checking of the statutory and case law), Mr. DeMonaco said:

> "I believe the legal analysis of the Criminal Division is in error and that their proposed strategy [of issuing a sentencing memo or a letter to DOE which <u>did not</u> contain grand jury information for dealing with the issue is flawed.... For instance, there are certain employees of DOE who may be subject to disciplinary action, as contained in the Fimberg Murtha memorandum. In addition, there are present existing conditions that may form the basis of a report if these conditions fall within the definition of organized crime."

Mr. DeMonaco also reminded Mr. Hartman again of his sign-off on the October 4, 1991, legal memorandum submitted to the court.[293]

Mr. DeMonaco's objections fell on deaf ears. The Criminal Division had taken an

---

[291]Nov. 11, 1991 memorandum from Kenneth Fimberg to F. Dennis Saylor IV, special counsel, Criminal Division. See, also Nov. 11, 1991 memorandum from Ken Fimberg to Charles DeMonaco entitled "Rocky Flats Investigation: Grand Jury Report" in which he states that Mr. Coffey took the same position as Mr. Saylor.

[292]Nov. 11, 1991 memorandum entitled "Subject: Rockwell Investigation - Issuance of a Grand Jury Report" from Charles DeMonaco to Barry Hartman. "This decision is based on their interpretation of organized crime, as used in OCCA, and that the conduct in question is not continuing. From subsequent discussions by Peter Murtha with Paul Coffey, it is my understanding that the Criminal Division does not believe that a common law report is authorized based on its review of OCCA's legislative history." <u>Id</u>.

[293]Nov. 11, 1991, memorandum entitled "Subject: Rockwell Investigation - Issuance of Grand Jury Report" from Charles DeMonaco to Barry Hartman.

entrenched position that there would be no Department-approved report and advised Mr. Norton that he was to so inform the judge and the grand jury.[294]  In its formal response to Mr. Norton, the Criminal Division stated that it was their

> "impression that your investigation has significantly reduced Rockwell's knowing violations of statutes relating to environmental and hazardous waste crimes. Thus, under the specific terms of subsection (a)(2), we would be hard pressed to point to an ongoing criminal condition, organized or otherwise, in need of a public alert."[295]

The division's lack of knowledge of the situation at Rocky Flats was perhaps best demonstrated by its ignorance of the fact that Rockwell had not been managing Rocky Flats for almost two years at that time.

Mr. Fimberg made one last argument to Mr. Norton in November to be allowed to assist the grand jury in the writing of its report. "As you know, I have supported and strongly recommended that a report be prepared and issued. It has been, and continues to be, my position that there is legal basis for a report and that a report is warranted, he wrote in a memo to Mr. Norton. "I stand ready and willing to assist the grand jury in preparing and submitting a report to the grand jury judge."[296]  There is no recorded response, but it is clear from information released by the grand jurors that Mr. Fimberg did not help them. In fact, they indicated that one day Mr. Fimberg told them their job was over and then simply walked out of the grand jury room.[297]  He apparently did not appear before them again, but all of his predictions about their subsequent actions -- and its effect on the U.S. Attorney's Office and Department of Justice -- were realized.

Mr. Norton told the grand jury that "the Justice Department has determined that the special grand jury statute does not allow or provide for a report in the circumstances of this case,"

---

[294]Nov. 11, 1991, memorandum entitled "Subject: Rockwell Investigation - Issuance of Grand Jury Report" from Charles DeMonaco to Barry Hartman.

[295]Nov. 21, 1991, letter from Robert E. Mueller III and John C. Keeney to Michael Norton.

[296]Nov. 11, 1991, memorandum entitled "Rocky Flats Grand Jury Report" from Kenneth Fimberg to Michael Norton.

[297]Bryan Abbas, "The Secret Story of the Rocky Flats Grand Jury," Westword, Sept.30-Oct. 6, 1992, p. 18. This probably occurred in November, as Mr. Fimberg and Mr. Murtha reported to Mr. Norton and Mr. Hartman about their final session on Nov. 19. Nov. 19, 1991, memorandum entitled "Rocky Flats Matter" from Kenneth Fimberg and Peter Murtha to Michael Norton and Barry Hartman.

and that it had no other authority under common law to do so.[298]  He also had a
conversation with the judge concerning the Criminal Division's opinion.[299]  Mr. Fimberg
still hoped that the grand jury would approve the substitute sentencing memorandum,
although he and Mr. Murtha expressed doubt that a document that would be negotiated with
Rockwell could also have grand jury input.[300]

## E.  The Role of the Court

Outside of the Justice Department, only Chief Judge Sherman Finesilver, the grand jury
judge and later the judge assigned to the actual Rocky Flats case, was in a position to
influence the special grand jury. This position of influence became more important after the
prosecutors, on orders from headquarters, abandoned the grand jury.  If the jury were to
write its own report and issue its own "presentment" of charges and persons it wished to
prosecute, Judge Finesilver was going to be their sole resource for legal guidance and
support.[301]

Judge Finesilver had apparently made a great impression on the jury with the 21-page
charge he provided to jurors upon their empanelment. That charge repeatedly emphasized
the jurors' public responsibilities, the scope of their powers and their duty to remain
independent of the prosecutor. Finesilver's charge indicated that they could write a report
on government officials. Moreover, they could, he said, "[b]y the terms of the Constitution,"
make a presentment "even over the active opposition of the government attorneys, if you
believe it is necessary in the interests of justice." They could direct the U.S. Attorney to issue
"such subpoenas as you may see fit" to obtain evidence.

> "You are the sole judges as to the number of witnesses you desire to hear. You are
> not required to summon witnesses which the accused person may wish to have
> examined unless you believe that an apparent violation may be explained by their
> testimony. Similarly, you may refuse to hear witnesses offered by the United States

[298]Undated "DOJ STATEMENT NO. 1: Talkpts (probably prepared by Kenneth Fimberg).

[299]Sworn Interview of Peter Murtha, Nov. 3, 1992, p. 50.

[300]Nov. 19, 1991, memorandum entitled "Rocky Flats Matter" from Kenneth Fimberg and Peter Murtha
to Michael Norton and Barry Hartman.

[301]Frequently, the grand jury judge and the judge assigned to an actual case are different. The chief
district judge serves as the grand jury judge, but the individual cases are usually heard by judges selected
through the normal distribution system.

Attorney if you do not believe their testimony will assist you in your functions."[302]

Moreover, according to the judge's charge, the grand jurors were not to view themselves as arms of the FBI or the U.S. Attorney's Office, despite the close working relationship that would develop. He warned them that they "must not yield your powers nor forego your independence of spirit." They would perform a disservice if they "did not indict where the evidence warranted an indictment."

Although the government attorneys were "sincere men and women" from whom they could expect candor, honesty and good faith efforts, it is "because you may tend to expect such high quality from the government's agents that there is a potentially grave risk to your independence of thought and action, which may cause you to lapse into reliance when you should be dubious or questioning." The government lawyers were "advocates for the government's interest . . . You must exercise your own judgment, and if the facts suggest a different balance than that advocated by the government attorneys, then you must achieve the appropriate balance even in the face of their opposition or criticism." Even the court can only "guide, but cannot dominate or command your actions." They were, the judge said, "defenders of the innocent as well as the accusers of the guilty."[303]

Because that charge was the central guiding document to the jurors in their work, this language left them prepared to carry on without the prosecutors (and even against the prosecutors' desires). Unfortunately, the charge by itself was an inadequate guide to the legal standards that reports and presentments must meet; without prosecutors guiding the process of composing these documents, it is unlikely that any set of grand jurors would, on their own, construct a report or presentments that meet the court's unstated legal standards. Again, only the judge was in a position to fill the gap in knowledge and information left by the withdrawal of the prosecutors.

According to press accounts, the grand jury's dispute with the prosecutors predated the issue of whether there would be a grand jury report or not. It initially centered upon the prosecutors' refusal to bring individual indictments against Department of Energy or Rockwell employees, despite Mr. Fimberg's statement sometime in 1991 that there was

---

[302]Information to Special Grand Jury 89-2, (D.Colo. Aug. 1, 1989), pp. 7-8 and 11.

[303]Information to Special Grand Jury 89-2, (D.Colo. Aug. 1, 1989), pp. 16-17, 19.

sufficient evidence to indict about 10 Rockwell employees.[304]   According to one news report, Mr. Fimberg and Mr. Murtha said DOE employees could not be indicted because the department as a whole condoned the crimes at the plant.  Mr. Fimberg gave as an example the use by Rockwell of the 771 incinerator to treat hazardous waste without the required RCRA permit. According to a transcript, he said the Department "as an institution was so extensively involved in and approved of this practice that criminal prosecution [of individual employees] ... in our view is not appropriate."[305]

Rockwell employees could not be charged either.  "Politics and criminals are sometimes difficult to separate," Mr.Fimberg allegedly told them.[306]  They did not know that the "politics" he was referring to may have been the plea bargain in which the government gave up the right to indict individuals.  At some point, Mr. Norton -- who did not normally appear before the grand jury -- came in to tell the jurors that he would not sign any indictment he had not drafted and would not draft an indictment naming any individuals.[307]

Jurors apparently had been somewhat mollified, however, by the expectation that they would write a report of their investigation.  However, Justice's decision to block a report, imposed on the prosecution team, only served to further fan the flames.  When prosecutors simply told jurors their work was done and walked out of the jury room in November 1991, jurors, relying on their charge, independently determined that their obligations were far from complete; the term of the grand jury was extended until April, and the jurors began working on their own report, presentments and indictments.

Why did Judge Finesilver extend the jury's term from December 1991 until April 16, 1992? The reasons for the extension are unclear.  One report is that the grand jury conducted a sit-in in the judge's office demanding an extension to write their report.  However, the prosecutors also may have sought an extension because, without an agreed-upon settlement (and the plea bargain was not firmed up until early 1992), the prosecutors still needed the grand jury as a club against any last-minute attempts by Rockwell to back out of the

---

[304]Bryan Abbas, "The Secret Story of the Rocky Flats Grand Jury," Westword, Sept. 30-Oct. 6, 1992, p. 18.

[305]Bryan Abbas, "The Secret Story of the Rocky Flats Grand Jury," Westword, Sept. 30-Oct. 6, 1992, p. 18.

[306]"The Grand Jury That Couldn't," Washington Post, Nov. 10, 1992, A1.

[307]Bryan Abbas, "The Secret Story of the Rocky Flats Grand Jury," Westword. Sept. 30-Oct. 6, 1992, p. 18.

agreement.[308]   In any case, the judge was certainly aware at the time he provided an extension of the grand jury's term that they intended to write a report.

Reportedly, when Mr. Norton heard the jurors were actually writing a report he advised them not to meet again.   Citing their independence, the foreman was less than complimentary in his response.[309]   Mr. Norton appeared before them at least one more time to attempt to get the jurors to sign off on the negotiated indictment. They refused,[310] and the prosecutors were forced to present an information to the court.

The judge, however, took a less direct, but equally effective, route to stopping the grand jury's report. He chose to withhold professional assistance to the grand jury as they worked on their report. Grand jury reports are usually drafted by the prosecutors. In a case of this complexity, with the prosecutors ordered by Washington to refrain from cooperating with the jury in producing a report, the judge represented the only source of guidance for jurors through the arcane of grand jury report law and precedent. In his opinion denying access to the report, Judge Finesilver claimed that he had "explained to the Special Grand Jury the detailed requirements of how to submit a report for public view."[311]   Reports about the grand jury dispute that. They indicate that the judge told them that an indictment had to have the signature of the U.S. Attorney to be valid, but on other the issue of the report, they were referred back to the original charge. He also scheduled sessions for them and provided a clerical employee to process documents.[312]   There is no indication that more than one personal session between the judge and the grand jury occurred.

---

[308]Rockwell referred to a threat by Mr. Fimberg in mid-December of 1991 to indict and provided exculpatory information for the grand jury in December of 1991. Dec. 13, 1991, letter from Lee Foreman to Michael Norton; Dec. 31, 1991 letter from Bryan Morgan to Kenneth Fimberg; Order Extending Grand Jury 89-2, In Re Special Grand Jury Proceedings,Special Grand Jury 89-2 (Rocky Flats Grand Jury) (D.Colo. Dec. 10, 1991). Both Mr. Norton and Mr. Fimberg also wanted the final product to be an indictment, not an information. If the grand jury was dismissed, there would be no opportunity for an indictment.

[309]The foreman is reported to have said, "If you're going to let one government chickenshit lawyer tell you what to do, you're not part of America." "The Grand Jury That Couldn't," Washington Post, Nov. 10, 1992, Al.

[310]Bryan Abbas, "The Secret Story of the Rocky Flats Grand Jury," Westword. Sept. 30-Oct. 6, 1992, p. 18.

[311]Order Regarding Motion for Release of Grand Jury Documents, In Re Grand Jury Proceedings, Special Grand Jury 89-2 (Rocky Flats Grand Jury) (D.Colo., Dec. 3, 1992), p. 10.

[312]Bryan Abbas, "The Secret Story of the Rocky Flats Grand Jury," Westword, Sept. 30-Oct. 6, 1992, p. 18-19.

Judge Finesilver's decision to refer jurors back to their original charge as "guidance", knowing that prosecutors were not providing support, was in effect a decision to leave the jurors rudderless. They also had no access to Justice's view of the appropriate standards. The end result, not surprisingly, was that their report failed to meet Judge Finesilver's interpretation of statutory or even common law standards.

Under the statute, the judge can extend the term of a grand jury until a publishable report can be issued either by redrafting or by taking additional testimony.[313] Judge Finesilver did neither, but dismissed the grand jury instead. When the Environmental Defense Fund filed a motion at the end of the case for a copy of "any" grand jury report, the judge denied it without comment.

## F.  Recent Efforts to Gain Release of the Report

By August of 1992, the rumor that a grand jury report existed, and that the grand jurors wanted it public, was rampant among the Colorado news media. One reporter on the courthouse beat requested a copy of the report several times a week. Late in September, she was given an order from Judge Finesilver which confirmed the existence of a report and ruled that the report would not be released. The judge said in his order that the report did not meet statutory standards, and that allegations were not supported by a preponderance of the evidence. Finally, he said that the U.S. Attorney's legal analysis on the "viability of filing criminal charges and the applicability of various defenses is entitled to considerable deference," a puzzling criteria because it is not included in the statute.[314] This statement completely ignored the fact that the final charges were the result of a year-long negotiation process between the prosecutors and the defendant.

After that ruling, the Rocky Mountain News filed a formal motion asking for the report. On December 3, 1992, Judge Finesilver issued a garbled and confusing order[315] denying its release on grounds which included the report's failure to meet statutory standards and the

---

[313]18 U.S.C. §3333(f)

[314]Sue Lindsay, "Scathing Report on Flats Squelched," Rocky Mountain News, Sept. 26, 1992, A1.

[315]For example, it is unclear whether the judge is applying (a)(1) standards -- which require the identification of individuals recommended for disciplinary action or removal and provide a process for responses from those persons -- or (a)(2) standards, which do not allow specific identification, to the report. Nowhere in the statute does it state that a report cannot be released because the jurors violated their secrecy oath, nor has that violation been proven.

grand jurors' breach of their oath of secrecy.[316]   Despite his failure to substantively assist them or order the U.S. Attorney to do so, he now stated that the special grand jury had fallen "short of the objectives of its empaneling" and could have drafted "an acceptable report, a report which the Court could, in good conscience, release to public view."[317]

At the same time, the judge wrote that:

> "While the Court will not release the special grand jury report in its entirety, nor allow release of the names or other identifying characteristics of individuals, the Court recognizes that there may be some portions of the report that may heighten awareness of the activities at Rocky Flats and address certain of the community's safety, health, and environmental concerns.   The Court therefore directs the Government to submit for in camera inspection a proposed redacted or excised version of the report; any and all documents subject to release must still comply with the statutory and common law guidelines discussed in detail below. The Court also holds that certain of the special grand jury's ministerial documents, or the contents thereof, may be released."[318]

In essence, the judge now instructed the U.S. Attorney -- who has already been ordered not to prepare or further the issuance of a report -- to do what by statute is the judge's responsibility: to determine whether the report meets the legal requirements and take additional steps to assure that it does. The problem is that there is no sitting grand jury to rewrite the report as the judge now sees fit.  Further, Judge Finesilver's statement implicitly acknowledged that there were important issues relating to Rocky Flats that had not been addressed in the plea agreement and the sentencing memorandum.  He wrote that he was:

> "convinced that the activities and operations at Rocky Flats require further exploration. The Court will continue to pursue appropriate avenues to illuminate

---

[316] . . . [T]he surreptitious and unlawful dissemination of matters occurring before the grand jury will militate further against the release of an otherwise inappropriate grand jury report." Order Regarding Motion for Release of Grand Jury Documents, In Re Grand Jury Proceedings Special Grand Jury 89-2 (Rocky Flats Grand Jury) (D.Colo. Dec. 12, 1992), p. 3. Judge Finesilver did not address his apparent conflict of interest as the grand jury judge and also as the case judge who approved the Rocky Flats settlement.

[317] Order Regarding Motion for Release of Grand Jury Documents, In Re Grand Jury Proceedings, Special Grand Jury 89-2 (Rocky Flats Grand Jury) (D.Colo. Dec. 12, 1992), p. 3.

[318] Order Regarding Motion for Release. p. 3; the judge elaborates on the prosecutors' method for submitting the redacted report to him on page 25.

the for public the activities at Rocky Flats and their impact on the health, safety, and environment of the community; those avenues include investigation and oversight by the state and federal governments, both of which have a critical responsibility and concurrent jurisdiction in this matter of great public concern."[319]

The judge did further enlighten his readers with any discussion of how he was going to "pursue appropriate avenues" with parties (and various non-parties) in a closed criminal case over which he had no continuing jurisdiction and with a grand jury which has been disbanded before an acceptable report was prepared. His sudden expressed interest in the case, more than six months after he found the plea agreement acceptable and coming only after extensive pressure from the public and news media for more information, appears to be empty of practical meaning.

The judge played a critical role in establishing the grand jury's view of their responsibilities, powers and independent position, and he had broad discretion in how he would proceed in this case. Those powers allowed him to work with and order the U.S. Attorney to work with the grand jury or provide other legal resources, interpret the standards for release of grand jury reports independent of Justice, and even to extend the grand jury's term if he desired to receive an acceptable report.[320]  Yet when problems arose between the prosecution and the grand jury because of the grand jury's view of its role and the instructions prosecutors had received from headquarters, the judge -- aware of the potentially serious consequences of the breach -- took no steps to mediate the impasse or assess the public interest in doing so, assist the grand jury to meet his interpretation of the requirements for an acceptable and releasable grand jury report or do an independent review of the evidence or the negotiations between the prosecutors and Rockwell.[321]

This lack of leadership left jurors on their own, first to attempt to write a report that would meet the vague legal requirements for release and then, in the wake of the judge's ruling sealing the report, to wrestle with their consciences whether their oath of secrecy was more

---

[319]Order Regarding Motion for Release of Grand Jury Documents, In Re Grand Jury Proceedings, Special Grand Jury 89-2 (Rocky Flats Grand Jury) (D.Colo. Dec. 12, 1992), p. 3.

[320]A fellow judge in the District of Colorado in 1991 released a grand jury report in a criminal case that named a specific public official and stated that he would have been indicted if the statute of limitations had not expired. Attachment to Nov. 7, 1991 memorandum from Kenneth Fimberg to F. Dennis Saylor IV.

[321]The judge also promised to appoint an advisory panel to review the contents of the plea agreement, but as far as the Subcommittee has been able to determine no such panel was ever established.  See Order to Show Cause, U.S.A. v. Rockwell International Corp. 92-CR-107 (D.Colo. April 24, 1992).

important than their oath to serve the truth as they saw it and the people of Colorado. If
the report failed to meet the judge's standards, he is responsible for that failure. If jurors
violated their oaths in an effort to defend the integrity of their work and findings, the judge
is equally responsible for creating an environment in which such a dilemma confronted those
jurors.

# SECTION X. THE EFFECTS OF THE PROSECUTION

One purpose of an enforcement action of the type undertaken by the Justice Department at Rocky Flats is to ensure that future actions by DOE and its contractors will be in conformance with the law. The results at Rocky Flats and within the Department of Energy have been mixed, at best.

## A. Access by Regulators to the Site

Since the raid on Rocky Flats, both state and federal regulators have enjoyed greater access to the facility, and their enforcement inspections have not been impeded by claims of national security concerns.

## B. Contractor Accountability Reforms

In this case, as in many other well documented occurrences of DOE/contractor misbehavior and mismanagement, the contract between DOE and its contractor was a major hurdle to ensuring contractor accountability and securing justice.

It was very clear that one of the driving forces influencing the government's decision to reach a plea agreement with Rockwell was the concern that the indemnity provisions included in the contract with Rockwell might require the government to reimburse Rockwell for any fines it paid as a result of pleading guilty to criminal conduct. And, to achieve that plea agreement, the Government had to give away many significant items, as noted above. This raises serious concerns about the DOE's contracting practices.

In 1991, DOE amended its acquisition regulations to prohibit the indemnification of fines, penalties and litigation expenses incurred by contractors as a result of criminal and civil violations of law through negligence or willful misconduct. These rules could significantly reduce the taxpayers exposure and provide an incentive for more responsible and efficient conduct by the contractor. However, the regulations will have no impact if they are not effectively administered. In the past, the department has often failed to use the authority it possessed to control its contractors and hold them accountable. Congress must closely oversee the Department to ensure it will effectively implement these new regulations.

## C. DOE Oversight and Enforcement

Subsequent to the Rocky Flats raid, DOE has taken action to properly promulgate worker

health and safety standards. That process is now under way. However, as with DOE's new contractor regulations, establishing the proper regulatory framework is only half of the battle. It is now up to Congress to ensure that DOE effectively enforces the new program it is promulgating.

The debarment process reviewed previously is just one of many incidents at the Department of Energy which suggest that the culture at DOE has in fact changed very little in recent years. Consider the following events which have taken place just this year:

Within one week after the settlement of this case, E.G.&G. was cited by the Colorado Department of Health for 56 violations of environmental regulations, related to "inadequate response to spills and defective equipment, inadequate staff training, or improper or inadequate waste characterization."[322]  Most troubling were the observations by a CDH regulator that the violations "demonstrate systematic problems throughout the Rocky Flats Plant", and that they revealed an "apparent lack of knowledge about system designs, operating conditions and procedures, and nature of materials handled."[323]

In 1992, DOE safety and health review teams issued two reports that cited extensive and serious worker health and safety problems at two DOE nuclear facilities; the Portsmouth Gaseous Diffusion Plant and the Hanford Nuclear Reservation.

The Hanford study was a special review of occupational safety and health programs at the high level waste tanks at the facility. The DOE review team concluded that: "The lack of a comprehensive vapor monitoring program, uncertainties concerning exposure hazards and a general lack of responsiveness to existing directives would, in an OSHA regulatory environment, present a strong case for consideration as a 'willful' violation.[324]

The team that conducted the Portsmouth review found 578 non-compliance issues at the facility, most of which were classified as "serious", and reached a conclusion as troubling as that reported by the Hanford team:

"The team found uncorrected noncompliance, poorly defined OSH responsibilities,

---

[322]"EG&G Cited By Colorado Department of Health for Significant Pattern of Violations of State Hazardous Waste Regulations," Colorado Department of Health News, June 17, 1992.

[323]Colorado Department of Health, op. cit.

[324]    U.S. Department of Energy, "Report on the EH Special Review of Occupational Safety and Health Programs for the Hanford High-Level Waste Tanks," Nov. 1992.

and inconsistent program implementation by the contractor's organizational elements. These elements, coupled with inadequate supervisor and staff training in hazards recognition, will likely cause a continuation of hazardous working conditions at [Portsmouth] if no mechanism is implemented to correct these problems."[325]

After the Portsmouth report was released, Secretary Watkins issued an order requiring DOE inspectors to provide 60 days advance written notice to DOE field offices and contractors before inspecting a plant, thus virtually eliminating the possibility of an unannounced or short notice inspection.[326] Such an action will do nothing to improve the poor safety and health conditions at DOE facilities; it certainly does not reflect any new attitude of openness, and it indicates that there has been little real progress made toward a better managed, more safely run or more environmentally sound organization.

In the spring of 1992 the U.S. General Accounting Office reported that the Rocky Flats Office Manager, the DOE official responsible for determining the award fee of EG&G for its performance at Rocky Flats plant had, with the concurrence of DOE Defense Program officials, increased the contractor's performance rating score recommended by his review board by 10 points. The effect was to guarantee that EG&G received $1.7 million in fees for the April-June, 1991 award period. The score recommended by the review board would have resulted in no fee for the contractor.[327]

According to GAO, in awarding the higher score, the manager cited some accomplishments that were inconsistent with the findings of the review board: failed to address 29 significant deficiencies identified by the board; and was unable to demonstrate that at least 51% of the award was based on environment, safety and health performance, despite the fact that DOE requires such a weighing.[328]

These incidents underscore the need to carefully oversee DOE's implementation and enforcement of its new worker health and safety regulations, and its contractor regulations.

---

[325]  U.S. Department of Energy, "Report on the Department of Energy Occupational Safety and Health Program Review of the Portsmouth Gaseous Diffusion Plant," Oct. 1992.

[326]  George Lobsenz, "DOE Inspection Order Prompts Concern from Hill," The Energy Daily, Oct. 21, 1992, pp. 1-2.

[327]  General Accounting Office, "Nuclear Health and Safety: Increased Rating Results in Award Fee to Rocky Flats Contractor," March 1992, (GAO/RCED-92-162).

[328]  ; General Accounting Office, "Nuclear Health and Safety: Increased Rating Results in Award Fee to Rocky Flats Contractor," March 1992, (GAO/RCED-92-162).

## ENDNOTE

The Subcommittee investigation into this matter was not simply an exercise to see if a few more dollars or a few more charges could have been squeezed out of an agreement. Serious environmental problems exist at the Rocky Flats facility. They just did not happen, nor were they the result of a one-time criminally negligent act. They were the result of conscious actions and decisions over many years by individuals who were legally responsible to know and comply with the laws passed to protect workers, citizens in nearby communities, and the environment.

The Department of Justice initiated and concluded its investigation with very strong statements about the serious infractions that occurred and the serious impacts they conveyed. The public has a right to know how and why, in light of those problems, and the apparent callousness with which the Department of Energy and its contractor conducted their weapons operations, the settlement did not reflect more fully the range of crimes and their seriousness and hold the decision makers accountable for their culpability.

This report has attempted to provide the Committee, the Congress, and the American people with a greater understanding of these issues. It is hoped that the Congress and the new Administration will draw upon the findings and recommendations contained in this report to help improve DOE operations, especially in the area of contractor accountability; ensure an efficient and effective clean up of the nation's weapons facilities; and strengthen the government's commitment to aggressive prosecution of individuals, corporations, and even federal agencies when serious environmental crimes are alleged.